## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CENTER CITY HEALTHCARE, LLC d/b/a HAHNEMANN UNIVERSITY HOSPITAL, *et al.*,[1] | Case No. 19-11466 (MFW) |
| Debtors. | (Jointly Administered) |
| IS BBFB LLC, and IS 245 NORTH 15th LLC, | |
| Plaintiffs, | |
| v. | Adv. Proc. No. 23-50337 (MFW) |
| CENTER CITY HEALTHCARE, LLC, | |
| Defendant. | |

## MEMORANDUM OF LAW OF DEBTOR
## CENTER CITY HEALTHCARE, LLC IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

| | |
|---|---|
| Mark Minuti (DE Bar No. 2659)<br>**SAUL EWING LLP**<br>1201 North Market Street, Suite 2300<br>P.O. Box 1266<br>Wilmington, DE 19899<br>Telephone: (302) 421-6840<br>mark.minuti@saul.com | Jeffrey C. Hampton<br>Adam H. Isenberg<br>**SAUL EWING LLP**<br>Centre Square West<br>1500 Market Street, 38th Floor<br>Philadelphia, PA 19102<br>Telephone: (215) 972-7777<br>jeffrey.hampton@saul.com<br>adam.isenberg@saul.com |

*Counsel to Center City Healthcare, LLC*

Date: April 12, 2024

---

[1]      The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540).

# <u>TABLE OF CONTENTS</u>

<b>Page</b>

TABLE OF AUTHORITIES ...................................................................................... ii

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ........................................................................................ 4

LEGAL STANDARD ................................................................................................ 24

ARGUMENT ............................................................................................................ 26

    I.     Plaintiffs Have Failed To Show That There Is A Reasonable Likelihood They Will Succeed On The Merits Of Their Claims ......................................... 26

           A.     Effect of Denial of Motion to Dismiss .................................... 27

           B.     Plaintiffs Cannot Meet their Burden ...................................... 28

           C.     The Zoning Permit ................................................................. 29

           D.     Zoning Code – Signage .......................................................... 30

           E.     Enforceability of EUU ........................................................... 31

    II.    Plaintiffs Have Failed To Show That They Will Suffer Irreparable Harm Absent Their Requested Injunction ................................................................. 32

           A.     Parking .................................................................................. 33

           B.     Signage .................................................................................. 33

           C.     Zahav .................................................................................... 34

    III.   Granting The Preliminary Injunction Will Harm CCH More Than It Will Benefit The Plaintiffs ...................................................................................... 36

    IV.   The Public Interest Is Served By Denying The Injunction Motion .................. 37

    V.    If The Court Were To Grant The Motion, A Substantial Bond Would Be Required ............................................................................................................ 38

CONCLUSION ......................................................................................................... 39

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

FEDERAL CASES

*A.L.K. Corp. v. Columbia Pictures Industries, Inc.*,
    440 F.2d 761 (3d Cir. 1971).................................................................................32

*Acierno v. New Castle Cnty.*,
    40 F.3d 645 (3d Cir. 1994)..................................................................................25

*Adams v. Freedom Forge Corp.*,
    204 F.3d 475 (3d Cir. 2000)................................................................................32

*Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*,
    C.A. No. 3:06-cv-1105, 2011 WL 4916397 (M.D. Pa. Oct. 17, 2011). ..................39

*Bennington Foods LLC v. St. Croix Renaissance, Grp., LLP*,
    528 F.3d 176 (3d Cir. 2008)................................................................................25

*Cont'l Group, Inc. v. Amoco Chem. Corp.*,
    614 F.2d 351 (3d Cir. 1980)................................................................................33

*ECRI v. McGraw-Hill, Inc.*,
    809 F.2d 223 (3d Cir. 1987)................................................................................32

*Fed. Home Loan Mortg. Corp. v. Thomas*,
    No. 2:16-CV-742-MHT-WC, 2017 WL 1100445 (M.D. Ala. Feb. 28, 2017) ......28

*Jurista v. Amerinox Processing, Inc.*,
    492 B.R. 707 (D.N.J. 2013) ...........................................................................26, 38

*Poarch v. Caliber Home Loans*,
    No. 119CV02785SDGLTW, 2021 WL 1053538 (N.D. Ga. Feb. 10, 2021) ..........28

*Pub. Interest Legal Found. v. Boockvar*,
    495 F. Supp. 3d 354 (M.D. Pa. Oct. 20, 2020) ....................................................25

*Reilly v. City of Harrisburg*,
    858 F.3d 173 (3d Cir. 2017)................................................................................25

*Siemens USA Holdings Inc v. Geisenberger*,
    17 F.4th 393 (3d Cir. 2021) ................................................................................27

*Societe Comptoir De L'Industrie Cotonniere, Establissements Boussac. v. Alexander's
Dep't Stores, Inc.*,
    190 F. Supp. 594 (S.D.N.Y. 1961), aff'd, 299 F.2d 33 (2d Cir. 1962)...................26

51738587.10

*Sunoco Partners Mktg & Terminals L.P. v. Powder Springs Logistics, LLC*,
    C.A. No. 17-1390-LPS-CJB, 2018 WL 395750 (D. Del. Jan. 8, 2018) ................................32

*Trinity Indus., Inc. v. Chicago Bridge & Iron Co.*,
    735 F.3d 131 (3d Cir. 2013)...............................................................................26

*Waters Corp. v. Agilent Techs. Inc.*,
    410 F. Supp. 3d 702 (D. Del. 2019).....................................................................25

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)...............................................................................25, 36, 37

*In re W.R. Grace & Co.*,
    475 B.R. 34 (D. Del. 2012)..................................................................................38


**STATE CASES**

*Doe v. Delaware State Univ. Bd. of Trustees*,
    C.A. No. 20-1559 (MN), 2021 WL 2036670 (D. Del. May 21, 2021)..................24-25, 32-33

*Vertigo Media, Inc. and Remote Media LLC, v. Earbuds Inc.*,
    C.A. No. 21-120 (MN), 2021 WL 4806410 (D. Del. 2021) ....................................26


## OTHER AUTHORITIES

Fed. R. Civ. P. 65(c) ....................................................................................38

Fed. R. Bankr. P. 7065..................................................................................38

2018 International Building Code Section 502.1..........................................................30

City of Philadelphia Building Code 4-200 § B-1.1.......................................................30

City of Philadelphia Zoning Code ...........................................................3, 17, 33

City of Philadelphia Zoning Code § 14-802-2.........................................................17, 18

City of Philadelphia Zoning Code § 14-802-2(5) .........................................................18

iii

Debtor Center City Healthcare, LLC (the "**CCH**") hereby submits this memorandum of law in opposition to *Plaintiffs IS BBFB, LLC and IS 245 North 15th LLC's Motion for Preliminary Injunctive Relief* [Adv. D. I. 41]  (the "**Injunction Motion**") filed by plaintiffs IS BBFB LLC and IS 245 North 15th LLC (the "**Plaintiffs**").

## PRELIMINARY STATEMENT[2]

The Plaintiffs' Motion fails on its face, as Plaintiffs do not even attempt to offer evidence establishing their entitlement to the extraordinary relief they seek beyond pointing to the EUU, which the Court found to be ambiguous. See *Memorandum Opinion* [Adv. D. I. 36] (the "**Memorandum Opinion**") denying, in part, *Debtor's Motion for Partial Dismissal of the Amended Complaint* [Adv. D. I. 11] (the "**Motion to Dismiss**").  Rather, they flatly conclude that "[t]he Court denied Defendant's Motion [to Dismiss], thereby demonstrating the existence of a probability of success on the merits."  *Plaintiffs' Memorandum of Law in Support of Their Motion for Preliminary Injunctive Relief* [Adv. D.I. 41] ("**Plaintiffs' Memorandum**"), at page 21.

Black-letter law says otherwise.  Unlike with respect to the Motion to Dismiss, the Court no longer must accept the Plaintiffs' factual allegations as true; it now can consider contrary evidence offered by CCH.  This evidence will include the following:

(i)      emails and other correspondence among the parties that negotiated the EUU and REA in which an easement for "Shared Parking" was proposed, but then was specifically excluded, as a result of agreement among the parties that there would be no shared parking on Lots D and E;

(ii)      "easement and unity of use agreements" for two *other* assemblages of real estate that Tenet sold as part of the 2018 Transactions, which were negotiated by the same principals who negotiated and executed the EUU, and at the same time.  These other "easement and unity of

---

[2]      Capitalized terms not otherwise defined in the Preliminary Statement shall have the meaning as set forth in the balance of this Memorandum.

use agreements" contain almost identical language as the EUU, but because shared parking was agreed to with respect to these other assemblages of real estate, they executed "Parking, Access and Utilities Easement Agreements" that expressly granted parking easements and the right to signage, instead of relying upon the provisions cited by Plaintiffs for the right to parking or signage. No "Parking, Access and Utilities Easement Agreement" was executed for the Hahnemann Campus;

(iii)    a "Parking Procedures and Criteria" memorandum prepared by Tenet and updated on an annual basis, including the year prior to the closing on the 2018 Transactions, that makes it clear that all of the "accessory parking" that the Plaintiffs seek was accessory to the hospital;

(iv)    multiple documents that show/acknowledge that the actual and authorized address of the parcel on which the rebranded Race Street Labs building is located is 216-20 N. Broad Street. The address – 1421 Race Street – that the Plaintiffs have unilaterally assigned to the renamed Race Street Labs, and which visitors supposedly cannot find, is **wholly fictional.** In fact, **Plaintiffs fabricated an address for Race Street Labs, and now complain that no one can find it**. In recognition of this reality, which the Injunction Motion fails to disclose to the Court, and the fact that only the City of Philadelphia Office of Property Assessment can authorize a change to a property's address, the Plaintiffs applied to the City of Philadelphia on March 14, 2024 for an address change for the parcel on which the Race Street Labs building is located, from 216-20 N. Broad Street to **yet a different address**: "1425 Race Street." This application was denied – a fact the Plaintiffs have failed to disclose to the Court. The legal address of Parcel C, on which Race Street Labs is located, is (and remains) 216-220 N. Broad Street;

(v)    deposition testimony from Zahav's 30(b)(6) witness that (a) Zahav has no issues with parking, (b) Zahav is not entitled to parking on the Hahnemann Campus under its lease with

the Plaintiffs, and (c) Zahav's alleged problems with deliveries, Uber drivers and the like had been greatly mitigated, if not eliminated, by the time the Injunction Motion was filed in early February.

(vi)     the City of Philadelphia Zoning Code, which provides that the use of the Race Street Labs building **does not require parking or handicapped accessible parking**.  The same applies to the Plaintiffs' other buildings on the Hahnemann Campus; and

(vii)    the failure of Plaintiffs to point to one document from the parties that negotiated and documented the EUU that supports their interpretation of the EUU.

For these reasons, and for the reasons set forth below, the Plaintiffs have no probability of success on the merits.  Moreover, any harm being suffered by the Plaintiffs – and CCH does not concede that the Plaintiffs have suffered any harm – is entirely due to the Plaintiffs' actions in mischaracterizing the address of Race Street Labs, which is 216-20 N. Broad Street, and to the manner in which Plaintiffs have chosen to develop the buildings on Parcel C.  The Plaintiffs accordingly cannot establish the elements necessary to obtain the extraordinary relief of an injunction.  As a result, the Injunction Motion should be denied.

As the Court is aware, CCH acquired its rights in the Real Estate after a lengthy mediation with various other parties in these cases, and is maintaining the Real Estate for the benefit of creditors.  Pending sale, it is incumbent on CCH to preserve the value of the Real Estate.  Towards these ends, and in the hope of resolving the Injunction Motion consensually, CCH offered to install, at its own expense, pursuant to a temporary license agreement until the Amended Complaint is adjudicated, and with a full reservation of rights, a sign that includes the identification of "Race Street Labs" at the foot of the "up ramp" and an enhanced Race Street Labs delivery sign at the top of the "down ramp," and to install (again, at its own expense and pursuant to a temporary license agreement) two accessible handicapped parking spots for Race Street Labs' use, on

3

property belonging to CCH.  In other words, CCH offered to address the supposed "emergencies" that caused Plaintiffs to file the Injunction Motion.  To no avail.

CCH can only conclude that the Plaintiffs are seeking to utilize the compressed time period in which the Injunction Motion will be adjudicated in an effort to obtain a meaningful portion of the relief sought by Plaintiffs in the Amended Complaint, without giving CCH an opportunity to develop a full evidentiary record, which the Court stated in its Memorandum Opinion is required.

<u>**STATEMENT OF FACTS**</u>

The factual background relevant to the Injunction Motion is as follows.

A.    **The 2018 Transactions**

Prior to January 11, 2018, Tenet Business Services Corporation ("**Tenet**") owned and operated Hahnemann University Hospital and its campus in Center City, Philadelphia (the "**Hahnemann Campus**").  The Hahnemann Campus made up the entire city block bounded by Broad Street (on the east), 15th Street (on the west), Vine Street (on the north) and Race Street (on the south).  This square block contained Hahnemann University Hospital (located primarily in buildings known as the "North and South Towers"), two buildings known as the "Bobst Building" and the "Feinstein Building," a medical school building known as the "New College" building, a building known as the "SHSH Building," parking facilities, an "up ramp," and a "down ramp" leading to a loading dock.

At the time it was owned by Tenet, the Hahnemann Campus was comprised of a number of legal parcels, all owned by Tenet, as described in the *Easement and Unity of Use Agreement* effective as of January 11, 2018 among PAHS New College MOB, LLC, PAHH Feinstein MOB, LLC, Broad Street Healthcare Properties, LLC and Broad Street Healthcare Properties III, LLC (the "**EUU**"), at p. 1.

On January 11, 2018, Tenet sold the Hahnemann Campus, Hahnemann University Hospital, and certain other assets pursuant to a series of transactions further described below (the "**2018 Transactions**").  The purchasers of the Hahnemann Campus, who were the original parties to the EUU, agreed that the Hahnemann Campus real estate would be divided into five new legal parcels, with the following addresses:

- Parcel A:  222-48 Broad Street, Philadelphia, Pennsylvania
- Parcel B:  225-51 N. 15th Street, Philadelphia, Pennsylvania
- Parcel C: 216-20 N. Broad Street, Philadelphia, Pennsylvania
- Parcel D: 200-14 N. Broad Street, Philadelphia, Pennsylvania
- Parcel E: 201-19 N. 15th Street, Philadelphia, Pennsylvania
- Parcel F: 221-23 N. 15th Street, Philadelphia, Pennsylvania[3]

These Parcels are generally depicted on Exhibit C to the *Reciprocal Easement and Operating Agreement* dated as of January 11, 2018 among PAHS New College MOB, LLC, PAHH Feinstein MOB, LLC, Broad Street Healthcare Properties, LLC and Broad Street Healthcare Properties III, LLC (the "**REA**"), which is reproduced below in annotated form[4].

---

[3]     *Id*.

[4]     The following annotations have been made to Exhibit C to the REA, as set forth below:  (i) color has been added to allow the Court to better see the location of the various parcels on the Hahnemann Campus; (ii) the letters "A", "B", "C" and "F" have been added to the applicable parcels; and (iii) cross-hatches have been added in the approximate location of the "up ramp" on Parcel E.



As is clear from REA Exhibit C, as well as from the EUU, the parties to the REA and EUU agreed that Parcel C would include both the Bobst Building (n/k/a Race Street Labs) and the Feinstein Building, and that Parcel C would have an address, as it must, at its point of street frontage, which is 216-20 N. Broad Street. *EUU*, at p. 1. The Bobst and Feinstein Buildings were included in one legal parcel because the Bobst Building did not have direct access to street frontage; as a result, it could not be a stand-alone parcel.

As part of the 2018 Transactions, Tenet sold Parcels A, D, E and F to entities owned and/or controlled by Joel Freedman[5] and Parcels B and C to entities that were owned and/or controlled by HSRE-PAHH I, LLC, which was a joint venture (the "**Joint Venture**") primarily owned by a subsidiary of Harrison Street Real Estate, LLC ("**HSRE**").[6]

B.      **Signage**

At the time of the 2018 Transactions, there was a pedestal sign (the "**Up Ramp Sign**") at the base of the "up ramp" on Parcel D, as depicted in the photograph below from Google Maps from November of 2018:[7]



The Up Ramp Sign did not identify an address or any particular building in the Hahnemann Campus, but was labeled – just like other signs on the Hahnemann Campus – "Hahnemann University Hospital."  The "Cardiac Care Center" referenced on the Up Ramp Sign was a former tenant of the Bobst Building, which had moved out prior to closing on the 2018 Transactions.  The

---

[5]      Specifically, Tenet sold Parcels A and F to Broad Street Healthcare Properties, LLC and Parcels D and E to Broad Street Healthcare Properties III, LLC.

[6]      Specifically, Parcel B was sold to PAHH New College MOB, LLC and Parcel C was sold PAHH Feinstein MOB, LLC.

[7]      Plaintiffs' Amended Complaint and January 24, 2024 letter discussed herein allege that CCH removed the Up Ramp Sign.  These allegations are untrue and expressly denied by CCH.

"Patient Drop Off" and "Patient Transfer" language on the sign was for the drop off and transfer, by ambulance, of hospital patients.

At the top of the "down ramp" on Parcel E is a sign (the "**Loading Dock Sign**") that remains in place and that includes the label "Receiving," with an arrow directing deliveries to the shared loading dock underneath the Bobst Building.  Unlike with respect to the "up ramp", the Plaintiffs (as the current owners of Lots B and C) have an easement to use the "down ramp," pursuant to the REA.  REA, at § 2(d).

### C.    The Negotiation of the REA and EUU

As part of the 2018 Transactions, the new owners of the various Parcels entered into the EUU and the REA.  In the context of its Motion to Dismiss, CCH was precluded from introducing evidence of the intent and purpose of the EUU and REA.  Now it can do so.

As explained in a December 6, 2017 email from Gregory Gosfield, Esq., counsel to, among others, Paladin Healthcare Capital, LLC[8], to David B. Sickle, counsel to HSRE, the purpose of the EUU was to allow the parties to the 2018 Transactions to obtain a "by right" zoning permit for the Hahnemann Campus.[9]  As explained by Mr. Gosfield:

> As a general matter, a by right zoning permit will be issued by the City if the applicant shows that the property complies with the Zoning Code.  The City generally looks at uses, configuration, and massing.  But the City also distinguishes between a lotline adjustment (i.e., lot line relocation) which has more minimal compliance requirements, and a traditional subdivision which is generally subdivision by subdividing one large parcel into many smaller parcels implicating streets and frontage (i.e., a subdivision plat). For example, in the event of a lotline adjustment, which is how the current project is designed, once the City confirms compliance with lot dimension and street frontage, then notwithstanding that the new lot line configurations may create separate non-complaint parcels, when all of the parcels are submitted as being subject to treatment as one zoning lot by a

---

[8]    Paladin Healthcare Capital, LLC was owned and/or controlled by Mr. Freedman.

[9]    See https://www.philadelphiazoning.com/philadelphia-zoning-permits/#:~:text=Some%20zoning%20permits%20can%20be,L%26I)%20for%20a%20formal%20review (defining "by right" permit).

declaration of unity of use, the City should approve the application and a by right permit should issue.  The City has informally advised us that if the zoning application is only for a change in lot lines, but all other characteristics remain the same, then under the unity of use the City would consider that a continuing permitted zoning lot without requiring any changes to meet upgrades that might otherwise apply if the proposed changes were to result in new burdens on the property.

Thus, the purpose of the EUU was solely to allow the parties to the 2018 Transactions to obtain a "by right" zoning permit for the Hahnemann Campus.  A copy of Mr. Gosfield's email is attached hereto as **Exhibit A**. [10]

On December 13, 2017, Mr. Sickle sent Mr. Gosfield a draft of the REA that included proposed language providing for an express easement for shared parking. A copy of Mr. Sickle's email and the draft REA is attached hereto as **Exhibit D**.

On December 16, 2017, Mr. Gosfield sent a "redline" version of the REA back to Mr. Sickle.  Mr. Gosfield's markup of the REA struck the draft "Shared Parking Facilities" easement **in its entirety** and included, at footnote 10, the note "NTD:  We are told there is no Shared Parking on the HUH Parcel."  A copy of Mr. Gosfield's December 16, 2017 email, the draft REA and the "redline" REA is attached hereto as **Exhibit E**.

On December 16, 2017, Mr. Sickle responded by email to Mr. Gosfield with his "high level comments" to Mr. Gosfield's revisions.  Among his high level comments was the following: "Shared Parking – We need to confirm with clients if any parking is used in common.  Who uses

---

[10]   Mr. Gosfield's email is consistent with an October 11, 2017 email from Brett Peanasky, a colleague of Mr. Gosfield, to Mr. Sickle (among other recipients), enclosing draft plans for lot line adjustments for the Hahnemann Campus.  Mr. Peanasky states that "We . . . believe that these lots all qualify as by-right.  Any non-compliance will be solved by recording a unity of use of zoning lots agreement."  A copy of this email is attached as **Exhibit B**.  It is also consistent with a November 14, 2017 letter from Ronald J. Patterson, another colleague of Mr. Gosfield, to a CONA lawyer (and copied to Mr. Sickle), in which Mr. Patterson states that "[w]here a lot or lots cannot comply, then [an engineering firm] and we are analyzing how to create compliant lots by way of a Unity of Use arrangement[ ]."  A copy of this letter is attached as **Exhibit C**.

the parking today (or is it operated as a public lot)?  Who knows this?"  A copy of Mr. Sickle's December 16, 2017 email is attached hereto as **Exhibit F**.

Following a call among the parties and counsel, Mr. Sickle returned a revised draft of the REA to Mr. Gosfield by email on December 21, 2017 that accepted the deletion of the proposed shared parking easement, as reflected in the draft previously circulated by Mr. Gosfield.  A copy of Mr. Sickle's December 21, 2017 email and the included draft REA is attached hereto as **Exhibit G**.

Given the above communications and drafts, it is clear that the parties to the REA and EUU, which the Court found must be interpreted together, did not intend to give the owners of Lots B and C the right to park on Lots D and E.

### D.     Other Easement and Unity of Use Agreements: The Broad Street Parcels and The STC Parcels

The same principals who negotiated and executed the EUU and the REA were at the same time negotiating and executing agreements involving two other assemblages of real estate that Tenet sold as part of the 2018 Transactions.  In both instances, the relevant parties executed "easement and unity of use agreements" with almost identical language as the EUU.  In neither instance, however, did the parties rely upon references to "Accessory Parking" usage, "Accessory Signs" usage, or the provisions of Section 2.1 of the agreements.[11]  Instead, they executed "*Parking, Access and Utilities Easement Agreements*" that expressly granted parking and signage easements.  In other words, the parties that negotiated and executed the EUU and REA did not rely

---

[11]     Section 2.1 of the Broad Street EUU and the STC EUU provide in relevant part that:

> For purpose of zoning, exclusively, all three (3) Owners hereby agree and state that the Parcels shall be considered one contiguous parcel of land.  In connection therewith, Owners hereby agree and covenant that the Parcels shall be used in such a manner as if the three (3) parcels that comprise the Property were one zoning property.  Such [current and] proposed use of the Property is for . . . **Accessory and Non-Accessory Parking, . . . Accessory Signs** . . . (emphasis added) [Bracketed language appears in STC EUU]

on the very same provisions that the Plaintiffs rely upon in this litigation for the right to parking and signage.

**Broad Street Parcels**.  As part of the 2018 Transactions, Tenet sold several adjoining parcels of real estate just north of Vine Street, in Center City Philadelphia.  The purchasers were Broad Street Healthcare Properties, LLC, Broad Street Healthcare Properties II, LLC and an HSRE subsidiary called PAHH Wood Street Garage, LLC ("**Wood Street**").  The purchasers executed an "easement and unity of use" agreement" in connection with this transaction (the "**Broad Street EUU**").  The recitals to the Broad Street EUU describes the "purpose" of one or more of the parcels as "Accessory and Non-Accessory Parking" and "Accessory Signs."  Paragraph 2.1 of the Broad Street EUU contains substantially identical language to paragraph 2.1 of the EUU, upon which the Plaintiffs' rely in Plaintiffs' Memorandum.  See, e.g., *Plaintiffs' Memorandum*, at p. 3.  A true and correct copy of the Broad Street EUU is attached hereto as **Exhibit H**.

The parties to the Broad Street EUU also executed a "Parking, Access and Utilities Easement Agreement (Wood Street Garage/Stiles)" (the "**Broad Street Parking Easement Agreement**"), a true and correct copy of which is attached hereto as **Exhibit I**.  The Broad Street Parking Easement Agreement explicitly "grant[s] and convey[s]" to Wood Street easements for the purpose of parking and signage.  See, *e.g.*, Broad Street Parking Easement Agreement, at par. 1 (granting easement over the "Parking Area", which is defined as certain below-ground parking area under Stiles Hall, and providing that "[t]he easements set forth herein include . . . the right to install, maintain, alter, repair, replace, and remove . . . signage . . . as currently exists or as [Wood Street] shall desire, in its sole discretion, to install, replace, or remove . . .").

**STC Parcels**.  Also as part of the 2018 Transactions, Tenet sold several adjoining parcels of real estate associated with St. Christopher's Hospital for Children – the hospital, a multi-level

11

garage on the hospital campus, and adjacent ground-level parking and driveway facilities.  The purchaser of the multi-level garage was an HSRE subsidiary called PAHH Erie Street Garage, LLC ("**Erie Street**").  The other purchasers were Front Street Healthcare Properties, LLC and Front Street Healthcare Properties II, LLC ("**Front I**" and "**Front II**"), which were non-Debtor entities ultimately owned and controlled by Mr. Freedman.  The purchasers executed an "easement and unity of use" agreement in connection with this transaction (the "**STC EUU**").  The recitals to the STC EUU state that the "purpose" of each of the parcels subject to the STC EUU included "Accessory Parking," and Paragraph 2.1 contains substantively identical language to paragraph 2.1 of the EUU.  A true and correct copy of the STC EUU is attached hereto as **Exhibit J.**

Similar to what was done in connection with the Broad Street Parcels, the parties to the STC EUU also executed a "Parking, Access and Utilities Easement Agreement (Erie Garage/St. Christopher's Hospital)" (the "**STC Parking Easement Agreement**"), a true and correct copy of which is attached hereto as **Exhibit K**.  The STC Parking Easement Agreement expressly "grant[s] and convey[s]" to Erie Street an easement over a "Driveway Area" from Front Street and "drive aisles" "for the purpose of "pedestrian and vehicular access, ingress, egress and regress . . ." STC Parking Easement Agreement, at par. 1.  It also grants an easement "through, within, over and across" the "Exterior Parking Areas", and provides that:

> [t]he parking spaces within the Exterior Parking Area shall be available to each Owner and their respective Permittees on an unreserved, non-exclusive, first-come, first-served basis subject to reasonable rules and regulations established by Hospital Owner from time to time with the prior written consent of the Garage Owner . . . , including (i) the right to charge parking fees . . . , (ii) the right to designate certain parking spaces within the Exterior Parking Areas as "handicap only" . . .

STC Parking Easement Agreement, at par. 2.

The STC Parking Easement Agreement also provides that "[t]he easements set forth herein include . . . the right to install, Maintain . . . , alter, repair, replace, and remove . . . signage . . . as

currently exists or as [Erie Street] shall desire, in its sole discretion, to install, replace, or remove

. . ."  Id., at par. 1.

A comparison of these three sets of documents is below:

|  | *Hahnemann Campus* | *Broad Street Parcels* | *STC Parcels* |
|---|---|---|---|
| **Easement and Unity of Use Agreement recitals describe use of some or all parcels as "Accessory Parking"** | Yes | Yes | Yes |
| **Easement and Unity of Use Agreement – Recital E**[12] | Substantively identical | Substantially identical | Substantially identical |
| **Easement and Unity of Use Agreement - Paragraph 2.1** | Substantially identical | Substantially identical | Substantially identical |
| **Companion Document** | REA | Broad Street Parking Easement Agreement | STC Parking Easement Agreement |
| **Does Companion Document Grant Express Rights to Parking?** | **No** | **Yes** | **Yes** |
| **Does Companion Document Grant Express Rights to Signage?** | **No** | **Yes** | **Yes** |

Clearly, the principals negotiating the 2018 Transactions did not intend to rely on the terms

of the Broad Street EUU or STC EUU to secure parking or signage rights.  They executed specific

and clear "Parking, Access and Utilities Easement Agreements" instead.  No such agreement was

executed in connection with the Hahnemann Campus.

---

12      Recital E provides as follows:

>     The Property consists of [  ] parcels.  Rather than consolidating the parcels into one parcel,
>     the Owners desire to create an easement and designate a "Unity of Use" among the parcels
>     to create a single zoning property or Parcel to as to fulfill the zoning requirements of L&I
>     and obtain from L&I the issuance of a Zoning permit for the property as if it were one
>     zoning property.  This Easement is simultaneously submitted to L&I in connection with a
>     permit application for the property and this Easement must be recorded against the Property
>     and run with the land.  The Owners affirm the uses of the Parcels affected by this Easement
>     are integrated and interdependent.

13

### E.    Post-Closing Organizational Chart

Consistent with the foregoing, after the closing of the 2018 Transaction, the parties created the "Project Liberty Post-Close Legal Entity Organization Chart," a copy of which is attached hereto as **Exhibit L**.  On page two of the Chart, Parcel D is identified as consisting of "redevelopment land/surface parking," evidencing an intent to maintain flexibility to use and redevelop Parcel D into something other than a parking lot.

### F.    Historical Usage

Tenet maintained, and updated on an annual basis, including the year prior to closing on the 2018 Transactions, detailed policies regarding parking.  According to a 2017 "Parking Procedures and Criteria" memorandum prepared by Tenet: (i) CCH's Lot D was a pay lot intended for use by Hahnemann University Hospital patients, their visitors and the general public; (ii) the four spots adjacent to the Bobst Building (n/k/a Race Street Labs) were reserved for out-patients at a so-called "Cath Lab operated by Hahnemann University Hospital"[13]; and (iii) the other parking spaces at the top of, or adjacent to, the "up ramp" were reserved by the hospital for hospital staff members who had obtained an "Emergency Responder Hang Tag" to "utilize when responding to a patient care emergency", or for ambulance services providing transport.  General employee and student parking was made available at numerous other facilities.  Thus, all of the parking on the Hahnemann Campus was intended to be used for hospital purposes.  A copy of Tenet's Parking Procedures and Criteria memorandum from 2017 is attached as **Exhibit M.**

### G.    The MOU

On August 29, 2022, the Court issued an Order [Docket No. 4216] approving the *Memorandum of Understanding Re Global Settlement Among, Inter Alia, Debtors, Debtors'*

---

[13]    As previously noted, this Cath Lab ceased operations prior to closing on the 2018 Transactions.

*Subsidiaries, Committee, Tenet, Conifer, MBNF Parties, HSRE Entities and CONA Parties* (the "**MOU**").  Pursuant to the MOU, CCH received, among other things, all equitable and other interests in, control over, and the right to certain proceeds from the ultimate sale or disposition of, Parcels A, D, E and F (collectively, the "**CCH Real Estate**"), as described above.  CCH took control of the CCH Real Estate on October 13, 2022 with the goal of marketing it for sale and distributing the net proceeds of sale to the Debtors' creditors in these Chapter 11 Cases.  Court approved brokers have been actively marketing the CCH Real Estate for sale since February of 2023.[14]

### H.    Plaintiffs Acquire Parcels B and C

The Plaintiffs acquired Parcels B and C from HSRE-controlled entities in or about July 2021.  A copy of the parties' Agreement of Sale and Purchase, which identifies the address for Parcel as 216-20 N. Broad Street, is attached hereto as **Exhibit N**.  A copy of the parties' Deed for Parcel C, which also identifies the address of the parcel as 216-20 N. Broad Street, is attached hereto as **Exhibit O**.  Sometime thereafter, Plaintiffs began to redevelop the Bobst Building into the "Race Street Labs."  All publicly available permits issued by the Philadelphia Department of License & Inspection since the Plaintiffs' acquisition of Parcel C make clear that the permits were applied for, and issued, with the address of 216-20 N. Broad Street.  Copies of a sampling of these permits are attached hereto as **Exhibit P**.

There is an abundance of parking within a 1-2 block radius of the Hahnemann Campus, including public surface parking lots and parking garages located at 1540 Vine Street, 1416 Wood

---

[14]    While the Plaintiffs have attempted to portray CCH as a poor caretaker of the SHSH Building, the SHSH Building is well secured and well maintained.  Moreover, Plaintiffs continue the false narrative that CCH improperly removed "fire lane" signage from the Ramp on its Parcel E.  The truth is that this signage was removed temporarily so that CCH could paint the walls along the up ramp, portions of which had been demolished by the Plaintiffs. Once the painting was concluded, the signs were replaced.

Street (a garage owned by an affiliate of Plaintiffs located at the intersection of Broad and Wood Streets), 15th and Cherry Streets and 150 N. Broad Street.  Plaintiffs themselves tout the availability of public parking on the Race Street Lab's website, as follows:

> With ease of access to I-676, getting to Race Street Labs is convenient by car.  There is structured parking within one block of the lab site.  Beyond that, **Center City offers many available lots for weekly or monthly arrangements and on-street city parking is available for both residents and non-residents** on designated blocks. Up to two spaces per thousand available for monthly rental.

*See* screenshot from racestreetlabs.com attached hereto as **Exhibit R** (emphasis added).  Further, in the "Amenities" section of the Race Street Lab's website, "Lifestyle amenities" is described to include "STRUCTURED PARKING WITHIN 1 BLOCK OF SITE."  *See* screenshot from racestreetlabs.com attached hereto as **Exhibit S**.

As part of their redevelopment efforts, Plaintiffs installed large signage on the exterior of their building identifying it as "Race Street Labs" and used the incorrect address of "1421 Race Street" on an entrance awning.  Contrary to Plaintiffs' statements otherwise, *Plaintiffs' Memorandum*, at p. 13, the signage on the exterior of Race Street Labs was not installed in "late 2023" and was not due to a lack of accessory signage located on the sidewalk; instead it was part of Plaintiffs' original construction plans for Race Street Labs, and was installed in June 2023.  As acknowledged in an January 24, 2024 email from Andrew Eisenstein ("[w]e have a giant sign that says 1421 that's visible from the street")[15], and as is clear from **Exhibit T**, which is a photograph taken from Race Street on February 28, 2024, this signage is easily visible from Race Street.

---

[15]    A copy of Mr. Eisenstein's email is attached as **Exhibit U**.  Attached hereto as **Exhibit V** is a June 6, 2023 email from Jason Friedland to Samantha Reese requesting "the specs/rendering for the canopy signage."

I.        **Zoning Requirements – Parking**

The "Parking & Loading Requirements" table on page 5 of Plaintiffs' Memorandum is both misleading and out of date.  Most obviously, the Plaintiffs have cobbled together select portions of the table and have omitted others.

Under the current City of Philadelphia Zoning Code, none of the buildings owned by Plaintiffs on the Hahnemann Campus, which is in a "CMX-5" district, is required to have parking, given their uses.  These buildings are (i) Race Street Labs, which is a research and development facility[16]; (ii) New College Building, which is an educational facility[17]; and (iii) the Feinstein Building, which is now zoned for a "group living."[18]  Set forth below are the relevant portions of Table 14-802-2 ("Required Parking in Commercial Districts"), from the Philadelphia Zoning Code[19]:

---

[16]    See note 18 below, which explains that the zoning for Parcel C was changed to "Group Living" on June 30, 2023.  The parking requirements for "Group Living" and "Research and Development" in a CMX-5 zone are the same.  No parking is required.

[17]    The New College Building houses the Drexel University School of Medicine.

[18]    On June 30, 2023, Plaintiffs obtained a zoning permit for the Feinstein Building for "group living."  A copy of this permit is attached as **Exhibit W**.  On March 1, 2024, Plaintiffs leased the Feinstein Building to the Philadelphia Municipal Authority, which simultaneously subleased it to the City of Philadelphia.  According to Section 3.2 of the parties' lease, the permitted uses of the Feinstein Building will be "governmental offices; public-facing social and emergency services; operating one or more daytime and/or overnight shelters for persons, along with related services; and all accessory uses customarily incidental to each of these."

Use of the Feinstein Building for "group living" is not within the stated scope of the EUU.  CCH reserves all rights regarding such change in usage and, among other things, its impact on the EUU and the parties' rights and obligations thereunder.

[19]    CCH has not included in the version of Table 14-802-2 set forth herein parking requirements for uses that clearly are not relevant to the Injunction Motion.  The complete version of Table 14-802-2 can be accessed via the following link:
https://export.amlegal.com/media/d4f993af38e9d7ff67799d69a7c6a2184370a681/DATAOBJECTS/0-0-0-34501.pdf.

## ZONING AND PLANNING

**Table 14-802-2: Required Parking in Commercial Districts (Except CMX-1, CA-1, and CA-2)**

| | Minimum Required Parking Spaces (spaces per unit/sq. ft. of gross floor area/beds/seats/room) | | |
|---|---|---|---|
| | **CMX-2/2.5** | **CMX-3** | **CMX-4/5** |
| **Residential Use Category** (as noted below) | | | |
| | | | |
| Group Living (except as noted below) | 1/10 permanent beds | 1/10 permanent beds | 0 |
| **Public, Civic, and Institutional Use Category** (as noted below) | | | |
| Educational Facilities | 1/1,000 sq. ft. | 1/1,000 sq. ft. | 0 |
| Hospital | 1/4 bed design capacity | 1/4 bed design capacity | 1/4 bed design capacity |
| **Industrial Use Category** (as noted below) | | | |
| Research and Development | None for the first 7,500 sq. ft. then 1/2,000 sq. ft. | 0 | 0 |

As is clear from the table reproduced (in truncated form) above, **none of uses for the Plaintiffs' buildings on the Hahnemann Campus requires off-street parking**. And, under the Zoning Code, **if no off-street parking is provided, no parking for persons with disabilities is required**. See Philadelphia Zoning Code, at § 14-802-2(5) (accessible parking is only required when off-street parking is provided).

### J.    Procedural History

**The Stay Violation**. Over CCH's objections, the Plaintiffs, in violation of the automatic stay, began constructing, on CCH's property, a "grand entrance" to the newly branded Race Street Labs.[20] Such actions included demolishing, altering and redeveloping portions of *CCH's* property, for their own benefit. As a result of the Plaintiffs' actions, on January 19, 2023, CCH filed a motion to enforce the automatic stay [D. I. 4468]. Immediately prior to the February 9, 2023 hearing on the motion, the parties agreed to continue the hearing to provide an opportunity to

---

[20]    Prior to such construction, the entrance to the building was utilitarian. Attached hereto as **Exhibit X** is a photograph, obtained in discovery, that shows the entrance to the Bobst Building shortly after construction began. Certain work on the entrance had been done when this picture was taken (e.g., an awning above the entrance had been removed).

explore settlement.  This continuance was conditioned upon the Plaintiffs' agreement, placed on the record, to take no further action on CCH's property.  In early April 2023, the Plaintiffs breached this this agreement by making further alterations to CCH's property.

**Plaintiffs' Original and Amended Complaints**.  On April 12, 2023, the Plaintiffs filed their original complaint [Adv. D. I. 1] in this Adversary Proceeding and on May 16, 2023, filed the Amended Complaint.

**The Motion to Dismiss and the Memorandum Opinion**.  On June 1, 2023, CCH filed its Motion to Dismiss asserting, *inter alia*, that the REA and EUU are unambiguous and do not include the easements that the Plaintiffs wish to exist.  Following briefing and oral argument, the Court entered its Order and Memorandum Opinion, granting in part, and denying in part, the Motion to Dismiss.  In its Memorandum Opinion, the Court construed the REA and EUU together and held that the EUU did not unambiguously support CCH's position.  *See* Memorandum Opinion, at p. 10.

Contrary to the Plaintiffs' position that "[t]he Court denied Defendant's Motion, thereby demonstrating the existence of a probability of success on the merits" (*Plaintiffs' Memorandum*, at p. 21), the Court did not rule in Plaintiffs' favor on any claim in the Amended Complaint.  As the Plaintiffs certainly know, the denial of a motion to dismiss is not the equivalent of a ruling or finding of a likelihood of success on the merits.  Specifically:

- in considering whether the EUU created an easement, the Court concluded "[c]onsequently, the Court cannot conclude, as the Defendant contends, that the EUU . . . is unambiguously <u>not</u> an easement." *Id.* at p. 15.

- in considering whether the EUU is limited to zoning purposes, the Court concluded "that a fair reading of the entire EUU does not support the Defendant's argument that the EUU unambiguously limits any easement it creates to zoning purposes." *Id.* at p. 18.

- In considering whether any easements included in Section 1.1 of the EUU were limited to the scope and definition to the easements in the REA, the Court concluded that a comma in that section "makes the clause ambiguous as it is reasonably susceptible to different interpretations." *Id.* at p. 19.

- Finally, in considering the meaning of the term "common areas" in the EUU, the Court concluded "that the use of the term 'common areas' in the EUU is not clear and unambiguous because it is reasonably susceptible to multiple interpretations." *Id.* at p. 21.

The Court ultimately concluded that "[a]dditional evidence on the intent of the parties, including how they historically treated [the EUU and REA] in practice, is necessary before the Court can determine which interpretation of the agreements is correct." *Id.* at p. 22.

## K.    Post-Memorandum Opinion Actions

On January 22, 2024, the Plaintiffs' counsel wrote to CCH's counsel characterizing the Court's Memorandum Opinion as "rejecting" CCH's position on the merits and demanding that CCH recognize the disputed easements at the heart of this Adversary Proceeding. *See* Plaintiffs' January 22, 2024 letter attached hereto as **Exhibit Y**.

To "set the table" for their Injunction Motion, the Plaintiffs followed up their January 22, 2024 letter with another letter from counsel on January 24, 2024, this time alleging that a new tenant in the Bobst / Race Street Labs Building, Zahav Biosciences ("**Zahav**"), was experiencing difficulties with deliveries and visits to their new space, which it incorrectly identified as "1421 Race Street."

The email from Zahav quoted in the letter is dated January 23, 2024, and states that "[t]here appears to be an issue related to some GPS systems being able to locate the building" and provides that "[i]t is therefore imperative that you install large signage at the end of the building driveway. This will help people know that have arrived at Race Street Labs, 1421 Race Street, and that they need to turn left into the driveway and drive up to the building."

The Plaintiffs' January 24, 2024 letter includes a threat to file the Injunction Motion if CCH failed to permit installation of signage for the Race Street Labs on CCH's property.  *See* Plaintiffs' January 24, 2024 letter, attached hereto as **Exhibit Z**.  Tellingly, neither Plaintiffs' counsel's letter of January 24, 2024, nor the Zahav email quoted therein, raise any issues with parking.

In an effort to avoid further litigation, CCH's counsel responded by letter dated January 25, 2024, correcting the Plaintiffs' assertion that the Court "rejected" CCH's position on the merits, noting that the Plaintiffs and their tenant were using the incorrect address for the Race Street Labs, but suggesting a solution to avoid the Injunction Motion, as follows:

> In its January 10, 2024 opinion and order (collectively, the "Decision"), the Court simply denied the Debtor's motion for partial dismissal.  The Court made no findings and entered no judgments in the Plaintiffs' favor and certainly did not "reject" any of the Debtor's underlying positions. . .
>
> \* \* \*
>
> Regarding Zahav Biosciences' ("Zahav") stated concerns about deliveries, as asserted in your January 24, 2024 letter, neither the Plaintiffs nor their tenants are entitled to signage on the Debtor's property under the REA, the Easement & Unity of Use Statement (the "EUU"), or otherwise. . . We would note, however, that the EUU identifies the address for the parcel containing the Bobst Building, as "216-20 N. Broad Street, Philadelphia, Pennsylvania" rather than 1421 Race Street.  It appears that your client is attempting to create a new address for the Bobst Building in a manner that is inconsistent with the EUU, and the Debtor reserves all rights on that issue.
>
> Having said this, we remind you that your client's tenant can utilize the Shared Loading Dock (as defined in the REA) for deliveries.  **We would be willing to discuss with the Debtor temporary placement (at a mutually agreed location, near Race Street at the entrance to the ramp leading to the Shared Loading Dock) of appropriate signage for deliveries via the Shared Loading Dock, subject to a written stipulation making clear that such agreement is without prejudice to either side's positions in the pending litigation.  Please contact us if you are interested in discussing this temporary compromise which would address Zahav's concerns**.  (emphasis added)

*See* Debtor's counsel's January 25, 2024 letter attached hereto as **Exhibit AA**.

21

Despite this suggestion, the Plaintiffs filed their Injunction Motion on February 5, 2024. Thereafter, CCH suggested an interim resolution of the disputes raised by the Injunction Motion, with a full reservation of rights, via agreed-upon signage at the bottom of the "up ramp" and the top of the "down ramp", along with handicapped accessible parking spots adjacent to the Feinstein Building.

**L.      The Injunction Motion**

The Injunction Motion seeks several forms of relief.  First, it seeks an order of the Court compelling CCH to "allow Plaintiffs, their tenants, and each of their invitees and licensees ongoing access, enjoyment, and use" of parking on Lots D and E, subject to commercially reasonable rules for use.  Second, it seeks an order of the Court compelling CCH to allow Plaintiffs to "place and update accessory signage" on Lots parcels D and E, at the locations of any pre-existing signage.

**M.      Zahav Deposition**

On March 21, 2024, CCH took the deposition of Saba Malak, the designated Rule 30(b)(6) representative of Zahav.  Although the relevant pages of the transcript from this deposition are attached hereto as **Exhibit BB**, certain particularly significant testimony is reproduced below:

Q:      So, are you saying there has been an impact and what I would take from your testimony is a positive impact [in deliveries]?

A:      Yes, there has been.  There has been an improvement.

Q:      And that is since late January and early February?

A:      Again, very hard to time it, but, no, more probably later in February.

Q:      Okay.  And that means I'm surmising that you've had less delivery issues?

A:      That is correct.

Q:      Have you had any delivery issues since mid-February or late February 2024?

> A:    I'm sure we have some but, you know, nowhere, nowhere the same number
> as before.

. . .

> A:    No specific instances since mid-February come to mind.

Trans. pp. 41 - 42.

Later in the deposition, when asked again about missing deliveries, Mr. Malak reiterated

that "[a]ll I can say is we've had fewer recently and I can't say if we've had any recently."  Tr. p.

90.

Regarding parking, Mr. Malak testified as follows:

> Q:    And you'll agree with me that this [lease] provision provides that,
> "Landlord shall make available on a monthly basis for the use by tenant and its
> employees five parking spaces at the parking garage located at 316 North Broad
> Street, Philadelphia, PA."  Do you see that?
>
> A:    Yes.

Trans. p. 50.

> Q:    Does Zahav Biosciences have any issues with parking at Race Street Labs?
>
> A:    Not to my knowledge.

Trans. p. 71.

Of the current four (4) Zahav employees, Mr. Malak testified that one walks to work and

two take the train.  Mr. Malak testified that he (the 4th employee) generally works at Race Street

Labs three days a week, and that he either walks to work or takes an Uber.  Tr. at pp. 52 – 53.

None of the Zahav employees requires handicapped parking.  Tr. at p. 50.

Regarding the ability of Uber drivers and others to locate Race Street Labs, Mr. Malak

testified that, although to his knowledge they could not locate the building using the 1421 Race

Street address, they were able to locate the building if directed to "1417 Race Street."  Tr., p. 94.

23

Mr. Malak also testified that he was informed by an electrician that use of "1415 Race Street" would allow visitors to locate Race Street Labs.  Trns., p. 96.  He further testified that, to his knowledge, the fire department is able to locate the building using an address of "1417 Race Street."  Trns., p. 112.

Finally, Mr. Malak testified that he was informed that the post office did not have 1421 Race Street on its records.  Trn., p. 38-39.

N.      **Plaintiffs' Attempt to Change the Address for Parcel C**

Notwithstanding the centrality of the Race Street Lab address to the Injunction Motion, the Plaintiffs provided no notice to CCH or the Court when, on March 14, 2024, it submitted an application to the City of Philadelphia Office of Property Assessment to change the legal address of Parcel C from 216-20 N. Broad Street to "1425 Race Street."  A true and correct copy of this application is attached as **Exhibit CC**.

CCH learned of this application only when it received it from the Plaintiffs, in discovery on the Injunction Motion.  Promptly after learning about the application, CCH's counsel contacted the City of Philadelphia Office of Property Assessment by email to inform them of CCH's position that the application should be denied or, at a minimum, delayed pending adjudication of the Amended Complaint.  A copy of this email is attached as **Exhibit DD**.

On March 28, 2024, CCH's counsel received an email from the City of Philadelphia Office of Property Assessment stating that Plaintiffs' application to change the address of Parcel C to "1425 Race Street" had been denied.  A copy of this email is attached as **Exhibit EE**.

## LEGAL STANDARD

Plaintiffs seek preliminary injunctive relief – "a drastic and 'extraordinary' remedy that is not to be routinely granted and is appropriate only in 'limited circumstances.'"  *Doe v. Delaware*

*State Univ. Bd. of Trustees*, C.A. No. 20-1559 (MN), 2021 WL 2036670, at *2 (D. Del. May 21, 2021) (quoting *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d. Cir. 2004)).  In order to obtain this extraordinary relief, Plaintiffs must establish four elements: (1) a likelihood of success on the merits, (2) the existence of irreparable harm in the absence of preliminary relief, (3) that the balance of equities weigh in their favor, and (4) that an injunction is in the public interest.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  The Court "cannot grant a preliminary injunction unless the moving party establishes ***both*** a likelihood of success on the merits and the existence of irreparable harm without the injunctive relief." *Waters Corp. v. Agilent Techs. Inc.*, 410 F. Supp. 3d 702, 707 (D. Del. 2019) (emphasis in original); *see also Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017).  And on the remaining two factors – the harm to the non-moving party and the public interest – Plaintiffs bear the burden of demonstrating to the Court that these factors weigh in favor of an injunction when (as here) the non-moving party comes forward with evidence of harm it and the public would suffer.  *See Acierno v. New Castle Cnty.*, 40 F.3d 645, 653 (3d Cir. 1994).

The primary purpose of a preliminary injunction is "maintenance of the status quo until a decision on the merits of a case is rendered." *Id.* at 647 (3d Cir. 1994).  An injunction is viewed as mandatory if it will "alter the status quo by commanding some positive act," and "mandatory injunctions are generally disfavored." *Pub. Interest Legal Found. v. Boockvar*, 495 F. Supp. 3d 354, 358 (M.D. Pa. Oct. 20, 2020) (citations omitted).  Where, as here, the relief sought by the injunction is mandatory because it commands a positive act, a movant faces a yet "higher standard" than the "extraordinary" injunction standard.  *Bennington Foods LLC v. St. Croix Renaissance, Grp., LLP*, 528 F.3d 176, 179 (3d Cir. 2008); *Acierno*, 40 F.3d at 653 ("A party seeking a mandatory preliminary injunction that will alter the status quo bears a particularly heavy

burden….").  For a mandatory injunction to be granted, "the moving party's 'right to relief must be indisputably clear.'" *Trinity Indus., Inc. v. Chicago Bridge & Iron Co.*, 735 F.3d 131, 139 (3d Cir. 2013) (citation omitted).  That is not the case here.

## ARGUMENT

### I.    PLAINTIFFS HAVE FAILED TO SHOW THAT THERE IS A REASONABLE LIKELIHOOD THEY WILL SUCCEED ON THE MERITS OF THEIR CLAIMS.

Plaintiffs have not shown a likelihood of success on the merits of their claims, and thus have failed to satisfy the first element required for injunctive relief.  To show a likelihood of success on the merits, a movant "must produce 'sufficient evidence' to satisfy the essential elements of the underlying cause of action."  *Jurista v. Amerinox Processing, Inc.*, 492 B.R. 707, 778 (D.N.J. 2013) (internal citations omitted).  A movant cannot rely on an unverified complaint or factual representations in its brief to satisfy the success on the merits element.  *See Vertigo Media, Inc. and Remote Media LLC, v. Earbuds Inc.*, C.A. No. 21-120 (MN), 2021 WL 4806410, at *5 (D. Del. 2021) ("[T]he moving party must put forth evidence supporting its claims, and neither attorney argument nor the allegations in the complaints suffice."); *see also Societe Comptoir De L'Industrie Cotonniere, Establissements Boussac. v. Alexander's Dep't Stores, Inc.*, 190 F. Supp. 594, 601 (S.D.N.Y. 1961), aff'd, 299 F.2d 33 (2d Cir. 1962) ("As support for a preliminary injunction the court can consider only facts presented by affidavit or testimony and cannot consider facts provable under the modern liberal interpretation of the complaint but which have not been proved.").

Beyond the EUU, which is in dispute and which the Court found to be ambiguous, the Plaintiffs have not offered any evidence, by declaration or otherwise, to support their claims that the EUU includes express easements for parking or signage.  But, the EUU alone cannot establish a likelihood of success on the merits, as the Court has determined that the language of the EUU is

26

ambiguous and that additional evidence on the intent of the parties is necessary before the Court can interpret the EUU. *See* Memorandum Opinion at pages 15, 18, 19, 21 and 22. For this reason alone, the Plaintiffs' Injunction Motion fails and must be denied.

### A.      Effect of Denial of Motion to Dismiss

The fact that the Court denied portions of the Motion to Dismiss is not the equivalent of a finding that the Plaintiffs are likely to succeed on the merits of their claims, given the significant difference between the modest hurdle for surviving a motion to dismiss and the high standard for imposing the extraordinary remedy of a preliminary injunction – particularly one that is "mandatory." Courts routinely recognize that the denial of a motion to dismiss is the not the equivalent of a finding of a likelihood of success on the merits.

The Third Circuit Court of Appeals acknowledged the different standards governing these motions in *Siemens USA Holdings Inc v. Geisenberger*, 17 F.4th 393 (3d Cir. 2021), a complex case involving various claims – including a preemption claim – brought against representatives of the State of Delaware for enforcing Delaware's escheat laws. *Id.* at 399. In *Siemens*, the District Court dismissed the plaintiff's preemption claim as unripe and accordingly denied the request for a preliminary injunction. *Id.* at 412.

On appeal, the Third Circuit reversed the dismissal of the preemption claims as unripe. *Id.* In doing so, the Third Circuit declined the plaintiff's request to enter a preliminary injunction "because further development of the evidentiary record is needed." *Id*. *Id.* at 417. In determining whether plaintiff would prevail on the preemption claim, the court stated "[s]tandards of review matter, and while a party is allowed to rely on well-pled factual allegations to survive a motion to dismiss, we agree with the Defendants that [plaintiff] cannot 'snatch complete victory from the jaws of defeat' in the absence of an adequately developed evidentiary record." *Id.* at 418 (quoting

Answering Br. at 35).  *See also Fed. Home Loan Mortg. Corp. v. Thomas*, No. 2:16-CV-742-MHT-WC, 2017 WL 1100445, at *2 (M.D. Ala. Feb. 28, 2017) ("To the extent that [plaintiff] may be relying on the survival of his claims past the motion to dismiss stage in litigation, such reliance is misplaced.  Importantly, just because [plaintiff]'s wrongful foreclosure claim has filtered through the motion to dismiss strainer does not mean that he has, or that the court may infer, a substantial likelihood of success on the merits of that claim."); *see also Poarch v. Caliber Home Loans*, No. 119CV02785SDGLTW, 2021 WL 1053538, at *1 (N.D. Ga. Feb. 10, 2021) ("In deciding the Motion to Dismiss, the Court had to accept the allegations in Plaintiff's Second Amended Complaint as true… But now the Court is called upon to weigh in on the merits of the claim based on the evidence in the record, and … Plaintiff's claim appears to be entirely baseless") (internal citation omitted).

### B.    Plaintiffs Cannot Meet their Burden

Even if the Plaintiffs had offered evidence supporting their interpretation of the EUU, the history of the negotiations outlined above, which make clear that a parking easement was not intended, a comparison of the EUU and the REA to the agreements executed in connection with the Broad Street Parcels and the STC Parcels, Tenet's "Parking Procedures and Criteria" memorandum (which shows that the parking on Lots D and E was intended solely for hospital use), the fact that Parcel D was referred to by the original parties to the EUU and the REA as the "redevelopment parcel," and the fact that Parcel D had been operated for years as a public pay parking lot for the benefit of hospital patients, their visitors, and the public, without reservation, all demonstrate, at minimum, that the Plaintiffs cannot meet the heavy burden to establish a likelihood of success on the merits of their claims to alleged parking and signage easements.

If, as Plaintiffs allege, the EUU includes express easements for all parties to use any of the unified parcels on the Hahnemann Campus for their proposed uses set forth in the EUU, *i.e.*, Accessory Parking, then there would have been no reason for (a) HSRE to include an express parking easement in the draft REA, (b) the parties to discuss/negotiate the same, and (c) the parking easement ultimately to have been rejected from inclusion in the final, filed REA.  At minimum, the parties' negotiation, and ultimate rejection, of an express easement for parking in the REA calls into question Plaintiffs' interpretation of the EUU as including broad, express use easements such that Plaintiffs cannot establish a likelihood of success of the merits of their claims.  Plaintiffs' position also stands in sharp contrast to the manner in which the parties granted parking and signage rights in connection with the Broad Street Parcels and the STC Parcels, where such rights were granted by separate documents.

## C.      The Zoning Permit

The Plaintiffs' claims that parking and signage on CCH's properties is somehow "mandated" by the Zoning Permit is contrary to the Zoning Permit which, on its face, did not approve any specific use for any of the parcels, but instead approved a unity of use.  In fact, the attachments to the Zoning Permit expressly state that (i) "signage is not part of this permit" and (ii) "existing legal non-conformity with no reconfigurations, changes in structures and changes in uses."  This is consistent with the above-cited December 6, 2017 email from Mr. Gosfield, which indicates that the purpose of the Zoning Permit attached hereto as **Exhibit FF**, was to allow for approval by right despite various potential non-compliance

### D.    Zoning Code – Signage

Plaintiffs argue that a pedestal sign on Race Street with "current building identification" is required by Section 502.1 of the 2018 International Building Code (the "**Building Code**").[21] Plaintiffs' argument is, at best, a convenient misreading of that code section.  Section 502.1 of the Building Code provides as follows:

> 502.1 Address Identification:
>
> New and existing **buildings** shall be provided with ***approved* address** identification. (italics in original).  The address identification shall be legible and placed in a position that is visible **from the street or road fronting the property**. . .  Where access is by means of a private road and the building address cannot be viewed from the public way, a monument, pole or other approved sign or means shall be used to identify the structure.  Address identification shall be maintained. (bolding/underlining added).

*See* Building Code §502.1.  Plaintiffs conflate the words "building" and "property" in the above code section as if they are the same.  They are not.  As already noted, the "*approved* address" for Plaintiffs' property (Parcel C) is 216-20 N. Broad Street.  Parcel C does not include frontage on Race Street, but instead fronts Broad Street, and neither of the buildings on Parcel C is "accessed by a private road."  To comply with Section 502.1 of the Building Code, a sign visible from "the street or road fronting the property" – Broad Street – is required, like the sign attached hereto as **Exhibit GG**, which was taken in June 2023.

For these reasons, Section 502.1 of the Building Code provides no support for the Plaintiffs' arguments that they, or their tenants, are somehow entitled to a sign on CCH's property near Race Street.[22]

---

[21]    *See* Philadelphia Code 4-200 § B-1.1 ("The '2018 International Building Code' as published by the International Code Council is hereby adopted as the Philadelphia Building Code…").

[22]    The remaining language of Section 502.1 cited in Plaintiffs' Memorandum at page 8 (starting with "the ability of fire, police…") is set forth the International Building Council commentary and is not part of Section 502.1. While the commentary highlights the importance of correct signage for emergency personnel, there is nothing

51738587.10

### E.   Enforceability of EUU

Although the Court does not need to decide this issue in connection with the Injunction Motion, there is serious doubt that the EUU is enforceable.  For reasons that are unclear, the zoning permit for the EUU, a copy of which is attached Exhibit EE, identifies one common owner for all of the Hahnemann Campus parcels, Tenet Healthsystem Hahnemann, LLC, and not the separate entities that actually acquired the parcels from Tenet.  Yet, by the time the permit was issued , the properties were no longer owned by Tenet Healthsystem Hahnemann, LLC.

The City of Philadelphia Department of Licenses and Inspections published an "Information Sheet Unity of Use" (the "**L&I Info Sheet**") that was in existence at the time the Plaintiffs acquired their properties.  A copy is attached hereto as **Exhibit HH**.  This L&I Info Sheet made clear that a Unity of Use required separate parcels to be owned by the same entity:

> 4.      Are the parcels required to be owned by the same entity?
>
> Yes, all parcels involved in the Unity of Use are required to have common ownership (e.g. owner in fee).

The L&I Info Sheet further made clear that a sale of parcels in a Unity of Use to different owners rendered the Unity of Use invalid:

> 5.      If one or more of the parcels is sold, is the Unity of Use still valid?
>
> If all of the parcels are sold and common ownership is maintained; the Unity of Use agreement is still valid.  If at any point, one or more parcels is sold resulting in the parcels included in the Unity of Use having different owners, the Unity of Use is no longer valid and must be dissolved through the issuance of a permit.

May 2022 and February 2023 versions of the L&I Info Statement, copies of which are attached hereto as **Exhibits II and JJ**, include section 5 noted above and also provide as follows:

---

in the commentary to contradict the express wording in Section 502.1, which requires any signage for Parcel C to be on Broad Street, the property fronting Parcel C.

11. Does an existing Unity of Use require common ownership?

> If the Unity of Use was permitted prior to 3/1/2022 and the zoning permit or recorded document does not reference common ownership, there is no restriction related to ownership on the joined parcels or the future sale of any parcel included in the use permit.

As noted above, the zoning permit approving the EUU identified one common owner, Tenet Healthsystem Hahnemann, LLC. All available L&I Info Sheets make clear that there can be no Unity of Use for the now separately owned Parcels.

## II.   PLAINTIFFS HAVE FAILED TO SHOW THAT THEY WILL SUFFER IRREPARABLE HARM ABSENT THEIR REQUESTED INJUNCTION.

The Plaintiffs are not entitled to a preliminary injunction because Plaintiffs have not clearly shown that they have and will suffer immediate, irreparable harm if the Court declines to grant their request for such relief. To establish the type of harm necessary to warrant that relief, a movant must make a "clear showing of immediate irreparable injury." *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987) (mere "risk of irreparable harm is not enough") (*quoting Cont'l Group, Inc. v. Amoco Chem. Corp.*, 614 F.2d 351, 359 (3d Cir. 1980)). "[S]peculation cannot support an injunction." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 488 (3d Cir. 2000); *see also A.L.K. Corp. v. Columbia Pictures Industries, Inc.*, 440 F.2d 761, 764 (3d Cir. 1971) ("The injury contemplated by the denial of a preliminary injunction must be actual and of serious consequence, not merely theoretical."). Courts thus must be "wary of issuing an injunction based solely upon allegations and conclusory affidavits submitted by plaintiff." *Sunoco Partners Mktg & Terminals L.P. v. Powder Springs Logistics, LLC*, C.A. No. 17-1390-LPS-CJB, 2018 WL 395750, at *14 (D. Del. Jan. 8, 2018)(*quoting Atari Games Corp. v. Ninetendo of Am., Inc.*, 897 F.2d 1572, 1575 (Fed. Cir. 1990)). Moreover, a plaintiff must establish a "causal nexus" between a defendant's conduct and the alleged harm. *Doe v. Delaware State University Board of Trustees*,

2021 WL 2036670 *2 (D. Del. 2021), *quoting Waters Corp. v. Agilent Technologies Inc.*, 410 F.Supp. 3d 702, 713 (D. Del. 2019).

### A.      Parking

In this case, Plaintiffs have not made the requisite "clear showing of immediate irreparable injury". *Cont'l Group*, 614 F.2d at 359 (emphasis added). The Plaintiffs devote less than one page of argument alleging irreparable harm (*See* Plaintiffs' Memorandum, at p. 22) and do not mention any harm, let alone irreparable harm, necessitating a preliminary injunction related to parking. In fact, Plaintiffs do not explain why, during the pendency of this litigation, visitors to their properties cannot use the numerous public parking spaces available around the Hahnemann Campus with easy access to the Race Street Labs.

Notably, the only current tenant in either of the buildings on Parcel C, Zahav, raised no concerns about parking and is not entitled to on-site parking under its lease. Moreover, the Plaintiffs' lease with their prospective tenant for the Feinstein Building does not provide for parking for the tenant. The Plaintiffs have offered no evidence that they are suffering harm, let alone irreparable harm, related to parking; as a result, the Injunction Motion must be denied. And the Plaintiffs have not addressed the requirements of the current Zoning Code, explained above, which are clear – none of the Plaintiffs' buildings on the Hahnemann Campus is required to have either off-street parking or handicapped accessible parking.

### B.      Signage

Regarding signage, the Plaintiffs claim that the lack of a "monument sign" could put "building users . . . at risk as it is more difficult to locate the building from the street without the sign at the base of the driveway by the sidewalk (where people typically look for building signage)." *Id*. Putting aside the fact that CCH offered to install such a "monument sign" that

included "Race Street Labs" on it on a temporary basis, pending determination of the Amended Complaint, the Plaintiffs are like the proverbial man who murders his parents and asks for mercy because his is an orphan.  When the Plaintiffs bought the Bobst and Feinstein Buildings from HSRE, they knowingly bought one legal parcel with frontage on Broad Street.  Rather than develop the adjacent buildings together, they chose to develop them separately, with the Bobst Building becoming a research and development center and the Feinstein Building becoming a group living facility.

In so doing, they chose not to connect the buildings internally. They also chose not to build their "grand entrance" to Race Street Labs at Broad Street.  No doubt they have kept the buildings separate due to their intention – stated explicitly in their recent lease of the Feinstein Building  to the Philadelphia Municipal Authority – to subdivide Parcel C into separate parcels; one with Race Street Labs and the other for the Feinstein Building.[23]  Having taken these steps, and having invented a new address for Race Street Labs, the Plaintiffs now complain that visitors may not be able to locate Race Street Labs.  Even if this is true – and the evidence suggests otherwise – it is a situation of the Plaintiffs' own making.  Again, **the Plaintiffs created a new name for the Bobst Building, invented an address for it, and now complain that no one can find it**.

### C.    Zahav

Plaintiffs also assert irreparable harm, due to lack of signage, based upon an email from Zahav that was requested by Plaintiffs.  But an examination of the Zahav email, and the testimony of its representative, makes clear that Zahav is not suffering any irreparable harm – if any harm at

---

[23]     Paragraph 5.2(c) of the Feinstein Lease provides that:

> Subdivision. Landlord has disclosed to Tenant that Landlord intends to subdivide into separate legal parcels the [Feinstein] Building and the Race Street Lab (the "**Subdivision**").

CCH reserves all rights regarding any such subdivision attempt.  A copy of the Feinstein Lease is attached hereto as **Exhibit KK**.

all – and the alleged issues experienced by carriers or visitors, even if true, are entirely of Plaintiffs' own making.  The address of the parcel on which Race Street Labs is located is 216-20 N. Broad Street.  If visitors or carriers are having difficulties finding the building using GPS or otherwise – and Zahav's testimony is clear that such difficulties had largely, if not entirely, dissipated by early February 2024 – it is because Plaintiffs and Zahav are using the wrong address.

The idea that carriers or visitors are have trouble finding the Plaintiffs' location – even using the address invented by the Plaintiffs – is at best doubtful.  As acknowledged by Andrew Eisenstein, a partner in Iron Stone Real Estate Partners, typing "Race Street Labs" into Google Maps or the Waze application, both lead the user to an area on Race Street immediately in front of the Up Ramp.  See **Exhibit LL** attached hereto (relevant portions of transcript from Mr. Eisenstein's deposition).

The Zahav email referenced above is carefully crafted, but its language makes clear that Zahav is not suffering present harm, but instead is concerned about possible harm in the future.  For example, the second paragraph of the email talks of lost items having "the potential to significantly disrupt [Zahav's] business," but the email does not state or provide any detail regarding existing business disruption.  Similarly, the same paragraph of the email provides that lost items "can cause serious problems for [Zahav]," making clear that Zahav has yet to experience, in its words, any "serious problems."   And, again, Zahav's 30(b)(6) representative testified that issues with deliveries had been resolved – largely if not completely – by early February.

In summary, there is no evidence of immediate irreparable harm being suffered by the Plaintiffs or their tenant due to the lack of signage at the base of the Up Ramp.

III.    **GRANTING THE PRELIMINARY INJUNCTION WILL HARM CCH MORE THAN IT WILL BENEFIT THE PLAINTIFFS.**

Because Plaintiffs have failed to establish irreparable harm and the likelihood of success on the merits of their claims against CCH, they are not entitled to a preliminary injunction, and the Court should deny the relief requested in the Injunction Motion.  But even if the Court determines that Plaintiffs have put forth some evidence toward the first two elements necessary for the granting of injunctive relief, the balance of the harms favors CCH.

If the Court looks beyond the first two elements, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Winter*, 555 U.S. at 24.  Here, there can be no question that the issuance of a preliminary injunction will significantly impact the marketing efforts for the sale of the CCH Real Estate, by informing potential purchasers that the Plaintiffs are likely to succeed on their easement claims and will essentially hold a "veto" over any potential redevelopment of Parcels D and E.  Such an injunction will, no doubt, decrease the number of potential purchasers for the CCH Real Estate and/or result in a significant depression of the purchase price for this property, to the detriment of the Debtors' estates and creditors.

To the contrary, and as indicated above, a denial of the Injunction Motion will not harm the Plaintiffs in any way.  *First*, and contrary to the Plaintiffs' claims, and as admitted by Mr. Eisenstein, the Plaintiffs' new signage for "Race Street Labs" and the (incorrect) address on the awning of their building are easily visible from Race Street; a sign on CCH's property is unnecessary.  *Second*, the alleged harms suffered by the Plaintiffs related to signage should be resolved by using the correct and agreed-upon address for the Race Street Labs, 216-20 N. Broad Street, or by the Plaintiffs and their tenants providing clear direction to Parcel C and/or the Loading Dock Ramp.  *Third*, as previously noted, CCH has offered to install (at its own expense) temporary

signs for "Race Street Labs" at the bottom of the "up ramp" and top of the "down ramp," as well as handicapped accessible parking spots, pending adjudication of the Amended Complaint, with a full reservation of rights.  And *fourth*, the Plaintiffs' tenants in the Race Street Lab and Feinstein Buildings have no rights to on-site parking.

There is no evidence that the Plaintiffs have suffered, or will suffer, any injury related to parking, given the abundance of parking within the vicinity of the former Hahnemann Campus with easy access to all of Parcel C – from 15th Street via the Plaintiffs' Walkway, from North Broad Street and/or through the Feinstein building.  The fact that Zahav signed its lease, moved into the Race Street Labs and raised no concerns regarding parking during the pendency of this Adversary Proceeding makes clear that Plaintiffs' allegations of harm related to parking are speculative, at best.

In sum, CCH and the Plaintiffs are party to a public Adversary Proceeding and dispute over alleged easements.  Prospective purchasers and tenants of the parties' properties are capable of reviewing the pleadings and making their own decisions as to the likely outcome of this litigation.  A preliminary injunction, at this time, based upon the language of the EUU which the Court found was ambiguous, before full development of the factual record, will "tip the scales" in Plaintiffs' favor and cause unwarranted and disproportionate harm to CCH and the Debtors' estates.

## IV.    THE PUBLIC INTEREST IS SERVED BY DENYING THE INJUNCTION MOTION.

Plaintiffs cannot show that injunctive relief advances the public interest in these circumstances.  "[C]ourts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Winter*, 555 U.S. at 24.

Here, Plaintiffs' sole argument that the public interest is served by granting their Injunction Motion is that they have demonstrated a likelihood of success on the merits and irreparable injury.

37

But as demonstrated above, Plaintiffs have not offered any credible evidence to support either of these injunction elements. The evidence presented herein demonstrates the opposite. The Injunction Motion should be denied and discovery on the Amended Complaint should move forward in earnest.

## V.    IF THE COURT WERE TO GRANT THE MOTION, A SUBSTANTIAL BOND WOULD BE REQUIRED.

Plaintiffs have failed to acknowledge the mandatory requirement imposed by Rule 65(c) of the Federal Rules of Civil Procedure (the "**Federal Rules**"), which is made applicable to this adversary proceeding by Bankruptcy Rule 7065, that entry of a preliminary injunction must be conditioned on the posting of security. When a party moves for an injunction under Federal Rule 65, it must post a bond in an amount sufficient to "pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "The purpose of the bond security is to maintain the status quo and protect the opposing party from incurring costs and damages in the event that the stay is wrongfully imposed." *Jurista*, 492 B.R. at 783. Courts have interpreted a movant's failure to address the bond requirement as "another factor weighing against the imposition of an injunction." *See Id.* at 784 (citing *In re W.R. Grace & Co.*, 475 B.R. 34, 209 (D. Del. 2012)). "[I]f the movant 'seeks the imposition of a stay without a bond, the applicant has the burden of demonstrating why the court should deviate from the ordinary full security requirement.'" *W.R. Grace*, 475 B.R. at 209 (quoting *In re Gen. Motors Corp.*, 409 B.R. 24, 30 (Bankr. S.D.N.Y. 2009)). Plaintiffs have not met that burden; indeed, they have not even attempted to do so.

If the Court imposes a preliminary injunction, CCH respectfully request that Plaintiffs be required to post a bond that takes into account the negative impact on the CCH Real Estate sale process and the value of the CCH Real Estate, the costs to carry the CCH Real Estate while the

38

"cloud" of the injunction hangs over the CCH Real Estate, and the cost to maintain and operate parking, including the cost of liability insurance.  Because a wrongfully enjoined party has an action only against the bond, "courts should err on the high side" when setting the bond amount. *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, C.A. No. 3:06-cv-1105, 2011 WL 4916397, at *4–*5 (M.D. Pa. Oct. 17, 2011).

## CONCLUSION

For the foregoing reasons, the Injunction Motion should be denied and the Court should grant CCH such further relief as is just and proper.

Dated: April 12, 2024

**SAUL EWING LLP**

By:/s/ *Mark Minuti*

Mark Minuti (DE Bar No. 2659)
1201 North Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6840
mark.minuti@saul.com

-and-

Jeffrey C. Hampton
Adam H. Isenberg
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102
Telephone: (215) 972-7777
jeffrey.hampton@saul.com
adam.isenberg@saul.com

*Counsel for Center City Healthcare, LLC*