# EXHIBIT E

From: Gosfield, Gregory[GGosfield@klehr.com]
Sent: Sat 12/16/2017 1:02:35 AM Coordinated Universal Time
To: Sickle, David R.[David.Sickle@dlapiper.com]
Subject: paladin - HSRE easement agreement
Attachment: 468851JV3_PHILI_ - Paladin _ Reciprocal Easement and Operating Agreement for HSRE-Project Liberty.DOCX
Attachment: Paladin _ Reciprocal Easement and Operating Agreement for HSRE Project Liberty - Paladin _ Reciprocal Easement and Operating Agreement for HSRE Project Liberty.pdf

David

In the spirit of expediency , and without having shared it with my client, I wanted to show you some of my thoughts. I worked with your draft, and I believe my tweaks are consistent with your thinking but before I spent more time trying to refine and reconcile it with the Mater Lease form, I wanted you to talk a look to see if you agree in general, that I should proceed to finish comments.

Thanks

Greg



**Gregory G. Gosfield, Esquire**
KLEHR | HARRISON | HARVEY | BRANZBURG LLP
BUSINESS LAW AT BUSINESS SPEED
1835 Market Street, Suite 1400 | Philadelphia, PA 19103
T (215) 569-4164 | F (215) 568-6603 | ggosfield@klehr.com
www.klehr.com

Web page: Greg Gosfield's profile site
Author of: "Ten Core Concepts for Healthcare Lease Provisions" Chapter 13 of the Health Law Handbook; 2013 Thomson Reuters
The Medical & Healthcare Facility Lease: Legal and Business Handbook; 2011 American Health Lawyers Association

Confidential

## RECIPROCAL EASEMENT AND OPERATING AGREEMENT

**THIS RECIPROCAL EASEMENT AND OPERATING AGREEMENT** (this "Agreement") is made as of this ___ day of January, 2018 (the "Effective Date"), by and among (i) PAHH New College MOB, LLC, a Delaware limited liability company ("New College Lot Owner"), (ii) PAHH Feinstein MOB, LLC, a Delaware limited liability company ("Feinstein/Bobst Lot Owner"), (iii) Broad Street Healthcare Properties, LLC, a Delaware limited liability company ("North/South Tower Lot Owner"), and (iv) Broad Street Healthcare Properties III, LLC, a Delaware limited liability company ("HUH Lot Owner").

## BACKGROUND:

A.    New College Lot Owner owns fee title to that certain parcel of real estate located in Philadelphia, Pennsylvania and legally described on Exhibit A-1 attached hereto and made a part hereof (the "New College Lot").

B.    Feinstein/Bobst Lot Owner owns fee title to that certain parcel of real estate located in Philadelphia, Pennsylvania and legally described on Exhibit A-2 attached hereto and made a part hereof (the "Feinstein/Bobst Lot").

C.    North/South Tower Lot Owner owns fee title to that certain parcel of real estate located in Philadelphia, Pennsylvania and legally described on Exhibit A-3 attached hereto and made a part hereof (the "North/South Tower Lot").

D.    HUH Lot Owner owns fee title to those certain parcels of real estate located in Philadelphia, Pennsylvania and legally described on Exhibit A-4 ("HUH Lot D") and Exhibit A-5 ("HUH Lot E", together, with HUH Lot D, sometimes called the "HUH Lots") attached hereto and made a part hereof.[1]

E.    The New College Lot, the Feinstein/Bobst Lot, the North/South Tower Lot, HUH Lot D and the HUH Lot E (each a "Lot" and collectively the "Lots") are contiguous to each other and collectively comprise all of the real property described in Exhibit B attached hereto and made a part hereof (the "Project Parcel"), which is bounded by North Broad Street (to the east), Race Street (to the south), North 15th Street (to the west) and Vine Street (to the north) in Philadelphia, Pennsylvania.

F.    A site plan showing the Project Parcel, as currently improved, is attached hereto and made a part hereof as Exhibit C (the "Site Plan"). The Project Parcel, together with the Buildings and other improvements now or hereafter constructed within or upon the Lots, is herein referred to as the "Entire Project."

G.    The Entire Project was previously owned and operated by a single entity ("Tenet") as an integrated hospital/medical complex containing (without limitation) medical office, hospital, medical college, parking and related uses. Immediately prior to the execution and delivery of this Agreement, Tenet conveyed each Lot to the respective Owners identified above.

H.    The Lots and the improvements constructed thereon are in certain respects physically and functionally dependent on one another and the parties hereto desire to declare and grant certain easements to one another, and to set forth certain other agreements, for the purpose

---

[1] NTD: Need to split out HUH Lot into two separate lots that exist so that they are not both being burdened when only one should be.

[ DOCPROPERTY "SWDocID" \* MERGEFORMAT ]

of facilitating the harmonious use and operation of the Entire Project, all as more particularly set forth herein.

**NOW, THEREFORE,** intending to be legally bound hereby, the parties hereto hereby agree as follows:

    1.   Certain Definitions.

    In addition to such defined terms and any terms defined elsewhere in this Agreement, the following terms shall have the respective meanings set forth below in this Section 1:

    (a)   "Arbitration Matter" shall mean and is limited to a dispute between one or more Owners with respect to the following matters arising under this Agreement: (i) the extent and location of the Shared Facilities and the Encroachments and Support Elements, based on the condition and operation of the Entire Project as of the Effective Date, (ii) the determination of the Maintenance Cost Allocation for any Shared Facilities; (iii) matters arising under Section 3 of this Agreement; (iv) matters arising under Section 7 of this Agreement concerning Alterations, (v) [PARTIES TO CONSIDER ADDITIONAL ITEMS SUBJECT TO DISPUTE RESOLUTION BY PROJECT ENGINEER].

    (b)   "Arbitrator" shall mean the party identified by the Lot Owners to conduct Arbitration Matters.

    (c)   "Benefited Owner" shall mean, with respect any easement expressly granted under this Agreement, an Owner who is expressly entitled pursuant to the terms and conditions of this Agreement to the use, benefit or enjoyment of a Shared Facility or Separate Facility or Encroachments and Support Elements that is located upon another Owner's Lot.

    (d)   "BOMA Standards" shall mean the Building Owners and Managers Association Manual then currently applicable, which as of the Effective Date is BOMA 2017 for Office Buildings: Standard Methods of Measurement (ANSI/BOMA Z65.1—2017.

    (e)   "Building" means a building or other enclosed structure now or hereafter located upon a Lot.

    (f)   "Claim" means and includes any loss, cost, damage, demand, litigation, cause of action, fine, penalty, liability, lien, injury, obligation or expense (including reasonable attorneys' and witness fees, disbursements and court costs).

    (g)   "Common Utility Plant" means the boiler, chiller, and such other facility producing utility service and its related machinery and equipment that is located within the Building on the _____ Lot, which provides steam heat, chilled water and such other utility service to the Buildings on the _____ Lot and the _____ Lot, as the same is replaced, improved or otherwise Maintained from time to time in accordance with this Agreement.

    (h)   "Emergency" means a circumstance or condition that (i) causes or is likely to imminently cause bodily injury or death to persons or significant physical damage to any Building or other improvement or any facility servicing the Entire Project or any part thereof, (ii) impairs or is likely to imminently impair, in any material respect, the structural integrity of any Building or other facility serving the Entire Project or any part thereof, (iii)

2

[ DOCPROPERTY "SWDocID" \* MERGEFORMAT ]

interrupts or is likely to imminently interrupt, in any material respect, Shared Utilities serving any Lot, other than pursuant to Maintenance undertaken in accordance with this Agreement.

(i)    "Encroachments and Support Elements"[2] means (i) any aboveground or underground portion or appurtenances of a Building that is located on one Lot, which encroaches onto an adjacent Lot, to the extent that such encroachment exists on the Effective Date, or is otherwise constructed after the Effective Date but does not materially adversely affect the encroached upon Lot and (ii) any Building or other improvement that is located on one Lot, which provides necessary structural support for a Building located on an adjacent Lot as of the Effective Date, or is otherwise constructed after the Effective Date but does not materially adversely affect the encroached upon Lot, but only to the extent necessary to provide continuing structural support.

(j)    "Entire Project" shall have the meaning set forth in Recital F of this Agreement.

(k)    "Fair Market Value" shall mean the product of bona fide, arms-length negotiations and represent the commercially reasonable, fair market value of the Premises for general commercial purposes, without taking into account the intended use of the Premises or the volume or value of any actual or expected federal health care program or other referrals to, or business otherwise generated for, either Lot Owners or tenants under Leases and the rental payments do not reflect any additional value Lot Owners or tenants under Leases may attribute to the proximity or convenience of the Lot to sources of referrals or business otherwise generated for which payment may be made in whole or in part under any federal health care program.

(l)    "Helipad" shall mean the helipad that is located on the roof of the Building on the New College Lot, which exclusively serves the hospital operated on the North/South Tower Lot.

(m)    "Indemnity Protocol" shall have the meaning set forth in Section 6.c.

(n)    "Interest Rate" means the lesser of (i) the highest rate of interest that may be charged in accordance with applicable Legal Requirements, or (ii) the greater of (A) twelve percent (12%) per annum, or (B) the prevailing "prime rate" as published from time to time in the *Wall Street Journal* (or if the *Wall Street Journal* ceases to publish such rate, the "prime rate" or other reference rate of interest as published by any other source reasonably selected by the New College Lot Owner), plus five percent (5%) per annum.

(o)    "Lease" means the lease between any Lot Owner and St. Christopher Healthcare LLC or other lease entity ("Master Tenant") and any sub lease between Master Tenant and a space tenant.

(p)    "Legal Requirements" means all laws, rules, orders, ordinances, codes, regulations and requirements, now or hereafter enacted or promulgated, of the United States of America, the Commonwealth of Pennsylvania, the City of Philadelphia and of any other sovereign or municipality now or hereafter having jurisdiction over the Entire Project, any Lease, or any portion thereof, and of any governmental or quasi-governmental agency thereof now or hereafter having such jurisdiction, and of any other lawful authority having such jurisdiction.

---

[2] NTD: Does not contemplate needed subsurface encroachments in the case of future development. Should that be folded in now?

3

(q)    "Lot Floor Area" shall mean, with respect to any Lot, the actual "Rentable Square Footage" (as defined and measured in accordance with BOMA Standards) of all Buildings and other improvements located on such Lot (including for these purposes all Buildings and improvements under construction for which a building permit has been issued).

(r)    "Maintenance" or "Maintain" shall mean the operation, maintenance, repair, reconditioning, refurbishing, reconfiguration, inspection, testing, cleaning, painting, installation, restoration, reconstruction and replacement (when necessary or desirable) of Shared Facilities or other elements of the Entire Project (as the context requires), and shall also include the right of access for any of the above purposes, subject, however, to any limitations set forth elsewhere in this Agreement.

(s)    "Maintenance Costs" shall mean, with respect to any Shared Facilities over any period of time, the actual out-of-pocket costs and expenses reasonably and directly incurred by the applicable Maintenance Party during such period, in connection with the Maintenance of the applicable Shared Facilities, whether preventive or curative, excluding any (i) expenditures which are capitalized or would be classified as capital expenditures under generally accepted accounting principles, consistently applied, or any amortization of such expenditures (except as expressly provided below), (ii) any interest or finance charges (except with respect to the payment of a capital expenditure included as a Maintenance Cost, (iii) depreciation or amortization (except as expressly provided below), any (iii) taxes or overhead costs or charges of the Maintenance Party, (iv) any employment or personnel costs of the Maintenance Party, (v) any costs or expenses that arise from the failure of the Maintenance Party to perform its Maintenance obligations hereunder causing an Event of Default[3] or as a consequence of any fire or other casualty (whether or not insured), (vi) any costs or expense (a) arising from the change of use, or (b) cost of reconfiguration, renovation or redevelopment of the Providing Owner's Property, and (vii) any costs or expenses to the extent arising from another Maintenance Party's gross negligence, willful misconduct, or failure to perform their applicable Maintenance obligations hereunder which cause an Event of Default, with such costs or expenses to be reimbursed by the applicable offending Maintenance Party.[4] If any Maintenance Party reasonably incurs any capital expenditures to Maintain the Shared Facilities for which it is responsible (other than such expenditures that would be excluded from Maintenance Costs pursuant to clauses (v)-(vii) above), then such capital expenditures shall be reimbursed by any Benefited Owners of such Shared Facility, such reimbursement based upon the Benefited Owner's proportionate use of such Shared Facility.[5] Except for utilities actually consumed in the operation of the Common Utility Plant (which shall be included as Maintenance Costs only if and to the extent separately metered to the Common Utility Plant) and utilities consumed in the performance of any Maintenance, Maintenance Costs shall not include the cost of any utilities that are consumed on any Property.

(t)    "Maintenance Cost Allocation" shall mean the allocation of the Maintenance Costs as between the Maintenance Party and the Benefited Owner(s) of such Shared Facility on the following basis: (i) with respect to the Maintenance of the Helipad and any other Separate Utilities, the North/South Tower Lot Owner shall be responsible for one hundred percent (100%) of all Maintenance Costs; with respect to all Shared Facilities, the Lot Owner shall each be responsible for its proportionate share of the applicable Maintenance Costs,

---

[3] NTD: To allow for minimal failures or excusable failures, such as events from Unavoidable Delay
[4] NTD: No maintenance party should be required to pay the cost of Maintenance due to another party; it should be reimbursed by the party causing it.
[5] NTD: We think this was to address when a Shared Facility cannot be repaired and must be replaced. If so, we think that a Maintenance Party should not have to bear the cost and then be reimbursed over the useful life. Should Maintenance work be subject to a three – bid third party RFP process?

4

[ DOCPROPERTY "SWDocID" \* MERGEFORMAT ]

based on the Fair Market Value determined by the Arbiter effective as of every second anniversary of the Effective Date[6].

(u)  "Maintenance Party" shall mean, with respect to any Shared Facilities, the Owner that is responsible for Maintaining such Shared Facilities in accordance with this Agreement. The Maintenance Party with respect to the Helipad shall be the North/South Tower Lot Owner, however, to the extent any Helipad Maintenance is required due to any damage, defect, harm, or ordinary wear and tear caused to the roof of the Building on the New College Lot unrelated to the use of the Helipad, New College Lot Owner shall be such Maintenance Party.[7] The Maintenance Party with respect to the Shared Loading Dock shall be the [Feinstein/Bobst] Lot Owner. With respect to all other Shared Facilities, the Maintenance Party shall be the Owner on whose Lot such Shared Facilities are located.

(v)  "Master Tenant" shall have the meaning set forth in Article 1 of this Agreement.

(w)  "Mortgage" shall mean, with respect to any Lot or portion thereof, a duly recorded (and not released) mortgage, deed of trust or similar instrument that creates and constitutes a lien upon such Lot to secure repayment of a loan obtained by the applicable Owner, and "Mortgagee" shall mean the holder(s) of record of such Mortgage; provided (in each case) each other Owner has received actual written notice (and not merely record notice or constructive notice) of such Mortgage and the name and address of each Mortgagee.

(x)  "Operating Standard" shall mean the standards of operations, cleanliness, security, appearance, repair and Maintenance generally applicable to similarly situated hospitals, educational and medical office facilities in the "Center City", Philadelphia area, with due consideration to the age of the applicable facilities. At a minimum, the Operating Standard requires that the applicable Lots, Buildings, and Shared Facilities within the Entire Project shall at all times be operated and Maintained in good working order and condition, ordinary wear and tear excepted, and in compliance with all applicable Legal Requirements.

(y)  "Owner" or "Owners" shall mean the New College Lot Owner, the Feinstein/Bobst Lot Owner, the North/South Tower Lot Owner and the HUH Lot Owner and their respective successors and assigns as the holder(s) of fee title to the Lots from time to time. If at any time a Lot is owned by more than one Person, then all such Persons collectively shall be the "Owner" of such Lot.

(z)  "Permittees" means, with respect to any Lot or Building, the Owner thereof and its Mortgagees, tenants and subtenants and their respective customers, visitors, invitees, licensees and concessionaires, but only during such times and to such extent that such Persons are entitled and authorized by such Owner to occupy, access and utilize the facilities on a Providing Owner's Lot[8].

(aa)  "Project Engineer" means (i) [Pennoni Associates Inc.][9], or any entity that directly or indirectly acquires or otherwise succeeds to all or substantially all of the business assets of Pennoni Associates Inc., so long as it is available and willing to serve in the

---

[6] NTD Allocations must not violate Anti-Kick Back and other fraud and abuse regulations. They should be set by a regulatory consultant.

[7] NTD: The Towers should not be required to maintain the helipad to the extent any maintenance is required due to New College roof issues that are unrelated to use of the helipad.

[8] NTD: A Permittee may be benefitted by less than all the Lots.

[9] NTD: There may be a better mechanism, to establish a Project Engineer than to set up from the start what could be a sinecure. The Arbitrator who decides costs and sot sharing should be a regulatory expert.

5

[ DOCPROPERTY "SWDocID" \* MERGEFORMAT ]

capacity of the Project Engineer under this Agreement, or (ii) if Pennoni Associates Inc. (or such successor) is not available and willing to serve in the capacity of the Project Engineer under this Agreement, any other firm of licensed professional engineers that is reasonably selected by the Owners.

(bb)    "Project Parcel" shall have the meaning set forth in Recital E of this Agreement.

(cc)    "Property" or "Properties" shall mean any, some or all of the Lots as improved from time to time, as the case may be and as the context may dictate.

(dd)    "Providing Owner" shall mean, with respect to any Shared Facility, the Owner upon whose Lot such Shared Facility is located.

(ee)    "Recorder's Office" means the Recorder of Deeds of Philadelphia, Pennsylvania.

(ff)    "Separate Facilities" shall mean those facilities that are installed to provide the applicable services for the benefit of one (1) Party and/or which are not Shared Facilities, such as the Helipad or emergency power supply serving only one Lot though located on a different Lot.

(gg)    "Shared Facility" or "Shared Facilities" shall mean (i) the Shared Interior Accessways, (ii) the Shared Loading Dock, and (iii) the Shared Utility Facilities.

(hh)    "Shared Interior Accessways" shall mean the interior doorways, hallways and passageways that currently provide interior access, circulation and passage ways (including emergency access and egress, to the extent required by applicable Legal Requirements) between adjoining Buildings located on adjacent Lots, substantially as the same are currently configured and available to and utilized by the Permittees of such Buildings on the Effective Date.

(ii)    Intentionally omitted[10]

(jj)    "Shared Loading Dock" shall mean the underground loading dock and related facilities [(including trash and refuse compactors)] located [primarily] on the [Bobst/Feinstein Lot], together with the ramp providing short-term truck staging and vehicular and pedestrian access to such facilities from Race Street over and across the [HUH Lot], in the approximate locations depicted on the Site Plan, which currently serve and provide off-street loading, shipping and receiving facilities for the Buildings located on the _____ Lot , the _____ Lot and the _____ Lot.

(kk)    "Shared Utility Facilities" shall mean any Utility Facilities that are located on one Lot and serve one or more other Lots.

(ll)    "Unavoidable Delay" means delay in the performance of any non-monetary obligations hereunder, to the extent that such delay is not reasonably avoidable and is caused by fire, flood, windstorms or other casualty events, strikes or labor unrest, unavailability of required labor, service or materials, extraordinarily adverse weather conditions (but only to the extent that such weather would not be reasonably anticipated and accounted for in the use and Maintenance of Entire Project in accordance with the Operating Standard), interruption of

---

[10] NTD: We are told there is no Shared Parking on the HUH Project

6

[ DOCPROPERTY "SWDocID" \* MERGEFORMAT ]

required utilities by acts or occurrences outside the Project Parcel, and other similar acts and occurrences outside the reasonable control of the Owner or other party required to perform such duties or obligations, provided, however, that (i) in no event shall the unavailability of required funds constitute or justify a claim of Unavoidable Delay, (ii) the Owner or other Person that is required to perform the affected obligation shall notify each other Owner not later than five (5) business days after becoming aware of the Unavoidable Delay.

(mm)  "Unity of Use Agreement" means that certain [Easement and Unity of Use Statement] by and among _____ dated as of _____ and recorded against the Project Parcel immediately prior to the recordation of this Agreement (as amended from time to time), pursuant to which the parties thereto have agreed to treat and operate the parcels comprising the Project Parcel as a single, contiguous zoning lot under the Philadelphia Zoning Code.

(nn)  "Utility Facilities" shall mean any facilities, fixtures, machinery, systems and equipment for the generation, delivery, distribution, collection, storage, circulation, measurement, metering, control, monitoring, inspection, management, Maintenance, exhaust and removal of electrical power, gas, oil, telecommunications, data transmission, heating, steam, ventilation, air conditioning, chilled water, potable water, storm water, sewage, fire sprinklers, alarms, enunciators and other life-safety systems and all other utilities and related facilities that serve any part of a Building or Lot, including the Common Utility Plant.

2.    Grant of Easements.

(a)    Intentionally omitted.

(b)    Shared Utility Facilities and Separate Facilities. Each Owner upon whose Property any Shared Utility Facilities or Separate Facilities are currently located hereby declares and grants, conveys and sets over unto the Owners of each other Lot that is currently served by such Shared Utility Facilities or Separate Facility, as the case may be, for their respective use and benefit, the non-exclusive right, privilege and easement to Maintain, use, connect and tap into (in the case of Shared Utility Facilities), operate and receive services from and through such Shared Utility Facilities or Separate Facilities, as the case may be, substantially as the Shared Utility Facilities or Separate Facilities, as the case may be, are used on the Effective Date. If and to the extent that any Lot receives utility service through Shared Utility Facilities located on another Lot (such as domestic water, steam, chilled water, electricity, gas, oil, telecommunication services or other consumable utilities), the Benefited Owner shall pay for the costs of such utility consumption either (a) directly to the utility company that provides such utility service, if and to the extent that such utility consumption is metered or submetered and billed directly to such Benefited Owner by the utility provider, (b) to the Providing Owner of such utility service, if and to the extent that such utility consumption is not separately metered and billed by the utility provider to the Benefited Owner's Property, in which case (x) if the utility consumption is submetered to the Benefited Owner's Property, then the Benefited Owner's share of the utility consumption cost shall be determined by the actual quantity of utilities consumed and the actual costs per unit charged to the Providing Owner by the utility provider, or (y) if the utility consumption is not submetered to the Benefited Owner's Property, then as soon as practicable after the date hereof the Providing Owner shall install (at the sole cost and expense of the Benefited Owner) a meter or submeter to determine the actual amount of the applicable utility service that is consumed at the Benefited Owner's Property, and until such meter or submeter is installed and operating the actual utility consumption costs shall be

7

allocated among the Properties receiving such utility service proportionately on the basis of the Lot Floor Area of each such Property, and subject to compliance with applicable law.[11].

(c)     Shared Interior Accessways. Each Owner upon whose Property any Shared Interior Accessways are currently located hereby declares and grants, conveys and sets over unto the Owner of each Building that currently connects to and utilizes such Shared Interior Accessways, for the use and benefit of the Permittees of such Building, the non-exclusive right, privilege and easement for ingress, egress and access over, upon, across and through the applicable Shared Interior Accessways. The exercise of such easement rights shall not unreasonably disrupt or disturb the use and operation of the Properties burdened by such easement rights and otherwise shall be subject to such reasonable rules and regulations which may be established from time to time by the applicable Providing Owner, consistent with the use of the Shared Interior Accessways prior to the Effective Date.

(d)     Helipad. The New College Lot Owner hereby declares and grants, conveys and sets over unto the North/South Tower Lot Owner, the exclusive right, privilege and easement to operate, use and Maintain the Helipad for the landing and take-off of helicopters transporting patients to and from the Hospital operated on the North/South Tower Lot, and with such accessory use as is substantially in the manner and degree that the Helipad has been accessed, operated, used and Maintained prior to the Effective Date. Notwithstanding anything to the contrary contained herein, (i) in no event shall the Owner or other Permittees of the North/South Tower Lot be permitted to use or Maintain the Helipad in any manner that injures or damages the Building located on the New College Lot such that it materially adversely affects the business conducted at the New College Lot, and (ii) without limiting clause (i), any Maintenance of the Helipad shall be coordinated with the New College Lot Owner and shall not involve or result in any borings into, penetrations of or attachments to the roof of the Building on the New College Lot unless the plans and specifications for such Maintenance and the contractor(s) performing such Maintenance are approved in writing by the New College Lot Owner.

(e)     Shared Loading Dock. Each Owner upon whose Property any portion or element of the Shared Loading Dock is currently located hereby declares and grants, conveys and sets over unto the respective Owners of the Feinstein/Bobst Lot, the _____ Lot and the _____ [12] Lot, for the use and benefit of the respective Permittees of such Lots, the non-exclusive right, privilege and easement to access, use and Maintain the Shared Loading Dock, for the delivery, receiving, loading and unloading of supplies, inventory and equipment to and the disposal, compaction and pick-up of garbage and refuse from the Buildings on such Lots, substantially in the same manner and to the same degree that the Shared Loading Dock has been used prior to the Effective Date. Access to and use and Maintenance of the Shared Loading Dock shall be scheduled and coordinated by the North/South Tower Lot Owner in a reasonable, non-discriminatory manner and shall be further subject to such reasonable rules and regulations that may be established from time to time by the North/South Tower Lot Owner.[13]

(f)     Easements for Encroachments and Support Elements. Each Owner upon whose Property any Encroachments or Support Elements are currently or may hereafter in accordance with this Agreement be located, hereby declares and grants, conveys and sets over unto to the Owner of each Building that currently constitutes or relies upon such Encroachments or Support Elements, the non-exclusive right, privilege and easement to access, use and Maintain such Encroachments and Support Elements, substantially as they currently exist and function.

---

[11] NTD: AKB law may not permit an empty building to pay a share of utilities that results in a windfall characterized as incommensurate remuneration to another referral health provider.

[12] Identify Lots that currently use the Shared Loading Dock.

[13] NTD: The hospital has he greatest need and the largest use of the loading dock

8

[ DOCPROPERTY "SWDocID" \* MERGEFORMAT ]

3.    <u>Easements Generally.</u> The easements and other rights granted in Section 2 of this Agreement are intended to allow the continued operation and Maintenance of the Entire Project substantially as the Entire Project has been operated and Maintained prior to the Effective Date. The scope, extent and utilization of the easements granted pursuant this Agreement shall not exceed in any material respect how the applicable Shared Facilities, Encroachments and Support Elements, and Separate Facilities have been operated and Maintained prior to the Effective Date.

(a)    Each Providing Owner of Shared Facilities or Separate Facilities shall have the right to relocate and/or reconfigure the Shared Facilities or Separate Facilities, as applicable, that are located upon its Property, at its sole cost and expense, provided that no such relocation or reconfiguration shall cause or result in any material interruption in the access to or use of the applicable Shared Facilities or Separate Facilities, as applicable, by the Benefited Owners, and provided further that the functionality of and access to the relocated Shared Facilities or Separate Facilities, as applicable, shall not be materially less than the functionality of and access to the applicable Shared Facilities or Separate Facilities, as applicable, as of the Effective Date and that the Maintenance Costs for such Shared Facilities or Separate Facilities, as applicable, will not be materially increased by the relocation thereof.

(b)    In the event that a Benefited Owner redevelops or changes the use of its Property such that its Property no longer requires or relies on a Shared Facility or the Encroachments and Support Elements or Separate Facilities, as applicable,, or in the event that a Benefited Owner otherwise abandons the use of any easement granted hereunder, then such easement (to the extent no longer required or relied upon) shall be deemed to be abandoned and terminated; <u>provided</u>, <u>however</u> that no easement granted hereunder shall be deemed abandoned by mere non-use, unless (x) the Benefited Owner and its Permittees cease to use the applicable easement for a continuous period in excess of one hundred eighty (180) days, other than by reason of repairs, restoration or redevelopment of its Property diligently prosecuted to completion, and (y) the applicable Benefited Owner and the Mortgagee(s) of the applicable Lot fail to object in writing to the abandonment and termination of the applicable easement within sixty (60) days after receiving written notice of abandonment and termination from the Providing Owner.

4.    <u>Maintenance of Shared Facilities.</u>

(a)    Each of the Shared Facilities or Separate Facilities, as applicable, shall be Maintained by the applicable Maintenance Party in accordance with the Operating Standard, as and when required to comply with the Operating Standard and the terms of this Agreement, subject to Unavoidable Delays, and so long as any Lot is operated by parties pursuant to a collective bargaining agreement, consistent with requirements to maintain labor harmony among all personnel working at the Entire Project. Except as otherwise expressly provided herein, each Maintenance Party shall perform and pay for its Maintenance obligations under this Agreement at it sole cost and expense.

(b)    If any Maintenance Party shall fail to Maintain the Shared Facilities for which it is responsible under this Agreement as and when required, and if such failure is not cured within ten (10) days after written notice from any Benefited Owner or the Permittees of any Benefited Owner (provided that such cure period shall be extended so long as the Maintenance Party commences the cure within such 10-day period and thereafter diligently and continuously prosecutes the cure to completion in accordance with the Operating Standard), or if the failure to Maintain the Shared Facilities constitutes or results in an Emergency, then in either case (i) any Benefited Owner or its Permittees shall have the right (but not the obligation) to enter upon the affected Property and to perform the required Maintenance on behalf and at the sole cost and expense of the Maintenance Party, and (ii) the Maintenance Party shall reimburse

9

[ DOCPROPERTY "SWDocID" \* MERGEFORMAT ]

the actual costs and expenses incurred by the Person performing the applicable Maintenance on its behalf within ten (10) days after written demand.

(c)     Subject to the Indemnity Protocol, each Maintenance Party shall pay on demand, and shall indemnify and hold harmless each Benefited Owner and its Permittees from and against, any and all Claims that are incurred by or asserted against such Benefited Owner or its Permittees as consequence or result of any failure by such Maintenance Party to perform its Maintenance obligations as and when required under this Agreement.

(d)     Any Maintenance Costs incurred by the Maintenance Party to Maintain Shared Facilities in accordance with this Agreement shall be allocated among the applicable Benefited Owners in accordance with the applicable Maintenance Cost Allocation. The Benefited Owners shall each pay their respective Shares of Maintenance Costs incurred by the Maintenance Party, in accordance with the applicable Maintenance Cost Allocation, within thirty (30) days after receiving from the Maintenance Party a written invoice for same with reasonable supporting documentation confirming the amount and prior payment thereof by the Maintenance Party.

(e)     With respect to each of the Shared Facilities, on or before [November 1] of each year, the applicable Maintenance Party shall prepare and deliver to the Benefited Owner(s) thereof, a written notice for the upcoming calendar year (the "Projection Notice") setting forth (1) the Maintenance Party's reasonable estimate of the Maintenance Costs expected to be incurred by during the upcoming calendar year based on a detailed budget (collectively, the "Projections") of Maintenance Costs, with an explanation as to increases anticipated from the prior year's operations and (2) the Maintenance Cost Allocation applicable to each Benefited Owner based on such Projections. If the Maintenance Party incurs material unbudgeted Maintenance Costs, then it shall have the right, not more than once each calendar year, except in the case of an Emergency which will not be limited in frequency of collection, to deliver a mid-year Projection Notice with updated Projections to each Benefited Owner, who in turn may audit such Projection Notice. If the Maintenance Party follows the foregoing procedures, then it may require each of the Benefited Owners to pay for Maintenance Costs in equal monthly installments equal to one-twelfth (1/12) of such Benefited Owner's Maintenance Cost Allocation of the Projections (as updated in accordance with this Agreement); and in such event the Maintenance Party shall deliver to the Benefited Owners a detailed reconciliation of the Projections and the actual Maintenance Costs incurred by the Maintenance Party (together with reasonable supporting documentation) not later than March 1 of the next following calendar year. Subject to the Benefited Parties right to audit: if the reconciliation confirms that the monthly installment payments paid by a Benefited Owner is less than the Benefited Owner's Maintenance Cost Allocation of the Maintenance Costs actually incurred by the Maintenance Party in the preceding calendar year, then the Benefited Owner shall pay the difference to the Maintenance Party within thirty (30) days after receiving the reconciliation; and if the reconciliation confirms that the monthly installment payments paid by a Benefited Owner exceed the Benefited Owner's Maintenance Cost Allocation of the Maintenance Costs actually incurred by the Maintenance Party in the preceding calendar year, then the Maintenance Party shall pay such excess, with interest at the Interest Rate, to the Benefited Owner within ten (10) days after completing the reconciliation. The reconciliation and amount of Maintenance Costs shall be subject to review and audit by the Benefited Parties, upon notice to the Maintenance Party not later than sixty (60) days after receiving the proposed reconciliation from the Maintenance Party. Each Maintenance Party shall keep detailed records of all Maintenance Costs, including detailed receipts, invoices and payment records, for at least three (3) years after the close of the calendar year in which the Maintenance Costs are incurred.

5.     Operations and Maintenance; Compliance with Unity of Use Agreement.

10

(a)     Subject to terms and conditions of Section 4 concerning the Maintenance of Shared Facilities, each Owner covenants and agrees that it and its Permittees shall use, develop, occupy and Maintain its Property, at such Owner's sole cost and expense, in accordance with the Operating Standard. Without limiting the foregoing but subject to Unavoidable Delays, each Owner shall be responsible for Maintaining, cleaning, keeping free from debris, removing snow and ice from (as it relates to surface areas which involve pedestrian or vehicular traffic) and otherwise keeping in as first-class condition and repair as required for compliance with the Operating Standard and all applicable Legal Requirements: (i) its respective Lot and the Buildings and other improvements located thereon from time to time; (ii) the sidewalks, walkways, driveways, parking areas and other exterior pedestrian areas and vehicular areas located on or immediately adjacent to such Owner's Lot; (iii) the landscaping located on such Owner's Lot; (iv) the lighting located on or serving such Owner's Lot; and (v) areas and facilities within such Owner's Lot over which another Owner has easement rights pursuant to this Agreement. Each Owner acknowledges and agrees that the Entire Project is intended to be a first class medical/educational/office real estate project and that the operation and Maintenance of each Property in accordance with the Operating Standard benefits the Entire Project and is essential to each other Owner.

(b)     No Owner shall permit any excessive light, noise, odor, vibration or other condition that, under the circumstances, is inconsistent with the Operating Standard or constitutes a nuisance under common law, to exist upon or emanate from the Property owned by such Owner. This Section 5(b) shall not limit or apply to any condition existing at the Effective Date that would otherwise be subject to this Section 5(b), or the construction or reconstruction or Maintenance activities undertaken by or on behalf of any Owner on its Lot in accordance with the Operating Standard and the terms and conditions of this Agreement, provided that such Owner shall take all reasonable measures to mitigate the adverse impacts caused by such activities to each other affected Lot.

(c)     No Owner shall permit or suffer the recordation or filing against any Lot or any other portion of the Entire Project, other than such Owner's Lot, of any materialmen's lien arising by reason of any work performed or materials ordered by or on behalf of such Owner or the Permittees of its Lot. If any such lien is filed or recorded, then the responsible Owner shall, not later than thirty (30) days after the filing or recordation thereof, remove or release such lien of record or bond over the enforcement of such lien in accordance with applicable Legal Requirements.

(d)     Each Owner, at its sole cost and expense and without reimbursement or contribution from any other Owner (as Maintenance Costs or otherwise) shall pay prior to delinquency all taxes, assessments, levies and other charges imposed by any governmental authority upon the Property owned by such Owner, subject to its right of contest provided in this Agreement.

(e)     Intentionally omitted[14]

6.     Insurance; Indemnity.

(a)     Insurance.[15] Each Owner, at its sole cost and expense and without reimbursement or contribution from any other Owner (as Maintenance Costs or otherwise), shall

---

[14] NTD: Unity of Use is a separate and independent document
[15] NTD: The insurance requirements here and in Exhibit D should be reconciled with the Master Lease, as Paladin entities will be paying all of it anyhow .

11

[ DOCPROPERTY "SWDocID" \* MERGEFORMAT ]

obtain and maintain at all times, the insurance required to be maintained by it pursuant to Exhibit D attached hereto and made a part.

(b)      Indemnification. Subject to Section 6(c), each Owner covenants and agrees to indemnify, defend (with counsel reasonably acceptable to the other Owner(s)) and hold harmless the other Owners, and such Owners' Permittees, officers, employees, direct and indirect owners, from and against any and all Claims for injury to persons or damage to property to the extent not to due to the negligence or misconduct of the indemnified party and to the extent caused by the indemnifying party arising from (i) any use, occupancy, act, occurrence or condition on or about such indemnifying Owner's Property, (ii) from the use or enjoyment of any Shared Facility or other easement rights created hereunder by such Owner or its Permittees, (iii) any activity, work, or thing done, permitted or suffered by such indemnifying Owner, its agents, contractors or employees in or about the Project Parcel or due to any other negligent act or omission of such indemnifying Owner, its agents, contractors or employees, or (iv) from such Owner's failure to perform its obligations under this Agreement. This Section 6(b) shall not apply to any damage to property arising from any Benefitted Owners' actions on the Providing Owner's Lot. This Section 6(b) shall survive termination or expiration of this Agreement.

(c)      Indemnification Protocol.[16] Whenever any claim arises for indemnification under this Lease, the party seeking indemnification (in each such case, the "Indemnified Party") must notify the party or parties from whom indemnification is being sought (in each such case, the "Indemnifying Party") of such claim ("Claim") in writing promptly and in no case later than ten (10) Business Days after such Indemnified Party has actual knowledge of the facts constituting the basis for such claim. Each Indemnified Party will also so notify the Indemnifying Party promptly and in no case later than fifteen (15) days after the Indemnified Party has actual knowledge of the commencement of any legal proceedings with respect to any such claim. The failure of any Indemnified Party to give timely notice hereunder shall not affect rights to indemnification hereunder, except to the extent that the Indemnifying Party has been damaged by such failure. Such notice will specify all facts known to such Indemnified Party giving rise to the indemnification sought and the amount or an estimate of the amount of the obligation or liability arising from such indemnifying event. If any lawsuit or enforcement action is filed by a third party against any Indemnified Party, written notice thereof shall be given to the Indemnifying Party as promptly as practicable (and in any event within fifteen (15) days after the service of the citation or summons). The failure of any Indemnified Party to give timely notice hereunder shall not affect rights to indemnification hereunder, except to the extent that the Indemnifying Party has been damaged by such failure. After such notice, the Indemnifying Party shall at its own cost, risk and expense, (i) take control of the defense and investigation of such lawsuit or action, and (ii) employ and engage legal counsel of its own choice, but, in any event, reasonably acceptable to the Indemnified Party, to handle and defend the same. The Indemnifying Party shall not, without the written consent of the Indemnified Party, which shall not be unreasonably withheld, conditioned or delayed, settle or compromise any Claim or consent to the entry of any judgment which does not include an unconditional written release by the claimant or plaintiff of the Indemnified Party from all liability in respect of such Claim, or settle or compromise any Claim if the settlement imposes equitable remedies or material obligations on the Indemnified Party other than financial obligations for which such Indemnified Party will be indemnified hereunder. No Claim which is being defended in good faith by the Indemnifying Party in accordance with the terms of this Agreement shall be settled or compromised by the Indemnified Party without the written consent of the Indemnifying Party, which consent shall not be unreasonably withheld. If the Indemnifying Party fails to assume the defense of such lawsuit or action within thirty (30) days after receipt of the claim notice, the Indemnified Party against which such lawsuit or action has been asserted will (upon delivering

---

[16] NTD This is paragraph 11.3.d of the Master Lease

[ DOCPROPERTY "SWDocID" \* MERGEFORMAT ]

notice to such effect to the Indemnifying Party) have the right to undertake, at the Indemnifying Party's cost and expense, the defense, compromise or settlement of such lawsuit or action on behalf of and for the account and risk of the Indemnifying Party; provided, however, that such lawsuit or action shall not be compromised or settled without the written consent of the Indemnifying Party, which consent shall not be unreasonably withheld, conditioned or delayed. If the Indemnified Party settles or compromises such lawsuit or action without the prior written consent of the Indemnifying Party, the Indemnifying Party will bear no liability hereunder for or with respect to such lawsuit or action. In the event either party assumes the defense of a particular lawsuit or action in the manner contemplated above, the party assuming such defense will keep the other party reasonably informed of the progress of any such defense, compromise or settlement. The indemnification obligations of Owners under this Section shall survive the expiration of the term, or the termination, of this Agreement.

(d)    Mutual Release and Waivers of Recovery. Each Owner hereby releases and discharges each other Owner and the Permittees of such other Owner's Lot from any responsibility, right of recovery or claim (including, without limitation, any claims for contribution or indemnity), for that portion of any loss or damage paid or reimbursed by any fire, extended coverage or other property insurance policy maintained by the releasing party (or, if greater, the insurance proceeds that would be available if the releasing party maintained all insurance required of it hereunder), no matter how such loss or damage is caused (whether by negligence or otherwise). Any fire, extended coverage or property insurance policy maintained by any Owner with respect to its Property shall contain (by endorsement or otherwise) a waiver of subrogation provision or endorsement in favor of each other Owner and its Permittees or, in the event that such provision is unavailable, then the applicable Owner shall obtain the express written approval and consent of their respective insurers to the terms of this Lease.

7.    Alterations.

(a)    Subject to the other provisions of this Section 7, each Owner may, at any time and from time to time, at such Owner's sole cost and expense, make additions, alterations, deletions from or changes in the improvements located within such Owner's Property (collectively, "Alterations"), and in connection therewith such Owner may relocate[17] Shared Facilities located upon its Property (subject to the conditions set forth in Section 3(b)).

(b)    Any Owner making Alterations (or demolishing or redeveloping improvements as contemplated in subsection (c) below) shall comply with the Operating Standard. To the extent reasonably practicable, in such a manner as to minimize any noise, interference or vibration, dust, debris or other condition that would disturb or interfere with the use, occupancy or conduct of business of any other Property.

(c)    If an Owner undertakes Alterations which are reasonably expected to cost more than [50%] of the fair market value of its Property, or if the improvements on any Lot are damaged or destroyed by fire or other casualty to an extent greater than [50%] of the replacement cost of the improvements and the applicable Owner elects to restore or replace the affected improvements, then in either such event, to the extent reasonably practicable without material increase in cost, the applicable Alterations, restorations and replacement work shall be designed and performed (subject to Section 8 below) in a manner that eliminates (if reasonably practicable) or reduces the affected Property's use of and reliance on Shared Utility Facilities, Encroachments and Support Elements. Following completion of the applicable Alterations, restorations or replacement, if such Property no longer uses or relies on the Shared Utilities,

---

[17] NTD: Owner's may relocate Shared Services, but there is no express provision to expand them. Does Paladin need express expansion rights

13

Encroachments or Support Elements (as the case may be), then the applicable Owner shall cease to be a Benefited Owner of the applicable easements created by Article 2 of this Agreement and the Owner's Maintenance Cost Allocation with respect to such easement shall be zero (0%).

        8.    <u>Damage</u>.

        (a)    If any Building or other improvements upon any Lot is damaged by fire or other casualty, then the affected Building or other improvements shall, at the election of the Owner of the Lot upon which such improvements are located, be repaired and restored as promptly as is reasonably possible by the Owner such Lot at its sole cost and expense (subject to the right of such Owner to make Alterations in accordance with Section 7). If such Owner elects not to perform such repair and restoration, such Owner shall promptly remove all damaged improvements and debris, leaving such Owner's Lot in a safe and slightly condition in accordance with the Operating Standard.

        (b)    Notwithstanding the foregoing or anything in this Agreement to the contrary, if any Shared Utility Facilities, the Shared Loading Dock or Shared Interior Accessway, are damaged or destroyed by fire or other casualty, then the Providing Owner on whose Lot such facilities are located shall, expeditiously, diligently and in a good and workmanlike manner, cause such damage or destruction to be remedied or repaired to a condition that is substantially similar to, or better than, the condition that existed immediately prior to such damage by restoring the Property to substantially the same design and configuration and as good (or better) condition that existed immediately prior to such damage or destruction (subject to the Owner's right to relocate Shared Facilities and to make Alterations in accordance with Section 7 above) and to a value which shall not be less than the value of the Premises prior to such fire or other casualty (the "Restoration"). The Restoration shall be commenced only after all required permits, authorizations and approvals shall have been obtained by the applicable Providing Owner or Providing Owner's Permittees from the appropriate governmental authority, at its own cost and expense. If such Providing Owner shall fail or neglect to restore the Premises with reasonable diligence, or having so commenced such Restoration, shall fail to complete the same with reasonable diligence, then the Benefited Owner shall have the right, but not the obligation, to complete such Restoration at Benefited Owner's cost and expense and the cost thereof shall be payable within thirty (30) days after Providing Owner's receipt of Benefited Owner's written demand therefor, together with interest thereon from the date of demand until paid. The obligations of Providing Owner under this Section 8 shall survive the expiration or earlier termination of this Agreement.

        9.    <u>Reasonable Rules and Regulations</u>.

        The exercise of all rights, responsibilities and obligations granted hereunder with regard to easements or other rights of access over any Owner's Property, shall in all cases not interfere with the conduct of business at the Lot and be exercised in a commercially reasonable manner in accordance with the Operating Standard and shall be subject, to any reasonable rules and regulations and other standards which may be established from time to time by the Providing Owner (which may include, without limitation, limiting access to specifically authorized Persons and closing areas burdened by easements for access hereunder at night and on weekends and holidays, for security reasons, and/or to avoid the implied public dedication of such areas), <u>provided</u>, <u>however</u>, that no such closing will prevent or materially interfere with the use and operation of the Entire Project in accordance with the Operating Standard.

        10.    <u>Emergencies</u>.

        In the event of the occurrence of an Emergency, there shall immediately and automatically (a) be provided prompt notice to all Owners, (b) be granted by and between all

14

[ DOCPROPERTY "SWDocID" \* MERGEFORMAT ]

parties hereto such temporary easements as are reasonably necessary for the preservation of life and property, all such emergency easements to terminate automatically with the expiration of the Emergency in connection with which they arose, and (c) be temporarily suspended any rights and easements granted hereunder which are necessary to be suspended for the preservation of life and property, all of such rights and easements to return to full force and effect automatically with the expiration of the Emergency in connection with which they arose.

      11.    Remedies; Self-Help.

          (a)    Except for consequential, punitive, or speculative damages, the Owners shall be entitled to all rights and remedies available at law or in equity including, without limitation, specific enforcement and injunctions, to enforce this Agreement.

          (b)    Intentionally omitted.[18]

          (c)    The failure of any Owner to perform any of its obligations hereunder shall entitle the intended Benefited Owner to undertake the performance of such obligations if, after the expiration of thirty (30) days following the giving of notice as provided in Section 14 hereof (except in the case of an Emergency, in which event no notice shall be required), the Owner so obligated shall have failed to effect such cure (or, if effecting such cure would take in excess of thirty (30) days, shall have failed to commence such cure or shall have failed to proceed thereafter diligently to complete such cure) and such Owner does not contest the validity of such failure to perform its obligations,[19] and the cost of effecting such cure shall be paid by the party so obligated within thirty (30) days of a presentation of a bill therefor.

          (d)    If any amount payable by one Owner to another Owner under this Agreement is not paid within five (5) business days after the date due, the amount due shall bear interest at the Interest Rate until paid in full by the delinquent Owner.

          (e)    In no event shall the failure of any Owner to perform any of its obligations hereunder entitle any other Owner to terminate this Agreement or any easements created hereunder because of such failure.

      12.    Attorney's Fees.

          Any Owner may enforce this Agreement by appropriate action and, in the event that it prevails in such action, shall recover as part of its cost a reasonable attorney's fee from such parties against whom such enforcement was successfully sought and obtained.

      13.    Notices.[20]

          (a)    Notice whenever provided for herein shall be in writing. Any notice required or permitted to be delivered hereunder shall be addressed as below, and shall be deemed received when (i) personally delivered (including delivery via email, provided that such email specifically states that it is intended to be notice) or (ii) one (1) Business Day after being deposited with a nationally recognized overnight courier service, charges prepaid, and properly addressed for next-day delivery. Either party may change its address for notice from time to time by delivery of at least three (3) Business Days prior written notice of such change to the other party hereto in the manner prescribed herein, and with a copy, given as aforesaid, to any

---

[18] NTD: Under Pennsylvania law, the judgment against the Owner will automatically be a lien against the Owner and on its real property.

[19] NTD: No self help if allegation of default is being contested.

[20] NTD: The notice provision is not the same as the Master Lease. Should be reconciled.

[ DOCPROPERTY "SWDocID" \* MERGEFORMAT ]

Mortgagee of a Property or any portion of a Property electing to receive a copy as provided in Section 14, below:

     (i)     If to the New College Lot Owner:

PAHH New College MOB, LLC
c/o Harrison Street Real Estate, LLC
444 West Lake Street, Suite 2100
Chicago, IL 60606
Attn: Mark Burkemper
Email: mburkemper@harrisonst.com

With required copies to:

DLA Piper LLP (US)
444 West Lake Street, Suite 900
Chicago, IL 60606
Attn: David Sickle
Email: david.sickle@dlapiper.com

     (ii)    If to the Feinstein/Bobst Lot Owner:

PAHH Feinstein MOB, LLC
c/o Harrison Street Real Estate, LLC
444 West Lake Street, Suite 2100
Chicago, IL 60606
Attn: Mark Burkemper
Email: mburkemper@harrisonst.com

With required copies to:

DLA Piper LLP (US)
444 West Lake Street, Suite 900
Chicago, IL 60606
Attn: David Sickle
Email: david.sickle@dlapiper.com

     (iii)   If to the North/South Tower Lot Owner:

Broad Street Healthcare Properties, LLC
222 N. Sepulveda Blvd., Suite 900
El Segundo, CA 90245
Attention: Joel Freedman and General Counsel
Email: jfreedman@pldn.com and
sattestatova@pldn.com

     (iv)   If to the HUH Lot Owner:

Broad Street Healthcare Properties III, LLC
222 N. Sepulveda Blvd., Suite 900
El Segundo, CA 90245
Attention: Joel Freedman and General Counsel
Email: jfreedman@pldn.com and
sattestatova@pldn.com

16

[ DOCPROPERTY "SWDocID" \* MERGEFORMAT ]

14.    Rights of Mortgagees. This Agreement shall be superior to any and all mortgages now existing or hereafter recorded against any or all of the Project Parcel. In addition to the notices to the Owners under Section 13, each Mortgagee of any Lot shall also be entitled to receive copies of all notices given to the Owner of such Lot, provided that such Mortgagee notifies each other Owner in writing that it is the holder of a Mortgage and specifies in such notice the address(es) to which notices to such Mortgagee shall be sent.

15.    Estoppels. Each Owner shall, at any time and from time to time, within ten (10) business days after any other Owner's request or that of any Mortgagee of the other Owner, execute, acknowledge and deliver to the requesting Owner a statement in writing (the "Estoppel Certificate"), certifying (i) that this Agreement is unmodified and in full force and effect (or if there have been any modifications, that the Agreement is in full force and effect as modified and stating the modifications); (ii) the dates to which Maintenance Costs and any other charges arising hereunder, have been paid; (iii) the amount of any prepaid amounts or credits due Owner, if any; and (iv) whether or not all conditions under the Agreement to be performed by the requesting Owner prior thereto have been satisfied and whether or not the requesting Owner is then in default in the performance of any covenant, agreement or condition contained in this Agreement and specifying each, if any, unsatisfied condition and each, if any, default of which the certifying Owner may have knowledge. Any certification delivered pursuant to the provisions of this Section shall be intended to be relied upon by the requesting Owner and any mortgagee or prospective mortgagee or purchaser of the Property or of any interest therein.

16.    Arbitration by Arbitrator.[21]  The Owners acknowledge and agree that certain disputes that may arise under this Agreement are not suitable for resolution by a court or jury and would be best resolved by the Project Engineer. Accordingly, all disputes that arise from time to time between two (2) or more Owners with respect to the Arbitration Matters expressly identified herein (and not other matters, unless the affected Owners expressly agree in writing) shall be resolved exclusively by the procedures set forth in this Section.

(a)    If any dispute arises between two (2) or more Owners with respect to any Arbitration Matter, then the affected Owners shall endeavor in good faith to resolve such dispute within thirty (30) days after notice thereof specifically initiating this Section 16 (the "Mediation Notice") is given by any Owner to the other affected Owners. At the request of any Owner, the Project Engineer may be consulted and enlisted to mediate the dispute during such thirty (30) day.

(b)    If the dispute is not resolved and documented by written agreement within thirty (30) days after the date of the Mediation Notice (as such period may be extended by mutual written agreement of the affected Owners), then at the written request of any affected Owner (the "Arbitration Notice") the dispute shall be resolved by the following fast track arbitration process ("Fast Track Arbitration"), the result of which shall be binding upon all affected Owners.

(c)    The parties agree that the arbitrator for any Fast Track Arbitration shall be the Project Engineer. In the event the then-current Project Engineer is unable or unwilling to serve as arbitrator consistent with the Fast Track Arbitration schedule set forth in this Section, then the arbitrator for the Fast Track Arbitration shall be a substitute Project Engineer selected by the North/South Tower Lot Owner.

---

[21] NTD: Paladin wants the arbitrator to be a regulatory specialist. For non-regulatory related issues, baseball arbitration may be more effective as it leaves the argument in the hands of each disputant, not the arbitrator.

[ DOCPROPERTY "SWDocID" \* MERGEFORMAT ]

(d)    Not later than forty-five (45) days after the Project Engineer is engaged as arbitrator pursuant to clause (i), the arbitrator shall hold a hearing in a format designated by the arbitrator to resolve each of the issues identified by the parties. The Fast Track Arbitration hearing shall take place at a location agreed upon by the parties. If the parties cannot agree, the arbitrator shall designate a location in Philadelphia Pennsylvania.

(e)    At least seven (7) days prior to the hearing, each party shall submit to the arbitrator and each other party, such documents and other information that the arbitrator requests, including (to the extent requested by the arbitrator) (A) all documents, affidavits, and other information on which such party intends to rely in any oral or written presentation to the arbitrator; (B) a proposed specific ruling on each Arbitration Matter to be resolved; (C) a written memorandum or brief in support of such party's proposed rulings, provided that the memorandum or brief shall not exceed five (5) pages or, if applicable, such other page limit that is specified by the arbitrator.

(f)    Except as otherwise provided in this Section 16 or as otherwise agreed in writing by the parties or as determined by the arbitrator, the Fast Track Arbitration proceeding shall be conducted by the arbitrator in accordance with the then current American Arbitration Association Construction Industry Arbitration Rules using the Fast Track Procedures, but shall not be administered by the American Arbitration Association.

(g)    The arbitrator shall rule on each disputed Arbitration Matter as soon as reasonably possible after the initiation of the Fast Track Arbitration, and, in any event, within fourteen (14) days following completion of the -hearing. The decision of the arbitrator shall be issued in writing. The arbitrator shall be paid its customary and reasonable fees plus expenses (including, if applicable, the fees and expenses of any attorneys or other advisors that the arbitrator deems necessary or appropriate to conduct the Fast Track Arbitration). The arbitrator shall award to the prevailing party its reasonable attorneys' fees, costs, expert witness costs, and expenses (including the arbitrator fees and expenses), incurred in the Fast Track Arbitration proceeding. For purposes of the award of attorneys' fees, costs, expert witness costs, and expenses, the arbitrator shall designate a party as the prevailing party if, in the judgment of the arbitrator, there is a prevailing party.

(h)    The rulings of the arbitrator and the award of fees and expenses in any arbitration and Fast Track Arbitration shall be final, binding, non-reviewable, and non-appealable, and may be entered as a final judgment in any court having jurisdiction..

17.    <u>Easement or License.</u>

The parties hereto understand that all of the Shared Facilities with respect to which they have purported to grant easements hereunder constitute real property. If, however, any of said equipment or Facilities at any time are not fixtures or real property, but are personal property, then the purported grant of an easement with respect thereto shall constitute the issuance of a license with respect thereto, subject to all of the other provisions of this Agreement applicable thereto.

18.    <u>Burdens and Benefits; Successors and Assigns.</u>

Each easement granted hereunder by any Owner shall burden all or part of such Owner's Property as described in the granting clause for such easement and shall benefit and be appurtenant to the Property or Properties expressly stated to be benefited thereby in such granting clause, and no other property. All the covenants, easements and other provisions of this Agreement (including, but not limited to, the benefits and burdens hereof) shall run with the land with respect to the Project Parcel and shall be binding upon, inure to the benefit of and be

18

enforceable by the parties hereto and their respective successors and assigns. Upon the transfer of ownership of any area subject to any easement hereunder, and the assumption by the transferee of the transferor's obligations under this Agreement, thereafter, the transferor thereof shall have no liability hereunder for any defaults hereunder occurring after the date of such transfer so long as the transferee of such ownership assumes such default liability in writing.

19.    Amendment.

(a)    This Agreement and the easements hereby granted and the other provisions hereof shall become effective upon the date of recordation of this Agreement in the Recorder's Office.

(b)    This Agreement may be amended only by a written instrument which shall be recorded in the Recorder's Office, and except as provided to the contrary in Section 19(c), shall be executed by:

(1)    All the Owners; and

(2)    Each Mortgagee under an existing Mortgage of record as of the date that such amendment is recorded.

Except as specifically provided above, the consent of no other Permittee of any Lot shall be required for any amendment of this Agreement to become effective, and except as specifically provided above.

(c)    Notwithstanding Section 19(b), any specific easement created by this Agreement may be amended by a written instrument executed by the Providing Owner and the Benefited Owner(s) of such easement and their respective Mortgagees, without requiring the consent or approval of any other Owner that is not a Benefited Owner of such easement or any Mortgagee of such other Owner's Lot.

20.    Term of this Agreement.

Subject to the provisions of Sections 3(b), 7 and 8 hereof (regarding the termination of specific easements granted hereunder) and this Section20, this Agreement shall remain in full force and effect for a period of ninety (90) years from the date hereof, and thereafter it shall be deemed to have been automatically renewed for successive terms of ten (10) years, except that at any time, and from time to time, this Agreement may be terminated by a unanimous written agreement of all Owners and Mortgagees. Such termination shall be effected by recordation in the Recorder's Office of a document executed by all of the Owners, stating that this Agreement shall be terminated as provided therein, which Agreement shall be joined in by each Mortgage. The options, privileges, covenants or rights created by this Agreement continue for as long as permitted by applicable law.[22]

21.    Severability.

If any provision of this Agreement shall be conclusively determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement shall not be affected thereby.

22.    Construction.

---

[22] NTD: Pennsylvania abolished the rule against perpetuities so the last sentence is unnecessary.

[ DOCPROPERTY "SWDocID" \* MERGEFORMAT ]

This Agreement shall be reasonably construed so as to carry out the intention to confer a commercially useable right of enjoyment on any grantee hereunder, without unreasonably burdening the Property subject to such easements.

23.    Unavoidable Delays.

If and to the extent that any Owner is delayed in the performance of any obligation hereunder, other than obligations that are to be or could be satisfied by the payment of money (including, without limitation, paying for Maintenance Costs and obtaining insurance required hereunder), and such delay constitutes Unavoidable Delay, then the time for performance of such obligation shall be extended for so long as the Unavoidable Delay continues, provided, however, that (i) such Owner notifies each other Owner in writing not later than five (5) business days after first becoming aware of the Unavoidable Delay, and (ii) such Owner uses all commercially reasonable efforts to minimize the extent and duration of the Unavoidable Delay and to expedite its performance of the applicable obligation.

24.    Limitation of Liability.

Notwithstanding anything contained herein to the contrary, each Owner agrees that no other Owner, nor any partner, officer, shareholder or director thereof, shall have any personal liability with respect to any provisions of this Agreement, and such Owner shall look solely to the estate and Property of such other Owner in the Entire Project for the collection of any judgment or the enforcement of any other judicial process requiring the payment or expenditure of money by such other Owner, in the event of any default by such other Owner with respect to any of such other Owner's obligations under this Agreement. No other assets of such other Owner or of any partner, officer, director or shareholder of such other Owner shall be subject to levy, execution or other judicial process for the satisfaction of an Owner's claims, and in the event a judgment is obtained against an Owner, the judgment docket shall be so noted. The provisions of this Section 24 shall inure to the benefit of each Owner's heirs, representatives, successors and assigns and their respective principals

25.    Not a Public Dedication.

Nothing herein contained shall be deemed to be a gift or dedication of any portion of the Property or portion thereof to the general public, or for any public use or purpose whatsoever. Except as herein specifically provided, no right, privileges or immunities of any Party hereto shall inure to the benefit of any third party Person, nor shall any third party Person be deemed to be a beneficiary of any of the provisions contained herein.

*[Signature on the Next Page]* [23]

---

[23] NTD: The document needs to be revised to be in recordable form and a CA notary used for the non-portfolio owners (this comment has already been relayed to DLA).

[ DOCPROPERTY "SWDocID" \* MERGEFORMAT ]

**IN WITNESS WHEREOF,** the Owners have set forth its hands and seals as of the day and year first above written.

BROAD STREET HEALTHCARE PROPERTIES, LLC

_____(SEAL)

By:

Its:

**[ACKNOWLEDGEMENT ON NEXT PAGE]**

[ DOCPROPERTY "SWDocID" \* MERGEFORMAT ]

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGEMENT

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF _____   )

COUNTY OF _____   )

On _____ ____, 2017, before me, _____,

       *Date*                                      *(Here Insert Name and Title Of the Officer)*

personally appeared _____

                                           *Name(s) of Signers*

_____,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____

                    *Signature of Notary Public*

**Place Notary Seal Above**

_____

[Acknowledgement page to Reciprocal Easement and Operating Agreement –
Broad Street Healthcare Properties, LLC]
[ DOCPROPERTY "SWDocID" \* MERGEFORMAT ]

BROAD STREET HEALTHCARE PROPERTIES III, LLC

_____(SEAL)
By:
Its:

**[ACKNOWLEDGEMENT ON NEXT PAGE]**

[Signature page to Reciprocal Easement and Operating Agreement –
Broad Street Healthcare Properties III, LLC]
[ DOCPROPERTY "SWDocID" \* MERGEFORMAT ]

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGEMENT

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF _____    )

COUNTY OF _____    )

On _____ ____, 2017, before me, _____,
       *Date*                              *(Here Insert Name and Title Of the Officer)*

personally appeared _____
                                      *Name(s) of Signers*

_____,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
                  *Signature of Notary Public*

**Place Notary Seal Above**

[Acknowledgment page to Reciprocal Easement and Operating Agreement –
Broad Street Healthcare Properties III, LLC]

[ DOCPROPERTY "SWDocID" \* MERGEFORMAT ]

[ DOCPROPERTY "SWDocID"  \* MERGEFORMAT ]

PAHH NEW COLLEGE MOB, LLC

_____(SEAL)
By: Stephen M. Gordon
Its: Authorized Signatory


STATE OF _____:
                             :                SS
COUNTY OF _____:


     On this, the ____ day of _____, 201_, before me, the undersigned Notary Public, personally appeared _____, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument, and acknowledge that she executed the same in the capacity therein stated for the purposes therein contained.


     IN WITNESS WHEREOF, I hereunto set my hand and official seal.


_____
Notary Public
My Commission Expires:

PAHH FEINSTEIN MOB, LLC

_____(SEAL)
By: Stephen M. Gordon
Its: Authorized Signatory


STATE OF _____:
                                                    :                              SS
COUNTY OF _____:


     On this, the ___ day of _____, 201_, before me, the undersigned Notary Public, personally appeared _____, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument, and acknowledge that she executed the same in the capacity therein stated for the purposes therein contained.


     IN WITNESS WHEREOF, I hereunto set my hand and official seal.


_____
Notary Public
My Commission Expires:


[Signature page to Reciprocal Easement and Operating Agreement –
PAHH Feinsten MOB, LLC]

[ DOCPROPERTY "SWDocID" \* MERGEFORMAT ]

EXHIBIT A-1

NEW COLLEGE LOT

[ DOCPROPERTY "SWDocID" \* MERGEFORMAT ]

EXHIBIT A-2

FEINSTEIN/BOBST LOT

[ DOCPROPERTY "SWDocID"  \* MERGEFORMAT ]

EXHIBIT A-3

NORTH/SOUTH TOWER LOT

EXHIBIT A-4

HUH LOT "D"

[ DOCPROPERTY "SWDocID"  \* MERGEFORMAT ]

EXHIBIT A-5

HUH LOT "E"

EXHIBIT B

PROJECT PARCEL

[ DOCPROPERTY "SWDocID" \* MERGEFORMAT ]

EXHIBIT C

SITE PLAN

[ DOCPROPERTY "SWDocID" \* MERGEFORMAT ]

## EXHIBIT D

### INSURANCE REQUIREMENTS [subject to confirmation/revision by insurance advisors][24]

    (a)   <u>Policies to Maintain.</u> Each Owner, at its sole cost and expense, shall provide and keep in force (or cause to keep in force) during the entire term of this Agreement, insurance providing at least the following coverages, pursuant to formal policies of insurance complying with the requirements set forth below:

    (i)   commercial general liability insurance and professional liability insurance, (including owner's protective liability coverage on operations of the Permittees, and/or their respective independent contractors engaged in construction, personal injury, and blanket contractual liability insurance) with a limit for each occurrence not less than (i) $3,000,000 as to any current of future tenant ("Tenant") and Drexel University as a subtenant ("Drexel Subtenant") or (ii) $1,000,000 as to any current or future subtenant ("Subtenant"), and to have general aggregate limits of not less than (i) $5,000,000 as to Tenant and [Drexel Subtenant], or (ii) $2,000,000 as to any other Subtenant, for each policy year, protecting and indemnifying Permittees against all claims for damages to person or property or for loss of life or of property occurring upon, in, or about the Lot, written on a claims made or occurrence basis. Such coverage shall contain endorsements: (i) deleting any liquor liability exclusion (if alcohol is sold on the Lot); (ii) including cross-liability; and (iii) waiving the insurer's rights of subrogation against Owner for events of which Owner is not, but Tenant and/or Subtenant is, covered; provided however, that with regard to the requirements of waiver of subrogation against Owner, Tenant shall utilize its best efforts to obtain such waiver in any insurance policy procured by Tenant or the Subtenant, and if it cannot do so, Owner shall have the right to procure, at Tenant's expense, an insurance policy containing such waiver if it can do so at the same or better price and on substantially the same terms and conditions;

    (ii)   property insurance on the Lot and all installations, additions and improvements which may now or hereafter be erected thereon against "Special Causes" of loss or damage in an amount sufficient to prevent Permittees from becoming co-insurers and in any event, including loss or damage from earthquakes and windstorm, in an amount not less than one hundred percent (100%) of the actual replacement value thereof (i.e., including the cost of debris removal) as determined by Owner in its reasonable discretion from time to time consistent with coverages for similarly situated properties. Such coverage shall contain an agreed amount endorsement reasonably acceptable to Owner;

    (iii)   business interruption insurance with coverage in a face amount of not less than the aggregate amount, for a period of twelve (12) months following the insured-against peril, of 100% of all rent (which includes all impositions and other amounts specified in such rent), if any, to be paid by Tenant; such coverage shall contain an agreed amount endorsement acceptable to Owner;

    (iv)   workers' compensation insurance (including employers' liability insurance), with a waiver of subrogation satisfactory to Owner in its reasonable discretion, covering all persons employed on the Lot to the extent required by applicable laws and requirements of the state in which the Lot is located, including, without limitation, during the course of work to the Lot;

---

[24] NTD: Should be same as in Master Lease.

[ DOCPROPERTY "SWDocID" \* MERGEFORMAT ]

(v)     mechanical breakdown insurance, if applicable, in an amount not less than one hundred percent (100%) of the actual replacement value thereof and of any improvements in which any such boiler is located (including the cost of debris removal but excluding foundations and excavations) as determined by Owner in its reasonable discretion from time to time;

(vi)     if sprinkler systems are located in the Building, sprinkler leakage insurance in amounts approved by Owner in its reasonable discretion;

(vii)     flood insurance (if the Lot is located in whole or in part within a special flood hazard area as designated by any department or agency of the United States government having jurisdiction);

(viii)     equipment coverage and elevator liability coverage, if applicable, in amounts approved by Owner in its reasonable discretion;

A.     motor vehicle liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence, including umbrella coverage, of One Million and No/100 Dollars ($1,000,000) (if applicable);

(ix)     [Garage keeper's Legal Liability Coverage, as reasonably required by Owner];

(x)     if during the term of this Agreement, Tenant or the Lot are covered by general liability, professional liability, patient healthcare professional malpractice or other liability insurance on a "claims made" basis, Owner shall cause, whether directly or indirectly, Tenant to procure and maintain, "tail" insurance coverage, with such coverage limits and such deductible amounts as shall be reasonably acceptable to Owner for general liability, professional liability, patient healthcare professional malpractice or other liability claims reported after the termination of Tenant's applicable lease or expiration of the claims made policy, but concerning services provided during the term of such applicable lease. Tenant shall provide Owner with a certificate evidencing that such insurance coverage is in effect for a period of no less than one (1) year subsequent to the termination of the applicable lease no later than ninety (90) days prior to the termination of the applicable lease;

(xi)     such other or additional insurance as Owner or Mortgagee may reasonably require upon not less than thirty (30) days prior written notice to Tenant.

(b)     Adjustment. The loss under all insurance policies insuring against property damage to the Buildings shall be payable to Mortgagee (or, if Mortgagee or requires, a financial institution acting as insurance depository) or, if there is none, to Owner who shall be named as an additional loss payee.

(c)     Insurance Company Requirements. All of the above-mentioned insurance policies and/or certificates evidencing such policies shall be written by insurance companies: (i) rated "A:VIII" or better in "Best's Insurance Guide" and at least "A" by Standard & Poor's Ratings Group; and (ii) authorized to do business in the state where the Lot is located.

(d)     Evidence of Insurance, Renewal. Owner shall renew such insurance and shall deliver to the other Owners certificates of insurance, promptly following the renewal of any such policy of insurance.

(e)     No Violation of Policies. Owner shall not permit any Permittee to violate, in any material respect, any of the conditions of any of the said policies of insurance..

2

[ DOCPROPERTY "SWDocID" \* MERGEFORMAT ]

(f)    Blanket/Umbrella. The insurance required by this Agreement, at the option of each Owner, may be effected by blanket and/or umbrella policies issued to Owner and covering the Lot, provided that the policies otherwise comply with the provisions of this Agreement and allocate to the different properties comprising the Lot the specified coverage, without possibility of reduction or coinsurance by reason of, or damage to, any other Lot.

(g)    Complying with Mortgagee. Each owner shall comply (and shall cause its Permittees to comply) with the insurance requirements of any Mortgagee under the Mortgage or any other loan document in connection therewith if they (a) require any insurance coverage not otherwise required under this Agreement or (b) provide for more stringent coverages, terms, conditions or provisions with respect to insurance coverage required under this Agreement for coverage customarily maintained on similar facilities in Philadelphia, Pennsylvania.

(h)    Waiver of Subrogation. No Owner shall be liable to another Owner or to any insurance company (by way of subrogation or otherwise) insuring the other party for any loss or damage to any building, structure or other tangible property, or any resulting loss of income, or losses under worker's compensation laws and benefits, even though such loss or damage might have been occasioned by the negligence of such party, its agents or employees if, and to the extent, that any such loss or damage is covered by insurance benefiting the party suffering such loss or damage or was required to be covered by insurance pursuant to this Agreement.

3

[ DOCPROPERTY "SWDocID" \* MERGEFORMAT ]

## RECIPROCAL EASEMENT AND OPERATING AGREEMENT

THIS RECIPROCAL EASEMENT AND OPERATING AGREEMENT (this "Agreement") is made as of this ___ day of January, 2018 (the "Effective Date"), by and among (i) PAHH New College MOB, LLC, a Delaware limited liability company ("New College Lot Owner"), (ii) PAHH Feinstein MOB, LLC, a Delaware limited liability company ("Feinstein/Bobst Lot Owner"), (iii) Broad Street Healthcare Properties, LLC, a Delaware limited liability company ("North/South Tower Lot Owner"), and (iv) Broad Street Healthcare Properties III, LLC, a Delaware limited liability company ("HUH Lot Owner").

### BACKGROUND:

A.    New College Lot Owner owns fee title to that certain parcel of real estate located in Philadelphia, Pennsylvania and legally described on Exhibit A-1 attached hereto and made a part hereof (the "New College Lot").

B.    Feinstein/Bobst Lot Owner owns fee title to that certain parcel of real estate located in Philadelphia, Pennsylvania and legally described on Exhibit A-2 attached hereto and made a part hereof (the "Feinstein/Bobst Lot").

C.    North/South Tower Lot Owner owns fee title to that certain parcel of real estate located in Philadelphia, Pennsylvania and legally described on Exhibit A-3 attached hereto and made a part hereof (the "North/South Tower Lot").

D.    HUH Lot Owner owns fee title to that~~that~~those certain ~~parcel~~parcels of real estate located in Philadelphia, Pennsylvania and legally described on Exhibit A-4 ("HUH Lot D") and Exhibit A-5 ("HUH Lot E", together, with HUH Lot D, sometimes called the "HUH Lots") attached hereto and made a part hereof ~~(the "HUH Lot")~~.[1]

E.    The New College Lot, the Feinstein/Bobst Lot, the North/South Tower Lot, HUH Lot D and the HUH Lot E (each a "Lot" and collectively the "Lots") are contiguous to each other and collectively comprise all of the real property described in Exhibit B attached hereto and made a part hereof (the "Project Parcel"), which is bounded by North Broad Street (to the east), Race Street (to the south), North 15th Street (to the west) and Vine Street (to the north) in Philadelphia, Pennsylvania.

F.    A site plan showing the Project Parcel, as currently improved, is attached hereto and made a part hereof as Exhibit C (the "Site Plan"). The Project Parcel, together with the Buildings and other improvements now or hereafter constructed within or upon the Lots, is herein referred to as the "Entire Project."

G.    The Entire Project was previously owned and operated by a single entity ("Tenet") as an integrated hospital/medical complex containing (without limitation) medical office, hospital, medical college, parking and related uses. Immediately prior to the execution and delivery of this Agreement, Tenet conveyed each Lot to the respective Owners identified above.

H.    The Lots and the improvements constructed thereon are in certain respects physically and functionally dependent on one another and the parties hereto desire to declare and grant certain easements to one another, and to set forth certain other agreements, for the purpose of facilitating the harmonious use and operation of the Entire Project, all as more particularly set forth herein.

[1] NTD: Need to split out HUH Lot into two separate lots that exist so that they are not both being burdened when only one should be.

**NOW, THEREFORE**, intending to be legally bound hereby, the parties hereto hereby agree as follows:

    1.    Certain Definitions.

In addition to such defined terms and any terms defined elsewhere in this Agreement, the following terms shall have the respective meanings set forth below in this Section 1:

    (a)    "Arbitration Matter" shall mean and is limited to a dispute between one or more Owners with respect to the following matters arising under this Agreement: (i) the extent and location of the Shared Facilities and the Existing Encroachments and Support Elements, based on the condition and operation of the Entire Project as of the Effective Date, (ii) the determination of the Maintenance Cost Allocation for any Shared Facilities; (iii) matters arising under Section 3 of this Agreement; (iv) matters arising under Section 7 of this Agreement concerning Alterations, (v) [PARTIES TO CONSIDER ADDITIONAL ITEMS SUBJECT TO DISPUTE RESOLUTION BY PROJECT UNITOWNER].

    (b)    "Arbitrator" shall mean the party identified by the Lot Owners to conduct Arbitration Matters.

    (c)    "Benefited Owner" shall mean, with respect any easement expressly granted under this Agreement, an Owner who is expressly entitled pursuant to the terms and conditions of this Agreement to the use, benefit or enjoyment of a Shared Facility or ExistingSeparate Facility or Encroachments and Support Elements that is located upon another Owner's Lot.

    (d)    "BOMA Standards" shall mean the Building Owners and Managers Association Manual then currently applicable, which as of the Effective Date is BOMA 2017 for Office Buildings: Standard Methods of Measurement (ANSI/BOMA Z65.1—2017.

    (e)    (e) "Building" means a building or other enclosed and occupable structure now or hereafter located upon a Lot.

    (f)    (d) "Claim" means and includes any loss, cost, damage, demand, litigation, cause of action, fine, penalty, liability, lien, injury, obligation or expense (including reasonable attorneys' and witness fees, disbursements and court costs).

    (g)    (e) "Common Utility Plant" means the [boiler, chiller] and, and such other facility producing utility service and its related machinery and equipment that is located within the Building on the _____ Lot, which provides [steam heat and, chilled water] and such other utility service to the Buildings on the _____ Lot and the _____ Lot, as the same is replaced, improved or otherwise Maintained from time to time in accordance with this Agreement.

    (h)    (f) "Emergency" means a circumstance or condition that (i) causes or is likely to imminently cause bodily injury or death to persons or significant physical damage to any Building or other improvement or any facility servicing the Entire Project or any part thereof, (ii) impairs or is likely to imminently impair, in any material respect, the structural integrity of any Building or other facility serving the Entire Project or any part thereof, (iii) interrupts or is likely to imminently interrupt, in any material respect, Shared Utilities serving any Lot, other than pursuant to Maintenance undertaken in accordance with this Agreement.

2

(i)    ~~(g) "Existing Encroachments and Support Elements":~~ means (i) any aboveground or underground portion or appurtenances of a Building that is located on one Lot, which encroaches onto an adjacent Lot, to the extent that such encroachment exists on the Effective Date, or is otherwise constructed after the Effective Date but does not materially adversely affect the encroached upon Lot and (ii) any Building or other improvement that is located on one Lot, which provides necessary structural support for a Building located on an adjacent Lot as of the Effective Date, or is otherwise constructed after the Effective Date but does not materially adversely affect the encroached upon Lot, but only to the extent necessary to provide continuing structural support.

(j)    "Entire Project" shall have the meaning set forth in Recital E of this Agreement.

(k)    "Fair Market Value" shall mean the product of bona fide, arms-length negotiations and represent the commercially reasonable, fair market value of the Premises for general commercial purposes, without taking into account the intended use of the Premises or the volume or value of any actual or expected federal health care program or other referrals to, or business otherwise generated for, either Lot Owners or tenants under Leases and the rental payments do not reflect any additional value Lot Owners or tenants under Leases may attribute to the proximity or convenience of the Lot to sources of referrals or business otherwise generated, for which payment may be made in whole or in part under any federal health care program.

(l)    ~~(h)~~ "Helipad" shall mean the helipad that is located on the roof of the Building on the New College Lot, which exclusively serves the hospital operated on the North/South Tower Lot.

(m)    "Indemnity Protocol" shall have the meaning set forth in Section 6.c.

(n)    ~~(i)~~ "Interest Rate" means the lesser of (i) the highest rate of interest that may be charged in accordance with applicable Legal Requirements, or (ii) the greater of (A) twelve percent (12%) per annum, or (B) the prevailing "prime rate" as published from time to time in the *Wall Street Journal* (or if the *Wall Street Journal* ceases to publish such rate, the "prime rate" or other reference rate of interest as published by any other source reasonably selected by the New College Lot Owner), plus five percent (5%) per annum.

(o)    "Lease" means the lease between any Lot Owner and St. Christopher Healthcare LLC or other lease entity ("Master Tenant") and any sub lease between Master Tenant and a space tenant.

(p)    ~~(j)~~ "Legal Requirements" means all laws, rules, orders, ordinances, codes, regulations and requirements, now or hereafter enacted or promulgated, of the United States of America, the Commonwealth of Pennsylvania, the City of Philadelphia and of any other sovereign or municipality now or hereafter having jurisdiction over the Entire Project, any Lease, or any portion thereof, and of any governmental or quasi-governmental agency thereof now or hereafter having jurisdiction, and of any other lawful authority having such jurisdiction.

(q)    ~~(k)~~ "Lot Floor Area" shall mean, with respect to any Lot, the ~~greater of (i) the actual "Gross Floor Area~~Rentable Square Footage" (as defined and measured in accordance with ~~the Philadelphia Zoning Code~~BOMA Standards) of all Buildings and other

---

[2] NTD: Does not contemplate needed subsurface encroachments in the case of future development. Should that be folded in now?

3

improvements located on such Lot (including for these purposes all Buildings and improvements under construction for which a building permit has been issued) ~~and (ii) twenty percent (20%) of the maximum "Gross Floor Area" that could be lawfully constructed on such Lot on a stand-alone basis in accordance with the Philadelphia Zoning Code.~~

(r) ~~(l)~~ "Maintenance" or "Maintain" shall mean the operation, maintenance, repair, reconditioning, refurbishing, reconfiguration, inspection, testing, cleaning, painting, installation, restoration, reconstruction and replacement (when necessary or desirable) of Shared Facilities or other elements of the Entire Project (as the context requires), and shall also include the right of access for any of the above purposes, subject, however, to any limitations set forth elsewhere in this Agreement.

(s) ~~(m)~~ "Maintenance Costs" shall mean, with respect to any Shared Facilities over any period of time, the actual out-of-pocket costs and expenses reasonably and directly incurred by the applicable Maintenance Party during such period, in connection with the Maintenance of the applicable Shared Facilities, whether preventive or curative, excluding any (i) expenditures which are capitalized or would be classified as capital expenditures under generally accepted accounting principles, consistently applied, or any amortization of such expenditures (except as expressly provided below), (ii) any interest or finance charges (except with respect to the payment of a capital expenditure included as a Maintenance Cost), (iii) depreciation or amortization (except as expressly provided below), any (iii) taxes or overhead costs or charges of the Maintenance Party, (iv) any employment or personnel costs of the Maintenance Party, (v) any costs or expenses that arise from the failure of the Maintenance Party to perform its Maintenance obligations hereunder causing an Event of Default[4] or as a consequence of any fire or other casualty (whether or not insured), ~~and~~ (vi) ~~and~~ any costs or expense (a) arising from the change of use, or (b) cost of reconfiguration, renovation or redevelopment of the Providing Owner's Property~~,~~ and (vii) any costs or expenses to the extent arising from another Maintenance Party's gross negligence, willful misconduct, or failure to perform their applicable Maintenance obligations hereunder which cause an Event of Default, with such costs or expenses to be reimbursed by the applicable offending Maintenance Party.[4] If any Maintenance Party reasonably incurs any ~~out-of-pocket~~ capital expenditures to Maintain the Shared Facilities for which it is responsible (other than such expenditures that would be excluded from Maintenance Costs pursuant to clauses (v) ~~and (vi)~~ (vii) above), then such capital expenditures shall be ~~amortized on a straight-line basis over the useful life of the applicable replacements or repairs (as determined in accordance with generally accepted accounting principles, consistently applied) and may be included in Maintenance Costs on the same basis~~ reimbursed by any Benefited Owners of such Shared Facility, such reimbursement based upon the Benefited Owner's proportionate use of such Shared Facility.[5] Except for utilities actually consumed in the operation of the Common Utility Plant (which shall be included as Maintenance Costs only if and to the extent separately metered to the Common Utility Plant) and utilities consumed in the performance of any Maintenance, Maintenance Costs shall not include the cost of any utilities that are consumed on any Property.

(t) ~~(n)~~ "Maintenance Cost Allocation" shall mean the allocation of the Maintenance Costs as between the Maintenance Party and the Benefited Owner(s) of such Shared Facility on the following basis: (i) with respect to the Maintenance of the Helipad and any other Separate Utilities, the North/South Tower Lot Owner shall be responsible for one hundred

---

[3] NTD: To allow for minimal failures or excusable failures, such as events from Unavoidable Delay

[4] NTD: No maintenance party should be required to pay the cost of Maintenance due to another party; it should be reimbursed by the party causing it.

[5] NTD: We think this was to address when a Shared Facility cannot be repaired and must be replaced. If so, we think that a Maintenance Party should not have to bear the cost and then be reimbursed over the useful life. Should Maintenance work be subject to a three – bid third party RFP process?

4

percent (100%) of all Maintenance Costs; ~~(ii) with respect to the Maintenance of the Shared Loading Dock, the Feinstein/Bobst Lot Owner, the _____ Lot Owner and the _____' Lot Owner shall each be responsible for its proportionate share of the applicable Maintenance Costs, based on the Lot Floor Area of each such Lot, (iii) with respect to the Maintenance of the Shared Parking Facilities, the _____ Lot Owner, the _____ Lot Owner and the _____' Lot Owner shall each be responsible for its proportionate share of the applicable Maintenance Costs, based on the Lot Floor Area of each such Lot; (iv) with respect to the Maintenance of Shared Interior Accessways between any two (2) or more Buildings on different Lots, the applicable Maintenance Costs shall be allocated between the Owners of such Lots in proportion to the Lot Floor Area of such Lots; (v) with respect to the Maintenance of all other~~ with respect to all Shared Facilities, the Lot Owner ~~of each Lot that directly benefits from such Shared Facilities shall~~ each be responsible for its proportionate share of the applicable Maintenance Costs, based on the ~~Lot Floor Area of the Lots the directly benefiting from such Share Facilities. Fair Market Value~~ determined by the Arbiter effective as of every second anniversary of the Effective Date[6].

(u) ~~(o)~~ "Maintenance Party" shall mean, with respect to any Shared Facilities, the Owner that is responsible for Maintaining such Shared Facilities in accordance with this Agreement. The Maintenance Party with respect to the Helipad shall be the North/South Tower Lot Owner~~,~~; however, to the extent any Helipad Maintenance is required due to any damage, defect, harm, or ordinary wear and tear caused to the roof of the Building on the New College Lot unrelated to the use of the Helipad, New College Lot Owner shall be such Maintenance Party.[7] The Maintenance Party with respect to the Shared Loading Dock shall be the [Feinstein/Bobst] Lot Owner. With respect to all other Shared Facilities, the Maintenance Party shall be the Owner on whose Lot such Shared Facilities are located.

(v) "Master Tenant" shall have the meaning set forth in Article 1 of this Agreement.

(w) ~~(p)~~ "Mortgage" shall mean, with respect to any Lot or portion thereof, a duly recorded (and not released) mortgage, deed of trust or similar instrument that creates and constitutes a lien upon such Lot to secure repayment of a loan obtained by the applicable Owner, and "Mortgagee" shall mean the holder(s) of record of such Mortgage; provided (in each case) each other Owner has received actual written notice (and not merely record notice or constructive notice) of such Mortgage and the name and address of each Mortgagee.

(x) ~~(q)~~ "Operating Standard" shall mean the standards of operations, cleanliness, security, appearance, repair and Maintenance generally applicable to ~~first class~~similarly situated hospitals, educational and medical office facilities in the "Center City", Philadelphia area, with due consideration to the age of the applicable facilities. At a minimum, the Operating Standard requires that the applicable Lots, Buildings, and Shared Facilities within the Entire Project shall at all times be operated and Maintained in good working order and condition, ordinary wear and tear excepted, and in compliance with all applicable Legal Requirements.

(y) ~~(r)~~ "Owner" or "Owners" shall mean the New College Lot Owner, the Feinstein/Bobst Lot Owner, the North/South Tower Lot Owner and the HUH Lot Owner and

---

[1] Include only the Lots that utilize the Shared Loading Dock.
[5] Include only the Lots that utilize the Shared Parking Facilities.
[6] NTD Allocations must not violate Anti-Kick Back and other fraud and abuse regulations. They should be set by a regulatory consultant.
[7] NTD: The Towers should not be required to maintain the helipad to the extent any maintenance is required due to New College roof issues that are unrelated to use of the helipad.

5

their respective successors and assigns as the holder(s) of fee title to the Lots from time to time. If at any time a Lot is owned by more than one Person, then all such Persons collectively shall be the "Owner" of such Lot.

(z)    ~~(s)~~ "Permittees" means, with respect to any Lot or Building, the Owner thereof and its Mortgagees, tenants and subtenants and their respective customers, visitors, invitees, licensees and concessionaires, but only during such times and to such extent that such Persons are entitled and authorized by such Owner to occupy, access and utilize the facilities ~~comprising the Entire Project (t)    "Person" shall mean any natural person or any corporation, partnership, limited liability company, trust, joint venture, association or other legal entity~~ on a Providing Owner's Lot[2].

(aa)    ~~(u)~~ "Project Engineer" means (i) [Pennoni Associates Inc.][3], or any entity that directly or indirectly acquires or otherwise succeeds to all or substantially all of the business assets of Pennoni Associates Inc., so long as it is available and willing to serve in the capacity of the Project Engineer under this Agreement, or (ii) if Pennoni Associates Inc. (or such successor) is not available and willing to serve in the capacity of the Project Engineer under this Agreement, any other firm of licensed professional engineers that is reasonably selected by the ~~Owner of the New College Lot~~ Owners.

(bb)    "Project Parcel" shall have the meaning set forth in Recital E of this Agreement.

(cc)    ~~(v)~~ "Property" or "Properties" shall mean any, some or all of the Lots as improved from time to time, as the case may be and as the context may dictate.

(dd)    ~~(w)~~ "Providing Owner" shall mean, with respect to any Shared Facility, the Owner upon whose Lot such Shared Facility is located.

(ee)    ~~(x)~~ "Recorder's Office" means the Recorder of Deeds of Philadelphia, Pennsylvania.

(ff)    "Separate Facilities" shall mean those facilities that are installed to provide the applicable services for the benefit of one (1) Party and/or which are not Shared Facilities, such as the Helipad or emergency power supply serving only one Lot though located on a different Lot.

(gg)    ~~(y)~~ "Shared Facility" or "Shared Facilities" shall mean (i) the ~~Helipad, (ii) the~~ Shared Interior Accessways, (ii~~i~~i) the Shared Loading Dock, ~~(iv) the Shared Parking Facilities~~ and (v~~i~~ii) the Shared Utility Facilities.

(hh)    ~~(z)~~ "Shared Interior Accessways" shall mean the interior doorways, hallways and passageways that currently provide interior access, circulation and passage ways (including emergency access and egress, to the extent required by applicable Legal Requirements) between adjoining Buildings located on adjacent Lots, substantially as the same are currently configured and available to and utilized by the Permittees of such Buildings on the Effective Date.

~~(aa)    "Shared Parking Facilities" shall mean the surface [and subsurface²] vehicular parking areas located on the [HUH Lot], in the approximate locations and~~

[2] NTD: A Permittee may be benefitted by less than all the Lots.

[3] NTD: There may be a better mechanism to establish a Project Engineer than to set up from the start what could be a sinecure. The Arbitrator who decides costs and set sharing should be a regulatory expert.

6

PHIL1 6683117v.13

~~configuration depicted on the Site Plan, together with the drive aisles located therein and accessways providing access, ingress and egress from and to the adjacent public streets. The Shared Parking Facilities contain approximately [82] surface [and 40 subsurface] parking spaces, including approximately [___] handicap parking spaces.~~

~~(bb)   "Shared Utility Facilities" shall mean any Utility Facilities that are located on one Lot and serve one or more other Lots.~~

(ii)   Intentionally omitted[10]

(jj)   ~~(cc)~~ "Shared Loading Dock" shall mean the underground loading dock and related facilities [(including trash and refuse compactors)] located [primarily] on the [Bobst/Feinstein Lot], together with the ramp providing short-term truck staging and vehicular and pedestrian access to such facilities from Race Street over and across the [HUH Lot], in the approximate locations depicted on the Site Plan, which currently serve and provide off-street loading, shipping and receiving facilities for the Buildings located on the _____ Lot , the _____ Lot and the _____ Lot.

(kk)   "Shared Utility Facilities" shall mean any Utility Facilities that are located on one Lot and serve one or more other Lots.

(ll)   ~~(dd)~~ "Unavoidable Delay" means delay in the performance of any non-monetary obligations hereunder, to the extent that such delay is not reasonably avoidable and is caused by fire, flood, windstorms or other casualty events, strikes or labor unrest, unavailability of required labor, service or materials, extraordinarily adverse weather conditions (but only to the extent that such weather would not be reasonably anticipated and accounted for in the use and Maintenance of Entire Project in accordance with the Operating Standard), interruption of required utilities by acts or occurrences outside the Project Parcel, and other similar acts and occurrences outside the reasonable control of the Owner or other party required to perform such duties or obligations, provided, however, that (i) in no event shall the unavailability of required funds constitute or justify a claim of Unavoidable Delay, (ii) the Owner or other Person that is required to perform the affected obligation shall notify each other Owner not later than five (5) business days after becoming aware of the Unavoidable Delay.

(mm)   ~~(ee)~~ "Unity of Use Agreement" means that certain [Easement and Unity of Use Statement] by and among _____ dated as of _____ and recorded against the Project Parcel immediately prior to the recordation of this Agreement (as amended from time to time), pursuant to which the parties thereto have agreed to treat and operate the parcels comprising the Project Parcel as a single, contiguous zoning lot under the Philadelphia Zoning Code[*].

(nn)   ~~(ff)~~ "Utility Facilities" shall mean any facilities, fixtures, machinery, systems and equipment for the generation, delivery, distribution, collection, storage, circulation, measurement, metering, control, monitoring, inspection, management, Maintenance, exhaust and removal of electrical power, gas, oil, telecommunications, data transmission, heating, steam, ventilation, air conditioning, chilled water, potable water, storm water, sewage, fire sprinklers, alarms, enunciators and other life-safety systems and all other utilities and related facilities that serve any part of a Building or Lot, including the Common Utility Plant.

2.   Grant of Easements.

---

[10] NTD: We are told there is no Shared Parking on the HUH Project

~~[*] Discuss deleting Article 4 of the draft Unity of Use Agreement. Article 4 is redundant of this Agreement.~~

PHIL1 6683117v.13

(a)    ~~Shared  Parking  Facilities.  Each  Owner  upon  whose  Property~~
~~Shared Parking Facilities are currently located hereby declares and grants, conveys and sets over~~
~~unto each other Owner[4], for the use and benefit of their respective Permittees, the non-exclusive~~
~~right, privilege and easement to access, enter upon and use such Shared Parking Facilities for the~~
~~parking of passenger vehicles, (subject to such reasonable rules and regulations which may be~~
~~established from time to time by the Owner(s) of the Lots burdened by this easement right,~~
~~consistent with the use and operation of the Shared Parking Facilities prior to the Effective Date)~~
~~together with the right of vehicular and pedestrian ingress, egress and access from, to and across~~
~~the Shared Parking Facilities.~~ Intentionally omitted.

(b)    Shared Utility Facilities and Separate Facilities. Each Owner upon
whose Property any Shared Utility Facilities or Separate Facilities are currently located hereby
declares and grants, conveys and sets over unto the Owners of each other Lot that is currently
served by such Shared Utility Facilities or Separate Facility, as the case may be, for their
respective use and benefit, the non-exclusive right, privilege and easement to Maintain, use,
connect and tap into (in the case of Shared Utility Facilities), operate and receive services from
and through such Shared Utility Facilities or Separate Facilities, as the case may be, substantially
as the Shared Utility Facilities or Separate Facilities, as the case may be, are used on the
Effective Date. If and to the extent that any Lot receives utility service through Shared Utility
Facilities located on another Lot (such as domestic water, steam, chilled water, electricity, gas,
oil, telecommunication services or other consumable utilities), the Benefited Owner shall pay for
the costs of such utility consumption either (a) directly to the utility company that provides such
utility service, if and to the extent that such utility consumption is metered or submetered and
billed directly to such Benefited Owner by the utility provider, (b) to the Providing Owner of
such utility service, if and to the extent that such utility consumption is not separately metered
and billed by the utility provider to the Benefited Owner's Property, in which case (x) if the
utility consumption is submetered to the Benefited Owner's Property, then the Benefited
Owner's share of the utility consumption cost shall be determined by the actual quantity of
utilities consumed and the actual costs per unit charged to the Providing Owner by the utility
provider, or (y) if the utility consumption is not submetered to the Benefited Owner's Property,
then as soon as practicable after the date hereof the Providing Owner shall install (at ~~its~~the sole
cost and expense of the Benefited Owner) a meter or submeter to determine the actual amount of
the applicable utility service that is consumed at the Benefited Owner's Property, and until such
meter or submeter is installed and operating the actual utility consumption costs shall be
allocated among the Properties receiving such utility service proportionately on the basis of the
Lot Floor Area of each such Property, and subject to compliance with applicable law.[11]

(c)    Shared Interior Accessways. Each Owner upon whose Property any
Shared Interior Accessways are currently located hereby declares and grants, conveys and sets
over unto the Owner of each Building that currently connects to and utilizes such Shared Interior
Accessways, for the use and benefit of the Permittees of such Building, the non-exclusive right,
privilege and easement for ingress, egress and access over, upon, across and through the
applicable Shared Interior Accessways. The exercise of such easement rights shall not
unreasonably disrupt or disturb the use and operation of the Properties burdened by such
easement rights and otherwise shall be subject to such reasonable rules and regulations which
may be established from time to time by the applicable Providing Owner, consistent with the use
of the Shared Interior Accessways prior to the Effective Date.

---

[4] ~~Confirm that each Lot is entitled to use the Shared Parking Facilities.~~
[11] NTD: AKB law may not permit an empty building to pay a share of utilities that results in a windfall
characterized as incommensurate remuneration to another referral health provider.

(d)    Helipad. The New College Lot Owner hereby declares and grants, conveys and sets over unto the North/South Tower Lot Owner, the exclusive[5] right, privilege and easement to operate, use and Maintain the Helipad for the landing and take-off of helicopters transporting patients to and from the Hospital operated on the North/South Tower Lot, and with such accessory use as is substantially in the manner and degree that the Helipad has been accessed, operated, used and Maintained prior to the Effective Date. Notwithstanding anything to the contrary contained herein, (i) in no event shall the Owner or other Permittees of the North/South Tower Lot be permitted to use or Maintain the Helipad in any manner that injures or damages the Building located on the New College Lot such that it materially adversely affects the business conducted at the New College Lot, and (ii) without limiting clause (i), any Maintenance of the Helipad shall be coordinated with the New College Lot Owner and shall not involve or result in any borings into, penetrations of or attachments to the roof of the Building on the New College Lot unless the plans and specifications for such Maintenance and the contractor(s) performing such Maintenance are approved in writing by the New College Lot Owner.

(e)    Shared Loading Dock. Each Owner upon whose Property any portion or element of the Shared Loading Dock is currently located hereby declares and grants, conveys and sets over unto the respective Owners of the Feinstein/Bobst Lot, the _____ Lot and the _____[12] Lot, for the use and benefit of the respective Permittees of such Lots, the non-exclusive right, privilege and easement to access, use and Maintain the Shared Loading Dock, for the delivery, receiving, loading and unloading of supplies, inventory and equipment to and the disposal, compaction and pick-up of garbage and refuse from the Buildings on such Lots, substantially in the same manner and to the same degree that the Shared Loading Dock has been used prior to the Effective Date. Access to and use and Maintenance of the Shared Loading Dock shall be scheduled and coordinated by the ~~Feinstein/Bobst~~North/South Tower Lot Owner in a reasonable, non-discriminatory manner and shall be further subject to such reasonable rules and regulations that may be established from time to time by the ~~Feinstein/Bobst~~North/South Tower Lot Owner.[13]

(f)    Easements for ~~Existing~~ Encroachments and Support Elements. Each Owner upon whose Property any ~~Existing~~ Encroachments or Support Elements are currently or may hereafter in accordance with this Agreement be located, hereby declares and grants, conveys and sets over unto to the Owner of each Building that currently constitutes or relies upon such ~~Existing~~ Encroachments or Support Elements, the non-exclusive right, privilege and easement to access, use and Maintain such ~~Existing~~ Encroachments and Support Elements, substantially as they currently exist and function.

3.    Easements Generally. The easements and other rights granted in Section 2 of this Agreement are intended to allow the continued operation and Maintenance of the Entire Project substantially as the Entire Project has been operated and Maintained prior to the Effective Date. The scope, extent and utilization of the easements granted pursuant to this Agreement shall not exceed in any material respect how the applicable Shared Facilities, ~~Existing~~ Encroachments and Support Elements, and Separate Facilities have been operated and Maintained prior to the Effective Date.

(a)    Each Providing Owner of Shared Facilities or Separate Facilities shall have the right to relocate and/or reconfigure the Shared Facilities or Separate Facilities, as applicable, that are located upon its Property, at its sole cost and expense, provided that no such relocation or reconfiguration shall cause or result in any material interruption in the access to or use of the applicable Shared Facilities or Separate Facilities, as applicable, by the Benefited

---

[5] ~~Confirm that the Helipad is used exclusively by Hahnemann in the North/South Tower.~~
[12] Identify Lots that currently use the Shared Loading Dock.
[13] NTD: The hospital has he greatest need and the largest use of the loading dock

9

Owners, and provided further that the functionality of and access to the relocated Shared Facilities or Separate Facilities, as applicable, shall not be materially less than the functionality of and access to the applicable Shared Facilities or Separate Facilities, as applicable, as of the Effective Date and that the Maintenance Costs for such Shared Facilities or Separate Facilities, as applicable, will not be materially increased by the relocation thereof.

(b)    In the event that a Benefited Owner redevelops or changes the use of its Property such that its Property no longer requires or relies on a Shared Facility or the Existing Encroachments and Support Elements or Separate Facilities, as applicable,, or in the event that a Benefited Owner otherwise abandons the use of any easement granted hereunder, then such easement (to the extent no longer required or relied upon) shall be deemed to be abandoned and terminated; provided, however that no easement granted hereunder shall be deemed abandoned by mere non-use, unless (x) the Benefited Owner and its Permittees cease to use the applicable easement for a continuous period in excess of one hundred eighty (180) days, other than by reason of repairs, restoration or redevelopment of its Property diligently prosecuted to completion, and (y) the applicable Benefited Owner and the Mortgagee(s) of the applicable Lot fail to object in writing to the abandonment and termination of the applicable easement within sixty (60) days after receiving written notice of abandonment and termination from the Providing Owner.

4.    Maintenance of Shared Facilities.

(a)    Each of the Shared Facilities or Separate Facilities, as applicable, shall be Maintained by the applicable Maintenance Party in accordance with the Operating Standard, as and when required to comply with the Operating Standard and the terms of this Agreement, subject to Unavoidable Delays, and so long as any Lot is operated by parties pursuant to a collective bargaining agreement, consistent with requirements to maintain labor harmony among all personnel working at the Entire Project. Except as otherwise expressly provided herein, each Maintenance Party shall perform and pay for its Maintenance obligations under this Agreement at it sole cost and expense.

(b)    If any Maintenance Party shall fail to Maintain the Shared Facilities for which it is responsible under this Agreement as and when required, and if such failure is not cured within ten (10) days after written notice from any Benefited Owner or the Permittees of any Benefited Owner (provided that such cure period shall be extended so long as the Maintenance Party commences the cure within such 10-day period and thereafter diligently and continuously prosecutes the cure to completion in accordance with the Operating Standard), or if the failure to Maintain the Shared Facilities constitutes or results in an Emergency, then in either case (i) any Benefited Owner or its Permittees shall have the right (but not the obligation) to enter upon the affected Property and to perform the required Maintenance on behalf and at the sole cost and expense of the Maintenance Party, and (ii) the Maintenance Party shall reimburse the actual costs and expenses incurred by the Person performing the applicable Maintenance on its behalf within ten (10) days after written demand.

(c)    EachSubject to the Indemnity Protocol, each Maintenance Party shall pay on demand, and shall indemnify and hold harmless each Benefited Owner and its Permittees from and against, any and all Claims that are incurred by or asserted against such Benefited Owner or its Permittees as consequence or result of any failure by such Maintenance Party to perform its Maintenance obligations as and when required under this Agreement.

(d)    Any Maintenance Costs incurred by the Maintenance Party to Maintain Shared Facilities in accordance with this Agreement shall be allocated among the applicable Benefited Owners in accordance with the applicable Maintenance Cost Allocation.

The Benefited Owners shall each pay their respective Shares of Maintenance Costs incurred by the Maintenance Party, in accordance with the applicable Maintenance Cost Allocation, within thirty (30) days after receiving from the Maintenance Party a written invoice for same with reasonable supporting documentation confirming the amount and prior payment thereof by the Maintenance Party.

(e)     With respect to each of the Shared Facilities, on or before [November 1] of each year, the applicable Maintenance Party shall prepare and deliver to the Benefited Owner(s) thereof, a written notice for the upcoming calendar year (the "Projection Notice") setting forth (1) the Maintenance Party's reasonable estimate of the Maintenance Costs expected to be incurred by during the upcoming calendar year based on a detailed budget (collectively, the "Projections") of Maintenance Costs, with an explanation as to increases anticipated from the prior year's operations and (2) the Maintenance Cost Allocation applicable to each Benefited Owner based on such Projections. If the Maintenance Party incurs material unbudgeted Maintenance Costs, then it shall have the right, not more than once each calendar year, except in the case of an Emergency which will not be limited in frequency of collection, to deliver a mid-year Projection Notice with updated Projections to each Benefited Owner, who in turn may audit such Projection Notice. If the Maintenance Party follows the foregoing procedures, then it may require each of the Benefited Owners to pay for Maintenance Costs in equal monthly installments equal to one-twelfth (1/12) of such Benefited Owner's Maintenance Cost Allocation of the Projections (as updated in accordance with this Agreement); and in such event the Maintenance Party shall deliver to the Benefited Owners a detailed reconciliation of the Projections and the actual Maintenance Costs incurred by the Maintenance Party (together with reasonable supporting documentation) not later than March 1 of the next following calendar year. If Subject to the Benefitted Parties right to audit: if the reconciliation confirms that the monthly installment payments paid by a Benefited Owner is less than the Benefited Owner's Maintenance Cost Allocation of the Maintenance Costs actually incurred by the Maintenance Party in the preceding calendar year, then the Benefited Owner shall pay the difference to the Maintenance Party within thirty (30) days after receiving the reconciliation; and if the reconciliation confirms that the monthly installment payments paid by a Benefited Owner exceed the Benefited Owner's Maintenance Cost Allocation of the Maintenance Costs actually incurred by the Maintenance Party in the preceding calendar year, then the Maintenance Party shall pay such excess, with interest at the Interest Rate, to the Benefited Owner within ten (10) days after completing the reconciliation. The reconciliation and amount of Maintenance Costs shall be subject to review and audit by the Benefited Parties, upon notice to the Maintenance Party not later than sixty (60) days after receiving the proposed reconciliation from the Maintenance Party. Each Maintenance Party shall keep detailed records of all Maintenance Costs, including detailed receipts, invoices and payment records, for at least three (3) years after the close of the calendar year in which the Maintenance Costs are incurred.

5.     Operations and Maintenance; Compliance with Unity of Use Agreement.

(a)     Subject to terms and conditions of Section 4 concerning the Maintenance of Shared Facilities, each Owner covenants and agrees that it and its Permittees shall use, develop, occupy and Maintain its Property, at such Owner's sole cost and expense, in accordance with the Operating Standard. Without limiting the foregoing but subject to Unavoidable Delays, each Owner shall be responsible for Maintaining, cleaning, keeping free from debris, removing snow and ice from (as it relates to surface areas which involve pedestrian or vehicular traffic) and otherwise keeping in as first-class condition and repair and in as required for compliance with the Operating Standard and all applicable Legal Requirements: (i) its respective Lot and the Buildings and other improvements located thereon from time to time; (ii) the sidewalks, walkways, driveways, parking areas and other exterior pedestrian areas and vehicular areas located on or immediately adjacent to such Owner's Lot; (iii) the landscaping

11

located on such Owner's Lot; (iv) the lighting located on or serving such Owner's Lot; and (v) areas and facilities within such Owner's Lot over which another Owner has easement rights pursuant to this Agreement. Each Owner acknowledges and agrees that the Entire Project is intended to be a first class medical/educational/office real estate project and that the operation and Maintenance of each Property in accordance with the Operating Standard benefits the Entire Project and is essential to each other Owner.

(b)    No Owner shall permit any excessive light, noise, odor, vibration or other condition that, under the circumstances, is inconsistent with the Operating Standard or constitutes a nuisance under common law, to exist upon or emanate from the Property owned by such Owner. This Section 5(b) shall not limit or apply to any condition existing at the Effective Date that would otherwise be subject to this Section 5(b), or the construction or reconstruction or Maintenance activities undertaken by or on behalf of any Owner on its Lot in accordance with the Operating Standard and the terms and conditions of this Agreement, provided that such Owner shall take all reasonable measures to mitigate the adverse impacts caused by such activities to each other affected Lot.

(c)    No Owner shall permit or suffer the recordation or filing against its any Lot or any other portion of the Entire Project, other than such Owner's Lot, of any mechanics', materialmen's or other enforcement lien arising by reason of any work performed or materials ordered by or on behalf of such Owner or the Permittees of its Lot. If any such lien is filed or recorded, then the responsible Owner shall, not later than thirty (30) days after the filing or recordation thereof, remove or release such lien of record or bond over the enforcement of such lien in accordance with applicable Legal Requirements.

(d)    Each Owner, at its sole cost and expense and without reimbursement or contribution from any other Owner (as Maintenance Costs or otherwise) shall pay prior to delinquency all taxes, assessments, levies and other charges imposed by any governmental authority upon the Property owned by such Owner, subject to its right of contest provided in this Agreement

(e)    Each Owner covenants and agrees that it and its Permittees shall use, develop, occupy and Maintain its Lot and the Buildings and other improvements located thereon from time to time in compliance with the Unity of Use Agreement, so long as the Unity of Use Agreement remains in effect and applies to the applicable Lot. Notwithstanding the foregoing or anything herein to the contrary, if the "Zoning Permit/Use Registration Permit" identified in the Unity of Use Agreement is revoked, rescinded or determined to be invalid (by appeal or otherwise) and as a consequence thereof one or more of the Lots comprising the Project Parcel fails to comply with applicable zoning and/or subdivision Legal Requirements, then:

(f)    The Owners shall take such action and execute such instruments to address the noncompliance as the [New College Lot Owner] reasonably determines to be appropriate to cure, eliminate or address the noncompliance, which actions may include (without limitation) (w) appealing any decision, judgment or other determination resulting in the revocation, rescission or invalidity of such Zoning Permit/Use Registration Permit, (x) reapplication for an appropriate Zoning Permit/Use Registration Permit and, if applicable, readjustment of the lot lines of the Lots as necessary or appropriate to obtain such Zoning Permit/Use Registration Permit, (y) submission of all or any of the Lots to the Pennsylvania Uniform Condominium Act, 68 Pa. C.S. §3101 et seq., the recordation of a condominium declaration wherein the affected Lots comprise separate units, and the creation of a governing board or owners' association in accordance with the requirement of such Act, and/or (z) seeking variances and other required approvals from the City of Philadelphia and other applicable

12

~~governmental agencies so that each Lot complies with applicable Legal Requirements concerning zoning, land use and subdivision matters.~~

~~(2)     Each Owner hereby irrevocably and unconditionally appoints the [New College Lot Owner] as its agent and attorney to act in its stead, and hereby irrevocably and unconditionally grants to the [New College Lot Owner] the unlimited power of attorney, to take all actions on its behalf and to execute and deliver on its behalf any and all applications, agreements and other instruments that the [New College Lot Owner] deems to be necessary or appropriate to cure, eliminate or address the noncompliance, including (without limitation) any one or more of the actions described in clause (1) above. The appointment and grant of power of attorney pursuant to this clause (2) are irrevocable and unconditional and coupled with the interest of each Owner in the Project Parcel.~~

~~(3)     All costs and expenses arising from the revocation, rescission or invalidity of the Zoning Permit/Use Registration Permit, including (without limitation) any fines or penalties for noncompliance and all costs and expenses that are incurred by the New College Lot Owner and any other Owner in connection with clause (1) above (including, without limitation, any transfer taxes and filing fees), shall be borne exclusively by the North/South Tower Lot Owner and the HUH Lot Owner. The North/South Tower Lot Owner and the HUH Lot Owner, jointly and severally, shall indemnify and hold harmless each other Owner, and shall upon written request defend each other Owner with counsel satisfactory to such other Owner, from and against any and all Claims that arise from the revocation, rescission or invalidity of the Zoning Permit/Use Registration Permit.~~

~~(e)     Further, notwithstanding anything herein or in the Unity of Use Agreement to the contrary, with the prior written approval of the [New College Lot Owner] and not otherwise, any Owner may seek and obtain a variance or rezoning of its Lot so that such Lot complies on a stand-alone basis with applicable zoning, land use and subdivision Legal Requirements, and in such event the applicable Lot shall cease to be subject to the Unity of Use Agreement, provided, however, that such action shall not directly or indirectly create or increase any noncompliance (lawful or otherwise) under applicable Legal Requirements of any other Lot nor directly or indirectly limit or restrict the use or development of any other Lot, unless the Owner of such other Lot expressly consents in writing to such action~~ Intentionally omitted[14]

6.     <u>Insurance; Indemnity</u>.

(a)     <u>Insurance</u>.[15] Each Owner, at its sole cost and expense and without reimbursement or contribution from any other Owner (as Maintenance Costs or otherwise), shall obtain and maintain at all times, the insurance required to be maintained by it pursuant to <u>Exhibit D</u> attached hereto and made a part.

(b)     <u>Indemnification</u>. Subject to Section 6(c), each Owner covenants and agrees to indemnify, defend (with counsel reasonably acceptable to the other Owner(s)) and hold harmless the other Owners, and such Owners' Permittees, officers, employees, direct and indirect owners, from and against any and all Claims for injury to persons or damage to property to the extent not to due to the negligence or misconduct of the indemnified party and to the extent caused by the indemnifying party arising from (i) any use, occupancy, act, occurrence or condition on or about such indemnifying Owner's Property, (ii) from the use or enjoyment of any Shared Facility or other easement rights created hereunder by such Owner or its Permittees, (iii) any activity, work, or thing done, permitted or suffered by such indemnifying Owner, its agents,

[14] NTD: Unity of Use is a separate and independent document

[15] NTD: The insurance requirements here and in Exhibit D should be reconciled with the Master Lease, as Paladin entities will be paying all of it anyhow .

contractors or employees in or about the Project Parcel or due to any other negligent act or omission of such indemnifying Owner, its agents, contractors or employees, or (iv) from such Owner's failure to perform its obligations under this Agreement. This Section 6(b) shall not apply to any damage to property arising from any Benefitted Owners' actions on the Providing Owner's Lot. This Section 6(b) shall survive termination or expiration of this Agreement.

        (c)    Indemnification Protocol.[16] Whenever any claim arises for indemnification under this Lease, the party seeking indemnification (in each such case, the "Indemnified Party") must notify the party or parties from whom indemnification is being sought (in each such case, the "Indemnifying Party") of such claim ("Claim") in writing promptly and in no case later than ten (10) Business Days after such Indemnified Party has actual knowledge of the facts constituting the basis for such claim. Each Indemnified Party will also so notify the Indemnifying Party promptly and in no case later than fifteen (15) days after the Indemnified Party has actual knowledge of the commencement of any legal proceedings with respect to any such claim. The failure of any Indemnified Party to give timely notice hereunder shall not affect rights to indemnification hereunder, except to the extent that the Indemnifying Party has been damaged by such failure. Such notice will specify all facts known to such Indemnified Party giving rise to the indemnification sought and the amount or an estimate of the amount of the obligation or liability arising from such indemnifying event. If any lawsuit or enforcement action is filed by a third party against any Indemnified Party, written notice thereof shall be given to the Indemnifying Party as promptly as practicable (and in any event within fifteen (15) days after the service of the citation or summons). The failure of any Indemnified Party to give timely notice hereunder shall not affect rights to indemnification hereunder, except to the extent that the Indemnifying Party has been damaged by such failure. After such notice, the Indemnifying Party shall at its own cost, risk and expense, (i) take control of the defense and investigation of such lawsuit or action, and (ii) employ and engage legal counsel of its own choice, but, in any event, reasonably acceptable to the Indemnified Party, to handle and defend the same. The Indemnifying Party shall not, without the written consent of the Indemnified Party, which shall not be unreasonably withheld, conditioned or delayed, settle or compromise any Claim or consent to the entry of any judgment which does not include an unconditional written release by the claimant or plaintiff of the Indemnified Party from all liability in respect of such Claim, or settle or compromise any Claim if the settlement imposes equitable remedies or material obligations on the Indemnified Party other than financial obligations for which such Indemnified Party will be indemnified hereunder. No Claim which is being defended in good faith by the Indemnifying Party in accordance with the terms of this Agreement shall be settled or compromised by the Indemnified Party without the written consent of the Indemnifying Party, which consent shall not be unreasonably withheld. If the Indemnifying Party fails to assume the defense of such lawsuit or action within thirty (30) days after receipt of the claim notice, the Indemnified Party against which such lawsuit or action has been asserted will (upon delivering notice to such effect to the Indemnifying Party) have the right to undertake, at the Indemnifying Party's cost and expense, the defense, compromise or settlement of such lawsuit or action on behalf of and for the account and risk of the Indemnifying Party; provided, however, that such lawsuit or action shall not be compromised or settled without the written consent of the Indemnifying Party, which consent shall not be unreasonably withheld, conditioned or delayed. If the Indemnified Party settles or compromises such lawsuit or action without the prior written consent of the Indemnifying Party, the Indemnifying Party will bear no liability hereunder for or with respect to such lawsuit or action. In the event either party assumes the defense of a particular lawsuit or action in the manner contemplated above, the party assuming such defense will keep the other party reasonably informed of the progress of any such defense, compromise or settlement. The indemnification obligations of Owners under this Section shall survive the expiration of the term, or the termination, of this Agreement.

---

[16] NTD: This is paragraph 11.3.d of the Master Lease

(d)    (c) Mutual Release and Waivers of Recovery. Each Owner hereby releases and discharges each other Owner and the Permittees of such other Owner's Lot from any responsibility, right of recovery or claim (including, without limitation, any claims for contribution or indemnity), for that portion of any loss or damage paid or reimbursed by any fire, extended coverage or other property insurance policy maintained by the releasing party (or, if greater, the insurance proceeds that would be available if the releasing party maintained all insurance required of it hereunder), no matter how such loss or damage is caused (whether by negligence or otherwise). Any fire, extended coverage or property insurance policy maintained by any Owner with respect to its Property shall contain (by endorsement or otherwise) a waiver of subrogation provision or endorsement in favor of each other Owner and its Permittees or, in the event that such provision is unavailable, then the applicable Owner shall obtain the express written approval and consent of their respective insurers to the terms of this Lease.

7.    Alterations.

(a)    Subject to the other provisions of this Section 7, each Owner may, at any time and from time to time, at such Owner's sole cost and expense, make additions, alterations, deletions from or changes in the improvements located within such Owner's Property (collectively, "Alterations"), and in connection therewith such Owner may relocate[17] Shared Facilities located upon its Property (subject to the conditions set forth in Section 3(b)).

(b)    Any Owner making Alterations (or demolishing or redeveloping improvements as contemplated in subsection (c) below) shall comply with the Operating Standard. To the extent reasonably practicable, in such a manner as to minimize any noise, interference or vibration, dust, debris or other condition that would disturb or interfere with the use, occupancy or conduct of business of any other Property.

(c)    If an Owner undertakes Alterations which are reasonably expected to cost more than [50%] of the fair market value of its Property, or if the improvements on any Lot are damaged or destroyed by fire or other casualty to an extent greater than [50%] of the replacement cost of the improvements and the applicable Owner elects to restore or replace the affected improvements, then in either such event, to the extent reasonably practicable without material increase in cost, the applicable Alterations, restorations and replacement work shall be designed and performed (subject to Section 8 below) in a manner that eliminates (if reasonably practicable) or reduces the affected Property's use of and reliance on Shared Utility Facilities, Existing Encroachments and Support Elements. Following completion of the applicable Alterations, restorations or replacement, if such Property no longer uses or relies on the Shared Utilities, Existing Encroachments or Support Elements (as the case may be), then the applicable Owner shall cease to be a Benefited Owner of the applicable easements created by Article 2 of this Agreement and the Owner's Maintenance Cost Allocation with respect to such easement shall be zero (0%).

8.    Damage.

(a)    If any Building or other improvements upon any Lot is damaged by fire or other casualty, then the affected Building or other improvements shall, at the election of the Owner of the Lot upon which such improvements are located, be repaired and restored as promptly as is reasonably possible by the Owner such Lot at its sole cost and expense (subject to the right of such Owner to make Alterations in accordance with Section 7). If such Owner elects not to perform such repair and restoration, such Owner shall promptly remove all damaged

---

[17] NTD: Owner's may relocate Shared Services, but there is no express provision to expand them. Does Paladin need express expansion rights

15

improvements and debris, leaving such Owner's Lot in a safe and slightly condition in accordance with the Operating Standard.

(b)     Notwithstanding the foregoing or anything in this Agreement to the contrary, if any Shared Utility Facilities, the Shared Loading Dock or Shared ~~Parking Facilities~~Interior Accessway, are damaged or destroyed by fire or other casualty, then the Providing Owner on whose Lot such facilities are located shall ~~be unconditionally obligated to repair and restore the affected facilities at its sole cost and expense (without regard to the amount of available insurance proceeds, if any) to the~~, expeditiously, diligently and in a good and workmanlike manner, cause such damage or destruction to be remedied or repaired to a condition that is substantially similar to, or better than, the condition that existed immediately prior to such damage by restoring the Property to substantially the same design and configuration and as good (or better) condition that existed immediately prior to ~~the applicable fair or other casualty~~such damage or destruction (subject to the Owner's right to relocate Shared Facilities and to make Alterations in accordance with ~~this Agreement. The repairs and restoration required under this Section 8(b) shall be commenced by the responsible Owner not later than thirty (30) days after the occurrence of the fire or other casualty and thereafter shall be diligently prosecuted to completion in accordance with the Operating Standard~~Section 7 above) and to a value which shall not be less than the value of the Premises prior to such fire or other casualty (the "Restoration"). The Restoration shall be commenced only after all required permits, authorizations and approvals shall have been obtained by the applicable Providing Owner or Providing Owner's Permittees from the appropriate governmental authority, at its own cost and expense. If such Providing Owner shall fail or neglect to restore the Premises with reasonable diligence, or having so commenced such Restoration, shall fail to complete the same with reasonable diligence, then the Benefited Owner shall have the right, but not the obligation, to complete such Restoration at Benefited Owner's cost and expense and the cost thereof shall be payable within thirty (30) days after Providing Owner's receipt of Benefited Owner's written demand therefor, together with interest thereon from the date of demand until paid. The obligations of Providing Owner under this Section 8 shall survive the expiration or earlier termination of this Agreement.

9.     Reasonable Rules and Regulations.

The exercise of all rights, responsibilities and obligations granted hereunder with regard to easements or other rights of access over any Owner's Property, shall in all cases not interfere with the conduct of business at the Lot and be exercised in a commercially reasonable manner in accordance with the Operating Standard and shall be subject, to any reasonable rules and regulations and other standards which may be established from time to time by the Providing Owner (which may include, without limitation, limiting access to specifically authorized Persons and closing areas burdened by easements for access hereunder at night and on weekends and holidays, for security reasons, and/or to avoid the implied public dedication of such areas), provided, however, that no such closing will prevent or materially interfere with the use and operation of the Entire Project in accordance with the Operating Standard.

10.     Emergencies.

In the event of the occurrence of an Emergency, there shall immediately and automatically (a) be provided prompt notice to all Owners, (b) be granted by and between all parties hereto such temporary easements as are reasonably necessary for the preservation of life and property, all such emergency easements to terminate automatically with the expiration of the Emergency in connection with which they arose, and (b̶c) be temporarily suspended any rights and easements granted hereunder which are necessary to be suspended for the preservation of life

16

and property, all of such rights and easements to return to full force and effect automatically with the expiration of the Emergency in connection with which they arose.

11.    Remedies; Self-Help.

(a)    ~~The~~Except for consequential, punitive, or speculative damages, the Owners shall be entitled to all rights and remedies available at law or in equity including, without limitation, specific enforcement and injunctions, to enforce this Agreement.

(b)    ~~In addition, if any Owner obtains judgment from a court of competent jurisdiction for money damages from any other Owner for any breach or other amounts due under this Agreement, and if such judgment is not paid in full within ten (10) days after becoming final and unappealable, then the Owner in whose favor the judgment is issued shall have the right to impose, record, maintain a lien (an "Enforcement Lien") against the defaulting Owner's Property in the amount due, plus interest at the Interest Rate in accordance with Section 11(d). Enforcement Liens may be foreclosed in the same manner as mortgage liens are foreclosed in the jurisdiction where the Project Parcel is located. Enforcement Liens shall arise from the date of recording, shall be subject and subordinate to all existing Mortgages against the defaulting Owner's Property as of the date the Enforcement Lien is recorded, and shall be superior to all Mortgages and other liens against the defaulting Owner's Property that are recorded after the date of recordation of the Enforcement Lien.~~ Intentionally omitted.[18]

(c)    The failure of any Owner to perform any of its obligations hereunder shall entitle the intended Benefited Owner to undertake the performance of such obligations if, after the expiration of thirty (30) days following the giving of notice as provided in Section 14 hereof (except in the case of an Emergency, in which event no notice shall be required), the Owner so obligated shall have failed to effect such cure (or, if effecting such cure would take in excess of thirty (30) days, shall have failed to commence such cure or shall have failed to proceed thereafter diligently to complete such cure); and such Owner does not contest the validity of such failure to perform its obligations,[19] and the cost of effecting such cure shall be paid by the party so obligated within thirty (30) days of a presentation of a bill therefor.

(d)    If any amount payable by one Owner to another Owner under this Agreement is not paid within five (5) business days after the date due, the amount due shall bear interest at the Interest Rate until paid in full by the delinquent Owner.

(e)    In no event shall the failure of any Owner to perform any of its obligations hereunder entitle any other Owner to terminate this Agreement or any easements created hereunder because of such failure.

12.    Attorney's Fees.

Any Owner may enforce this Agreement by appropriate action and, in the event that it prevails in such action, shall recover as part of its cost a reasonable attorney's fee from such parties against whom such enforcement was successfully sought and obtained.

13.    Notices.[20]

___

[18] NTD: Under Pennsylvania law, the judgment against the Owner will automatically be a lien against the Owner and on its real property.
[19] NTD: No self help if allegation of default is being contested.
[20] NTD: The notice provision is not the same as the Master Lease. Should be reconciled.

(a)    Notice whenever provided for herein shall be in writing. Any ~~notice, demand, consent, approval, election or other communication which any Owner shall desire or be required to give pursuant to the provision of this Agreement shall be in writing, shall be sent by electronic mail, certified U. S. mail return receipt requested, or by~~ required or permitted to be delivered hereunder shall be addressed as below, and shall be deemed received when (i) personally delivered (including delivery via email, provided that such email specifically states that it is intended to be notice) or (ii) one (1) Business Day after being deposited with a nationally recognized overnight courier service ~~(such as FedEx), and shall be deemed to have been given, (a) if by mail as aforesaid, two (2) days after the time two counterparts of the same are deposited in the United States mail, one by certified mail return receipt requested, and the other by regular mail, with postage prepaid, enclosed in securely sealed envelopes (b) if by courier as aforesaid, one (1) business day after deposit with such courier service, and (c) if by electronic mail, on the same business day as transmission with proof of transmission on or before 5:00pm Philadelphia time, addressed in either case as follows, or to such other address as such Owner, as the case may be, may hereafter designate by notice given pursuant to this Section 14,~~ charges prepaid, and properly addressed for next-day delivery. Either party may change its address for notice from time to time by delivery of at least three (3) Business Days prior written notice of such change to the other party hereto in the manner prescribed herein, and with a copy, given as aforesaid, to any Mortgagee of a Property or any portion of a Property electing to receive a copy as provided in Section 14, below:

       (i)    If to the New College Lot Owner:

                         _____
                         _____
                         _____
                         Email: _____

                         PAHH New College MOB, LLC
                         c/o Harrison Street Real Estate, LLC
                         444 West Lake Street, Suite 2100
                         Chicago, IL 60606
                         Attn: Mark Burkemper
                         Email: mburkemper@harrisonst.com

           With required copies to:

                         _____
                         _____
                         _____
                         Email: _____

                         DLA Piper LLP (US)
                         444 West Lake Street, Suite 900
                         Chicago, IL 60606
                         Attn: David Sickle
                         Email: david.sickle@dlapiper.com

       (ii)    If to the Feinstein/Bobst Lot Owner:

                         _____
                         _____
                         _____

18

~~Email:~~ _____

PAHH Feinstein MOB, LLC
c/o Harrison Street Real Estate, LLC
444 West Lake Street, Suite 2100
Chicago, IL 60606
Attn: Mark Burkemper
Email: mburkemper@harrisonst.com

With required copies to:

~~Email:~~ _____

DLA Piper LLP (US)
444 West Lake Street, Suite 900
Chicago, IL 60606
Attn: David Sickle
Email: david.sickle@dlapiper.com

(iii)   If to the North/South Tower Lot Owner:

~~Email:~~ _____

~~With required copies to:~~

~~Email:~~ _____

Broad Street Healthcare Properties, LLC
222 N. Sepulveda Blvd., Suite 900
El Segundo, CA 90245
Attention: Joel Freedman and General Counsel
Email: jfreedman@pldn.com and
sattestatova@pldn.com

(iv)   If to the HUH Lot Owner:

~~Email:~~ _____

~~With required copies to:~~

19

~~Email:~~

Broad Street Healthcare Properties III, LLC
222 N. Sepulveda Blvd., Suite 900
El Segundo, CA 90245
Attention: Joel Freedman and General Counsel
Email: jfreedman@pldn.com and
sattestatova@pldn.com

14.    Rights of Mortgagees. This Agreement shall be superior to any and all mortgages now existing or hereafter recorded against any or all of the Project Parcel. ~~[NOTE: EXISTING MORTGAGEES MUST CONSENT AND SUBORDINATE TO THIS AGREEMENT.] Notwithstanding the foregoing or anything herein to the contrary, any Enforcement Lien arising under this Agreement shall be subject and subordinate to any and all Mortgages that are recorded prior to the recordation of the Enforcement Lien.~~ In addition to the notices to the Owners under Section 13, each Mortgagee of any Lot shall also be entitled to receive copies of all notices given to the Owner of such Lot, provided that such Mortgagee notifies each other Owner in writing that it is the holder of a Mortgage and specifies in such notice the address(es) to which notices to such Mortgagee shall be sent.

15.    Estoppels. Each Owner shall, at any time and from time to time, within ten (10) business days after any other Owner's request or that of any Mortgagee of the other Owner, execute, acknowledge and deliver to the requesting Owner a ~~written instrument in recordable form~~ statement in writing (the "Estoppel Certificate"), certifying (i) that this Agreement is unmodified and in full force and effect ~~and has not been modified, supplemented or amended (or~~ (or if there have been any modifications~~, supplements or amendments~~, that it~~the~~ Agreement is in full force and effect as modified~~, supplemented or amended~~ and stating ~~such~~the modifications~~, supplements and amendments~~); (ii) the dates to which Maintenance Costs and any other charges arising hereunder, have been paid; (iii) the amount of any prepaid amounts or credits due Owner, if any; and (iv) whether or not~~, to the best of the Owner's knowledge,~~ all conditions under the Agreement to be performed by the requesting Owner prior thereto have been satisfied and whether or not the requesting Owner is then in default in the performance of any covenant, agreement or condition contained in this Agreement and specifying each, if any, unsatisfied condition and each, if any, default of which the certifying Owner may have knowledge~~; and (v) any other fact or condition related to the Agreement or the certifying Owner reasonably requested~~. Any certification delivered pursuant to the provisions of this Section shall be intended to be relied upon by the requesting Owner and any mortgagee or prospective mortgagee or purchaser of the Property or of any interest therein.

16.    Arbitration by ~~Project Engineer~~ Arbitrator.[21] The Owners acknowledge and agree that certain disputes that may arise under this Agreement are not suitable for resolution by a court or jury and would be best resolved by the Project Engineer. Accordingly, all disputes that arise from time to time between two (2) or more Owners with respect to the Arbitration Matters expressly identified herein (and not other matters, unless the affected Owners expressly agree in writing) shall be resolved exclusively by the procedures set forth in this Section.

(a)    If any dispute arises between two (2) or more Owners with respect to any Arbitration Matter, then the affected Owners shall endeavor in good faith to resolve such

---

[21] NTD: Paladin wants the arbitrator to be a regulatory specialist. For non-regulatory related issues, baseball arbitration may be more effective as it leaves the argument in the hands of each disputant, not the arbitrator.

PHIL1 6683117v.13

dispute within thirty (30) days after notice thereof specifically initiating this Section 16 (the "Mediation Notice") is given by any Owner to the other affected Owners. At the request of any Owner, the Project Engineer may be consulted and enlisted to mediate the dispute during such thirty (30) day.

(b)      If the dispute is not resolved and documented by written agreement within thirty (30) days after the date of the Mediation Notice (as such period may be extended by mutual written agreement of the affected Owners), then at the written request of any affected Owner (the "Arbitration Notice") the dispute shall be resolved by the following fast track arbitration process ("Fast Track Arbitration"), the result of which shall be binding upon all affected Owners.

(c)      The parties agree that the arbitrator for any Fast Track Arbitration shall be the Project Engineer. In the event the then-current Project Engineer is unable or unwilling to serve as arbitrator consistent with the Fast Track Arbitration schedule set forth in this Section, then the arbitrator for the Fast Track Arbitration shall be a substitute Project Engineer selected by the ~~New College~~North/South Tower Lot Owner.

(d)      Not later than forty-five (45) days after the Project Engineer is engaged as arbitrator pursuant to clause (i), the arbitrator shall hold a hearing in a format designated by the arbitrator to resolve each of the issues identified by the parties. The Fast Track Arbitration hearing shall take place at a location agreed upon by the parties. If the parties cannot agree, the arbitrator shall designate a location in Philadelphia Pennsylvania.

(e)      At least seven (7) days prior to the hearing, each party shall submit to the arbitrator and each other party, such documents and other information that the arbitrator requests, including (to the extent requested by the arbitrator) (A) all documents, affidavits, and other information on which such party intends to rely in any oral or written presentation to the arbitrator; (B) a proposed specific ruling on each Arbitration Matter to be resolved; (C) a written memorandum or brief in support of such party's proposed rulings, provided that the memorandum or brief shall not exceed five (5) pages or, if applicable, such other page limit that is specified by the arbitrator.

(f)      Except as otherwise provided in this Section 16 or as otherwise agreed in writing by the parties or as determined by the arbitrator, the Fast Track Arbitration proceeding shall be conducted by the arbitrator in accordance with the then current American Arbitration Association Construction Industry Arbitration Rules using the Fast Track Procedures, but shall not be administered by the American Arbitration Association.

(g)      The arbitrator shall rule on each disputed Arbitration Matter as soon as reasonably possible after the initiation of the Fast Track Arbitration, and, in any event, within fourteen (14) days following completion of the -hearing. The decision of the arbitrator shall be issued in writing. The arbitrator shall be paid its customary and reasonable fees plus expenses (including, if applicable, the fees and expenses of any attorneys or other advisors that the arbitrator deems necessary or appropriate to conduct the Fast Track Arbitration). The arbitrator shall award to the prevailing party its reasonable attorneys' fees, costs, expert witness costs, and expenses (including the arbitrator fees and expenses), incurred in the Fast Track Arbitration proceeding. For purposes of the award of attorneys' fees, costs, expert witness costs, and expenses, the arbitrator shall designate a party as the prevailing party if, in the judgment of the arbitrator, there is a prevailing party.

21

(h)    The rulings of the arbitrator and the award of fees and expenses in any arbitration and Fast Track Arbitration shall be final, binding, non-reviewable, and non-appealable, and may be entered as a final judgment in any court having jurisdiction..

17.    Easement or License.

The parties hereto understand that all of the Shared Facilities with respect to which they have purported to grant easements hereunder constitute ~~fixtures and are, therefore~~ real property. If, however, any of said equipment or Facilities at any time are not fixtures or real property, but are personal property, then the purported grant of an easement with respect thereto shall constitute the issuance of a license with respect thereto, ~~irrevocable and~~ subject to all of the other provisions of this Agreement applicable thereto.

18.    Burdens and Benefits; Successors and Assigns.

Each easement granted hereunder by any Owner shall burden all or part of such Owner's Property as described in the granting clause for such easement and shall benefit and be appurtenant to the Property or Properties expressly stated to be benefited thereby in such granting clause, and no other property. All the covenants, easements and other provisions of this Agreement (including, but not limited to, the benefits and burdens hereof) shall run with the land with respect to the Project Parcel and shall be binding upon, inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns. Upon the transfer of ownership of any area subject to any easement hereunder, and the assumption by the transferee of the transferor's obligations under this Agreement, thereafter, the transferor thereof shall have no liability hereunder for any defaults hereunder occurring after the date of such transfer so long as the transferee of such ownership assumes such default liability in writing.

19.    Amendment.

(a)    This Agreement and the easements hereby granted and the other provisions hereof shall become effective upon the date of recordation of this Agreement in the Recorder's Office.

(b)    This Agreement may be amended only by a written instrument which shall be recorded in the Recorder's Office, and except as provided to the contrary in Section 19(c), shall be executed by:

(1)    All the Owners; and

(2)    Each Mortgagee under an existing Mortgage of record as of the date that such amendment is recorded.

Except as specifically provided above, the consent of no other Permittee of any Lot shall be required for any amendment of this Agreement to become effective, and except as specifically provided above.

(c)    Notwithstanding Section 19(b), any specific easement created by this Agreement may be amended by a written instrument executed by the Providing Owner and the Benefited Owner(s) of such easement and their respective Mortgagees, without requiring the consent or approval of any other Owner that is not a Benefited Owner of such easement or any Mortgagee of such other Owner's Lot.

20.    Term of this Agreement.

22

Subject to the provisions of Sections 3(b), 7 and 8 hereof (regarding the termination of specific easements granted hereunder) and this Section 20, this Agreement shall remain in full force and effect for a period of ninety (90) years from the date hereof, and thereafter it shall be deemed to have been automatically renewed for successive terms of ten (10) years, except that at any time, and from time to time, this Agreement may be terminated by a unanimous written agreement of all Owners and Mortgagees. Such termination shall be effected by recordation in the Recorder's Office of a document executed by all of the Owners, stating that this Agreement shall be terminated as provided therein, which Agreement shall be joined in by each Mortgagee. ~~If any of the~~ The options, privileges, covenants or rights created by this Agreement ~~would otherwise be unlawful or void for violation of (i) the rule against perpetuities or some analogous statutory provisions, (ii) the rule restricting restraints on alienation, or (iii) any other statutory or common law rules imposing time limits, then such provision shall continue only until twenty-one (21) years after the death of the survivor of the now living lawful descendants of Her Royal Highness Queen Elizabeth II, the Queen of England~~ continue for as long as permitted by applicable law.[22]

21.    Severability.

If any provision of this Agreement shall be conclusively determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement shall not be affected thereby.

22.    Construction.

This Agreement shall be reasonably construed so as to carry out the intention to confer a commercially useable right of enjoyment on any grantee hereunder, without unreasonably burdening the Property subject to such easements.

23.    Unavoidable Delays.

If and to the extent that any Owner is delayed in the performance of any obligation hereunder, other than obligations that are to be or could be satisfied by the payment of money (including, without limitation, paying for Maintenance Costs and obtaining insurance required hereunder), and such delay constitutes Unavoidable Delay, then the time for performance of such obligation shall be extended for so long as the Unavoidable Delay continues, provided, however, that (i) such Owner notifies each other Owner in writing not later than five (5) business days after first becoming aware of the Unavoidable Delay, and (ii) such Owner uses all commercially reasonable efforts to minimize the extent and duration of the Unavoidable Delay and to expedite its performance of the applicable obligation.

24.    Limitation of Liability.

Notwithstanding anything contained herein to the contrary, each Owner agrees that no other Owner, nor any partner, officer, shareholder or director thereof, shall have any personal liability with respect to any provisions of this Agreement, and such Owner shall look solely to the estate and Property of such other Owner in the Entire Project for the collection of any judgment or the enforcement of any other judicial process requiring the payment or expenditure of money by such other Owner, in the event of any default by such other Owner with respect to any of such other Owner's obligations under this Agreement. No other assets of such other Owner or of any partner, officer, director or shareholder of such other Owner shall be subject to levy, execution or other judicial process for the satisfaction of an Owner's claims, and in the event a judgment is obtained against an Owner, the judgment docket shall be so noted. The

_____

[22] NTD: Pennsylvania abolished the rule against perpetuities so the last sentence is unnecessary.

PHIL 6683117v.11

provisions of this Section 24 shall inure to the benefit of each Owner's heirs, representatives, successors and assigns and their respective principals

25.    Not a Public Dedication.

Nothing herein contained shall be deemed to be a gift or dedication of any portion of the Property or portion thereof to the general public, or for any public use or purpose whatsoever. Except as herein specifically provided, no right, privileges or immunities of any Party hereto shall inure to the benefit of any third party Person, nor shall any third party Person be deemed to be a beneficiary of any of the provisions contained herein.

*[Signature on the Next Page]* [22]

---

[22] NTD: The document needs to be revised to be in recordable form and a CA notary used for the non-portfolio owners (this comment has already been relayed to DLA).

PHIL 6683117v.13

24

IN WITNESS WHEREOF, the parties here to, intending to be legally bound hereby, have duly executed and sealed this Agreement effective the date first above written.

25

IN WITNESS WHEREOF, the Owners have set forth its hands and seals as of the day and year first above written.

BROAD STREET HEALTHCARE PROPERTIES, LLC

_____(SEAL)
By:
Its:

[ACKNOWLEDGEMENT ON NEXT PAGE]

[Signature page to Reciprocal Easement and Operating Agreement Broad Street Healthcare Properties, LLC]

PHIL1 6683112v.3

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGEMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF _____ )

COUNTY OF _____ )

On _____ , 2017, before me, _____

    *Date* _____          *(Here Insert Name and Title Of the Officer)*

personally appeared _____

                                     *Name(s) of Signers)*

_____

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

                          I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

                          WITNESS my hand and official seal.

                          Signature _____

                                  *Signature of Notary Public*

                          ***Place Notary Seal Above***

[Acknowledgement page to Reciprocal Easement and Operating Agreement – Broad Street Healthcare Properties, LLC]

PHH 6683117v.3

BROAD STREET HEALTHCARE PROPERTIES III, LLC

_____(SEAL)
By:
Its:

[ACKNOWLEDGEMENT ON NEXT PAGE]

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGEMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF _____ )

COUNTY OF _____ )

On _____ 2017, before me _____

     *Date*                              *(Here Insert Name and Title Of the Officer)*

personally appeared _____

                                  *Name(s) of Signers)*

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument, the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

                                  I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

                                  WITNESS my hand and official seal.

                                  Signature _____

                                        *Signature of Notary Public*

                                  *Place Notary Seal Above*

[Acknowledgment page to Reciprocal Easement and Operating Agreement – Broad Street Healthcare Properties III, LLC]

PAHH NEW COLLEGE ~~LOT OWNER:~~ MOB, LLC

_____ ~~a(n)~~ _____

_____ (SEAL)
By: Stephen M. Gordon
Its: Authorized Signatory

By: _____
Name: _____
By: _____

STATE OF _____ :
                                                                      SS
COUNTY OF _____ :


On this, the ____ day of _____, 201__, before me, the undersigned Notary Public, personally appeared _____, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument, and acknowledge that she executed the same in the capacity therein stated for the purposes therein contained.


IN WITNESS WHEREOF, I hereunto set my hand and official seal.


_____
Notary Public
My Commission Expires:


[Signature page to Reciprocal Easement and Operating Agreement –
PAHH New College MOB, LLC]

PAHH FEINSTEIN/~~BOBST LOT OWNER:~~ MOB, LLC:

_____ ~~a(n)~~ _____

_____ (SEAL)
By: Stephen M. Gordon
Its: Authorized Signatory

~~By:~~ _____
~~Name:~~ _____
~~It:~~ _____

~~NORTH/SOUTH TOWER LOT OWNER:~~

_____ ~~a(n)~~ _____

~~By:~~ _____
~~Name:~~ _____
~~It:~~ _____

~~HUH LOT OWNER:~~

_____ ~~a(n)~~ _____
_____

~~By:~~ _____
~~Name:~~ _____
~~Its:~~ _____

~~COMMONWEALTH OF PENNSYLVANIA~~

_____ ~~SS~~

STATE OF _____ :
                                 : SS
COUNTY OF ~~PHILADELPHIA~~ _____ :

    On ~~this,~~ the – __ day of _____, ~~201__,~~ before me, ~~a notary public in and for the notary public in and for the Commonwealth and County aforesaid,~~ the undersigned ~~officer~~Notary Public, personally appeared _____, ~~who acknowledged himself/herself to be~~ _____ ~~of~~ _____ ~~and that  he as such~~ _____ ~~executed the foregoing instrument~~ _____, known to me (or

[Signature page to Reciprocal Easement and Operating Agreement – PAHH Feinsten MOB, LLC]

satisfactorily proven) to be the person whose name is subscribed to the within instrument, and acknowledge that she executed the same in the capacity therein stated for the purposes therein contained.


IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

_____

_____
Notary Public
My Commission Expires:

COMMONWEALTH OF PENNSYLVANIA                    :

                                                :    SS

COUNTY OF PHILADELPHIA                          :


On the ____ day of _____, ____, before me, a notary public in and for the notary public in and for the Commonwealth and County aforesaid, the undersigned officer, personally appeared _____, who acknowledged himself/herself to be _____ of _____, and that he as such _____ executed the foregoing instrument for the purposes therein contained.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

_____

_____
Notary Public
My Commission Expires:

COMMONWEALTH OF PENNSYLVANIA                    :

                                                :    SS

COUNTY OF PHILADELPHIA                          :

On the ____ day of _____, ____, before me, a notary public in and for the notary public in and for the Commonwealth and County aforesaid, the undersigned officer, personally appeared _____ who acknowledged himself/herself to be _____ of _____, and that he as such _____ executed the foregoing instrument for the purposes therein contained.

PHIL1 6683117v3

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

_____

Notary Public
My Commission Expires:

COMMONWEALTH OF PENNSYLVANIA          :

                                      :    SS

COUNTY OF PHILADELPHIA                :

On the _____ day of _____, before me, a notary public in and for the
notary public in and for the Commonwealth and County aforesaid, the undersigned officer,
personally appeared _____, who acknowledged himself/herself to be
_____ of _____, and that he, as such,
_____ executed the foregoing instrument for the purposes therein contained.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

_____

Notary Public
My Commission Expires:

EXHIBIT A-1

NEW COLLEGE LOT

EXHIBIT A-2

FEINSTEIN/BOBST LOT

EXHIBIT A-3

NORTH/SOUTH TOWER LOT

EXHIBIT A-4

HUH LOT "D"

EXHIBIT A-5

HUH LOT "E"

EXHIBIT B

PROJECT PARCEL

EXHIBIT C

SITE PLAN

# EXHIBIT D

## INSURANCE REQUIREMENTS [subject to confirmation/revision by insurance advisors][1]

(a)    Policies to Maintain. Each Owner, at its sole cost and expense, shall ~~obtain~~provide and ~~maintain~~keep in force (or cause to ~~be maintained~~keep in force) during the entire term of this Agreement, insurance providing at least the following coverages, pursuant to formal policies of insurance complying with the requirements set forth below:

~~(1)    Property/Casualty Insurance. Each Owner shall (i) keep its Property insured against damage by fire, acts of domestic and foreign terrorism, any type of wind (including named storms) and such other hazards covered by a special form or all-risk insurance policy (A) for the full insurable value thereof on a replacement cost basis without any coinsurance (B) with a deductible not to exceed $25,000 except for wind, named storm and earthquake, which shall provide for a deductible of no more than five percent (5%) of the total insurable value of the applicable Property, (C) containing Law & Ordinance coverage if any Building or other improvements or the use of the Property shall at any time constitute legal non-conforming structures or uses, including coverage for loss to the undamaged portion of the Building (with a limit equal to replacement cost), the cost of demolition and the increased costs of construction and (D) shall maintain boiler and machinery insurance and such other property insurance as reasonably required to comply with the Operating Standard (and in any event providing adequate coverage over the obligation of the Owner thereof). Administrative Agent. The full insurable value of the Buildings and other improvements on any Lot shall be re-determined from time to time (but not more frequently than once in any twelve (12) calendar months) at the request of any Owner, in consultation with the Project Engineer.~~

~~(2)    Business Interruption Insurance. Each Owner shall maintain business interruption insurance, including rental income loss and extra expense, (A) covering all perils required herein to be insured against, (B) covering a period of restoration of eighteen (18) months and containing an extended period of indemnity endorsement which provides that after the physical loss to the Building and other improvements on such Owner's Lot has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of twelve (12) months from the date that the loss is repaired or the affected Building is replaced and operation are resumed, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period and (C) in an amount equal to one hundred percent (100%) of the projected gross revenue (less non-continuing expenses) from the such Owner's Property as reasonably determined by such Owner.~~

(i)    ~~(3)    Liability Insurance. Each Owner shall maintain (i) commercial general liability insurance (with no exclusion for acts of domestic and foreign terrorism) with respect to its Property for both personal injury, bodily injury to or death of a person and for property damage providing for limits of liability not less than $3,000,000 per occurrence and $5,000,000 in the aggregate, (ii) umbrella liability coverage providing excess coverage up to $10,000,000 on terms consistent with the general liability insurance required hereinabove, and (iii) other liability insurance as reasonably required in accordance with the Operating Standard, including but not limited to auto liability coverage. Such liability insurance shall contain a broad form endorsement and include without limitation coverage for premises and operations, collapse, explosion and underground hazard, products/completed operations, blanket contractual liability insurance specifically covering but not limited to, for each Owner, the contractual obligations of such Owner pursuant to this Agreement, broad form property damage, personal injury, independent contractors, owner's protective liability coverage, employees as additional~~

[1] NTD: Should be same as in Master Lease.

PHL1 6683147v.4.3

~~insureds, cross-liability coverage. The fellow-employee liability exclusion is to be deleted. In addition, each Owner maintain and cause its tenant and subtenants to maintain (A) worker's compensation insurance and employer's liability insurance covering employees at the applicable Property (in the amounts not less than the amounts required by applicable Legal Requirements), (B) Employer's liability insurance, (C) professional liability insurance, and (D) at any time while any Shared Parking Facilities or other parking areas are being operated, the Owner of the Lot(s) upon which such parking areas are being operated shall maintain Garage Keepers Legal Liability insurance insuring against claims for liability arising out of the operation of such parking areas and any improvements thereon, with a combined single limit for each occurrence of not less than One Million Dollars ($1,000,000.00)~~ commercial general liability insurance and professional liability insurance, (including owner's protective liability coverage on operations of the Permittees, and/or their respective independent contractors engaged in construction, personal injury, and blanket contractual liability insurance) with a limit for each occurrence not less than (i) $3,000,000 as to any current of future tenant ("Tenant") and Drexel University as a subtenant ("Drexel Subtenant") or (ii) $1,000,000 as to any current or future subtenant ("Subtenant"), and to have general aggregate limits of not less than (i) $5,000,000 as to Tenant and [Drexel Subtenant], or (ii) $2,000,000 as to any other Subtenant, for each policy year, protecting and indemnifying Permittees against all claims for damages to person or property or for loss of life or of property occurring upon, in, or about the Lot, written on a claims made or occurrence basis. Such coverage shall contain endorsements: (i) deleting any liquor liability exclusion (if alcohol is sold on the Lot); (ii) including cross-liability; and (iii) waiving the insurer's rights of subrogation against Owner for events of which Owner is not, but Tenant and/or Subtenant is, covered; provided however, that with regard to the requirements of waiver of subrogation against Owner, Tenant shall utilize its best efforts to obtain such waiver in any insurance policy procured by Tenant or the Subtenant, and if it cannot do so, Owner shall have the right to procure, at Tenant's expense, an insurance policy containing such waiver if it can do so at the same or better price and on substantially the same terms and conditions;

~~(4)    Builder's Risk. At all times during which structural construction, repairs or alterations are being made with respect to any Building or other improvements located on a Lot, and only if the property or liability coverage forms do not otherwise apply, the applicable Owner shall also maintain (A) commercial general liability and umbrella liability insurance covering claims related to the construction, repairs or alterations being made which are not covered by or under the terms or provisions of the commercial general liability and umbrella liability insurance policy required in Paragraph 3 above, and (B) the insurance provided for in Paragraph 1 above written in a so-called builder's risk completed value form (1) on a non-reporting basis, (2) against all risks insured against pursuant to Paragraph 1, and (3) including permission to occupy the applicable Property.~~

~~(5)    Policy Requirements. All insurance policies shall be obtained under valid and enforceable policies. The liability insurance policies required hereunder shall be endorsed to name each other Owner and its Mortgagee(s) as additional insureds, without contribution, under a standard non-contributory mortgagee clause. The proceeds of insurance paid on account of any damage or destruction to any Property shall be paid to the applicable Owner or its Mortgagee, to be applied as provided in Section 8(b) of this Agreement.~~

~~(i)    All such insurance policies and endorsements shall be fully paid for by the applicable Owner and shall be issued by such insurance companies authorized to do business in the state in which the Project Parcel is located, with a rating of "A-X" or better as established by Best's Rating Guide or "A-" or better by Standard & Poor's Ratings Group.~~

~~(ii)    Each property insurance policy shall provide that such policy may not be canceled except upon thirty (30) days' prior written notice (except ten (10) days' prior notice for~~

2

~~non-renewal or cancellation due to non-payment of premium) to each other Owner and that no act or negligence of the Owner, or any other insured under the policy, or failure to comply with the provisions of any policy which might otherwise result in a forfeiture of the insurance or any part thereof , shall in any way affect the validity or enforceability of the insurance insofar as the additional insured are concerned. If available using commercially reasonable efforts, each liability insurance policy shall provide that such policy may not be canceled except upon thirty (30) days' prior written notice (except ten (10) days' prior notice for non-renewal or cancellation due to non-payment of premium) to each other Owner (provided that if the insurer will not or cannot provide the required notice, Borrower shall be obligated to provide such notice)~~ property insurance on the Lot and all installations, additions and improvements which may now or hereafter be erected thereon against "Special Causes" of loss or damage in an amount sufficient to prevent Permittees from becoming co-insurers and in any event, including loss or damage from earthquakes and windstorm, in an amount not less than one hundred percent (100%) of the actual replacement value thereof (i.e., including the cost of debris removal) as determined by Owner in its reasonable discretion from time to time consistent with coverages for similarly situated properties. Such coverage shall contain an agreed amount endorsement reasonably acceptable to Owner;

(iii) business interruption insurance with coverage in a face amount of not less than the aggregate amount, for a period of twelve (12) months following the insured-against peril, of 100% of all rent (which includes all impositions and other amounts specified in such rent), if any, to be paid by Tenant; such coverage shall contain an agreed amount endorsement acceptable to Owner;

(iv) workers' compensation insurance (including employers' liability insurance), with a waiver of subrogation satisfactory to Owner in its reasonable discretion, covering all persons employed on the Lot to the extent required by applicable laws and requirements of the state in which the Lot is located, including, without limitation, during the course of work to the Lot;

(v) mechanical breakdown insurance, if applicable, in an amount not less than one hundred percent (100%) of the actual replacement value thereof and of any improvements in which any such boiler is located (including the cost of debris removal but excluding foundations and excavations) as determined by Owner in its reasonable discretion from time to time;

(vi) if sprinkler systems are located in the Building, sprinkler leakage insurance in amounts approved by Owner in its reasonable discretion;

(vii) flood insurance (if the Lot is located in whole or in part within a special flood hazard area as designated by any department or agency of the United States government having jurisdiction);

(viii) equipment coverage and elevator liability coverage, if applicable, in amounts approved by Owner in its reasonable discretion;

A. motor vehicle liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence, including umbrella coverage, of One Million and No/100 Dollars ($1,000,000) (if applicable);

(ix) [Garage keeper's Legal Liability Coverage, as reasonably required by Owner];

(x)     if during the term of this Agreement, Tenant or the Lot are covered by general liability, professional liability, patient healthcare professional malpractice or other liability insurance on a "claims made" basis, Owner shall cause, whether directly or indirectly, Tenant to procure and maintain, "tail" insurance coverage, with such coverage limits and such deductible amounts as shall be reasonably acceptable to Owner for general liability, professional liability, patient healthcare professional malpractice or other liability claims reported after the termination of Tenant's applicable lease or expiration of the claims made policy, but concerning services provided during the term of such applicable lease. Tenant shall provide Owner with a certificate evidencing that such insurance coverage is in effect for a period of no less than one (1) year subsequent to the termination of the applicable lease no later than ninety (90) days prior to the termination of the applicable lease;

(xi)     such other or additional insurance as Owner or Mortgagee may reasonably require upon not less than thirty (30) days prior written notice to Tenant.

(b)     Adjustment. The loss under all insurance policies insuring against property damage to the Buildings shall be payable to Mortgagee (or, if Mortgagee or requires, a financial institution acting as insurance depository) or, if there is none, to Owner who shall be named as an additional loss payee.

(c)     Insurance Company Requirements. All of the above-mentioned insurance policies and/or certificates evidencing such policies shall be written by insurance companies: (i) rated "A:VIII" or better in "Best's Insurance Guide" and at least "A" by Standard & Poor's Ratings Group; and (ii) authorized to do business in the state where the Lot is located.

(d)     Evidence of Insurance, Renewal. Owner shall renew such insurance and shall deliver to the other Owners certificates of insurance, promptly following the renewal of any such policy of insurance.

(e)     No Violation of Policies. Owner shall not permit any Permittee to violate, in any material respect, any of the conditions of any of the said policies of insurance.

(f)     (iii) Blanket policies shall be permitted in satisfaction of the insurance required to be maintained by any Owner only if (i) any such policy shall in all other respects comply with the requirements of this Agreement and (ii) such policy is approved in advance in writing by the other Owners Blanket/Umbrella. The insurance required by this Agreement, at the option of each Owner, may be effected by blanket and/or umbrella policies issued to Owner and covering the Lot, provided that the policies otherwise comply with the provisions of this Agreement and allocate to the different properties comprising the Lot the specified coverage, without possibility of reduction or coinsurance by reason of, or damage to, any other Lot.

(iv)     Each insurance policy required to be maintained hereunder shall include a waiver of subrogation in favor of each other Owner and its Permittees, with respect to any insured loss or damage caused by the negligence or other fault of the applicable other Owners or their respective Permittees.

(6)     Any Owner may obtain additional insurance that is not expressly required hereunder; provided, however, that (i) such policies shall not be invalidated by the releases and waivers of subrogation contained in this Agreement, and (ii) no such party shall be entitled to exercise its right to maintain insurance coverage in such a way as to decrease the amount that may be realized under any insurance policy required hereunder.

4

(7)    Upon the renewal or replacement of existing coverage or the obtaining of additional coverage and at any other time upon the request of the other party, each Owner shall provide to the other duplicate copies of the policies of insurance or certificates of its insurance agent, certifying to the other party the insurance coverage required, and including photocopies of all policies certified to by such agent to be true and correct, together with a receipted bill reflecting full payment of all premiums for such policies for at least one year.

(8)    The coverages, amounts and forms of insurance required hereunder shall be updated from time by mutual agreement of the Owners (provided that if the Owners disagree, then the reasonable determination of the New College 1 ot Owner shall govern).

(g)    Complying with Mortgagee. Each owner shall comply (and shall cause its Permittees to comply) with the insurance requirements of any Mortgagee under the Mortgage or any other loan document in connection therewith if they (a) require any insurance coverage not otherwise required under this Agreement or (b) provide for more stringent coverages, terms, conditions or provisions with respect to insurance coverage required under this Agreement for coverage customarily maintained on similar facilities in Philadelphia, Pennsylvania.

(h)    Waiver of Subrogation. No Owner shall be liable to another Owner or to any insurance company (by way of subrogation or otherwise) insuring the other party for any loss or damage to any building, structure or other tangible property, or any resulting loss of income, or losses under worker's compensation laws and benefits, even though such loss or damage might have been occasioned by the negligence of such party, its agents or employees if, and to the extent, that any such loss or damage is covered by insurance benefiting the party suffering such loss or damage or was required to be covered by insurance pursuant to this Agreement.

PHIL1 6683117v.13

Document comparison by Workshare Compare on Friday, December 15, 2017
7:58:56 PM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://PHL1DMS5/PHIL1/6683117/1 |
| Description | #6683117v1<PHIL1> - Paladin: Reciprocal Easement and Operating Agreement for HSRE Project Liberty |
| Document 2 ID | interwovenSite://PHL1DMS5/PHIL1/6683117/3 |
| Description | #6683117v3<PHIL1> - Paladin: Reciprocal Easement and Operating Agreement for HSRE Project Liberty |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 352 |
| Deletions | 208 |
| Moved from | 9 |
| Moved to | 9 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 578 |