# EXHIBIT N

## AGREEMENT OF SALE AND PURCHASE

THIS AGREEMENT OF SALE AND PURCHASE ("**Agreement**") made this 24th day of February, 2021 (the "**Effective Date**") by and among **PAHH NEW COLLEGE MOB, LLC** ("**PAHH COLLEGE LLC**"), PAHH FEINSTEIN MOB, LLC ("**PAHH FEINSTEIN LLC**"), PAHH BROAD STREET MOB, LLC, ("**PAHH BROAD STREET LLC**"), and **PAHH WOOD STREET GARAGE, LLC** ("**PAHH WOOD, LLC**", WITH PAHH COLLEGE LLC, PAHH FEINSTEIN LLC, and PAHH BROAD STREET LLC, collectively the "**Seller**"), each a limited liability company organized under the laws of the State of Delaware and having an address c/o Harrison Street Real Estate Capital, LLC, 444 W. Lake Street, Suite 2100 Chicago, IL 60606, and IS 245 NORTH 15TH STREET LLC ("**IS 245 LLC**"), IS PAHH OZ LLC ("**IS PAHH LLC**"), IS3 WEST GIRARD, LLC ("**IS3 LLC**") and IS BBFB LLC, each a limited liability company organized under the laws of the Commonwealth of Pennsylvania and having an address at c/o Iron Stone Real Estate Partners, 2929 Walnut Street, Suite 1540, Philadelphia, PA 19104 (with **IS 245 LLC, IS PAHH LLC, IS3 LLC, and IS BBFB LLC, collectively the "Purchaser**"), and together with Seller, the "**Parties**" and each, a "**Party**").

In consideration of the mutual promises, covenants, and agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser agree as follows:

## ARTICLE I
## DEFINITIONS

**Section 1.1    Definitions.**  For purposes of this Agreement, the following capitalized terms have the meanings set forth in this Section 1.1:

"**216 Real Property**" means that certain parcel of real property located at 216-220 N. Broad Street, Philadelphia, PA, commonly known as the Bobst Building and the Feinstein Building, as more particularly described by the legal description attached hereto and made a part hereof as **Exhibit A-1**, together with all of Seller's right, title and interest, if any, in and to all improvements, fixtures located thereon, and all rights, privileges and recorded easements appurtenant to any of the foregoing.

"**231 Real Property**" means that certain parcel of real property located at 231 N. Broad Street, Philadelphia, PA, commonly known as 231 N. Broad Street, as more particularly described by the legal description attached hereto and made a part hereof as **Exhibit A-2**, together with all of Seller's right, title and interest, if any, in and to all improvements, fixtures located thereon, and all rights, privileges and recorded easements appurtenant to any of the foregoing.

"**245 Real Property**" means that certain parcel of real property located at 245 N. 15th Street, Philadelphia, PA, commonly known as the New College Building, as more particularly described by the legal description attached hereto and made a part hereof as **Exhibit A-3**, together with all of Seller's right, title and interest, if any, in and to all improvements, fixtures located thereon, and all rights, privileges and recorded easements appurtenant to any of the foregoing.

"**1450 Real Property**" means that certain parcel of real property located at 1450 Wood Street Philadelphia, PA, commonly known as the Wood Street Garage, as more particularly described by the legal description attached hereto and made a part hereof as **Exhibit A-4**, together with all of Seller's right, title and interest, if any, in and to all improvements, fixtures located thereon, and all rights, privileges and recorded easements appurtenant to any of the foregoing.

"**Assignment**" has the meaning ascribed to such term in Section 10.3(b) and shall be in the form attached hereto as **Exhibit C**.

"**Authorities**" means the various federal, state and local governmental and quasi-governmental bodies or agencies having jurisdiction over the Real Property, or any portion thereof.

"**Bulk Sales Laws**" means, individually and collectively, the following laws and statutes of the Commonwealth of Pennsylvania, as amended and recodified from time to time: (i) 43 P.S. § 788.3, (ii) 69 P.S. § 529, (iii) 72 P.S. 1403; (iv) 72 P.S. § 7240, and (v) 72 P.S. § 7321.1.

"**Bulk Sales Clearance Certificate**" has the meaning ascribed to such term in Section 15.1.

"**Business Day**" means any day other than a Saturday, Sunday and any day which is a legal holiday under the laws of the Commonwealth of Pennsylvania or is a day on which banking institutions located in such state are authorized or required by law or other governmental action to close.

"**Certificate as to Foreign Status**" has the meaning ascribed to such term in Section 10.3(c) and shall be in the form attached as **Exhibit B**.

"**Certifying Person**" has the meaning ascribed to such term in Section 4.3(a).

"**Closing**" means the consummation of the purchase and sale of the Property contemplated by this Agreement, as provided for in Article X.

"**Closing Date**" means the date on which the Closing of the transactions contemplated hereby actually occurs.

"**Closing Statement**" has the meaning ascribed to such term in Section 10.4(a).

"**Code**" has the meaning ascribed to such term in Section 4.3.

"**Deed**" has the meaning ascribed to such term in Section 10.3(a).

"**Documents**" has the meaning ascribed to such term in Section 5.2(a).

"**Drexel**" means Drexel University, as successor by merger to Philadelphia Health & Education Corporation.

"**Earnest Money Deposit**" has the meaning ascribed to such term in Section 4.1.

IS_012499

"**Environmental Laws**" means each and every federal, state, county and municipal statute, ordinance, rule, regulation, code, order, requirement, directive, binding written interpretation and binding written policy pertaining to Hazardous Substances issued by any Authorities and in effect as of the Effective Date with respect to or which otherwise pertains to or affects the Real Property, or any portion thereof, the use, ownership, occupancy or operation of the Real Property, or any portion thereof, or Purchaser, and as same have been amended, modified or supplemented from time to time prior to the Effective Date, including but not limited to the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. § 9601 et seq.), the Hazardous Substances Transportation Act (49 U.S.C. § 1802 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.), as amended by the Hazardous and Solid Wastes Amendments of 1984, the Water Pollution Control Act (33 U.S.C. § 1251 et seq.), the Safe Drinking Water Act (42 U.S.C. § 300f et seq.), the Clean Water Act (33 U.S.C. § 1321 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.), the Solid Waste Disposal Act (42 U.S.C. § 6901 et seq.), the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.), the Emergency Planning and Community Right-to-Know Act of 1986 (42 U.S.C. § 11001 et seq.), the Radon Gas and Indoor Air Quality Research Act of 1986 (42 U.S.C. § 7401 et seq.), the National Environmental Policy Act (42 U.S.C. § 4321 et seq.), the Superfund Amendment Reauthorization Act of 1986 (42 U.S.C. § 9601 et seq.), the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.) (collectively, the "**Environmental Statutes**"), and any and all rules and regulations which have become effective prior to the Effective Date under any and all of the Environmental Statutes.

"**Escrow Agent**" means Certified Abstract Company, Inc., as agent for the Title Company, or another licensed title insurance agency doing business in the Commonwealth of Pennsylvania and mutually approved by Seller and Purchaser.

"**Escrowed Funds**" has the meaning ascribed to such term in Section 17.1(b).

"**Existing Survey**" means Seller's existing survey of the Real Property as made available electronically to Purchaser for its review.

"**Governmental Regulations**" means all statutes, ordinances, rules and regulations of the Authorities applicable to Seller or the use or operation of the Real Property or any portion thereof.

"**Hazardous Substances**" means (a) asbestos, radon gas and urea formaldehyde foam insulation, (b) any solid, liquid, gaseous or thermal contaminant, including smoke vapor, soot, fumes, acids, alkalis, chemicals, petroleum products or byproducts, polychlorinated biphenyls, phosphates, lead or other heavy metals and chlorine, (c) any solid or liquid waste (including, without limitation, hazardous waste), hazardous air pollutant, hazardous substance, hazardous chemical substance and mixture, toxic substance, pollutant, pollution, regulated substance and contaminant, and (d) any other chemical, material or substance, the use or presence of which, or exposure to the use or presence of which, is prohibited, limited or regulated by any Environmental Laws.

"**Identified Terrorist**" has the meaning ascribed to such term in Section 8.2(e).

"**Investigations**" has the meaning ascribed to such term in Section 5.1.

IS_012500

"**Leases**" means, those certain leases described on **Exhibit D**, but expressly excluding the Master Lease.

"**Licenses and Permits**" means, collectively, any and all current and unexpired licenses, permits, certificates of occupancy, approvals, dedications, subdivision maps and entitlements now or hereafter issued, approved or granted by the Authorities in connection with the Real Property, together with all renewals and modifications thereof.

"**Master Lease**" means, collectively, those certain leases by and between Seller and St. Christopher's Healthcare, each dated January 11, 2018, and any of Seller's rights and interests in and to such leases.

"**Master Lease Guarantor**" means, collectively, Philadelphia Academic Health Holdings, LLC, a Delaware limited liability company and Paladin Healthcare Capital, LLC, a Delaware limited liability company.

"**Master Lease Guaranty**" means, collectively, those Guaranties of Lease, between the entities comprising Seller and the entities comprising Master Lease Guarantor, each dated January 11, 2018.

"**Master Tenant**" or "St. Christopher's Healthcare" means St. Christopher's Healthcare, LLC, a Delaware limited liability company.

"**Objection Date**" has the meaning ascribed to such terms in Section 6.2(b).

"**New Objection Date**" has the meaning ascribed to such term in Section 6.2(b).

"**New Title Objections**" has the meaning ascribed to such term in Section 6.2(b).

"**Permitted Exceptions**" has the meaning ascribed to such term in Section 6.2(a).

"**Permitted Outside Parties**" has the meaning ascribed to such term in Section 5.3(b).

"**Property**" has the meaning ascribed to such term in Section 2.1.

"**Proration Items**" has the meaning ascribed to such term in Section 10.4(a).

"**Purchase Price**" has the meaning ascribed to such term in Section 3.1.

"**Purchaser's Affiliates**" means any present or future: (i) shareholder, partner, member, manager or owner of Purchaser; (ii) entity that, directly or indirectly, controls, is controlled by or is under common control with Purchaser and (iii) the heirs, executors, administrators and personal or legal representatives of any or all of the foregoing.

"**Purchaser's Costs**" has the meaning ascribed to such term in Section 3.2.

"**Real Property**" means the 216 Real Property, the 231 Real Property, the 245 Real Property, and the 1450 Real Property, as each is more particularly described by the legal descriptions attached hereto and made a part hereof as **Exhibit A**, together with all of Seller's right, title and interest, if any, in and to all improvements, fixtures located thereon, and all rights, privileges and recorded easements appurtenant to any of the foregoing.

"**Scheduled Closing Date**" means the sixtieth (60th) day after the expiration of the Due Diligence Period (or, if such day is not a Business Day, then on the next following Business Day).

"**Seller's Affiliates**" means any past, present or future: (i) shareholder, partner, member, manager or owner of Seller; (ii) entity that, directly or indirectly, controls, is controlled by or is under common control with Seller and (iii) the heirs, executors, administrators and personal or legal representatives of any or all of the foregoing.

"**Tax**" means any federal, state, local or foreign taxes, charges, fees, duties, tariffs, levies or other assessments, including income, gross receipts, net proceeds, ad valorem, turnover, real property, personal property, sales, use, franchise, excise, value added, goods and services, license, payroll, unemployment, environmental, customs duties, capital stock, disability, stamp, user, transfer, fuel, excess profits, occupational and interest equalization, windfall profits, alternative or add-on minimum, estimated, registration, withholding, social security (or similar), or other Tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty, or addition thereto, whether disputed or not, together with any installments with respect thereto and any estimated payments or estimated taxes and whether disputed or not, including any liability for Taxes as a result of being a member of a consolidated, combined, unitary or aggregate group for any taxable period and any liability for Taxes of another person or entity pursuant to any document, agreement, contract or instrument, as a transferee or successor, or under Treasury Regulations Section 1.1502-6 or analogous state, local or foreign law or otherwise, and including any liability for abandoned or unclaimed property.

"**Tenants**" shall mean the tenants under the Leases.

"**Termination Surviving Obligations**" means the rights, liabilities and obligations set forth in any provisions of this Agreement which pursuant to their explicit terms survive any termination of this Agreement.

"**Title Affidavit**" has the meaning ascribed to such term in Section 6.2(f).

"**Title Company**" means Certified Abstract Company, Inc.

"**Title Defect**" has the meaning ascribed to such term in Section 6.3.

"**Title Objections**" has the meaning ascribed to such term in Section 6.2(b).

"**To Purchaser's Knowledge**" means the present actual (as opposed to constructive or imputed) knowledge solely of: (i) Andrew Eisenstein, (ii) Matthew Canno, and (iii) Jason Friedland. The individuals named above are named solely for the purpose of defining and narrowing the scope of Purchaser's knowledge and not for the purpose of imposing any liabilities on or creating any duties running from or imposed upon from such individuals to Seller, and in no event shall such individuals be personally liable for any representation made herein.

"**To Seller's Knowledge**" means the present actual (as opposed to constructive or imputed) knowledge, without any independent investigation or inquiry whatsoever solely of Brian Mutchler. The individual named above is named solely for the purpose of defining and narrowing the scope of Seller's knowledge and not for the purpose of imposing any liabilities on

IS_012502

or creating any duties running from or imposed upon such individuals to Purchaser, and in no event shall such individuals be personally liable for any representation made herein.

**Section 1.2    References: Exhibits and Schedules**.   Except as otherwise specifically indicated, all references in this Agreement to Articles or Sections refer to Articles or Sections of this Agreement, and all references to Exhibits or Schedules refer to Exhibits or Schedules attached hereto, all of which Exhibits and Schedules are incorporated into, and made a part of, this Agreement by reference. The words "herein," "hereof," "hereinafter" and words and phrases of similar import refer to this Agreement as a whole and not to any particular Section or Article.

## ARTICLE II
## AGREEMENT OF PURCHASE AND SALE

**Section 2.1    Agreement**.   Seller hereby agrees to sell, convey and assign to Purchaser, and Purchaser hereby agrees to purchase and accept from Seller, on the Closing Date and subject to the terms and conditions of this Agreement, all of the following (collectively, the "**Property**"):

(a)    the Real Property;

(b)    to the extent assignable, all of Seller's right, title and interest in and to the Licenses and Permits; and

(c)    to the extent assignable, all of Seller's right, title and interest in and to the following (collectively "**Other Property**"):  (a) all furniture, equipment, supplies (including fuel oil, if any) and other personal property owned by Seller and/or Seller's Affiliates and located at and used in connection with the use, operation or maintenance of the Real Property (the "**Personal Property**"); and (b) all intangible property owned by Seller arising from or used solely in connection with the ownership, use, operation or maintenance of the Real Property or the Personal Property, including: (i) all assignable warranties and guaranties issued to Seller in connection with the Property; (ii) the Licenses and Permits; (iii) all assignable trademarks and trade names relating to the Real Property; and (iv) all assignable or deliverable surveys, drawings, plans, specifications, diagrams, space finish plans, third-party reports, environmental assessments and other architectural or engineering work product relating to the Real Property. Seller acknowledges that the Personal Property specifically includes the following: (i) a new emergency generator for the Real Property that is currently located off-site, and which shall be located at the Real Property on the Closing Date; (ii) four (4) new elevators currently located at the Real Property; and (iii) a new evaporator coil, which shall be located at the Real Property on or prior to the Closing Date.

Specifically excluded from the transactions contemplated herein and the definition of the "Property" are: (i) all items of personalty, including without limitation such items that may be affixed or secured to any improvement located on the Real Property, owned by any Tenants or any person other than Seller; (ii) all interests in or claims under or in connection with Master Lease (and Seller hereby retains and any all claims, rights, and remedies against and otherwise with respect to the Master Lease and with respect to the Master Tenant or Master Lease Guarantor, and Seller makes no representations or warranties, and expressly disclaims any representations or warranties, with respect to the Master Lease, the Master Tenant thereunder, or anything related thereto); (iii) all claims, rights, interests and proceeds with respect to state or local Tax payments, refunds, and credits (including property Tax refunds and charity Tax

IS_012503

credits) related to the Real Property with respect to periods ending prior to the Closing Date, and the right to pursue appeals of same; (iv) all claims, causes of action, choses in action, rights of recovery, rights of set off and rights of recoupment of Seller and Seller's Affiliates with respect to periods prior to the Closing Date and any payments, awards or other proceeds resulting therefrom (collectively, the "**Seller Claims**"); and (v) the rights of Seller and Seller's Affiliates under this Agreement.

     **Section 2.2**    **Indivisible Economic Package**.  Purchaser has no right to purchase, and Seller has no obligation to sell, less than all of the Property, it being the express agreement and understanding of Purchaser and Seller that, as a material inducement to Seller and Purchaser to enter into this Agreement, Purchaser has agreed to purchase, and Seller has agreed to sell, all of the Property, subject to and in accordance with the terms and conditions hereof.  In addition, the parties acknowledge that this Agreement is intended to effect the transfer of title to all of properties constituting the Property, and notwithstanding any reference in this Agreement to any singular property, building or parcel or any other similar reference implying that this Agreement relates to only one property, this Agreement shall be construed to relate to the transfer of title to all of the properties constituting the Property (so that, provisions relating to the delivery of the Deed, and so forth, shall be construed to require a separate deed for each such property rather than a single deed, and the like), but all other references to the Property shall be deemed to refer to all of the Property in the aggregate.

# ARTICLE III
# CONSIDERATION

     **Section 3.1**    **Purchase Price**.  The purchase price for the Property (the "**Purchase Price**") shall be Thirty Six Million Dollars ($36,000,000) in lawful currency of the United States of America, payable as provided in Section 3.2.  The allocation of the Purchase Price between (i) the 216 Real Property (and Other Property related thereto) (ii) the 231 Real Property (and Other Property related thereto), (iii) the 245 Real Property (and Other Property related thereto) and (iv) the 1450 Real Property (and Other Property thereto), shall be agreed to by the parties prior to the expiration of the Due Diligence Period.

     **Section 3.2**    **Method of Payment of Purchase Price**.  No later than noon Eastern time on the Scheduled Closing Date, Purchaser shall pay the Purchase Price (less the Earnest Money Deposit which for sake of clarity shall be credited to the Purchase Price), together with all other costs and amounts to be paid by Purchaser at the Closing pursuant to the terms of this Agreement ("**Purchaser's Costs**"), by Federal Reserve wire transfer of immediately available funds to the account of Escrow Agent.  Escrow Agent, following authorization by the parties prior to 4:00 p.m. Eastern Time on the Scheduled Closing Date, shall (i) pay to Seller by Federal Reserve wire transfer of immediately available funds to an account designated by Seller, the Purchase Price, less any costs or other amounts to be paid by Seller at Closing pursuant to the terms of this Agreement, (ii) pay to the appropriate payees out of the proceeds of Closing payable to Seller all costs and other amounts to be paid by Seller at Closing pursuant to the terms of this Agreement, and (iii) pay Purchaser's Costs to the appropriate payees at Closing pursuant to the terms of this Agreement.

IS_012504

## ARTICLE IV
## EARNEST MONEY DEPOSIT
## AND ESCROW INSTRUCTIONS

**Section 4.1** **The Earnest Money Deposit**. Within two (2) Business Days after the Effective Date, Purchaser shall deposit with Escrow Agent, by Federal Reserve wire transfer of immediately available funds, the sum of One Million Dollars ($1,000,000) as an earnest money deposit on account of the Purchase Price (and together with all interest earned thereon, if any, the "**Earnest Money Deposit**."

**Section 4.2** **Escrow Instructions**. The Earnest Money Deposit shall be held in escrow by the Escrow Agent in an interest-bearing account, in accordance with the provisions of Article XVII. All interest that accrues on the Earnest Money Deposit shall be deemed to be part of and included in the Earnest Money Deposit for all purposes under this Agreement, including but not limited to that such interest shall be applied against the Purchase Price.

**Section 4.3** **Designation of Certifying Person**. In order to ensure compliance with the requirements of Section 6045 of the Internal Revenue Code of 1986, as amended (the "**Code**"), and any related reporting requirements of the Code, the Parties agree as follows:

(a) Provided the Escrow Agent shall execute a statement in writing (in form and substance reasonably acceptable to the Parties) pursuant to which it agrees to assume all responsibilities for information reporting required under Section 6045(e) of the Code, Seller and Purchaser shall designate the Escrow Agent as the person to be responsible for all information reporting under Section 6045(e) of the Code (the "**Certifying Person**"). If the Escrow Agent refuses to execute a statement pursuant to which it agrees to be the Certifying Person, Seller and Purchaser shall agree to appoint another third party as the Certifying Person.

(b) Seller and Purchaser each hereby agree:

(i) to provide to the Certifying Person all information and certifications regarding such party, as reasonably requested by the Certifying Person or otherwise required to be provided by a party to the transaction described herein under Section 6045 of the Code; and

(ii) to provide to the Certifying Person such party's taxpayer identification number and a statement (on Internal Revenue Service Form W-9 or an acceptable substitute form, or on any other form that the applicable current or future Code sections and regulations might require and/or any form reasonably requested by the Certifying Person), signed under penalties of perjury, stating that the taxpayer identification number supplied by such party to the Certifying Person is correct.

IS_012505

## ARTICLE V
## ACCESS TO THE REAL PROPERTY

**Section 5.1    Due Diligence Period.**   Commencing on the Effective Date, Purchaser shall have sixty (60) days (the "**Due Diligence Period**") to investigate the Property and to satisfy itself with respect to the condition of the Property, the surrounding areas, and the feasibility of purchasing the Property (collectively the "**Investigations**").   Subject to the provisions of Section 5.4, Purchaser shall have the right to enter upon and investigate any and all aspects of the Property it deems appropriate, and Seller agrees to reasonably cooperate with Purchaser in Purchaser's review and inspection of the Property. During the Due Diligence Period, Seller will provide Purchaser and Purchaser's agents with access to the Property for the purposes of conducting any and all testing, sampling and investigation that Purchaser deems appropriate with respect to the Property.   Notwithstanding anything to the contrary contained herein, Purchaser, its agents, contractors and employees shall not unreasonably interfere with the ongoing operation of the Property or the use and enjoyment of the Property by Seller and the Tenants.

In order to aid Purchaser in its Investigations of the Property, Seller, either prior to or within five (5) days after the Effective Date, shall deliver to Purchaser such information concerning the Property as may be reasonably requested by Purchaser and which Seller has in its possession, including, but not limited to, copies of all (i) existing environmental and other physical reports, including the Existing Survey, and (ii) other agreements and documents with respect to the Property (with the foregoing collectively, but subject to the provisions of 5.3, the "Documents").  Any new Documents obtained by Seller relating to the Property prior to Closing shall be delivered to Purchaser within three (3) Business Days of receipt by Seller.

**Section 5.2    Right of Termination.**   Purchaser shall have the right to send written notice to Seller that Purchaser elects to terminate this Agreement for any reason or no reason, on or before the expiration of the Due Diligence Period, in which event this Agreement shall be deemed to be terminated and of no further force or effect, and the parties hereto shall be relieved of all liabilities and obligations under this Agreement, except those which specifically survive termination, and the Earnest Money Deposit shall be returned to Purchaser.  If Purchaser does not provided timely notice of termination in accordance with the foregoing sentence, then (i) Purchaser shall have waived its right to terminate the Agreement under this Section 5.2, and (ii) the Earnest Money shall become non-refundable to Purchaser for any reason other than termination of the Agreement as a consequence of a default by Seller (including a material breach of any representation or warranty by Seller under this Agreement) and/or the failure of any other condition precedent to Purchaser's obligation to close under this Agreement; and if this Agreement is terminated as a result of Purchaser's failure to consummate Closing in accordance with the terms of this Agreement, then the entire Earnest Money Deposit shall be immediately paid to Seller.

**Section 5.3    Documents**.  Purchaser expressly acknowledges and agrees that Seller has only operated the Property for a short time, and has very limited information concerning the Property. Accordingly, the Documents provided by Seller for Purchaser's review are extremely limited and should not be relied by Purchaser without independent verification by Purchaser. In furtherance of the foregoing:

(a)    Purchaser and the Permitted Outside Parties have the right to review and inspect, at Purchaser's sole cost and expense, the Documents.  The Documents do not include

IS_012506

and Purchaser has not and shall not have the right to review or inspect Seller's proprietary materials, any third party's proprietary materials, any privileged materials, and/or materials not directly related to the leasing, maintenance and/or management of the Property, including, without limitation, Seller's internal memoranda, financial projections, budgets, appraisals, proposals for work not actually undertaken, engineering reports and studies, accounting and tax records (other than real property tax records) and similar elective, privileged or confidential information, or any documentation in any respect related to the Master Lease, the Master Tenant, the Master Lease Guaranty, or the Master Lease Guarantor (and any litigation related to the Master Lease the, Master Tenant, the Master Lease Guaranty, or the Master Lease Guarantor), or any documentation in any respect related to the Seller Claims.

(b)    Purchaser acknowledges that any and all of the Documents may be proprietary and confidential in nature and have been provided to Purchaser solely to assist Purchaser in determining the desirability of purchasing the Property in accordance with this Section 5.3(b) and Article XII. Purchaser agrees not to disclose the contents of the Documents or the results of the Investigations or any of the provisions, terms or conditions contained therein to any party outside of Purchaser's organization other than Purchaser's attorneys, partners, accountants, or lenders, consultants, equity participants, and/or other persons within Purchaser's organization, who have agreed to comply with the non-disclosure requirements of Article XII (collectively, for purposes of this Section 5.3(b), the "**Permitted Outside Parties**"). Purchaser further agrees that within its organization, and as to the Permitted Outside Parties, the Documents, the contents thereof and the results of the Investigations will be disclosed and exhibited only to those persons within Purchaser's organization or to those Permitted Outside Parties who are responsible for determining the desirability of Purchaser's acquisition of the Property or on a need-to-know basis in connection with Purchaser's acquisition of the Property.

(c)    Purchaser acknowledges that some of the Documents may have been prepared by third parties and may have been prepared prior to Seller's ownership of the Property. **PURCHASER HEREBY ACKNOWLEDGES THAT SELLER HAS NOT MADE AND DOES NOT MAKE ANY REPRESENTATION OR WARRANTY REGARDING THE TRUTH, ACCURACY OR COMPLETENESS OF THE DOCUMENTS. SELLER HAS NOT UNDERTAKEN ANY INDEPENDENT INVESTIGATION AS TO THE TRUTH, ACCURACY OR COMPLETENESS OF THE DOCUMENTS AND SELLER IS PROVIDING THE DOCUMENTS SOLELY AS AN ACCOMMODATION TO PURCHASER. THE PROVISIONS OF THIS SECTION 5.2 WILL EXPRESSLY SURVIVE THE TERMINATION OF THIS AGREEMENT OR THE CLOSING, AS THE CASE MAY BE.**

Section 5.4    **Entry Obligations**.

(a)    From and after the Effective Date, subject to the rights of Tenants, Purchaser, upon prior notice to Seller, may access the Real Property, during normal business hours. Purchaser agrees that in entering upon or examining the Real Property, Purchaser and the Permitted Outside Parties will not materially disturb the Tenants or materially interfere with the use of the Real Property pursuant to the Leases; materially interfere with the operation and maintenance of the Real Property; damage any part of the Real Property or any personal property owned or held by Tenants or any other person or entity; injure or otherwise cause bodily harm to Seller or Tenants, or to any of their respective agents, guests, invitees, contractors and employees, or to any other person or entity; or permit any liens to attach to the Real Property by

IS_012507

reason of the exercise of Purchaser's access rights under this Article V. Prior to any entry onto the Real Property, Purchaser will furnish or cause to be furnished to Seller evidence of, and will cause to be maintained and kept in effect, without expense to Seller, at all times that any entry is made upon the Real Property: (1) insurance against claims for personal injury (including death), and property damage, under a policy or policies of general public liability insurance of not less than $2,000,000 in respect to bodily injury (including death), and not less than $10,000,000 of excess liability insurance, naming Seller, its mortgagee, if any, and HSREP VI Holding, LLC as additional named insureds; and (2) adequate workers' compensation insurance in statutory limits to cover employees of Purchaser and any Permitted Outside Parties that plan to enter onto the Real Property. The policy described in clause (1) above shall be on an occurrence basis and not on a claims made basis and shall provide that such policy cannot be canceled without at least thirty (30) days prior written notice to Seller, and each policy shall be issued by a recognized, responsible insurance company licensed to do business in the Commonwealth of Pennsylvania with a deductible not to exceed $20,000. Proof of payment of the premium of each policy and an Accord evidence of insurance certificate shall also be delivered to Seller upon request by Seller. Purchaser shall not undertake any testing, sampling or other invasive or destructive investigations of the Property or any part thereof during any such access without Seller's prior written consent, in Seller's sole discretion. If any inspection or test disturbs or otherwise alters the condition of the Property, then Purchaser will promptly (and in any event within one Business Day) restore the Property to the same condition as existed before the inspection or test.

(b)       Purchaser hereby indemnifies, defends and holds Seller, Seller's Affiliates and their respective partners, agents, directors, managers, officers, employees, successors and assigns harmless from and against any and all liens, claims, causes of action, damages, liabilities, demands, suits, and obligations to third parties, together with all losses, penalties, costs and expenses (collectively the "**Losses**") relating to any of the foregoing (including but not limited to court costs and reasonable attorneys' fees and expenses), arising out of any access by Purchaser or any of the Permitted Outside Parties, whether prior to or after the date hereof, with respect to the Real Property or any violation of the provisions of this Article V, except, however, with respect to (i) the willful misconduct of Seller, and (ii) Losses arising from the mere discovery (and not exacerbation) of pre-existing defects. The provisions of this Section 5.4 will expressly survive the termination of this Agreement or the Closing, as the case may be.

**Section 5.5    Sale "As Is"** THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT HAVE BEEN NEGOTIATED BETWEEN SELLER AND PURCHASER. THIS AGREEMENT REFLECTS THE MUTUAL AGREEMENT OF SELLER AND PURCHASER, AND PURCHASER HAS HAD THE RIGHT AND OPPORTUNITY TO CONDUCT ITS OWN INDEPENDENT EXAMINATION OF THE PROPERTY. OTHER THAN THE MATTERS REPRESENTED IN SECTION 8.1 OR OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, PURCHASER HAS NOT RELIED UPON AND WILL NOT RELY UPON, EITHER DIRECTLY OR INDIRECTLY, ANY REPRESENTATION OR WARRANTY OF SELLER OR ANY OF SELLER'S AFFILIATES, AGENTS OR REPRESENTATIVES, AND PURCHASER HEREBY ACKNOWLEDGES THAT NO SUCH REPRESENTATIONS OR WARRANTIES HAVE BEEN MADE.

SELLER SPECIFICALLY DISCLAIMS, AND NONE OF SELLER, SELLER'S AFFILIATES, ITS AGENTS OR REPRESENTATIVES OR ANY OTHER PERSON IS MAKING ANY REPRESENTATION, WARRANTY OR ASSURANCE WHATSOEVER

TO PURCHASER EXCEPT AS MAY BE EXPRESSLY SET FORTH IN SECTION 8.1 OR OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT AND NO WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EITHER EXPRESS OR IMPLIED, EXCEPT AS MAY BE EXPRESSLY SET FORTH IN SECTION 8.1 OR OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, ARE MADE BY SELLER OR RELIED UPON BY PURCHASER WITH RESPECT TO THE STATUS OF TITLE TO OR THE MAINTENANCE, REPAIR, CONDITION, DESIGN OR MARKETABILITY OF THE PROPERTY, OR ANY PORTION THEREOF, INCLUDING BUT NOT LIMITED TO (a) ANY IMPLIED OR EXPRESS WARRANTY OF MERCHANTABILITY, (b) ANY IMPLIED OR EXPRESS WARRANTY OF FITNESS IN WHOLE OR IN PART FOR ANY OR A PARTICULAR PURPOSE, (c) ANY RIGHTS OF PURCHASER UNDER APPROPRIATE STATUTES TO CLAIM DIMINUTION OF CONSIDERATION, (d) ANY CLAIM BY PURCHASER FOR DAMAGES BECAUSE OF DEFECTS, WHETHER KNOWN OR UNKNOWN, WITH RESPECT TO THE BUILDINGS, STRUCTURES AND OTHER IMPROVEMENTS OR THE PERSONAL PROPERTY, (E) THE FINANCIAL CONDITION OR PROSPECTS OF THE PROPERTY, (f) THE COMPLIANCE OR LACK THEREOF OF THE REAL PROPERTY OR THE BUILDINGS, STRUCTURES AND OTHER IMPROVEMENTS WITH GOVERNMENTAL REGULATIONS, INCLUDING WITHOUT LIMITATION ACCESS LAWS OR ENVIRONMENTAL LAWS, NOW EXISTING OR HEREAFTER ENACTED OR PROMULGATED, AND (g), THE MASTER LEASE, MASTER TENANT, THE MASTER LEASE GUARANTY OR ANYTHING ELSE RELATED THERETO, IT BEING THE EXPRESS INTENTION OF SELLER AND PURCHASER THAT, EXCEPT ONLY AS EXPRESSLY SET FORTH IN SECTION 8.1, THE PROPERTY WILL BE CONVEYED AND TRANSFERRED TO PURCHASER IN ITS PRESENT CONDITION AND STATE OF REPAIR, "AS IS" AND "WHERE IS," WITH ALL FAULTS.

PURCHASER REPRESENTS FOR ITSELF AND EACH OF PURCHASER'S AFFILIATES THAT IT IS A KNOWLEDGEABLE, EXPERIENCED AND SOPHISTICATED PURCHASER OF REAL ESTATE, AND THAT EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT IT IS RELYING SOLELY ON ITS OWN EXPERTISE AND THAT OF PURCHASER'S AFFILIATES AND CONSULTANTS IN PURCHASING THE PROPERTY. PURCHASER AND EACH OF PURCHASER'S AFFILIATES HAVE BEEN GIVEN A SUFFICIENT OPPORTUNITY TO CONDUCT AND HAS CONDUCTED SUCH INSPECTIONS, INVESTIGATIONS AND OTHER INDEPENDENT EXAMINATIONS OF THE Property AND RELATED MATTERS AS EACH OF THEM DEEMS NECESSARY, INCLUDING BUT NOT LIMITED TO THE PHYSICAL AND ENVIRONMENTAL CONDITIONS THEREOF, AND WILL RELY SOLELY UPON SAME.

UPON CLOSING, PURCHASER WILL ASSUME THE RISK THAT ADVERSE MATTERS, INCLUDING, BUT NOT LIMITED TO, ADVERSE PHYSICAL AND ENVIRONMENTAL CONDITIONS, MAY NOT HAVE BEEN REVEALED BY PURCHASER'S INSPECTIONS AND INVESTIGATIONS. PURCHASER ACKNOWLEDGES AND AGREES THAT, UPON CLOSING, SELLER WILL SELL AND CONVEY TO PURCHASER, AND PURCHASER WILL ACCEPT THE PROPERTY, "AS IS, WHERE IS," WITH ALL FAULTS, SUBJECT TO THE WARRANTIES SET FORTH IN THE DEED AND OTHER DOCUMENTS EXECUTED

IS_012509

AT CLOSING. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT THERE ARE NO ORAL AGREEMENTS, WARRANTIES OR REPRESENTATIONS COLLATERAL TO OR AFFECTING THE PROPERTY BY SELLER, ANY SELLER'S AFFILIATE OR ANY OF ITS RESPECTIVE AGENTS OR ANY THIRD PARTY EXCEPT AS   OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT. PURCHASER ACKNOWLEDGES THAT THE PURCHASE PRICE REFLECTS THE "AS IS, WHERE IS" NATURE OF THIS SALE AND ANY FAULTS, LIABILITIES, DEFECTS OR OTHER ADVERSE MATTERS THAT MAY BE ASSOCIATED WITH THE PROPERTY.  PURCHASER, WITH PURCHASER'S COUNSEL, HAS FULLY REVIEWED THE DISCLAIMERS AND WAIVERS SET FORTH IN THIS AGREEMENT AND UNDERSTANDS THEIR SIGNIFICANCE AND AGREES THAT THE DISCLAIMERS AND OTHER AGREEMENTS SET FORTH HEREIN ARE AN INTEGRAL PART OF THIS AGREEMENT, AND THAT SELLER WOULD NOT HAVE AGREED TO SELL THE PROPERTY TO PURCHASER FOR THE PURCHASE PRICE WITHOUT THE DISCLAIMERS AND OTHER AGREEMENTS SET FORTH IN OR IMPLIED BY THIS AGREEMENT.

PURCHASER FOR ITSELF AND PURCHASER'S AFFILIATES FURTHER COVENANT AND AGREE NOT TO SUE SELLER AND SELLER'S AFFILIATES ON, AND RELEASE SELLER AND SELLER'S AFFILIATES OF AND FROM, AND WAIVE, ANY CLAIM OR CAUSE OF ACTION, INCLUDING WITHOUT LIMITATION ANY STRICT LIABILITY CLAIM OR CAUSE OF ACTION, THAT PURCHASER OR PURCHASER'S AFFILIATES MAY HAVE AGAINST SELLER OR SELLER'S AFFILIATES UNDER ANY ENVIRONMENTAL LAW, NOW EXISTING OR HEREAFTER ENACTED OR PROMULGATED, RELATING TO ENVIRONMENTAL MATTERS OR ENVIRONMENTAL CONDITIONS IN, ON, UNDER, ABOUT OR MIGRATING FROM OR ONTO THE REAL PROPERTY, INCLUDING, WITHOUT LIMITATION, THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION AND LIABILITY ACT, OR BY VIRTUE OF ANY COMMON LAW RIGHT, NOW EXISTING OR HEREAFTER CREATED, RELATED TO ENVIRONMENTAL CONDITIONS OR ENVIRONMENTAL MATTERS IN, ON, UNDER, ABOUT OR MIGRATING FROM OR ONTO THE REAL PROPERTY. THE TERMS AND CONDITIONS OF THIS SECTION 5.4 WILL EXPRESSLY SURVIVE THE TERMINATION OF THIS AGREEMENT OR THE CLOSING, AS THE CASE MAY BE, AND WILL NOT MERGE WITH THE PROVISIONS OF THE DEED OR ANY CLOSING DOCUMENTS.

## ARTICLE VI
## TITLE AND SURVEY MATTERS

**Section 6.1    Survey.**  Purchaser acknowledges receipt of, the Existing Survey.  Any modification, update or recertification of the Existing Survey or new survey shall be at Purchaser's election and sole cost and expense, and Seller hereby authorizes Purchaser at Purchaser's sole cost and expense to obtain such modification, update or recertification from Seller's survey consultant or with respect to a new survey, Purchaser's survey consultant.

**Section 6.2    Title Commitment.**

IS_012510

(a)      Promptly after the Effective Date, Purchaser shall order from Title Company and direct Title Company promptly to deliver to Purchaser and Seller a preliminary title commitment, for an owner's policy of title insurance with respect to the Property, together with complete and legible copies of all instruments and documents referred to as exceptions to title (the "**Title Commitment**").  For purposes of this Agreement, "**Permitted Exceptions**" hereunder shall consist of the following:  (i) all matters shown on the Existing Survey or any update thereof; (ii) the lien of real estate taxes and assessments not yet due and payable, (iii) Governmental Regulations (including any violations thereof), (iv) the Leases and all subleases, services contracts, liens and other matters created by, through or under the Tenants, (v) all matters created by, through or under Purchaser and all matters approved or deemed approved by Purchaser as expressly provided in this Agreement, (vi) rights of tenants under the Leases, and (vii) those matters listed on **Exhibit H** attached hereto and incorporated herein ("**Existing Title Exceptions**").

(b)      By the date (the "**Objection Date**") which is thirty (30) days after the Effective Date, Purchaser shall provide Seller with written notice of its objection to any matters in the Title Commitment that Purchaser deems unacceptable  ("**Title Objections**") other than the Permitted Exceptions. In the event Seller does not receive the Title Objections by the Objection Date, Purchaser will be deemed to have accepted the exceptions to title set forth on the Title Commitment as Permitted Exceptions. Further, any matters shown in the Title Commitment or any update thereto to which Purchaser does not object within the time periods provided herein shall be a Permitted Exception hereunder. Provided, further, by the date (the "**New Objection Date**") which is five (5) Business Days after Purchaser or Purchaser's counsel receives written notice of any new exception to title to the Real Property that were not in the original Title Commitment referenced above (other than Permitted Exceptions) recorded in the land records, Purchaser shall provide Seller with written notice of its objection to such new exception if Purchaser deems same unacceptable ("**New Title Objections**"). In the event Seller does not receive the New Title Objections by the New Objection Date, Purchaser will be deemed to have accepted the exceptions to title set forth on any updates to the Title Commitment as Permitted Exceptions. Notwithstanding the foregoing terms of this Section 6.2(b), any matter described in Section 6.2(c) and/or Section 6.2(d) hereof shall be deemed a Title Objection without the necessity of any written notice and shall require the disposition described in Sections 6.2(c) and/or (d), respectively. Provided, further, and for avoidance of doubt, Purchaser may object to New Title Objections (with varying New Objection Dates) if Purchaser receives notice of such exceptions on varying dates.

(c)      All taxes, water rates or charges, sewer rents and assessments, plus interest and penalties thereon, which on the Closing Date are liens against the Real Property will be, at Seller's election, either (i) paid prior to or at Closing, or (ii) credited against the Purchase Price (subject to the provision for apportionment of taxes, water rates or charges, and sewer rents herein contained).

(d)      As used herein, "Mandatory Cure Items" means (i) liens and security interests arising from voluntary financing obtained by Seller, (ii) involuntary liens, such as mechanics' liens and judgments, arising from contracts let by Seller and/or its Affiliates and/or the acts or omissions of Seller and/or its Affiliates, and/or (iii) non-monetary liens voluntarily placed on title by Seller after the Effective Date without Purchaser's approval, which approval shall not be unreasonably withheld, conditioned or delayed.  If on the Closing Date the Real Property shall be affected by any mortgage lien constituting a Mandatory Cure Items, then Seller

IS_012511

shall provide at Closing a payoff letter, cancellation or discharge with respect to such Mandatory Cure Items reasonably satisfactory to the Title Company (which may be provided in escrow pending payment to the lender contemporaneously with the Closing). If on the Closing Date the Real Property shall be affected by any Mandatory Cure Items which is not paid off at Closing, Seller shall not be required to discharge or satisfy the same of record provided the money necessary to satisfy the lien is retained by the Title Company at Closing, and the Title Company omits the lien as an exception from the Title Commitment and a credit is given to Purchaser for the recording charges for a satisfaction or discharge of such lien; provided, however, that if (i) the lien is a mortgage, judgment or other lien against a predecessor in title, or a party of similar name to a predecessor in title, then Seller shall not be required to discharge or satisfy the same of record provided that Seller causes Seller's title insurer to provide an indemnity or other customary agreement to the Title Company, in form and substance reasonably satisfactory to the Title Company, and the Title Company either omits the lien as an exception from the Title Commitment or insures against collection thereof from or out of the Real Property, or (ii) is a non-monetary lien placed on the Property under clause (iii) in the first sentence above, shall cause the removal of such non-monetary lien. For avoidance of doubt, Seller shall be obligated to comply with the terms of this Section 6.2(d) with respect to all Mandatory Cure Items, regardless of whether or not Purchaser objects to any such liens.

(e)    If on the Closing Date there shall be security interests, other than Mandatory Cure Items, filed against the Real Property, such items shall not be Title Objections if (i) the personal property covered by such security interests was not owned by Seller or is no longer in or on the Real Property, or (ii) such personal property is the property of a tenant, and Seller executes and delivers an affidavit to such effect or the security interest identifies personal property not Real Property, or (iii) the security interest was filed more than five (5) years prior to the Closing Date and was not renewed. All other security interest that constitute Mandatory Cure Items shall be satisfied or discharged by Seller at or prior to Closing.

(f)    At Closing, Seller will deliver to Title Company an owner's title affidavit substantially in the form attached hereto as **Exhibit E** ("**Title Affidavit**").

### Section 6.3    Title Defect.

(a)    In the event Seller receives notice from Purchaser of any Title Objection or New Title Objection, as the case may be, which is not a Permitted Exception (collectively and individually, a "**Title Defect**") within the time periods required under Section 6.2, Seller may elect (but shall not be obligated, except as to Mandatory Cure Items) to attempt to remove or otherwise cure, or cause to be removed or otherwise cured at its expense, any such Title Defect, and shall provide Purchaser with notice, within seven (7) days after Seller's receipt of any such objection, of its intention to attempt to cure any such Title Defect. If Seller elects to attempt to cure any Title Defect, the Scheduled Closing Date shall be extended, for a period not to exceed five (5) Business Days, for the purpose of attempting such removal or cure. In the event that (i) Seller elects not to attempt to remove or otherwise cure any such Title Defect, or (ii) Seller is unable to cure any such Title Defect within five (5) Business Days after the Scheduled Closing Date, Seller shall so advise Purchaser, and Purchaser shall have the right to terminate this Agreement (in which event the Earnest Money Deposit shall be refunded to Purchaser), or to waive such Title Defect and proceed to the Closing. (In addition, if Seller fails to cure any Mandatory Cure Items within five (5) Business Days after the Scheduled Closing Date, then such failure shall be deemed to be a default under this Agreement, whereupon Purchaser shall be

entitled to the remedies set forth in Section 13.1 below.). Purchaser shall make such election within ten (10) Business Days of receipt of Seller's notice. If Purchaser elects to proceed to the Closing, any Title Defects waived by Purchaser shall be deemed to constitute Permitted Exceptions. In any such event of termination, Purchaser shall promptly destroy or return the Documents to Seller, after which neither Party shall have any further obligation to the other under this Agreement except for the Termination Surviving Obligations.

## ARTICLE VII
## INTERIM OPERATING COVENANTS

**Section 7.1**    **Interim Operating Covenants**.

    (a)    Seller covenants to Purchaser that Seller will:

    (i)    **Operations**.  Seller agrees to continue to operate, or cause its manager to operate, the Property as currently operated. Seller shall not, however, enter into any Leases prior to Closing without consent from Purchaser, such consent not to be unreasonably withheld.

    (ii)    **Service Contracts**.  Except in the event of an emergency repair, not enter into any service contract unless such service contract is terminable on thirty (30) days' notice without penalty or unless Purchaser consents thereto in writing, which approval will not be unreasonably withheld, delayed or conditioned. Seller shall prior to or simultaneously with the Closing terminate all service contracts to which it is a party, unless Purchaser notifies Seller not less than fifteen (15) days prior to the expiration of the Due Diligence Period that it desires to assume any such contracts, in which case the Seller shall assign said Contracts to Purchaser under the Assignment.

    (iii)    **Notices**.  To the extent received by Seller, from the Effective Date until Closing, promptly deliver to Purchaser copies of written notices of violations received by Seller from Authorities affecting the Property

    (b)    Purchaser covenants to Seller that Purchaser will use diligent efforts to cause Drexel to agree in writing prior to the expiration of the Due Diligence Period (i) to terminate that certain Corrective Work Agreement dated as of January 11, 2018, by and among Drexel, Master Tenant, PAHH College LLC, PAHH Feinstein LLC, and PAHH Bellet MOB, LLC ("**Bellet**") (the "**CWA**") on or prior to the Closing Date, and (ii) on or prior to the Closing Date to release in full all of the entities comprising Seller, Bellet, and Purchaser from all liabilities and obligations under and with respect to the CWA (such written agreement is referred to herein as the "**CWA Termination**"). Seller shall, at no material out-of-pocket cost to Seller, reasonably cooperate with Purchaser in Purchaser's efforts to obtain the CWA Termination. In the event that the CWA Termination has not then been obtained, each of Purchaser and Seller shall have the right to terminate this Agreement upon written notice to the other party not later than the expiration of the Due Diligence Period, in which case the Earnest Money Deposit shall be returned to Purchaser, and neither party shall have any rights or obligations hereunder, except those that expressly survive termination hereof.

## ARTICLE VIII
## REPRESENTATIONS AND WARRANTIES

**Section 8.1     Seller's Representations and Warranties**.  The following constitute the sole representations and warranties of Seller, which representations and warranties shall be true as of the Effective Date.  Subject to the limitations set forth in Section 8.3 of this Agreement, Seller represents and warrants to Purchaser the following:

(a)     **Status**.  Each Seller is a duly organized and validly existing limited liability company under the laws of the State of Delaware.

(b)     **Authority**.  The execution and delivery of this Agreement and the performance of Seller's obligations hereunder have been or will be duly authorized by all necessary action on the part of Seller, and this Agreement constitutes the legal, valid and binding obligation of Seller, subject to (i) applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditors' rights generally from time to time in effect; and (ii) limitations on the enforcement of equitable remedies.

(c)     **Non-Contravention**.  The execution and delivery of this Agreement by Seller and the consummation by Seller of the transactions contemplated hereby will not (i) violate any judgment, order, injunction, decree, regulation or ruling of any court or governmental authority; (ii) conflict with or result in a breach of the organizational documents of Seller; or (iii) conflict with, result in a breach of, or constitute a default under, any note, mortgage, deed of trust or indenture, or any lease or other material agreement or instrument to which Seller is a party or by which it is bound.

(d)     **Suits and Proceedings**.  There are no legal actions, suits or proceedings pending which have been served upon Seller, nor, to Seller's Knowledge, threatened in writing against Seller or the Real Property which, if adversely determined, would materially and adversely affect Seller's ability to consummate the transactions contemplated hereby other than the actions described on **Schedule 8.1(d)**.

(e)     **Non-Foreign Entity**.  Seller is not a "foreign person" or "foreign corporation" as those terms are defined in the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder.

(f)     **Tenants**.  To Seller's Knowledge as of the Effective Date, the only tenants of the Real Property are the tenants under the Leases and any and sublessees or licensees thereof.  Except as set forth in the Documents, no brokerage or leasing commissions or other compensation is or will be due or payable to any person, firm, corporation or other entity with respect to or on account of the current term of the Leases or other agreements entered into by Seller with respect to the Property or any extension or renewal thereof.

(g)     **Service Contracts**.  Seller has no employees and is not engaged in any retail sales. To Seller's Knowledge as of the Effective Date, the Real Property is not subject to any service contracts that will be binding on Purchaser or the Real Property after the Closing, other than (i) operating agreements, service contracts and other agreements entered into by, through or under Tenants, and (ii) service contracts and other agreements identified on **Schedule 8.1(g)**.

(h)     **Agreements, Purchase Options, Etc**.  Apart from this Agreement and the Drexel Option, Seller has not entered into any written agreement for and, to Seller's knowledge there are no rights, options, or other agreements of any kind to purchase or otherwise acquire or

IS_012514

sell any of the Real Property, or any interest therein, nor any claims to such rights, options, or other agreements, other than pursuant to matters of record against the Property and as set forth in the Leases.

(i)     **Zoning and Violations**. The zoning classification of the Real Property is, as to the 216 Real Property: CMX5, as to the 245 Real Property: CMX4, and as to the 1450 Real Property: CMX5, each subject to a unity of use agreement, and Seller's use of the Real Property is in compliance therewith. The zoning classification as to the 231 Real Property is CMX4, and Seller's use of the 231 Real Property is in compliance therewith. To Seller's knowledge, there are no outstanding notices of uncorrected violations of the housing, building, safety or fire ordinances in the property file kept by the City of Philadelphia's Department of Licenses and Inspections.

**Section 8.2     Purchaser's Representations and Warranties** Purchaser represents and warrants to Seller the following:

(a)     **Status**. Each Purchaser is a duly organized and validly existing limited liability company under the laws of the Commonwealth of Pennsylvania

(b)     **Authority**. The execution and delivery of this Agreement and the performance of Purchaser's obligations hereunder have been duly authorized by all necessary action on the part of Purchaser, and this Agreement constitutes the legal, valid and binding obligation of Purchaser, subject to (i) applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditors' rights generally from time to time in effect; and (ii) limitations on the enforcement of equitable remedies.

(c)     **Non-Contravention**. The execution and delivery of this Agreement by Purchaser and the consummation by Purchaser of the transactions contemplated hereby will not (i) violate any judgment, order, injunction, decree, regulation or ruling of any court or governmental authority; (ii) conflict with or result in a breach of the organizational documents of Purchaser; or (iii) conflict with, result in a breach of, or constitute a default under, any note, mortgage, deed of trust or indenture, or any lease or other material agreement or instrument to which Purchaser is a party or by which it is bound.

(d)     **Suits and Proceedings**. There are no legal actions, suits or proceedings pending which have been served upon Purchaser, nor, to Purchaser's Knowledge, threatened in writing against Purchaser or the Real Property which, if adversely determined, would materially and adversely affect Purchaser's ability to consummate the transactions contemplated hereby other than those actions described on **Schedule 8.2(d)**.

(e)     **Consents**. No consent, waiver, approval or authorization is required from any person, entity or governmental authority (that has not already been obtained) in connection with the execution and delivery of this Agreement by Purchaser or the performance by Purchaser of the obligations hereunder.

(f)     **Anti-Terrorism**. Neither Purchaser, nor any Purchaser's Affiliate or officer, director, shareholder, partner, investor or member of Purchaser or any Purchaser's Affiliate is named by any Executive Order of the United States Treasury Department as a terrorist, a "Specially Designated National and Blocked Person," or any other banned or blocked person, entity, nation or transaction pursuant to any law, order, rule or regulation that is enforced

or administered by the Office of Foreign Assets Control (collectively, an "**Identified Terrorist**"). Purchaser is not engaging in this transaction on the behalf of, either directly or indirectly, any Identified Terrorist.

**Section 8.3    Merger of Representations, Warranties and Covenants.**    All representations, warranties, covenants and agreements made or undertaken by Seller under this Agreement, unless otherwise specifically provided herein, will not survive the Closing but will be merged into the Deed. From and after the Closing, Purchaser will not have any right to bring any action against Seller as a result of any untruth or inaccuracy of such representations, warranties or certifications or any breach of Seller's obligations hereunder.

**ARTICLE IX**
**CONDITIONS PRECEDENT TO CLOSING**

**Section 9.1    Conditions Precedent to Obligation of Purchaser**. The obligation of Purchaser to consummate the transactions hereunder shall be subject to the fulfillment on or before the Closing Date of all of the following conditions, any or all of which may be waived by Purchaser in its sole discretion:

(a)    Seller shall have delivered to Purchaser all of the items required to be delivered to Purchaser pursuant to the terms of this Agreement, including but not limited to, those provided for in Section 10.3;

(b)    All of the representations and warranties of Seller contained in Section 8.1 of this Agreement shall be true and correct in all material respects as of the Closing Date, with appropriate modifications as explicitly permitted under this Agreement, except for those representations and warranties which address matters only as of a particular date (which will remain true and correct in all material respects as of such date);

(c)    Seller shall have performed and observed, in all material respects (and subject to the 5-Business Day cure period set forth in Section 13.1 below), all covenants and agreements set forth in this Agreement to be performed and observed by Seller as of the Closing Date;

(d)    Purchaser shall not have validly terminated this Agreement in accordance with the terms hereof (including Sections 5.2 above and 10.3(e) below).

(e)    The Title Company shall be willing to issue to each entity comprising Purchaser, subject to payment of the premium therefor, an ALTA Owner's Policy of title insurance, with extended coverage (i.e., with ALTA General Exceptions 1 through 5 deleted), issued by the Title Company as of the date and time of the recording of each Deed, in the amount of the allocated Purchase Price for each respective Real Property, insuring the applicable Purchaser as owner of fee simple title to the applicable Property, and subject only to the Permitted Exceptions and the printed conditions and exceptions of such policy.

(f)    The United States Bankruptcy Court for the District of Delaware shall have issued an order modifying the automatic stay to allow Seller to terminate the Master Lease without prejudice to any rights of Seller, its affiliates, and successors and assigns with respect to the Master Lease or the Master Lease Guaranty. Seller hereby agrees that it shall make the appropriate filings in said Bankruptcy Court requesting approval for termination of the Master

Lease not later than five (5) Business Days following the Effective Date, and shall diligently and in good faith seek such order promptly after such filing. Seller shall keep Purchaser apprised of all material developments in connection with such filing and the proceedings thereof, including but not limited to providing Purchaser with copies of all such filings in said proceeding and with advance written notice of any and all hearings in connection therewith. Provided, further, that if Bankruptcy Court has not issued an order allowing Seller to terminate the Master Lease by the Closing Date, then Purchaser shall have the right to extend the Closing Date for up to an additional ninety (90) days by providing written notice of such extension to Seller prior to the Closing Date, whereupon Seller shall diligently and in good faith continue to seek such order. After the granting of any such order under this subparagraph (f) but no later than seven (7) days prior to the Closing Date, Seller shall terminate the Master Lease and provide Purchaser with evidence of same.

Purchaser's obligations under this Agreement are not subject to any financing contingency or other conditions or contingency for the availability or adequacy of debt, equity or any other financing.

**Section 9.2    Conditions Precedent to Obligation of Seller**.  The obligation of Seller to consummate the transaction hereunder shall be subject to the fulfillment on or before the Closing Date (or as otherwise provided) of all of the following conditions, any or all of which may be waived by Seller in its sole discretion:

(a)    Seller shall have received the Purchase Price as adjusted pursuant to, and payable in the manner provided for, in this Agreement;

(b)    Purchaser shall have delivered to Seller all of the items required to be delivered to Seller under Section 10.2 of this Agreement;

(c)    All of the representations and warranties of Purchaser contained in Section 8.2 of this Agreement shall be true and correct in all material respects as of the Closing Date, with appropriate modifications permitted under this Agreement, except for those representations and warranties which address matters only as of a particular date (which will remain true and correct in all material respects as of such date); and

(d)    Purchaser shall have performed and observed, in all material respects (and subject to the 5-Business Day Cure Period set forth in Section 13.2 below), all covenants and agreements set forth in this Agreement to be performed and observed by Purchaser as of the Closing Date.

(e)    Drexel shall have waived or shall be deemed to have waived that certain right to purchase a portion of the Property set forth in the applicable Leases (the "**Drexel Option**"); provided that if Seller has not obtained Drexel's waiver or deemed waiver required hereunder, Seller may elect, in its sole and absolute discretion, to extend the Closing Date by twenty (20) days to attempt to obtain such waiver or deemed waiver by providing to Purchaser written notice of such election to extend the Closing Date, which notice shall be delivered to Purchaser at least one (1) Business Day prior to the Closing Date.

(f)    The United States Bankruptcy Court for the District of Delaware shall have issued an order modifying the automatic stay to allow Seller to terminate the Master Lease without prejudice to any rights of Seller, its affiliates, and successors and assigns with respect to

IS_012517

the Master Lease or the Master Lease Guaranties. Seller hereby agrees that it shall make the appropriate filings in said Bankruptcy Court requesting approval for termination of the Master Lease not later than five (5) Business Days following the Effective Date, and shall diligently and in good faith seek such order promptly after such filing. Seller shall keep Purchaser apprised of all material developments in connection with such filing and the proceedings thereof, including but not limited to providing Purchaser with copies of all such filings in said proceeding and with advance written notice of any and all hearings in connection therewith. Provided, further, that if Bankruptcy Court has not issued an order allowing Seller to terminate the Master Lease by the Closing Date, then Seller shall have the right to extend the Closing Date for up to an additional ninety (90) days by providing written notice of such extension to Purchaser prior to the Closing Date, whereupon Seller shall diligently and in good faith continue to seek such order. After the granting of any such order under this subparagraph (f) but no later than seven (7) days prior to the Closing Date, Seller shall terminate the Master Lease and provide Purchaser with evidence of same.

**Section 9.3    Failure of Conditions.** In the event any of the Purchaser's conditions set forth in Section 9.1 ("**Purchaser's Conditions**") or Seller's conditions set forth in Section 9.2 ("**Seller's Conditions**" and the Purchaser's Conditions and the Seller's Conditions are collectively referred to from time to time as "**Conditions**") shall not be satisfied as of the Scheduled Closing Date, Seller (upon the failure of any Purchaser's Condition) or Purchaser (upon the failure of any Seller's Condition), as applicable, shall have the right to adjourn the Closing for a period not to exceed five (5) Business Days in order to satisfy any such Conditions by giving written notice to the other party on or before the Scheduled Closing Date, but such adjournment right shall only apply if the applicable Condition(s) is/are subject to cure. If any of the Purchaser's Conditions shall not be satisfied as of the Scheduled Closing Date (as same may be adjourned pursuant to this Section 9.3), then in addition to any remedies that Purchaser may have under Section 10.3 below, Purchaser shall have the right to terminate this Agreement by giving written notice to Seller, whereupon the Earnest Money shall be returned to Purchaser. If any of the Seller's Conditions shall not be satisfied as of the Scheduled Closing Date (as same may be adjourned pursuant to this Section 9.3), then Seller shall have the right to terminate this Agreement by giving written notice to Purchaser, whereupon the Earnest Money Deposit shall be paid to Seller. If this Agreement shall be terminated pursuant to this Section 9.3, neither Party shall have any further rights or obligations hereunder except with respect to the Termination Surviving Obligations. Notwithstanding the foregoing, nothing in this Section 9.3 shall be deemed to limit or waive the provisions of Article XIII hereof in the event of a default by a Party governed thereby.

## ARTICLE X
## CLOSING

**Section 10.1    Closing.** The consummation of the transactions contemplated by this Agreement by delivery of documents and payments of money shall take place at noon Eastern time on the Scheduled Closing Date through an escrow with Escrow Agent, unless the Parties agree to a "live closing". The Parties mutually confirm that Purchaser's obligations under this Agreement are not contingent on being able to obtain or to obtain financing, but Seller agrees that it shall, without cost to Seller, reasonably cooperate with Purchaser as to closing procedures and mechanics to reasonably accommodate Purchaser's lender, if any. At Closing, the events of forth in this Article X will occur, it being understood that the performance or tender of

performance of all matters set forth in this Article X are mutually concurrent conditions which may be waived by the party for whose benefit they are intended.  The acceptance of the Deed by Purchaser shall be deemed to be full performance and discharge of each and every agreement and obligation on the part of Seller to be performed hereunder unless otherwise specifically provided in this Agreement, in which case the acceptance of the Deed shall not constitute full performance and discharge of the specified obligations of Seller.

**Section 10.2    Purchaser's Closing Obligations**.  On the Closing Date, Purchaser, at its sole cost and expense, will deliver the following items to Seller at Closing as provided herein:

(a)    The Purchase Price, after all adjustments are made as herein provided, by Federal Reserve wire transfer of immediately available funds, in accordance with the timing and other requirements of Section 3.2;

(b)    A counterpart original of the Assignment, duly executed by Purchaser;

(c)    A counterpart of the Closing Statement, duly executed by Purchaser;

(d)    A counterpart of the Assignment and Assumption of Leases in the form attached hereto as **Exhibit G** (the "**Assignment of Leases**"), duly executed by Purchaser;

(e)    A certificate, dated as of the date of Closing, stating that the representations and warranties of Purchaser contained in Section 8.2 are true and correct in all material respects as of the Closing Date, except for those representations and warranties which address matters only as of a particular date (which will remain true and correct in all material respects as of such date); and

(f)    Such tax forms and such other documents as may be reasonably necessary or appropriate to effectuate the consummation of the transaction which is the subject of this Agreement.

**Section 10.3    Seller's Closing Obligations**.    At the Closing, Seller will deliver to Purchaser the following documents.

(a)    A separate special warranty deed(s) (4 total) (collectively the "**Deed**"), substantially in the form attached hereto as **Exhibit F**, duly executed and acknowledged by Seller, conveying to each respective Purchaser the Real Property subject to the Permitted Exceptions, and the Deed shall contain a notice with respect to certain environmental conditions on the Real Property, if applicable.  Each respective Deed shall convey the following Real Property to the following Purchaser:  (i) the 216 Real Property to IS BBFB, LLC; (ii) the 231 Real Property to IS PAHH LLC; (iii) the 245 Real Property to IS 245 LLC; and (iv) the 1450 Real Property to IS3 LLC.

(b)    A counterpart original of an assignment and assumption of all of Seller's right, title and interest in and to the Other Property and the Contracts (if any)  in the form attached hereto as **Exhibit C** (the "**Assignment**"), duly executed by Seller, conveying and assigning to Purchaser all of Seller's right, title, and interest, if any, in and to the assignable Other Property and the Contracts;

(c)     A counterpart original of the Assignment of Leases, duly executed by Seller;

(d)     Evidence reasonably satisfactory to Purchaser and Title Company that the person executing the documents delivered by Seller pursuant to this Section 10.3 on behalf of Seller has full right, power, and authority to do so such as customary certifications, resolutions and operating agreements;

(e)     A certificate in the form attached hereto as **Exhibit B** ("**Certificate as to Foreign Status**") certifying that Seller is not a "foreign person" as defined in Section 1445 of the Internal Revenue Code of 1986, as amended;

(f)     A certificate, dated as of the date of Closing (the "**Bring-Down Certificate**"), stating that the representations and warranties of Seller contained in Section 8.1 are true and correct in all material respects as of the Closing Date, except for those representations and warranties which address matters only as of a particular date (which will remain true and correct in all material respects as of such date), with appropriate modifications to reflect any changes therein permitted by this Agreement or identifying any representation or warranty which no longer is true and correct and explaining the state of facts giving rise to the change.  In the event of modifications or changes, Seller shall identify same to Purchaser in reasonable detail within a reasonable time after, to Seller's Knowledge, a change has occurred.  In no event shall Seller be liable to Purchaser for, or be deemed to be in default hereunder, if any representation or warranty is no longer true and correct in all material respects (nor shall such change constitute the failure of a condition precedent to Closing), unless such change results from or causes a breach of an independent express obligation of Seller under this Agreement, in which event the provisions of Section 13.3 below shall apply.  If such change does not constitute or cause a breach of an independent express obligation of Seller under this Agreement, then Seller's representations and warranties set forth in this Agreement shall be deemed to have been modified by all statements made in the Bring-Down Certificate; provided, however, if such change would have a demonstrable material adverse effect on the Property, then Purchaser shall have the right to terminate this Agreement upon written notice to Seller and in such event the Earnest Money shall be refunded to Purchaser and neither Party shall have any further rights or obligations hereunder except with respect to the Termination Surviving Obligations;

(g)     The Title Affidavit;

(h)     To the extent not previously delivered, City Certification Statements issued by the Philadelphia Department of Licenses and Inspections stating whether there are any violations against any Property and stating the zoning classifications of each respective Property as follows: (i) 216 Real Property: CMX5; (ii) 231 Real Property: CMX4; (iii) 245 Real Property: CMX5; and (iv) 1450 Real Property: CMX5; and

(i)     Such tax forms and such other documents as may be reasonably necessary or appropriate to effectuate the consummation of the transaction which is the subject of this Agreement.

In addition, as soon as reasonably possible after the Closing, Seller shall deliver to Purchaser the following, to the extent in Seller's possession or control and not located at the on-site management office of the Property:  all plans, surveys and specifications relating to the

IS_012520

Property, the Licenses and Permits, and other files relevant to the future operation of the Property.

**Section 10.4    Prorations**.

(a)    Seller and Purchaser agree to adjust, as of 11:59 p.m. on the day preceding the Closing Date (the "**Proration Time**"), the amount (if any) of the following items: (i) all Taxes due for calendar year 2021; (ii) utilities; (iii) charges under any Service Contracts; (iv) base rent payable under the Leases; (v) additional rent paid to Seller by the Tenants under the Leases, and (vi) any other items customarily prorated, e.g. parking revenues or other items of income or expense with respect to the Property. Seller shall retain the right to collect from the Tenants all rentals arising under the Leases on or prior to the Closing Date (collectively, the "**Proration Items**"). Except for the Proration Items expressly identified above, there shall be no proration of any items of income or expense relating to the Property, and Purchaser will assume and be responsible for all costs and expenses arising from the ownership and operation of the Property that becomes due and payable after the Closing. Seller will be entitled to all deposits presently in effect with the utility providers, and Purchaser will be obligated to make its own arrangements for any deposits with the utility providers.

Seller will be charged and credited for the amounts of all of the Proration Items relating to the period up to and including the Proration Time, and Purchaser will be charged and credited for all of the Proration Items relating to the period after the Proration Time. The estimated Closing prorations shall be set forth on a preliminary closing statement to be prepared by Seller and submitted to Purchaser prior to the Closing Date (the "**Closing Statement**"). The Closing Statement, once agreed upon, shall be signed by Purchaser and Seller and may be delivered electronically. The prorations shall be paid at Closing by Purchaser to Seller (if the prorations result in a net credit to Seller) or by Seller to Purchaser (if the prorations result in a net credit to Purchaser) by increasing or reducing the cash to be delivered by Purchaser in payment of the Purchase Price at the Closing. If the actual amounts of the Proration Items are not known as of the Closing Date, the prorations will be made at Closing on the basis of the best evidence then available; thereafter, when actual figures are received, re-prorations will be made on the basis of the actual figures, and a final cash settlement will be made between Seller and Purchaser. No prorations will be made in relation to insurance premiums, and Seller's insurance policies will not be assigned to Purchaser. The provisions of this Section 10.4(a) will survive the Closing for twelve (12) months.

(b)    Uncollected rent shall not be prorated at Closing. Seller shall retain the right to collect from the Tenants all rentals arising under the Leases on or prior to the Closing Date. Further, notwithstanding anything in this Agreement to the contrary, (i) Seller will have the right to seek to collect, whether through demand, litigation or otherwise any delinquent rental or other sums due to Seller from Tenants (and any former tenants of the Property), and any amounts recovered by Seller in respect of delinquent rental or other sums due to Seller from Tenants (or former tenants of the Property) shall be retained by Seller, and (ii) all of Seller's claims, rights, defenses, liabilities, and causes of action of any kind or nature against Tenants (and any former tenants of the Property) or any guarantor of Tenants' (or such former tenants') obligations under the Leases are fully preserved and reserved by Seller. Any delinquent rentals recovered by Purchaser, net of reasonable costs of collection paid to third parties, shall be immediately paid over by Purchaser to Seller.

IS_012521

**Section 10.5   Costs of Title Company and Closing Costs**. Costs of the Title Company and other Closing costs incurred in connection with the Closing will be allocated as follows:

(a)   Seller shall pay (i) Seller's attorneys' fees; (ii) one-half of all realty transfer fees and taxes (subject to Purchaser's obligations under Section 18.14); and (iii) the cost of discharging any liens that Seller is obligated to discharge pursuant to the terms and conditions of this Agreement.

(b)   Purchaser shall pay (i) Purchaser's attorneys' fees; (ii) the costs of Purchaser's due diligence investigations with respect to the Property, including but not limited to the cost of the updating the Existing Survey; (iii) the costs of recording the Deed and all other documents, except for discharges of any liens that Seller is obligated to discharge pursuant to the terms and conditions of this Agreement; (iv) all premiums and other costs in connection with obtaining the Title Policy, any mortgagee title insurance policy that Purchaser desires to obtain (the "**Mortgagee Title Policy**") and any additional coverage or endorsements or deletions (including, without limitation, the deletion of the survey exception) to the Title Policy and/or Mortgagee Title Policy that are desired by Purchaser; (v) one-half of all realty transfer fees and taxes (and any additional payments of transfer fees and taxes due from Purchaser in accordance with and to the extent arising under Section 18.14 below); and (vi) any escrow fees of the Title Company and Escrow Agent.

(c)   Any other costs and expenses of Closing not provided for in this Section 10.5 shall be allocated between Purchaser and Seller in accordance with the custom in the City of Philadelphia.

**ARTICLE XI**
**CASUALTY AND CONDEMNATION**

**Section 11.1   Casualty**. Seller shall bear the risk of all loss or damage to the Property from all causes until Closing. If, at any time prior to Closing, any portion of the Property is destroyed or damaged as a result of fire or any other casualty whatsoever, Seller shall give notice thereof to Purchaser. As used herein, a "Major Casualty" shall mean a casualty event occurring after the Effective Date and prior to Closing where (i) the cost of repair exceeds One Million Dollars ($1,000,000), or (ii) the cost of repairs exceeds by One Hundred Thousand Dollars ($100,000) or more the sum of (x) the insurance proceeds reasonably anticipated by the Parties to be payable as a consequence of the casualty, plus (y) the deductible amount under Seller's insurance (which shall be credited by Seller to Purchaser at Closing), plus (z) any additional sums credited by Seller to Purchaser at Closing on account of the casualty, in Seller's discretion. Upon the occurrence of a Major Casualty, Purchaser may terminate this Agreement by delivering to Seller written notice of termination within five (5) Business Days after Purchaser is notified of the casualty. Upon such termination, the Earnest Money Deposit shall be returned to Purchaser and thereafter this Agreement shall be canceled with no further liability of either party to the other (except with respect to the Termination Surviving Obligations). If the casualty event does not constitute a Major Casualty or if it does constitute a Major Casualty but this Agreement is not terminated as provided above, then the parties shall proceed to Closing, the proceeds of any insurance with respect to the Property paid between the date of this Agreement and Closing, together with an amount equal to Seller's deductible under its casualty insurance policy insuring the Property, shall be credited to Purchaser at the time of Closing, and all unpaid claims and rights in connection with any casualty to the Property shall be assigned to Purchaser at Closing

without in any manner affecting the Purchase Price. In furtherance of the foregoing, Seller agrees that it shall maintain through the Closing Date property and casualty insurance providing substantially the same coverage as is provided by Seller's insurance as of the Effective Date.

**Section 11.2  Condemnation of Real Property.** If, prior to Closing, Seller receives notice of the commencement of any condemnation proceeding or other proceeding in the nature of eminent domain in connection with the Real Property, or that any material change is made to the current means of ingress and egress to the Real Property or to the roads or driveways adjoining the Real Property, Seller agrees to notify Purchaser thereof. Purchaser then shall have the right, at Purchaser's option, to terminate this Agreement by giving written notice to Seller within five (5) Business Days after receipt of such notice. Upon such termination, the Earnest Money Deposit shall be returned to Purchaser and thereafter this Agreement shall be canceled with no further liability of either party to the other (except with respect to the Termination Surviving Obligations). If Purchaser does not so terminate this Agreement, Purchaser shall proceed to Closing hereunder as if no such proceeding had commenced and will pay Seller the full Purchase Price in accordance with this Agreement; Seller shall assign to Purchaser all of its right, title and interest in and to any compensation for such condemnation, and Seller shall not negotiate or settle any claims for compensation prior to Closing without Purchaser's participation.

**ARTICLE XII**
**CONFIDENTIALITY**

**Section 12.1  Confidentiality.** Seller and Purchaser each expressly acknowledge and agree that the transactions contemplated by this Agreement and the terms, conditions, and negotiations concerning the same will be held in confidence by each of them and will not be disclosed by either of them except to their respective legal counsel, accountants, consultants, advisors, officers, partners, directors, managers, and shareholders, equity participants and lenders and on a need-to-know bases, employees, except and only to the extent that such disclosure may be necessary for their respective performances hereunder. Purchaser further acknowledges and agrees that, unless and until the Closing occurs, all information obtained by Purchaser in connection with the Property will not be disclosed by Purchaser to any third persons without the prior written consent of Seller. Nothing contained in this Article XII will preclude or limit either Party from disclosing or accessing any information otherwise deemed confidential under this Article XII in response to lawful process or subpoena or other valid or enforceable order of a court of competent jurisdiction or any filings with governmental authorities required by reason of the transactions provided for herein pursuant to advice of counsel, or as otherwise may be required in connection with any legal proceedings. In addition, prior to or after the Closing, any release to the public of information with respect to the sale contemplated herein or any matters set forth in this Agreement will be made only in a form approved by Purchaser and Seller and their respective counsel, which approval shall not be unreasonably withheld, conditioned or delayed. The provisions of this Article XII will survive the termination of this Agreement, and only the provisions of the immediately prior sentence regarding release of information to the public will survive Closing.

IS_012523

## ARTICLE XIII
## REMEDIES

**Section 13.1    Default by Seller**.    In the event of a material breach by Seller of any terms of this Agreement, if such breach is not cured by Seller within five (5) Business Days after notice of default from Purchaser, then Purchaser may, as Purchaser's sole and exclusive remedy, elect by notice to Seller either of the following: (a) terminate this Agreement, in which event Purchaser will receive from the Escrow Agent the Earnest Money Deposit, and Seller will reimburse Purchaser for all of Purchaser's out-of-pocket costs and expenses incurred pursuant to this Agreement up to Fifty Thousand Dollars ($50,000) in the aggregate, whereupon Seller and Purchaser will have no further rights or obligations under this Agreement, except with respect to the Termination Surviving Obligations; (b) seek to enforce specific performance of Seller's obligations under this Agreement.  Purchaser expressly waives its rights to seek damages in the event of Seller's default hereunder, except as expressly provided above.  Purchaser shall be deemed to have elected to terminate this Agreement in accordance with and subject to the terms of the preceding clause (a) if Purchaser fails to file suit for specific performance against Seller in a court having jurisdiction in Philadelphia County, Pennsylvania on or before sixty (60) days following the Scheduled Closing Date.  Notwithstanding the foregoing, nothing contained in this Section 13.1 will limit Purchaser's remedies at law, in equity or as herein provided in pursuing remedies for a breach by Seller of any of the Termination Surviving Obligations, subject to the limitations set forth in Section 8.3.

**Section 13.2    Default by Purchaser**.    In the event of a material breach by Purchaser of any terms of this Agreement, if such breach is not cured by Purchaser within five (5) Business Days after notice of default from Seller, then Seller shall have the right to terminate this Agreement and to receive from Purchaser, as liquidated damages, an amount equal to the Earnest Money Deposit (including the interest accrued thereon).  Purchaser and Seller agree it would be impractical and extremely difficult to fix the damages which Seller may suffer.  Purchaser and Seller hereby agree that (a) an amount equal to the Earnest Money Deposit, together with all interest accrued thereon, is a reasonable estimate of the total net detriment Seller would suffer in the event Purchaser defaults and fails to complete the purchase of the Property, and (b) such amount will be the full, agreed and liquidated damages for Purchaser's default and failure to complete the purchase of the Property, and will be Seller's sole and exclusive remedy (whether at law or in equity) for any default of Purchaser resulting in the failure of consummation of the Closing, whereupon this Agreement will terminate and Seller and Purchaser will have no further rights or obligations hereunder, except with respect to the Termination Surviving Obligations. The payment of such amount as liquidated damages is not intended as a forfeiture or penalty but is intended to constitute liquidated damages to Seller. Notwithstanding the foregoing, nothing contained herein will limit Seller's remedies at law, in equity or as herein provided in the event of a breach by Purchaser of any of the Termination Surviving Obligations.

**Section 13.3    Notices of Default**.    The Parties agree that neither Party shall be deemed to be in default unless it has received a notice of default and a five (5)-Business Day opportunity to cure; provided that this Section shall not be applicable to a default consisting of a failure to close on a time of the essence closing date properly established in accordance with this Agreement. The provisions of this Article XIII will expressly survive the termination of this Agreement.

## ARTICLE XIV
## NOTICES

**Section 14.1   Notices.**

(a)     All notices or other communications required or permitted hereunder shall be in writing, and shall be given by any nationally recognized overnight delivery service with proof of delivery, or by e-mail (provided that receipt of such e-mail is electronically confirmed), sent to the intended addressee at the addresses set forth below, or to such other addresses or to the attention of such other persons as the addressee will have designated by written notice sent in accordance herewith. Unless changed in accordance with the preceding sentence, the addresses for notices given pursuant to this Agreement will be as follows:

| | |
|---|---|
| If to Purchaser: | IS 245 North 15th Street LLC<br>IS PAHH OZ LLC<br>IS3 West Girard, LLC<br>IS BBFB LLC<br>c/o Iron Stone Real Estate Partners<br>2929 Walnut Street, Suite 1540<br>Philadelphia, PA  19104<br>Attn.: Matthew Canno and Andrew Eisenstein<br>E-mail: eisenstein@iron-stone.com; and matt@iron-stone.com |
| with a copy to: | Eckert Seamans Cherin & Mellott, LLC<br>Two Liberty Place<br>50 S. 16th Street, 22nd Floor<br>Philadelphia, PA  19102<br>Attn.: Daniel N. Reisman, Esquire<br>E-mail:dreisman@eckertseamans.com |
| If to Seller: | PAHH New College MOB, LLC<br>PAHH Feinstein MOB, LLC<br>PAHH Broad Street MOB, LLC<br>PAHH Wood Street Garage, LLC<br><br>c/o Harrison Street Real Estate Capital<br>444 W. Lake Street, Suite 2100<br>Chicago, IL  60606<br>Attn.: Brian Mutchler<br>E-mail: bmuchler@harrisonst.com |
| with a copy to: | Harrison Street Real Estate Capital<br>444 W. Lake Street, Suite 2100<br>Chicago, IL  60606<br>Attn.: Michael Gershowitz<br>E-mail: mgershowitz@harrisonst.com |

IS_012525

and a copy to:        David Sickle
                      DLA Piper
                      444 W. Lake Street, Suite 900
                      Chicago, IL 60606
                      E-mail: david.sickle@dlapiper.com

If to Escrow Agent:    Certified Abstract Company, Inc.
                      500 Office Center Drive – Suite 400
                      Fort Washington, PA 19034
                      Attn: Jennifer Ann Ehinger
                      Email: jennifer@certifiedabstract.com

With a copy to the party not sending a notice to Escrow Agent.

(b)      Notices given by (i) overnight delivery service as aforesaid shall be deemed received and effective on the first Business Day following such dispatch and (ii) e-mail as aforesaid shall be deemed given at the time and on the date of the e-mail provided same is sent prior to 5:00 p.m. (EST) on a Business Day (if sent later, then notice shall be deemed given on the next Business Day). Notices may be given by counsel for the Parties described above, and such notices shall be deemed given by said Party for all purposes hereunder. The provisions of this Article XIV will expressly survive the termination of this Agreement or the Closing, as the case may be.

## ARTICLE XV
## BULK SALES

**Section 15.1  Bulk Sales**.  The Parties acknowledge that the Bulk Sales Laws of the Commonwealth of Pennsylvania require that certain Authorities be notified in advance of the date of Closing, of the proposed sale and conveyance of the Real Property by Seller to Purchaser, and that, to the extent that same is made available by the Commonwealth of Pennsylvania, Seller obtain and deliver to Purchaser a clearance certificate (a "**Bulk Sales Clearance Certificate**") evidencing the payment by Seller of certain taxes, assessments and contributions to the Commonwealth of Pennsylvania. The Parties further acknowledge that, as a result of procedures for the administration of applications for the Bulk Sales Clearance Certificate, and anticipated delays therein, it may not be reasonably possible for Seller to obtain and deliver such Bulk Sales Clearance Certificates as of the Closing Date or for some period of time thereafter. Seller shall be responsible for providing all pre-closing notices to Authorities required under such laws and for providing, at Closing, evidence reasonably acceptable to Purchaser that such preclosing notices have been delivered. Seller will provide Purchaser on or before the Closing Date true, correct and complete copies of all required applications for Bulk Sales Clearance Certificates, which Seller shall promptly file with the appropriate governmental departments of the Commonwealth of Pennsylvania after Closing. After the filing of the bulk sales application, Seller agrees to exercise commercially reasonable efforts to cooperate with Purchaser to cause the Commonwealth of Pennsylvania to deliver to Purchaser the Bulk Sales Clearance Certificate at or as soon after the date of Closing as is reasonably possible. Seller hereby indemnifies, defends and holds harmless Purchaser from any and all liabilities and losses that Purchaser may incur as a result of Seller's failure to perform its obligations and satisfy its liabilities under the Bulk Sales Laws. The foregoing representation and covenants shall survive Closing and may be

assigned by Purchaser to subsequent purchasers of the Real Property.

## ARTICLE XVI
## BROKERAGE

**Section 16.1    Brokers**. Purchaser and Seller represent that they have not dealt with any brokers, finders or salesmen in connection with this transaction other than Jones Lang LaSalle ("**Broker**"). Seller shall be responsible for the payment of any commissions due and payable to Broker in accordance with the terms of a separate agreement entered into between Seller and Broker. Seller and Purchaser agree to indemnify, defend and hold each other harmless from and against any and all loss, cost, damage, liability or expense, including reasonable attorneys' fees, which either Party may sustain, incur or be exposed to by reason of the breach of any representations made by the indemnifying party under this Section 16.1. The provisions of this Article XVI will survive any Closing or termination of this Agreement.

## ARTICLE XVII
## ESCROW AGENT

**Section 17.1    Escrow**.

(a)    Escrow Agent will hold the Earnest Money Deposit in escrow in an interest-bearing account of the type generally used by Escrow Agent for the holding of escrow funds. In the event the Closing occurs, the Earnest Money Deposit will be released to Seller, and Purchaser shall receive a credit against the Purchase Price in the amount of the Earnest Money Deposit. In all other instances, Escrow Agent shall not release the Earnest Money Deposit to either Party until Escrow Agent has been requested in writing by Seller or Purchaser to release the Earnest Money Deposit and has given the other Party five (5) Business Days to dispute, or consent to, the release of the Earnest Money Deposit. If such non-requesting Party disputes the release of the Earnest Money Deposit, Escrow Agent shall not release the Earnest Money Deposit.

(b)    Escrow Agent shall not be liable to any Party for any act or omission, except for bad faith, gross negligence or willful misconduct, and the Parties severally and not jointly agree to indemnify Escrow Agent and hold Escrow Agent harmless from any and all claims, damages, losses or expenses arising in connection herewith. The Parties acknowledge that Escrow Agent is acting solely as stakeholder for their mutual convenience. In the event Escrow Agent receives written notice of a dispute between the Parties with respect to the Earnest Money Deposit and the interest earned thereon (the "**Escrowed Funds**"), Escrow Agent shall not be bound to release and deliver the Escrowed Funds to either Party but may either (i) continue to hold the Escrowed Funds until otherwise directed in a writing signed by all Parties or (ii) deposit the Escrowed Funds with the clerk of any court of competent jurisdiction. Upon such deposit, Escrow Agent will be released from all duties and responsibilities hereunder. Escrow Agent shall have the right to consult with separate counsel of its own choosing (if it deems such consultation advisable) and shall not be liable for any action taken, suffered or omitted by it in accordance with the advice of such counsel.

(c)    Escrow Agent shall not be required to defend any legal proceeding which may be instituted against it with respect to the Escrowed Funds, the Property or the subject matter of this Agreement unless requested to do so by Purchaser or Seller and unless Escrow

IS_012527

Agent is indemnified to its satisfaction against the cost and expense of such defense. Escrow Agent shall not be required to institute legal proceedings of any kind and shall have no responsibility for the genuineness or validity of any document or other item deposited with it or the collectability of any check delivered in connection with this Agreement. Escrow Agent shall be fully protected in acting in accordance with any written instructions given to it hereunder and believed by it to have been signed by the proper parties.

## ARTICLE XVIII
## MISCELLANEOUS

**Section 18.1  Waivers.**  No waiver of any breach of any covenant or provisions contained herein will be deemed a waiver of any preceding or succeeding breach thereof, or of any other covenant or provision contained herein.  No extension of time for performance of any obligation or act will be deemed an extension of the time for performance of any other obligation or act.

**Section 18.2  Recovery of Certain Fees.**  In the event a Party files any action or suit against another Party by reason of any breach of any of the covenants, agreements or provisions contained in this Agreement, then in that event the prevailing Party will be entitled to recover certain fees from the other Party including all reasonable attorneys' fees and costs resulting therefrom. For purposes of this Agreement, the term "attorneys' fees" or "attorneys' fees and costs" shall mean the fees and expenses of counsel to the Parties, which may include printing, photocopying, duplicating and other expenses, air freight charges, and fees billed for law clerks, paralegals and other persons not admitted to the bar but performing services under the supervision of an attorney, and the costs and fees incurred in connection with the enforcement or collection of any judgment obtained in any such proceeding. The provisions of this Section 18.2 shall survive the termination of this Agreement, Closing and the entry of any judgment, and shall not merge, or be deemed to have merged, into the Deed or any judgment.

**Section 18.3  Construction.**  Headings at the beginning of each Article and Section are solely for the convenience of the Parties and are not a part of this Agreement.  Whenever required by the context of this Agreement, the singular will include the plural and the masculine will include the feminine and vice versa.  This Agreement will not be construed as if it had been prepared by one of the Parties, but rather as if both Parties had prepared the same.  All exhibits and schedules referred to in this Agreement are attached and incorporated by this reference, and any capitalized term used in any exhibit or schedule which is not defined in such exhibit or schedule will have the meaning attributable to such term in the body of this Agreement.  In the event the date on which Purchaser or Seller is required to take any action under the terms of this Agreement is not a Business Day, the action will be taken on the next succeeding Business Day.

**Section 18.4  Counterparts.**  This Agreement may be executed in multiple counterparts, each of which, when assembled to include a signature for each Party contemplated to sign this Agreement, will constitute a complete and fully executed Agreement. All such fully executed counterparts will collectively constitute a single agreement. The delivery of a copy of an executed counterpart of this Agreement via electronic means, such as e-mail, PDF, or facsimile, shall be as legally binding on the Party so delivering same as the delivery of a counterpart bearing an original signature.

**Section 18.5  Severability.** If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any rule of law or public policy, all of the other

conditions and provisions of this Agreement will nevertheless remain in full force and effect, so long as the economic or legal substance of the transactions contemplated hereby is not affected in any adverse manner to either Party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties will negotiate in good faith to modify this Agreement so as to reflect the original intent of the Parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

**Section 18.6  Entire Agreement**.  This Agreement is the final expression of, and contains the entire agreement between, the Parties with respect to the subject matter hereof, and supersedes all prior understandings with respect thereto. This Agreement may not be modified, changed, supplemented or terminated, nor may any obligations hereunder be waived, except by written instrument, signed by the party to be charged or by its agent duly authorized in writing, or as otherwise expressly permitted herein.

**Section 18.7  Governing Law.  THIS AGREEMENT WILL BE CONSTRUED, PERFORMED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE COMMONWEALTH OF PENNSYLVANIA, BUT WITHOUT REGARD TO THE LAWS OF SUCH STATE GOVERNING CONFLICT OR CHOICE OF LAW.  SELLER AND PURCHASER HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF ANY PENNSYLVANIA OR FEDERAL COURT SITTING IN PENNSYLVANIA IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT AND HEREBY IRREVOCABLY AGREE THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING SHALL BE HEARD AND DETERMINED IN PENNSYLVANIA OR FEDERAL COURT SITTING IN PENNSYLVANIA.**

**Section 18.8  No Recording**.  The Parties agree that neither this Agreement nor any affidavit or memorandum concerning it will be recorded, and any recording of this Agreement or any such affidavit or memorandum by Purchaser will be deemed a material default by Purchaser hereunder. The provisions of this Section 18.8 will expressly survive the Closing.

**Section 18.9  Further Actions**.  The Parties agree to execute such instructions to the Title Company and such other instruments and to do such further acts as may be reasonably necessary to carry out the provisions of this Agreement.

**Section 18.10  Exhibits and Schedules**.  The following sets forth a list of Exhibits and Schedules to the Agreement:

| | |
|---|---|
| Exhibit A | Legal Descriptions of the Real Property |
| Exhibit B | Form of Certificate as to Foreign Status |
| Exhibit C | Form of Bill of Sale, Assignment of Other Property and Assigned Contracts |
| Exhibit D | Leases |
| Exhibit E | Form of Title Affidavit |
| Exhibit F | Form of Deed |
| Exhibit G | Form of Assignment and Assumption of Leases |
| Exhibit H | Existing Title Exceptions |
| Schedule 8.1(d) | Seller's Suits and Proceedings |
| Schedule 8.1(g) | Service Contracts |

IS_012529

Schedule 8.2(d)        Purchaser's Suits and Proceedings

**Section 18.11 <u>No Partnership</u>**.  Notwithstanding anything to the contrary contained herein, this Agreement shall not be deemed or construed to make the Parties partners or joint venturers, it being the intention of the Parties to merely create the relationship of Seller and Purchaser with respect to the Property to be conveyed as contemplated hereby.

**Section 18.12 <u>Limitations on Benefits</u>**.  It is the explicit intention of Purchaser and Seller that no person or entity other than Purchaser, Seller and their permitted successors and assigns is or shall be entitled to bring any action to enforce any provision of this Agreement against any of the Parties, and the covenants, undertakings and agreements set forth in this Agreement shall be solely for the benefit of, and shall be enforceable only by, Purchaser, Seller and their respective successors and assigns as permitted hereunder.  Except as set forth in this Section 18.12, nothing contained in this Agreement shall under any circumstances whatsoever be deemed or construed, or be interpreted, as making any third party a beneficiary of any term or provision of this Agreement, any instrument or document delivered pursuant hereto or any transactions contemplated hereunder or thereunder, and Purchaser and Seller expressly reject any such intent, construction or interpretation of this Agreement.

**Section 18.13 <u>Discharge of Obligations and Release</u>**.  The acceptance of the Deed by Purchaser shall be deemed to be a full performance and discharge of every representation and warranty made by Seller herein and every agreement and obligation on the part of Seller to be performed pursuant to the provisions of this Agreement, except for (i) those  representations (if any) and obligations that expressly survive Closing, and (ii) those obligations and representations set forth in the Deed and other Closing documents.  The acceptance of the Purchase Price at Closing by Seller shall be deemed to be a full performance and discharge of every representation and warranty made by Purchaser herein and every agreement and obligation on the part of Purchaser to be performed pursuant to the provisions of this Agreement except for the obligations that specifically survive the Closing pursuant to the explicit provisions of this Agreement.  Other than with respect to the provisions that specifically survive the Closing, as of the consummation of Closing, each Party hereby releases the other Party and its respective Seller's Affiliates or Purchaser's Affiliates, as applicable, from any and all claims, damages and actions arising out of or in connection with this Agreement or the Property.

**Section 18.14 <u>Assignment</u>**.  Purchaser shall not transfer this Agreement or any interest herein or in the Property to any third party without the prior written consent of the Seller, in its sole discretion. Notwithstanding the foregoing, Purchaser shall have the right to be substituted as the purchaser under this Agreement by a yet-to-be-formed single purpose (the "**SPE**") that is a Purchaser Affiliate, which SPE shall obtain title at Closing to the Property.  In furtherance of the foregoing, conditioned on Closing occurring, Purchaser shall have the right to be substituted by the SPE as the Purchaser under this Agreement through a novation, incorporating the same terms as those in this Agreement.  Upon such novation, the SPE expressly assumes the Purchaser's rights and obligation under this Agreement and the Purchaser shall be released from all of its obligations under this Agreement.  Seller hereby consents to such novation, and while such consent shall be self-effectuating without the need for further documentation, Seller shall, at the request of Purchaser, enter into a novation document effectuating the foregoing.  Any expense relating to the novation shall be borne by Purchaser, including any increase in realty transfer tax liability, and Purchaser and the SPE shall indemnify, defend and hold Seller harmless from and against any and all realty transfer taxes and any and all other costs, liabilities, etc. incurred by

IS_012530

Purchaser related thereto in connection with the transaction and novation described herein.  This paragraph shall survive Closing.

**Section 18.15 Waiver; Time is of the Essence**.  The Parties waive the formal requirements for tender of payment and deed in order to declare a default.  Time is of the essence for all covenants and conditions set forth in this Agreement.

**Section 18.16 Displaced Contract Workers Ordinance.**  If Purchaser does not (or is not permitted to) assume any of the Service Contracts (such Service Contracts that are not assumed being referred to herein as "**Un-assumed Contracts**"), Purchaser shall either (a) enter into a new contract with the same contractor that provided services under any of the Un-assumed Contracts, and in so doing require such contractor to continue to employ those employees who are currently employed at the Real Property in connection with  such Un-assumed Contract or (b) Purchaser shall replace such contractor under such Un-assumed Contract in accordance with the Protection of Displaced Contract Workers Ordinance, Chapter 9-2300 of the Philadelphia Code (the "**PDCW**"), acting, pursuant to the PDCW, as the "awarding authority," or, to the extent necessary to conform to the PDCW, acting as the agent of the "awarding authority." Purchaser shall indemnify, defend and hold harmless Seller for Purchaser's failure to so comply with the PDCW.

**Section 18.17 1031 Exchange**.  Either Party may consummate the purchase or sale (as applicable) of the Property as part of a so-called like kind exchange (an "**Exchange**") pursuant to § 1031 of the Internal Revenue Code of 1986, as amended (the "**Code**"), provided that:  (a) the Closing shall not be delayed or affected by reason of the Exchange nor shall the consummation or accomplishment of an Exchange be a condition precedent or condition subsequent to the exchanging party's obligations under this Agreement; (b) the exchanging party shall effect its Exchange through an assignment of this Agreement, or its rights under this Agreement, to a qualified intermediary; (c) neither party shall be required to take an assignment of the purchase agreement for the relinquished or replacement property or be required to acquire or hold title to any real property for purposes of consummating an Exchange desired by the other party; and (d) the exchanging party shall pay any additional costs that would not otherwise have been incurred by the non-exchanging party had the exchanging party not consummated the transaction through an Exchange.  Neither party shall by this Agreement or acquiescence to an Exchange desired by the other party have its rights under this Agreement affected or diminished in any manner or be responsible for compliance with or be deemed to have warranted to the exchanging party that its Exchange in fact complies with § 1031 of the Code. In furtherance of the foregoing, the party engaging in a Section 1031 Exchange hereby defends, indemnifies, and holds harmless the other party from and against any costs and liabilities, including reasonable attorneys' fees, arising in connection with such Section 1031 Exchange.  The party engaging in a Section 1031 exchange shall provide whatever safeguards are reasonably requested by the other party to ensure that all of such party's obligations under this Agreement shall be satisfied in accordance with the terms hereof.  The party engaging in the Section 1031 Exchange acknowledges that it solely is responsible for the efficacy of any Section 1031 Exchange that it elects to effectuate and that the other party shall have no liability in the event that the Section 1031 Exchange transaction fails to qualify as a Section 1031 Exchange

*[Remainder of Page Intentionally Left Blank]*

IS_012531

IN WITNESS WHEREOF, Seller and Purchaser have respectively executed this Agreement as of the Effective Date.

**PURCHASER:**

**IS 245 NORTH 15TH STREET LLC**

By: _____

Name: Matthew Cann

Title: Manager

**IS PAHH OZ LLC**

By: _____

Name: Matthew Cann

Title: Manager

**IS3 WEST GIRARD, LLC**

By: _____

Name: Matthew Cann

Title: Manager

**IS BBFB LLC**

By: _____

Name: Matthew Cann

Title: Manager

**[SIGNATURES CONTINUE ON FOLLOWING PAGE]**

[SIGNATURE PAGE]

IS_012532

**SELLER:**

**PAHH NEW COLLEGE MOB, LLC**

By: _____
        Name:  Stephen M. Gordon
        Title:  Authorized Signatory

**PAHH FEINSTEIN MOB, LLC**

By: _____
        Name:  Stephen M. Gordon
        Title:  Authorized Signatory

**PAHH WOOD STREET GARAGE, LLC**

By: _____
        Name:  Stephen M. Gordon
        Title:  Authorized Signatory

**PAHH BROAD STREET MOB, LLC**

By: _____
        Name:  Stephen M. Gordon
        Title:  Authorized Signatory

**As to Articles IV, XIII, and XVII only:**

**ESCROW AGENT:**

**CERTIFIED ABSTRACT COMPANY, INC.**

By: _____
Name:      Jennifer Ann Ehinger
Title:        President

[SIGNATURE PAGE]

**EXHIBIT A-1**

**Legal Description**

*216 Real Property (PAHH Feinstein LLC)*

**Fee Parcel:**

ALL THAT CERTAIN lot or piece of ground with the building and improvements thereon erected, SITUATE in the 10th Ward of the City of Philadelphia and described according to a Survey and Plan thereof made by Frederick T. Thorpe, Jr., Surveyor and Regulator of the 3rd District dated June 5, 1945 as follows, to wit:-

BEGINNING at a point on the Westerly side of Broad Street (113 feet wide) at the distance of 157 feet Northwardly from the Northerly side of Race Street (50 feet wide); thence extending Westwardly on a line parallel with Race Street through a wall 100 feet to a point; thence extending Southwardly on a line parallel with Broad Street 15 feet, 8 inches to a point; thence extending Westwardly on a line parallel with Race Street through a wall 60 feet to a point on the Easterly side of Carlisle Street (40 feet wide); thence extending Northwardly along the Easterly side of Carlisle Street on a line parallel with Broad Street 15 feet, 8 inches to a point; thence extending Westwardly on a line parallel with Race Street crossing the head of Carlisle Street 10 feet 6 inches more or less to a point; thence extending Northwardly on a line parallel with Broad Street through a wall 53 feet to a point; thence extending Eastwardly on a line parallel with Race Street through a wall 170 feet more or less to a point on the Westerly side of Broad Street aforesaid; thence extending Southwardly along the said side of Broad Street 53 feet to the first mentioned point and place of beginning.

**AND**

ALL THAT CERTAIN lot or piece of ground, Situate in the Tenth Ward of the City of Philadelphia, described according to a Plan made for Hahnemann Medical College and Hospital by Don H. Joseph, Surveyor and Regulator of the Third District, dated March 16, 1962 to wit:-

BEGINNING at an interior point measured Westwardly the distance of 0 feet, 6 inches from the Westerly side of Carlisle Street (40 feet wide) the last mentioned point being on the Northerly dead end of said Carlisle Street the distance of 157 feet, 0 inches along the said Westerly side of Carlisle Street from the Northerly side of Race Street (50 feet wide) (said beginning point being 195 feet, 6 inches Eastwardly from the Easterly side of 15th Street (50 feet wide); thence extending Northwardly parallel with 15th Street 53 feet, 4-1/2 inches to a point; thence Westwardly parallel with Race Street 9 feet, 8-1/2 inches; thence Northwardly parallel with 15th Street 53 feet, 9 inches to a point; thence Eastwardly parallel with Race Street, 1 foot, 1-1/2 inches to a point; thence Northwardly parallel with 15th Street 29 feet, 11 inches to a point; thence Eastwardly parallel with Race Street 7 feet, 7 inches to a point; thence Northwardly parallel with 15th Street 53 feet, 4 inches to a point; thence Eastwardly at right angles to 15th Street 46 feet, 9 inches to a point; thence Southwardly parallel with 15th Street 42 feet, 3 inches to a point; thence Eastwardly at right angles to 15th Street 32 feet, 11 inches to a point; thence Southwardly parallel with 15th Street 94 feet, 3-1/2 inches to a point; thence Westwardly parallel

with Race Street 48 feet, 6 inches to a point; thence Southwardly parallel with 15th Street 53 feet, 4-1/2 inches to a point on the Northerly dead end of said Carlisle Street; thence Westwardly along the Northerly dead end of said Carlisle Street 30 feet, 0 inches to a point, being the first mentioned point and place of beginning.

**The above-described parcels are together described as follows:**

**Parcel C Fee Parcel:**

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND SITUATE, LYING AND BEGINNING IN THE CITY AND COUNTY OF PHILADELPHIA, COMMONWEALTH OF PENNSYLVANIA, AS SHOWN ON A PLAN BY PENNONI ASSOCIATES ENTITLED "HAHNEMANN UNIVERSITY HOSPITAL – PROPOSED SUBDIVISION PLAN" BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE WESTERLY SIDE OF BROAD STREET (ON CITY PLAN, LEGALLY OPEN, 113' WIDE), SAID POINT BEING LOCATED 155.932' NORTHERLY FROM THE INTERSECTION OF SAID WESTERLY SIDE OF BROAD STREET AND THE NORTHERLY SIDE OF RACE STREET (ON CITY PLAN, LEGALLY OPEN, 50' WIDE) AND RUNNING:

1) THENCE: ALONG PARCEL D, N78°59'00"W, A DISTANCE OF 91.495' TO A POINT;
2) THENCE: CONTINUING ALONG SAME, S11°21'00"W, A DISTANCE OF 7.952' TO A POINT;
3) THENCE: CONTINUING ALONG SAME, N78°59'00"W, A DISTANCE OF 7.382' TO A POINT;
4) THENCE: CONTINUING ALONG SAME, S11°21'00"W, A DISTANCE OF 8.646' TO A POINT;
5) THENCE: CONTINUING ALONG SAME, N78°59'00"W, A DISTANCE OF 61.122' TO A POINT;
6) THENCE: CONTINUING ALONG SAME, N11°21'00"E, A DISTANCE OF 2.000' TO A POINT;
7) THENCE: CONTINUING ALONG SAME, N78°59'00"W, A DISTANCE OF 10.667' TO A POINT,
COMMON TO THE EASTERLY LINE OF PARCEL E;
8) THENCE: ALONG THE EASTERLY LINE OF PARCEL E, N11°21'00"E, A DISTANCE OF 16.035' TO A POINT;
9) THENCE: CONTINUING ALONG SAME, N78°59'00"W, A DISTANCE OF 29.832' TO A POINT;
10) THENCE: CONTINUING ALONG SAME, N11°21'00"E, A DISTANCE OF 42.833' TO A POINT;
11) THENCE: CONTINUING ALONG SAME, N78°59'00"W, A DISTANCE OF 9.708' TO A POINT,
COMMON TO PARCEL B;
12) THENCE: ALONG THE EASTERLY LINE OF PARCEL B, N11°21'00"E, A DISTANCE OF 64.291' TO A POINT;

13) THENCE: CONTINUING ALONG SAME, S78°59'00"E, A DISTANCE OF 1.125' TO A POINT;

14) THENCE: CONTINUING ALONG SAME, N11°21'00"E, A DISTANCE OF 25.416' TO A POINT;

15) THENCE: CONTINUING ALONG SAME, S78°59'00"E, A DISTANCE OF 7.667' TO A POINT;

16) THENCE: CONTINUING ALONG SAME, N11°21'00"E, A DISTANCE OF 57.755' TO A POINT,
COMMON CORNER TO PARCEL A;

17) THENCE: ALONG PARCEL A, S78°39'00"E, A DISTANCE OF 46.670' TO A POINT;

18) THENCE: CONTINUING ALONG SAME, S11°21'00"W, A DISTANCE OF 42.110' TO A POINT;

19) THENCE: CONTINUING ALONG SAME, S78°39'00"E, A DISTANCE OF 32.915' TO A POINT;

20) THENCE: CONTINUING ALONG SAME, S11°21'00"W, A DISTANCE OF 94.348' TO A POINT;

21) THENCE: CONTINUING ALONG SAME, S78°59'00"E, A DISTANCE OF 121.833' TO A POINT ON SAID WESTERLY SIDE OF BROAD STREET;

22) THENCE: CONTINUING ALONG THE WESTERLY SIDE OF BROAD STREET, S11°21'00"W, A DISTANCE OF 54.443' TO THE POINT AND PLACE OF BEGINNING.

BEING assessed and known as 216-20 N. Broad Street
BEING OPA Parcel No. 77-2-0240-02

**Parcel C Easement Parcel:**

TOGETHER WITH the reciprocal easements set forth in Reciprocal Easement and Operating Agreement made by and between Broad Street Healthcare Properties, LLC, Broad Street Healthcare Properties III, LLC, PAHH Feinstein MOB, LLC and PAHH New College MOB, LLC dated December 30, 2017 made effective January 11, 2018, and recorded January 18, 2018 in the Office of the Recorder of Deeds for the County of Philadelphia as Document No. 53316755.

## EXHIBIT A-2

### Legal Description

*231 Real Property (PAHH Broad Street LLC)*

ALL THAT CERTAIN lot or piece of ground, SITUATE in the 5th Ward of the City of Philadelphia, described in accordance with a Plan of Property prepared by Barton and Martin Engineers, dated
March 22, 1996.

BEGINNING at a point on the Easterly side of Broad Street (113 feet wide) at the distance of 303 feet, 6 inches Northward from the Northerly side of Race Street (50 feet wide); thence extending from said beginning point Northward along the said Easterly side of Broad Street 40 feet, 3 inches to a point; thence Eastward 120 feet parallel with Race Street to a point on the Westerly side of Watts Street (30 feet wide); thence Southward along the said Westerly side of Watts Street 12 feet, 9 inches to an angle point; thence Southwestward along the Northwesterly side of said Watts Street 28 feet, 8-1/2 inches to a point; thence Westward 111 feet, 11 inches parallel with Race Street to a point in the Easterly side of said Broad Street being the first mentioned point and place of beginning.

BEING Nos. 231-233 North Broad Street
BEING OPA Parcel No. 77-7-0115-50

**Also described as:**

**LOT 8 – SOUTH**

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND SITUATE, LYING AND BEGINNING IN THE CITY AND COUNTY OF PHILADELPHIA, COMMONWEALTH OF PENNSYLVANIA, AS SHOWN ON A PLAN BY PENNONI ASSOCIATES ENTITLED "HAHNEMANN UNIVERSITY HOSPITAL – PROPOSED SUBDIVISION PLAN" BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE EASTERLY SIDE OF BROAD STREET (113' WIDE) SAID POINT BEING THE FOLLOWING COURSE FROM THE INTERSECTION OF THE EASTERLY SIDE OF BROAD STREET AND THE NORTHERLY SIDE OF RACE STREET (50' WIDE) RUNNING:

a) N11°21'00"E, A DISTANCE OF 303.050' TO THE POINT OF BEGINNING
1) THENCE: ALONG SAID EASTERLY SIDE OF BROAD STREET, N11°21'00"E, A DISTANCE
OF 40.250' TO A POINT;
2) THENCE: LEAVING SAID EASTERLY SIDE OF BROAD STREET, S78°59'00"E, A DISTANCE OF 120.000' TO A POINT ON THE WESTERLY SIDE OF WATTS STREET (30' WIDE);

3) THENCE: ALONG SAID WESTERLY SIDE OF WATTS STREET, S11°21'00"W, A DISTANCE OF 12.750' TO A POINT;

4) THENCE: CONTINUING ALONG SAME, S27°43'20"W, A DISTANCE OF 28.708' TO A POINT;

5) THENCE: LEAVING SAID WESTERLY SIDE OF WATTS STREET, N78°59'00"W, A DISTANCE OF 111.917' TO THE POINT OF BEGINNING.

IS_012538

## EXHIBIT A-3

### Legal Description

*245 Real Property (PAHH College LLC)*

**Fee Parcel:**
ALL THAT CERTAIN lot or parcel of ground together with the buildings and improvements thereon erected.

SITUATE in the 8th Ward of the City of Philadelphia, Commonwealth of Pennsylvania, described as follows, to wit:-

BEGINNING at a point on the Eastwardly side of 15th Street (50 feet wide) at the distance of 63 feet, 4-1/2 inches measured Southwardly along the same from the Southerly side of Vine Street (157 feet wide); thence Eastwardly parallel with Vine Street 196 feet to a point on the Westerly side of Carlisle Street (12 feet wide); thence Southwardly partly along said side of Carlisle Street and parallel with 15th Street, 114 feet, 4 inches to a point; thence Westwardly parallel with Vine Street, 1 foot, 5 inches to a point; thence Southwardly parallel with 15th Street, 57 feet, 9 inches to a point; thence Westwardly parallel with Vine Street, 7 feet, 7 inches to a point; thence Southwardly parallel with 15th Street through a wall 26 feet, 1-1/2 inches to a point; thence Westwardly parallel with Vine Street, 1 foot, 2 inches to a point; thence Southwardly parallel with 15th Street, 84 feet, 7 inches to a point; thence Westwardly parallel with Vine Street, 62 feet, 3 inches to a point; thence Northwardly parallel with 15th Street, 21 feet to a point; thence Westwardly parallel with Vine Street partly through 2 certain walls 123 feet, 7 inches to a point on the Easterly side of said 15th Street; thence Northwardly along said side of 15th Street, 261 feet, 9-1/2 inches to the first mentioned point and place of beginning.

**Also described as:**

**Parcel B Fee Parcel:**
ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND SITUATE, LYING AND BEGINNING IN THE CITY AND COUNTY OF PHILADELPHIA, COMMONWEALTH OF PENNSYLVANIA, AS SHOWN ON A PLAN BY PENNONI ASSOCIATES ENTITLED "HAHNEMANN UNIVERSITY HOSPITAL – PROPOSED SUBDIVISION PLAN" BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE SOUTHERLY SIDE OF VINE STREET (ON CITY PLAN, LEGALLY OPEN, VARIABLE WIDTH) WHERE IT INTERSECTS WITH THE EASTERLY SIDE OF 15TH STREET (ON CITY PLAN, LEGALLY OPEN, 70' WIDE) AND RUNNING:

1) THENCE: ALONG SAID SOUTHERLY SIDE OF VINE STREET, S78°59'00"E, A DISTANCE OF 174.381' TO A POINT COMMON TO PARCEL A;
2) THENCE: ALONG THE WESTERLY LINE OF PARCEL A, S11°21'00"W, A DISTANCE OF 122.199' TO A POINT;

3) THENCE: CONTINUING ALONG SAME, S78°39'00"E, A DISTANCE OF 20.198' TO A POINT COMMON TO PARCEL C;

4) THENCE: ALONG THE WESTERLY LINE OF PARCEL C, S11°21'00"W, A DISTANCE OF 56.015' TO A POINT;

5) THENCE: CONTINUING ALONG SAME, N78°59'00"W, A DISTANCE OF 7.667' TO A POINT;

6) THENCE: CONTINUING ALONG SAME, S11°21'00"W, A DISTANCE OF 25.416' TO A POINT;

7) THENCE: CONTINUING ALONG SAME, N78°59'00"W, A DISTANCE OF 1.125' TO A POINT;

8) THENCE: CONTINUING ALONG SAME, S11°21'00"W, A DISTANCE OF 85.291' TO A POINT, COMMON TO PARCEL E;

9) THENCE: ALONG THE NORTHERLY LINE OF PARCEL E, N78°59'00"W, A DISTANCE OF 62.210' TO A POINT;

10) THENCE: CONTINUING ALONG SAME, N11°21'00"E, A DISTANCE OF 21.842 TO A POINT;

11) THENCE: CONTINUING ALONG PARCELS E & F, N78°59'00"W, A DISTANCE OF 123.582' TO A POINT ON THE EASTERLY SIDE OF 15th STREET;

12) THENCE: ALONG THE EASTERLY SIDE OF 15TH STREET, N11°21'00"E, A DISTANCE OF 267.197' TO THE POINT AND PLACE OF BEGINNING.

BEING known and assessed as 225-51 N. 15th Street

BEING OPA Parcel No. 77-2-0285-02

**Parcel B Easement Parcel:**

TOGETHER WITH the reciprocal easements set forth in Reciprocal Easement and Operating Agreement made by and between Broad Street Healthcare Properties, LLC, Broad Street Healthcare Properties III, LLC, PAHH Feinstein MOB, LLC and PAHH New College MOB, LLC dated December 30, 2017 made effective January 11, 2018, and recorded January 18, 2018 in the Office of the Recorder of Deeds for the County of Philadelphia as Document No. 53316755.

## EXHIBIT A-4

### Legal Description

*1450 Real Property (PAHH Wood, LLC)*

**LOT 2 – HUH NORTH FEE PARCEL:**
ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND SITUATE, LYING AND BEGINNING IN THE CITY AND COUNTY OF PHILADELPHIA, COMMONWEALTH OF PENNSYLVANIA, AS SHOWN ON A PLAN BY PENNONI ASSOCIATES ENTITLED "HAHNEMANN UNIVERSITY HOSPITAL – EXISTING CONDITIONS / PROPOSED PLAN" BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE SOUTHERLY SIDE OF WOOD STREET (40' WIDE) WHERE IT INTERSECTS WITH THE WESTERLY SIDE OF BROAD STREET (113' WIDE) AND RUNNING:

1) THENCE: ALONG SAID WESTERLY SIDE OF BROAD STREET, S11°21'00"W, A DISTANCE OF 106.575' TO A POINT COMMON TO LOT 1;
2) THENCE: ALONG THE NORTHERLY LINE OF LOT 1, N78°59'00"W, A DISTANCE OF 237.947' TO A POINT COMMON TO LOT 3;
3) THENCE: ALONG THE EASTERLY LINE OF LOT 3, N11°21'00"E, A DISTANCE OF 22.779' TO A POINT;
4) THENCE: CONTINUING ALONG SAME, S78°59'00"E, A DISTANCE OF 6.460' TO A POINT;
5) THENCE: CONTINUING ALONG SAME, N11°21'00"E, A DISTANCE OF 29.468' TO A POINT;
6) THENCE: CONTINUING ALONG SAME, S78°59'00"E, A DISTANCE OF 33.740' TO A POINT;
7) THENCE: CONTINUING ALONG SAME, N11°21'00"E, A DISTANCE OF 54.327' TO A POINT ON THE SOUTHERLY LINE OF SAID WOOD STREET;
8) THENCE: ALONG THE SAID SOUTHERLY LINE OF WOOD STREET, S78°59'00"E, A DISTANCE OF 197.747' TO THE FIRST MENTIONED POINT OF BEGINNING.

BEING NOS. 306-20 N. BROAD STREET
BEING OPA PARCEL NO. 88-3-4001-02

**LOT 2 – HUH NORTH EASEMENT PARCEL:**

TOGETHER WITH THE RECIPROCAL EASEMENTS SET FORTH IN PARKING, ACCESS AND UTILITIES EASEMENT AGREEMENT MADE BY AND BETWEEN PAHH WOOD STREET GARAGE, LLC, BROAD STREET HEALTHCARE PROPERTIES, LLC AND BROAD STREET HEALTHCARE PROPERTIES II, LLC DATED DECEMBER 20, 2017 MADE EFFECTIVE JANUARY 11, 2018, AND RECORDED JANUARY 18, 2018 IN THE OFFICE OF THE RECORDER OF DEEDS FOR THE COUNTY OF PHILADELPHIA AS DOCUMENT NO. 53316753.

## EXHIBIT B

<u>Form of Certificate as to Foreign Status</u>

## FIRPTA NON-FOREIGN SELLER CERTIFICATE
## ENTITY TRANSFEROR/SELLER

Section 1445 of the Internal Revenue Code provides that a transferee (buyer) of a United States real property interest must withhold tax if the transferor/seller is a foreign person. To hold the disposition of a U.S. real property interest by _____, a Delaware limited liability company (collectively, "**Transferor**"), the undersigned hereby certifies to _____ ("**Transferee**"), the following on behalf of transferor:

1. Transferor is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as these terms are defined in the Internal Revenue Code and Income Tax Regulations);

2. Transferor's Employer Identification Number is: _____.

3. Transferor's address is:    _____
   c/o Harrison Street Real Estate Capital
   444 W. Lake Street, Suite 2100
   Chicago, IL 60606

4. Transferor understands that this certification may be disclosed to the Internal Revenue Service by the Transferee and that any false statement contained herein could be punishable by fine, imprisonment, or both.

Under penalties of perjury, the undersigned declares that (he/she) (has/have) examined this certification and to the best of the undersigned's knowledge, information and belief, the information contained herein is true, correct and complete and the undersigned further declares that (he/she) (has/have) the authority to sign this document on behalf of the transferor.

## [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**TRANSFEROR:**

_____, LLC

By: _____

     Name:

     Title:

Dated: _____, 2021

## EXHIBIT C

Form of Bill of Sale, Assignment of Other Property and Contracts

**THIS BILL OF SALE, ASSIGNMENT AND ASSUMPTION OF OTHER PROPERTY AND CONTRACTS** ("**Assignment**") is made this _____ day of _____ 2021, between PAHH Erie Street Garage, LLC, a Delaware limited liability company (collectively, "**Assignor**"), and **ISSTC PROPCO, LLC**, a Pennsylvania limited partnership ("**Assignee**")

## B A C K G R O U N D:

**WHEREAS,** Assignor, is the seller, and Assignee is the buyer, under that certain Agreement of Sale dated February __, 2021, as amended (collectively, the "**Agreement**"), in which Assignor, as seller, agreed to sell and Assignee, as purchaser, agreed to purchase that certain parcel of land located at _____, Philadelphia Pennsylvania (the "**Property**"), owned by _____.

**WHEREAS,** pursuant to the Agreement, under which Closing is taking place on the date hereof, Assignor desires to transfer, sell, assign, convey, grant and deliver to Assignee, all of Assignor's right, title, interest and privileges in and to the Other Property and Contracts (if any), and Assignee desires to accept such assignment and assume Assignor's obligations under the Other Property and Contracts (if any) arising from and after the date hereof.

**WHEREAS,** any capitalized terms used in this instrument that are defined in the Agreement shall have the meanings given such terms in the Agreement if not otherwise defined herein.

**NOW, THEREFORE,** intending to be legally bound hereby, and in consideration of the mutual covenants contained herein, Assignor and Assignee agree as follows:

1.     Assignor hereby absolutely and irrevocably transfers, sells, assigns, conveys, grants and delivers to Assignee all of Assignor's right, title, interest, claims and privileges in and to the Contracts which are listed on Exhibit "A" attached hereto and made a part hereof, and the Other Property.

2.     Assignee hereby assumes and agrees to perform all of the Assignor's obligations, to be performed under the Contracts and the Other Property from and after the date of this Assignment.

3.     The rights and obligations of the parties hereto shall be binding upon and inure to the benefit of Assignee and Assignor and their respective successors and assigns.

|     This Assignment, and all claims or causes of actions, whether in contract or tort, that may be based upon, arise out of, or relate to this Assignment, or the negotiation, execution, or performance of this Assignment including, but not limited to, any claim or cause of action based upon, arising out of, or related to any representation or warranty made in, or in connection with, this Assignment or as an inducement to enter into this Assignment, shall be governed by the internal laws of the Commonwealth of Pennsylvania.

5.     This Assignment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one entire original Assignment.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

IS_012545

*IN WITNESS WHEREOF*, the parties have executed this Assignment and Assumption of Other Property and Contracts as of the day and year first written.

**ASSIGNOR:**

_____, LLC

By: _____
      Name:
      Title:

**ASSIGNEE:**

_____, LLC

By: _____
      Name:
      Title:

IS_012546

## EXHIBIT D

### Leases

| Property | Document | Tenant | Effective Date | Notes |
|---|---|---|---|---|
| New College Building | Lease (As Amended) | Drexel University | November 10, 1998 | Lease Date: November 10, 1998, as restated April 25, 2002 1st Amendment: November 1,2001 2nd Amendment November 10, 2008 3rd Amendment: September 16, 2010 |
| New College Building | Lease Amendment and Restatement "Splitter" | Drexel University | January 11, 2018 | |
| New College Building | Corrective Work Agreement | Drexel University | January 11, 2018 | |
| New College Building | Recognition Agreement | Drexel University | January 11, 2018 | |
| New College Building | Lease Agreement | Drexel University | January 16, 2016 | For 3,188 SF on 5th floor that is not currently occupied and term has technically expired 1/31/21 without LL receipt of renewal notice. |
| New College Building | Lease Agreement and First Amendment | Cingular | February 17, 2006 | Most recent lease document from Cingular, whose equipment is still on site and operating, despite this document showing expiration in 2011. Has been reaching out for new lease. |
| New College Building | Lease Agreement | Cingular | June 12, 1990 | Original lease document from the predecessor to Cingular, whose equipment is still on site and operating, despite this document showing expiration in 2011. Has been reaching out for new lease. |
| New College Building | Lease Agreement | Cingular | April 22, 1994 | First Amendment to lease from the predecessor to Cingular, whose equipment is still on site and operating, despite this document showing expiration in 2011. Has been reaching out for new lease. |
| Feinstein Building/ Bobst Building | Lease (As Amended) | Drexel University | November 10, 1998 | Lease Date: November 10, 1998, as restated April 25, 2002 1st Amendment: November 1,2001 2nd Amendment November 10, 2008 3rd Amendment: September 16, 2010 |

IS_012547

| | Feinstein Building/ Bobst Building | Lease Amendment and Restatement "Splitter" | Drexel University | January 11, 2018 | |
| --- | --- | --- | --- | --- | --- |
| | Feinstein Building/ Bobst Building | Corrective Work Agreement | Drexel University | January 11, 2018 | |
| | Feinstein Building/ Bobst Building | Recognition Agreement | Drexel University | January 11, 2018 | |
| | Feinstein Building/ Bobst Building | Fully Executed Assignment, Assumption and Amendment to Lease Agreement | DaVita | August 1, 2020 | |
| | Feinstein Building/ Bobst Building | Lease Agreement | DaVita (from Dialysis Unit of Center City Philadelphia, LLC) | August 21, 2016 | |
| | Feinstein Building/ Bobst Building | Effective Date Memorandum | DaVita | August 1, 2020 | |
| | Feinstein Building/ Bobst Building | Guaranty | DaVita | August 1, 2020 | |
| | 231 N Broad Street | Lease Agreement | Arthur Huppert, MD | June 28, 2017 | |

IS_012548

**EXHIBIT E**

<u>Form of Title Affidavit</u>

[attached]

IS_012549

OWNERS AFFIDAVIT - PENNSYLVANIA
FTPA-7 (revised 12/2015)

# *First American Title Insurance Company*

**COMMITMENT NO. :** _____ **PREMISES:**

_____

That this ____ day of _____, 2021, before the undersigned officer, personally appeared Stephen M. Gordon ("**Affiant**") who acknowledged himself/herself to be the Authorized Signatory of _____, a Delaware limited liability company ("**Owner**"). Owner is the owner of _____, City of Philadelphia, County of Philadelphia, State of Pennsylvania (the "**Premises**"); Owner is a limited liability company, duly formed under the laws of the State of Delaware. Owner owes no delinquent corporate taxes to the Commonwealth of Pennsylvania.

Affiant, solely on behalf of Owner (and not personally), states the following to Affiant's knowledge ("**Affiant's knowledge**," as used herein means and is limited to the current actual knowledge of _____, without any duty of inquiry or investigation).

That to Affiant's knowledge, there are no mortgages, judgments, encumbrances, easements, or pending suits adversely affecting the Owner(s) or the Premises not set forth in the Commitment.

Other than ordinary maintenance in the ordinary course of operations, there have been no repairs, additions or improvements made on or to the Premises, nor any demolition, excavation, or other site work on the Premises, within six (6) months from the date of this affidavit which has not been paid or will not be paid as of Closing [except certain chilled water coils from Johnson Controls in the amount of $99,851.00, which will be paid at or prior to Closing][1] [other than: NONE][2].

To Affiant's knowledge, the Owner(s) has/have not received any notice relating to the filing of a mechanics' lien claim which has not been paid, bonded over, or otherwise resolved.

That to Affiant's knowledge, no sidewalks have been laid, nor has any curbing, street paving, sewer, water pipe or any other municipal work been done or ordered to be done for which municipal claims could be filed against the said Premises.

To Affiant's knowledge, Owner has not received notice of any violation of any restrictions affecting the Premises which has not been resolved.

That to Affiant's knowledge there are no leases, contracts to sell the land, or parties in possession other than Owner except as follows: _____

That the present transaction is not made for the purpose of hindering, delaying or defrauding any creditors and to the knowledge of Affiant does not come within the provisions of the Bankruptcy or Insolvency Acts (or any amendments thereof).

This Affidavit is made for the purpose of inducing First American Title Insurance Company or its duly authorized agent to issue its title insurance policy(ies).

[SIGNATURE PAGE FOLLOWS]

---

[1] As to the 216 Real Property only.
[2] All Real Property except the 216 Real Property.
EAST\179101247.10

(Page 1 of 2)
OWNERS AFFIDAVIT – PENNSYLVANIA
FTPA-7 (revised 12/2015)

COMMONWEALTH OF PENNSYLVANIA    )

                                                       ) SS

COUNTY OF _____    )


ON THE _____ DAY OF _____ 2021, before me, the undersigned Notary Public, the undersigned Affiant personally appeared and, who being duly sworn according to law and intending to be legally bound, depose(s) and say(s) that the foregoing statements are true and correct to the best of Affiant's knowledge and belief.

Affiant:


_____
Stephen M. Gordon
Authorized Signatory



_____    My Commission Expires:_____
Notary Public

EXHIBIT F

Form of Deed

**Prepared by and return to:**

_____

_____

_____

Certified Abstract Company, Inc.
500 Office Center Drive, Suite 400
Fort Washington, PA 19034
File: _____

**Property:**
OPA #_____
_____, Philadelphia, PA

_____

### SPECIAL WARRANTY DEED

This Special Warranty Deed is dated as of _____ __, 2021, effective as of _____ __, 2021, by **[INSERT NAME OF EACH RESPECTIVE SELLER]**, LLC, a Delaware limited liability company (the "**Grantor**") in favor of **[INSERT NAME OF EACH RESPECTIVE PURCHASER]**, LLC, a Pennsylvania limited liability company (the "**Grantee**").

WITNESSETH, that the said Grantor, for and in consideration of the sum of THIRTY SIX MILLION AND 0/100 DOLLARS ($36,000,000.00)[3] lawful money of the United States of America unto it well and truly paid by the said Grantee, at or before the sealing and delivery hereof, the receipt of which is hereby acknowledged, has granted, bargained and sold, aliened, enfeoffed, released and confirmed, and by these presents does grant, bargain and sell, alien, enfeoff, release and confirm unto the said Grantee, its successors and assigns,

ALL THAT CERTAIN real property and the improvements located thereon situate in the City and County of Philadelphia, Pennsylvania, being known as _____ and tax parcel number _____ and being more particularly described on Exhibit A attached hereto and incorporated herein as though set forth at length, provided, however, the foregoing does not include, and the Grantee expressly retains, all interests in or claims under or in connection with those certain leases by and between Grantor and St. Christopher's Healthcare (the "**Master Tenant**"), each dated January 11, 2018 (collectively, the "**Master Lease**"), and any such interests in or claims under or with respect to the Master Tenant, or the guarantors under the Master Lease, and all claims, causes of action, choses in action, rights of recovery, rights of set off and rights of recoupment of Grantor and Grantor's affiliates with respect to periods prior to the Closing Date and any payments, awards or other proceeds resulting therefrom.

_____

[3] Replace with applicable allocated purchase price

EAST\179101247.10

TOGETHER WITH all and singular the buildings and improvements, ways, streets, alleys, passages, waters, water-courses, rights, liberties, privileges, hereditaments and appurtenances, as well as all existing, non-conforming uses thereon, whatsoever thereunto belonging, or in any wise appertaining, and the reversions and remainders, rents, issues and profits thereof, and all the estate, right, title, interest, property, claim and demand whatsoever of the said Grantor in law, equity, or otherwise howsoever, of, in and to the same and every part thereof.

TO HAVE AND TO HOLD the said buildings, improvements, hereditaments and premises hereby granted, or mentioned and intended so to be, with the appurtenances, unto the said Grantee, its successors and assigns, to and for the only proper use and behoof of the said Grantee, its successors and assigns, forever.

AND the said Grantor, for itself and its successors and assigns, does covenant, promise, grant and agree, to and with the said Grantee, its successors and assigns, by these presents, that they, the said Grantor and its successors and assigns, all and singular the hereditaments and premises hereby granted or mentioned and intended so to be, with the appurtenances, unto the said Grantee, its successors and assigns, against it, the said Grantors, its successors and assigns, and against all and every person or persons whomsoever lawfully claiming or to claim the same or any part thereof, by, from or under Grantor, shall and will SPECIALLY WARRANT and forever DEFEND.

[Signature appears on the following page.]

IS_012553

**IN WITNESS WHEREOF**, intending to be legally bound, the undersigned Grantor has executed this Special Warranty Deed the day and year first above mentioned.

_____, LLC, a Delaware
limited liability company


BY:_____

Name:

Title:


STATE OF _____          )
                                                          )ss.:
COUNTY OF _____          )


      On this the _____ day of _____, 2021, before me, the undersigned officer, personally appeared _____, who acknowledged himself/herself to be the _____ of _____, LLC, a Delaware limited liability company, and that he/she as such _____, being authorized to do so, executed the foregoing instrument for the purposes therein contained by the signing the name of the company by himself/herself as _____.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.


_____
Notary Public
My commission expires:

IS_012554

**Exhibit A**
**Legal Description**

Certificate of Address:

The mailing address of the Grantee is:

2929 Walnut Street, Suite 1540,
Philadelphia, PA  19104

I certify the Grantee's address above is correct.

_____

Name:

IS_012555

**EXHIBIT G**

FORM OF ASSIGNMENT AND ASSUMPTION OF LEASES

   This instrument is executed and delivered as of the _____ day of _____, 2021 pursuant to that certain Agreement of Sale and Purchase ("Agreement") dated _____, 2021, by and between _____, a _____ corporation ("Seller"), and _____, a _____ ("Purchaser"), covering the real property described in Exhibit A attached hereto ("Real Property").

   1. <u>Assignment of Leases</u>. For good and valuable consideration, Seller hereby assigns, transfers, sets over and conveys to Purchaser, and Purchaser hereby accepts all of the landlord's right, title and interest in and to the tenant leases listed in Exhibit B attached hereto ("Leases").

   2. <u>Assumption</u>. Purchaser hereby assumes the obligations of Seller under the Leases arising from and after the Closing Date.

   3. <u>Agreement Applies</u>. The covenants, agreements, disclaimers, representations, warranties, indemnities and limitations provided in the Agreement with respect to the Real Property (including, without limitation, the limitations of liability provided in the Agreement), are hereby incorporated herein by this reference as if herein set out in full and shall inure to the benefit of and shall be binding upon Purchaser and Seller and their respective successors and assigns.

     [Signature Page Follows]

**IN WITNESS WHEREOF**, Seller and Purchaser have executed this Assignment of Leases effective as of the date set forth above.

<u>**SELLER:**</u>

_____,    **a**

_____

By:   _____
Name:  Stephen M. Gordon
Title:  Authorized Signatory

<u>**PURCHASER:**</u>

_____,    **LLC,**    a/an
_____limited liability company

By: _____
Name: _____
Title: _____

Signature page to
Assignment of Leases

**EXHIBIT A**
**REAL PROPERTY**

Exhibit A-1

EAST\179101247.10

**EXHIBIT B**
**SCHEDULE OF LEASES**

Exhibit B-1

IS_012559

**EXHIBIT H**
EXISTING TITLE EXCEPTIONS

*216 Real Property (PAHH Feinstein LLC)*

      1.     Rights of tenants, under the terms of the Leases and any subleases thereunder, with no right or option to purchase.

      2.     Easements, encroachments, overlaps, shortages of area, boundary line disputes and other matters affecting title that an accurate and complete survey would disclose.

      3.     Center City District assessments, not yet due and payable.

      4.     The following conditions set forth on that certain ALTA/NSPS Land Title Survey of Hahnemann University Hospital made by Pennoni Associates, Inc., dated January 3, 2018, last revised January 8, 2018, and designated Project No. PALHC17001, (the "Survey"):

          a.   Party walls shared with premises adjoining on the West and North

      5.     Reciprocal Easement and Operating Agreement made by and between Broad Street Healthcare Properties, LLC, Broad Street Healthcare Properties III, LLC, PAHH Feinstein MOB, LLC and PAHH New College MOB, LLC dated December 30, 2017 made effective January 11, 2018, and recorded January 18, 2018 in the Office of the Recorder of Deeds for the County of Philadelphia as Document No. 53316755.

      6.     Easement & Unity of Use Statement made by and between Broad Street Healthcare Properties, LLC, Broad Street Healthcare Properties III, LLC, PAHH Feinstein MOB, LLC and PAHH New College MOB, LLC dated December 30, 2017 made effective January 11, 2018, and recorded January 18, 2018 in the Office of the Recorder of Deeds for the County of Philadelphia as Document No. 53316752.

      7.     Real estate taxes, not yet due and payable.

      8.     Purchase option set forth in Section 25(q) of that certain unrecorded Lease dated November 10, 1998, as restated April 25, 2002, between Tenet HealthSystem Hahnemann, LLC and Philadelphia Health & Education Corporation, as the same has been and may be amended from time to time, as affected by that certain waiver of right of first refusal as set forth in letter dated January 11, 2018, from Drexel University, as successor by merger to Philadelphia Health & Education Corporation and by that certain Amended and Restated Lease dated January 11, 2018, by and between PAHH Feinstein MOB, LLC and Drexel University, as successor by merger to Philadelphia Health & Education Corporation.

      9.     Recognition Agreement made by and among St. Christopher's Healthcare, LLC, a Delaware limited liability company, ("Sublandlord"), Drexel University, a Pennsylvania non-profit corporation, ("Subtenant") and PAHH Feinstein MOB, LLC, a Delaware limited liability company, ("Master Landlord") dated December 30, 2017 made effective January 11, 2018, and recorded January 18, 2018 in the Office of the Recorder of Deeds for the County of Philadelphia as Document No. 53316783.

Exhibit H-1

*231 Real Property (PAHH Broad Street LLC)*

1.    Rights of tenants, under the terms of the Leases and any subleases thereunder, with no right or option to purchase.

2.    Easements, encroachments, overlaps, shortages of area, boundary line disputes and other matters affecting title that an accurate and complete survey would disclose.

3.    Center City District assessments, not yet due and payable.

4.    The following conditions set forth on that certain ALTA/NSPS Land Title Survey of Hahnemann University Hospital made by Pennoni Associates, Inc., dated January 3, 2018, last revised January 8, 2018, and designated Project No. PALHC17001, (the "Survey"):

    a.   Party walls shared with premises adjoining on the North and South

5.    Real estate taxes not yet due and payable.

Exhibit H-2

*245 Real Property (PAHH College LLC)*

1.     Rights of tenants, under the terms of the Leases and any subleases thereunder, with no right or option to purchase.

2.     Easements, encroachments, overlaps, shortages of area, boundary line disputes and other matters affecting title that an accurate and complete survey would disclose.

3.     Center City District assessments, not yet due and payable.

4.     Rights granted to Bell Telephone Company of Pennsylvania as in Deed Book PLMcS 391 page 39.

5.     The following conditions set forth on that certain ALTA/NSPS Land Title Survey of Hahnemann University Hospital made by Pennoni Associates, Inc., dated January 3, 2018, last revised January 8, 2018, and designated Project No. PALHC17001, (the "Survey"):

a.   Party walls shared with premises adjoining on the East

6.     Reciprocal Easement and Operating Agreement made by and between Broad Street Healthcare Properties, LLC, Broad Street Healthcare Properties III, LLC, PAHH Feinstein MOB, LLC and PAHH New College MOB, LLC dated December 30, 2017 made effective January 11, 2018, and recorded January 18, 2018 in the Office of the Recorder of Deeds for the County of Philadelphia as Document No. 53316755.

7.     Easement & Unity of Use Statement made by and between Broad Street Healthcare Properties, LLC, Broad Street Healthcare Properties III, LLC, PAHH Feinstein MOB, LLC and PAHH New College MOB, LLC dated December 30, 2017 made effective January 11, 2018, and recorded January 18, 2018 in the Office of the Recorder of Deeds for the County of Philadelphia as Document No. 53316752.

8.     Real estate taxes not yet due and payable.

9.     Purchase option set forth in Section 25(q) of that certain unrecorded Lease dated November 10, 1998, as restated April 25, 2002, between Tenet HealthSystem Hahnemann, LLC and Philadelphia Health & Education Corporation, as the same has been and may be amended from time to time, as affected by that certain waiver of right of first refusal as set forth in letter dated January 11, 2018, from Drexel University, as successor by merger to Philadelphia Health & Education Corporation and by that certain Amended and Restated Lease dated January 11, 2018, by and between PAHH Feinstein MOB, LLC and Drexel University, as successor by merger to Philadelphia Health & Education Corporation.

10.    Recognition Agreement made by and among St. Christopher's Healthcare, LLC, a Delaware limited liability company, ("Sublandlord"), Drexel University, a Pennsylvania non-profit corporation, ("Subtenant") and PAHH New College MOB, LLC, a Delaware limited liability company, ("Master Landlord") dated December 30, 2017 made effective January 11, 2018, and recorded January 18, 2018 in the Office of the Recorder of Deeds for the County of Philadelphia as Document No. 53316780.

11.    Recognition Agreement made by and among St. Christopher's Healthcare, LLC, a Delaware limited liability company, ("Sublandlord"), Drexel University, a Pennsylvania non-profit corporation, ("Subtenant") and PAHH New College MOB, LLC, a Delaware limited liability company, ("Master Landlord") dated December 30, 2017 made effective January 11, 2018, and recorded January 18, 2018 in the Office of the Recorder of Deeds for the County of Philadelphia as Document No. 53316781.

Exhibit H-3

IS_012562

*1450 Real Property (PAHH Wood, LLC)*

      1.     Easements, encroachments, overlaps, shortages of area, boundary line disputes and other matters affecting title that an accurate and complete survey would disclose.

      2.     Center City District assessments, not yet due and payable.

      3.     The following conditions set forth on that certain ALTA/NSPS Land Title Survey of Hahnemann University Hospital made by Pennoni Associates, Inc., dated January 3, 2018, last revised January 8, 2018, and designated Project No. PALHC17001, (the "Survey"):

              b.    Party walls shared with premises adjoining on the West and North

      4.     Parking, Access And Utilities Easement Agreement made by and between PAHH Wood Street Garage, LLC, Broad Street Healthcare Properties, LLC and Broad Street Healthcare Properties II, LLC dated December 30, 2017 made effective January 11, 2018, and recorded January 18, 2018 in the Office of the Recorder of Deeds for the County of Philadelphia as Document No. 53316753 and as approximately shown on the ALTA/NSPS Land Title Survey of Hahnemann University Hospital made by Pennoni Associates, Inc., dated January 3, 2018, last revised January 8, 2018, and designated Project No. PALHC17001.

      1.     Easement & Unity of Use Statement made by and among PAHH Wood Street Garage, LLC, Broad Street Healthcare Properties, LLC and Broad Street Healthcare Properties II, LLC dated December 30, 2017 made effective January 11, 2018, and recorded January 18, 2018 in the Office of the Recorder of Deeds for the County of Philadelphia as Document No. 53316750.

      2.     Real estate taxes not yet due and payable.

Exhibit H-4

**SCHEDULE 8.1(d)**

<u>Seller's Suits and Proceedings</u>

None.

IS_012564

**SCHEDULE 8.1(g)**

<u>Service Contracts</u>

| Trade | Company |
| --- | --- |
| Fire Sprinkler | Johnson Controls |
| Fire Alarm | ESS |
| Fire Suppression | Kistler-O'Brien |
| Diesel Fuel | Atlantic Switch |
| Switchgear | Scott Testing |
| Cooling Water | Barclay Water |
| Mechanical | Trane |
| BMS Systems | Johnson Controls |
| Plumbing | Goldner |
| Elevator | Thyssen Krupp |
| Pest Control | Aardvark |
| Security | Allied Universal |
| Housekeeping | Crothall |
| Snow Removal | BTM Construction |
| Maintenance | Crothall |
| Diesel Tanks | Crompco, LLC |

.

IS_012565

**SCHEDULE 8.2(d)**

<u>Purchaser's Suits and Proceedings</u>

None.

IS_012566