# EXHIBIT D

.

From: Sickle, David B. [O=PIPER & MARBURY/OU=PM/CN=RECIPIENTS/CN=SICKLE]

Sent: Wed 12/13/2017 12:47:40 AM Coordinated Universal Time

To: Gosfield, Gregory[GGosfield@klehr.com]; 'Goldstein, Richard J.'[rjg@hangley.com]; Besser, Alison[ABesser@klehr.com]; 'Svetlana Attestatova' (sattestatova@pldn.com)[sattestatova@pldn.com]; Burkemper, Mark (HSRE)[mburkemper@harrisonst.com]; Michael Borchetta[MBorchetta@harrisonst.com]; DSokol@harrisonst.com[DSokol@harrisonst.com]; David Scolnic (dscolnic@hangley.com)[dscolnic@hangley.com]; Michael Gershow Jr (MGershow@harrisonst.com[MGershow@harrisonst.com]; Patterson, Ronald (RPatterson@klehr.com)[RPatterson@klehr.com]; Peanasky, Brett (BPeanasky@klehr.com)[BPeanasky@klehr.com]; Long, Adam[Adam.Long@dlapiper.com]; Joel Freedman (jfreedman@pldn.com)[jfreedman@pldn.com]; Cowin, Merle Teitelbaum[Merle.Cowin@dlapiper.com]; Berkoff, Adam T [Adam.Berkoff@dlapiper.com]; Sitkoff, Erica S.

[Erica.Sitkoff@dlapiper.com]

Subject: RE: Paladin/Harrison Street-zoning issues [IWOV-HASP1.FID116121]

Attachment: Reciprocal Easement and Operating Agreement for HSRE-Project Liberty Phi...doc

I have enclosed our draft of the REA for the Hahnemann block. This remains subject to review and approval by all parties.

**David Sickle**
Partner
T +1 312.368.4081
F +1 312.630.7361
M +1 312.218.5308
E david.sickle@dlapiper.com



DLA Piper LLP (US)
444 West Lake Street, Suite 900
Chicago, Illinois 60606-0089
United States
www.dlapiper.com

From: Sickle, David B.
Sent: Tuesday, December 12, 2017 1:24 PM
To: Gosfield, Gregory'; 'Goldstein, Richard J.'; Besser, Alison
Cc: Peanasky, Brett; Sitkoff, Erica S.; Long, Adam; Scolnic, David M.; Cowin, Merle Teitelbaum; Patterson, Ronald
Subject: RE: Paladin/Harrison Street-zoning issues [IWOV-HASP1.FID116121]

Today.

**David Sickle**
Partner
T +1 312.368.4081
F +1 312.630.7361
M +1 312.218.5308
E david.sickle@dlapiper.com



DLA Piper LLP (US)
444 West Lake Street, Suite 900
Chicago, Illinois 60606-0089
United States
www.dlapiper.com

From: Gosfield, Gregory [mailto:GGosfield@klehr.com]
Sent: Tuesday, December 12, 2017 12:51 PM
To: Goldstein, Richard J.; Besser, Alison
Cc: Peanasky, Brett; Sickle, David B.; Sitkoff, Erica S.; Long, Adam; Scolnic, David M.; Cowin, Merle Teitelbaum; Patterson, Ronald
Subject: RE: Paladin/Harrison Street-zoning issues [IWOV-HASP1.FID116121]

Can you advise when we should expect to get your draft of the reciprocal easement?

Gregory G. Gosfield, Esq.
KLEHR | HARRISON | HARVEY | BRANZBURG LLP
BUSINESS LAW AT BUSINESS SPEED
1835 Market Street, Suite 1400 | Philadelphia, PA 19103
T (215) 569-4164 | F (215) 568-6603 | ggosfield@klehr.com

Web page: Greg Gosfield's profile site

From: Goldstein, Richard J. [mailto:rjg@hangley.com]
Sent: Tuesday, December 12, 2017 1:49 PM
To: Besser, Alison
Cc: Peanasky, Brett; Gosfield, Gregory; 'Sickle, David B.'; Sitkoff, Erica S.'; 'Long, Adam'; Scolnic, David M.; 'Cowin, Merle Teitelbaum'; Patterson, Ronald
Subject: RE: Paladin/Harrison Street-zoning issues [IWOV-HASP1.FID116121]

That would be excellent. Thanks for your efforts.

Confidential

Richard J. Goldstein, Esquire
Hangley Aronchick Segal Pudlin & Schiller
20 Brace Road
Suite 201
Cherry Hill, NJ 08034
phone 856-616-2172
fax 856-616-2170
-or-
One Logan Square
27th Floor
Philadelphia, PA 19103
phone 215-496-7011
fax 215-568-0300

email: rgoldstein@hangley.com
http://secure-web.cisco.com/1E6el9xzbubFSO_dvXnFb9IfuSjNN8UEO7mbUghLQAg5BGyVvyPZQ1cDavOII-REZ-
XGvOD1OGC8jfuJ6K8ETcupdhxgrHEAA0xvBZ3ROIe6zMm0QeGkapN7NEjqPqNDznSgxISacAV4rWeVgQuq7LuPl8UUnSnikBRaiwWk2fVX0j4SGX1Yt9-C1iKw5bGr-
BFeCCy8P33C3_5OYTCEAzMrMtxxr-vsnPGH6EuPgIwHo_ao6rxe2YyL5dKcjgg2Q/http%3A%2F%2Fwww.hangley.com

Hangley Aronchick Segal Pudlin & Schiller is a Pennsylvania Professional Corporation. The shareholder responsible for the firm's Cherry Hill office is Richard J. Goldstein.

**From:** Besser, Alison [mailto:ABesser@klehr.com]
**Sent:** Tuesday, December 12, 2017 1:48 PM
**To:** Goldstein, Richard J. <rjg@hangley.com>
**Cc:** Peanasky, Brett <BPeanasky@klehr.com>; Gosfield, Gregory <GGosfield@klehr.com>; 'Sickle, David B.' <David.Sickle@diapiper.com>; 'Sitkoff, Erica S.' <Erica.Sitkoff@dlapiper.com>; 'Long, Adam' <Adam.Long@dlapiper.com>; Scolnic, David M. <dms@hangley.com>; 'Cowin, Merle Teitelbaum' <Merle.Cowin@dlapiper.com>; Patterson, Ronald <RPatterson@klehr.com>
**Subject:** RE: Paladin/Harrison Street-zoning issues [IWOV-HASP1.FID116121]

Correct....my note below is regarding the second permit to be obtained with the new addresses and OPA Numbers. Your email below says that you understand that we will not have that second permit for closing. My response is that we are attempting to have that second permit for closing.

Alison A. Besser
KLEHR | HARRISON | HARVEY | BRANZBURG LLP
T: 215.320.3406

**From:** Goldstein, Richard J. [mailto:rjg@hangley.com]
**Sent:** Tuesday, December 12, 2017 1:45 PM
**To:** Besser, Alison
**Cc:** Peanasky, Brett; Gosfield, Gregory; 'Sickle, David B.'; 'Sitkoff, Erica S.'; 'Long, Adam'; Scolnic, David M.; 'Cowin, Merle Teitelbaum'; Patterson, Ronald
**Subject:** RE: Paladin/Harrison Street-zoning issues [IWOV-HASP1.FID116121]

Our lender has advised that it will require the new OPA numbers for closing and I understood that this was needed to record the deeds which will perfect the lot adjustments...

Richard J. Goldstein, Esquire
Hangley Aronchick Segal Pudlin & Schiller
20 Brace Road
Suite 201
Cherry Hill, NJ 08034
phone 856-616-2172
fax 856-616-2170
-or-
One Logan Square
27th Floor
Philadelphia, PA 19103
phone 215-496-7011
fax 215-568-0300

email: rgoldstein@hangley.com
http://secure-web.cisco.com/1E6el9xzbubFSO_dvXnFb9IfuSjNN8UEO7mbUghLQAg5BGyVvyPZQ1cDavOII-REZ-
XGvOD1OGC8jfuJ6K8ETcupdhxgrHEAA0xvBZ3ROIe6zMm0QeGkapN7NEjqPqNDznSgxISacAV4rWeVgQuq7LuPl8UUnSnikBRaiwWk2fVX0j4SGX1Yt9-C1iKw5bGr-
BFeCCy8P33C3_5OYTCEAzMrMtxxr-vsnPGH6EuPgIwHo_ao6rxe2YyL5dKcjgg2Q/http%3A%2F%2Fwww.hangley.com

Hangley Aronchick Segal Pudlin & Schiller is a Pennsylvania Professional Corporation. The shareholder responsible for the firm's Cherry Hill office is Richard J. Goldstein.

**From:** Besser, Alison [mailto:ABesser@klehr.com]
**Sent:** Tuesday, December 12, 2017 1:37 PM
**To:** Goldstein, Richard J. <rjg@hangley.com>
**Cc:** Peanasky, Brett <BPeanasky@klehr.com>; Gosfield, Gregory <GGosfield@klehr.com>; 'Sickle, David B.' <David.Sickle@dlapiper.com>; 'Sitkoff, Erica S.' <Erica.Sitkoff@dlapiper.com>; 'Long, Adam' <Adam.Long@dlapiper.com>; Scolnic, David M. <dms@hangley.com>; 'Cowin, Merle Teitelbaum'

DLA_080489

<Merle.Cowin@dlapiper.com>; Patterson. Ronald <RPatterson@klehr.com>
**Subject:** RE: Paladin/Harrison Street-zoning issues [IWOV-HASP1.FID116121]

Attached please find the Zoning Permit Applications and draft form of Unity of Uses that we intend to file tomorrow, as Planning is requiring that Pennoni prepare a sheet to attach to the plan with a statement that there will be an easement for the garage and MOB to use the driveway on the hospital parcel to Erie (note that this does NOT require us to go back to the City Surveyor). I have attached redlines of the Unity of Uses against the last circulated draft.

Please note that regarding your comment below re new permits with the new addresses and OPA numbers; we will be attempting to obtain those for closing.

Thanks,
Alison

Alison A. Besser
KLEHR | HARRISON | HARVEY | BRANZBURG LLP
T: 215.320.3406

**From:** Goldstein, Richard J. [mailto:rjg@hangley.com]
**Sent:** Tuesday, December 12, 2017 11:47 AM
**To:** Goldstein, Richard J.; Patterson, Ronald
**Cc:** Peanasky, Brett; Gosfield, Gregory; Besser, Alison; 'Sickle, David B.'; 'Sitkoff, Erica S.'; 'Long, Adam'; Scolnic, David M.; 'Cowin, Merle Teitelbaum'
**Subject:** RE: Palatin/Harrison Street-zoning issues [IWOV-HASP1.FID116121]

Ron, I am following up on my email to you below of Friday . Please let us know where things stand. With only 12 business days left this year after today, we are concerned about your ability to secure the zoning permits from L&I and complete the processing of the new account numbers and addresses with OPA so closing can take place as planned. Thanks for all of your hard work . Rick

**From:** Goldstein, Richard J. [mailto:rjg@hangley.com]
**Sent:** Friday, December 08, 2017 4:29 PM
**To:** Patterson, Ronald <RPatterson@klehr.com>
**Cc:** Peanasky, Brett <BPeanasky@klehr.com>; Gosfield, Gregory <GGosfield@klehr.com>; Sickle, David B. <David.Sickle@dlapiper.com>; Sitkoff, Erica S. <Erica.Sitkoff@dlapiper.com>; Long, Adam <Adam.Long@dlapiper.com>; Scolnic, David M. <dms@hangley.com>; Cowin, Merle Teitelbaum <Merle.Cowin@dlapiper.com>
**Subject:** Palatin/Harrison Street-zoning issues [IWOV-HASP1.FID116121]

Ron, We just completed an encouraging conversation with our client's lender regarding the zoning issues/status. Peter Kelson was on the call as lender's zoning counsel. Lender made it clear that we will need to have the zoning permit permitting the lot adjustment issued by L&I and OPA tax account numbers issued and the Unity of Use Agreement signed and recorded with the recordation of the deeds and mortgages at time of closing. They understand we will not likely have the follow up permit from L&I based on the new street addresses/tax accounts until after closing occurs and that the 30 day appeal period will not have expired by the time of closing.

We are somewhat concerned about timing given that we all hoped that applications to L&I would be submitted on or about the 5th and Monday is the 11th. With the holidays rapidly approaching we are worried about all of these required steps being completed timely so as to permit us to close on Jan 2.
We look forward to any update you can provide as available and appreciate your efforts to make sure we are all positioned to be able to close when intended. Thank you. Rick

Richard J. Goldstein, Esquire
Hangley Aronchick Segal Pudlin & Schiller
20 Brace Road
Suite 201
Cherry Hill, NJ 08034
phone 856-616-2172
fax 856-616-2170
-or-
One Logan Square
27th Floor
Philadelphia, PA 19103
phone 215-496-7011
fax 215-568-0300

email: rgoldstein@hangley.com
http://secure-web.cisco.com/1E6eL9xzbubFSO_dvXnFb9IfuSjNN8UEO7mbUghLQAg5BGyVvyPZQ1cDav0II-RE7-XGvODL0GC8jfuJ6K8ETciuudhxgrHEAAOxVBZ3ROie6zMm0QeGkapN7NEjqPqNDznSgxISacAV4rWeVgQuq7LuPi8UUnSnik8RaiwWk2fvX0i4SGXIYt9-C1iKw5bGr-BFeCCy8P33C3_SQYTCEAzMrMbxx-vsnPGH6EuPglwHo_ao6rxeZYyL5dKcjgg2Q/http%3A%2F%2Fwww.hangley.com

Hangley Aronchick Segal Pudlin & Schiller is a Pennsylvania Professional Corporation. The shareholder responsible for the firm's Cherry Hill office is Richard J. Goldstein.

Confidential

## RECIPROCAL EASEMENT AND OPERATING AGREEMENT

**THIS RECIPROCAL EASEMENT AND OPERATING AGREEMENT** (this "Agreement") is made as of this ___ day of January, 2018 (the "Effective Date"), by and among (i) PAHH New College MOB, LLC, a Delaware limited liability company ("New College Lot Owner"), (ii) PAHH Feinstein MOB, LLC, a Delaware limited liability company ("Feinstein/Bobst Lot Owner"), (iii) Broad Street Healthcare Properties, LLC, a Delaware limited liability company ("North/South Tower Lot Owner"), and (iv) Broad Street Healthcare Properties III, LLC, a Delaware limited liability company ("HUH Lot Owner").

## BACKGROUND:

A. New College Lot Owner owns fee title to that certain parcel of real estate located in Philadelphia, Pennsylvania and legally described on Exhibit A-1 attached hereto and made a part hereof (the "New College Lot").

B. Feinstein/Bobst Lot Owner owns fee title to that certain parcel of real estate located in Philadelphia, Pennsylvania and legally described on Exhibit A-2 attached hereto and made a part hereof (the "Feinstein/Bobst Lot").

C. North/South Tower Lot Owner owns fee title to that certain parcel of real estate located in Philadelphia, Pennsylvania and legally described on Exhibit A-3 attached hereto and made a part hereof (the "North/South Tower Lot").

D. HUH Lot Owner owns fee title to that certain parcel of real estate located in Philadelphia, Pennsylvania and legally described on Exhibit A-4 attached hereto and made a part hereof (the "HUH Lot").

E. The New College Lot, the Feinstein/Bobst Lot, the North/South Tower Lot and the HUH Lot (each a "Lot" and collectively the "Lots") are contiguous to each other and collectively comprise all of the real property described in Exhibit B attached hereto and made a part hereof (the "Project Parcel"), which is bounded by North Broad Street (to the east), Race Street (to the south), North 15th Street (to the west) and Vine Street (to the north) in Philadelphia, Pennsylvania.

F. A site plan showing the Project Parcel, as currently improved, is attached hereto and made a part hereof as Exhibit C (the "Site Plan"). The Project Parcel, together with the Buildings and other improvements now or hereafter constructed within or upon the Lots, is herein referred to as the "Entire Project."

G. The Entire Project was previously owned and operated by a single entity ("Tenet") as an integrated hospital/medical complex containing (without limitation) medical office, hospital, medical college, parking and related uses. Immediately prior to the execution and delivery of this Agreement, Tenet conveyed each Lot to the respective Owners identified above.

1

H.  The Lots and the improvements constructed thereon are in certain respects physically and functionally dependent on one another and the parties hereto desire to declare and grant certain easements to one another, and to set forth certain other agreements, for the purpose of facilitating the harmonious use and operation of the Entire Project, all as more particularly set forth herein.

**NOW, THEREFORE**, intending to be legally bound hereby, the parties hereto hereby agree as follows:

1.    Certain Definitions.

In addition to such defined terms and any terms defined elsewhere in this Agreement, the following terms shall have the respective meanings set forth below in this Section 1:

(a)  "Arbitration Matter" shall mean and is limited to a dispute between one or more Owners with respect to the following matters arising under this Agreement: (i) the extent and location of the Shared Facilities and the Existing Encroachments and Support Elements, based on the condition and operation of the Entire Project as of the Effective Date, (ii) the determination of the Maintenance Cost Allocation for any Shared Facilities; (iii) matters arising under Section 3 of this Agreement; (iv) matters arising under Section 7 of this Agreement concerning Alterations, (v) [PARTIES TO CONSIDER ADDITIONAL ITEMS SUBJECT TO DISPUTE RESOLUTION BY PROJECT ENGINEER].

(b)  "Benefited Owner" shall mean, with respect any easement expressly granted under this Agreement, an Owner who is expressly entitled pursuant to the terms and conditions of this Agreement to the use, benefit or enjoyment of a Shared Facility or Existing Encroachments and Support Elements that is located upon another Owner's Lot.

(c)  "Building" means a building or other enclosed and occupable structure now or hereafter located upon a Lot.

(d)  "Claim" means and includes any loss, cost, damage, demand, litigation, cause of action, fine, penalty, liability, lien, injury, obligation or expense (including reasonable attorneys' and witness fees, disbursements and court costs).

(e)  "Common Utility Plant" means the [boiler, chiller] and related machinery and equipment that is located within the Building on the _____ Lot, which provides [steam heat and chilled water] to the Buildings on the _____ Lot and the _____ Lot, as the same is replaced, improved or otherwise Maintained from time to time in accordance with this Agreement.

(f)  "Emergency" means a circumstance or condition that (i) causes or is likely to imminently cause bodily injury or death to persons or significant physical damage to any Building or other improvement or any facility servicing the Entire Project or any part thereof, (ii) impairs or is likely to imminently impair, in any material respect, the structural integrity of any Building or other facility serving the Entire Project or any part thereof, (iii)

interrupts or is likely to imminently interrupt, in any material respect, Shared Utilities serving any Lot, other than pursuant to Maintenance undertaken in accordance with this Agreement.

(g) "Existing Encroachments and Support Elements" means (i) any aboveground or underground portion or appurtenances of a Building that is located on one Lot, which encroaches onto an adjacent Lot, to the extent that such encroachment exists on the Effective Date, and (ii) any Building or other improvement that is located on one Lot, which provides necessary structural support for a Building located on an adjacent Lot as of the Effective Date, but only to the extent necessary to provide continuing structural support.

(h) "Helipad" shall mean the helipad that is located on the roof of the Building on the New College Lot, which exclusively serves the hospital operated on the North/South Tower Lot.

(i) "Interest Rate" means the lesser of (i) the highest rate of interest that may be charged in accordance with applicable Legal Requirements, or (ii) the greater of (A) twelve percent (12%) per annum, or (B) the prevailing "prime rate" as published from time to time in the *Wall Street Journal* (or if the *Wall Street Journal* ceases to publish such rate, the "prime rate" or other reference rate of interest as published by any other source reasonably selected by the New College Lot Owner), plus five percent (5%) per annum.

(j) "Legal Requirements" means all laws, rules, orders, ordinances, codes, regulations and requirements, now or hereafter enacted or promulgated, of the United States of America, the Commonwealth of Pennsylvania, the City of Philadelphia and of any other sovereign or municipality now or hereafter having jurisdiction over the Entire Project or any portion thereof, and of any governmental or quasi-governmental agency thereof now or hereafter having such jurisdiction, and of any other lawful authority having such jurisdiction.

(k) "Lot Floor Area" shall mean, with respect to any Lot, the greater of (i) the actual "Gross Floor Area" (as defined and measured in accordance with the Philadelphia Zoning Code) of all Buildings and other improvements located on such Lot (including for these purposes all Buildings and improvements under construction for which a building permit has been issued), and (ii) twenty percent (20%) of the maximum "Gross Floor Area" that could be lawfully constructed on such Lot on a stand-alone basis in accordance with the Philadelphia Zoning Code.

(l) "Maintenance" or "Maintain" shall mean the operation, maintenance, repair, reconditioning, refurbishing, reconfiguration, inspection, testing, cleaning, painting, installation, restoration, reconstruction and replacement (when necessary or desirable) of Shared Facilities or other elements of the Entire Project (as the context requires), and shall also include the right of access for any of the above purposes, subject, however, to any limitations set forth elsewhere in this Agreement.

(m) "Maintenance Costs" shall mean, with respect to any Shared Facilities over any period of time, the actual out-of-pocket costs and expenses reasonably and directly incurred by the applicable Maintenance Party during such period, in connection with the Maintenance of the applicable Shared Facilities, excluding any (i) expenditures which are

capitalized or would be classified as capital expenditures under generally accepted accounting principles, consistently applied, or any amortization of such expenditures (except as expressly provided below), (ii) any interest or finance charges, (iii) depreciation or amortization (except as expressly provided below), any (iii) taxes or overhead costs or charges of the Maintenance Party, (iv) any employment or personnel costs of the Maintenance Party, (v) any costs or expenses that arise from the failure of the Maintenance Party to perform its Maintenance obligations hereunder or as a consequence of any fire or other casualty (whether or not insured), and (vi) and any costs or expense arising from the change of use, reconfiguration, renovation or redevelopment of the Providing Owner's Property. If any Maintenance Party reasonably incurs any out-of-pocket capital expenditures to Maintain the Shared Facilities for which it is responsible (other than such expenditures that would be excluded from Maintenance Costs pursuant to clauses (v) and (vi) above), then such capital expenditures shall be amortized on a straight-line basis over the useful life of the applicable replacements or repairs (as determined in accordance with generally accepted accounting principles, consistently applied) and may be included in Maintenance Costs on the same basis. Except for utilities actually consumed in the operation of the Common Utility Plant (which shall be included as Maintenance Costs only if and to the extent separately metered to the Common Utility Plant), Maintenance Costs shall not include the cost of any utilities that are consumed on any Property.

(n) "Maintenance Cost Allocation" shall mean the allocation of the Maintenance Costs as between the Maintenance Party and the Benefited Owner(s) of such Shared Facility on the following basis: (i) with respect to the Maintenance of the Helipad, the North/South Tower Lot Owner shall be responsible for one hundred percent (100%) of all Maintenance Costs; (ii) with respect to the Maintenance of the Shared Loading Dock, the Feinstein/Bobst Lot Owner and the _____ Lot Owner and the _____ [1] Lot Owner shall each be responsible for its proportionate share of the applicable Maintenance Costs, based on the Lot Floor Area of each such Lot, (iii) with respect to the Maintenance of the Shared Parking Facilities, the _____ Lot Owner, the _____ Lot Owner and the _____ [2] Lot Owner shall each be responsible for its proportionate share of the applicable Maintenance Costs, based on the Lot Floor Area of each such Lot, (iv) with respect to the Maintenance of Shared Interior Accessways between any two (2) or more Buildings on different Lots, the applicable Maintenance Costs shall be allocated between the Owners of such Lots in proportion to the Lot Floor Area of such Lots; (v) with respect to the Maintenance of all other Shared Facilities, the Owner of each Lot that directly benefits from such Shared Facilities shall be responsible for its proportionate share of the applicable Maintenance Costs, based on the Lot Floor Area of the Lots the directly benefiting from such Share Facilities.

(o) "Maintenance Party" shall mean, with respect to any Shared Facilities, the Owner that is responsible for Maintaining such Shared Facilities in accordance with this Agreement. The Maintenance Party with respect to the Helipad shall be the North/South Tower Lot Owner. The Maintenance Party with respect to the Shared Loading Dock shall be the

---

[1] Include only the Lots that utilize the Shared Loading Dock.

[2] Include only the Lots that utilize the Shared Parking Facilities.

[Feinstein/Bobst] Lot Owner.  With respect to all other Shared Facilities, the Maintenance Party shall be the Owner on whose Lot such Shared Facilities are located.

(p) "Mortgage" shall mean, with respect to any Lot or portion thereof, a duly recorded (and not released) mortgage, deed of trust or similar instrument that creates and constitutes a lien upon such Lot to secure repayment of a loan obtained by the applicable Owner, and "Mortgagee" shall mean the holder(s) of record of such Mortgage; provided (in each case) each other Owner has received actual written notice (and not merely record notice or constructive notice) of such Mortgage and the name and address of each Mortgagee.

(q) "Operating Standard" shall mean the standards of operations, cleanliness, security, appearance, repair and Maintenance generally applicable to first-class hospitals, educational and medical office facilities in the "Center City", Philadelphia area, with due consideration to the age of the applicable facilities.   At a minimum, the Operating Standard requires that the applicable Lots, Buildings, and Shared Facilities within the Entire Project shall at all times be operated and Maintained in good working order and condition, ordinary wear and tear excepted, and in compliance with all applicable Legal Requirements.

(r) "Owner" or "Owners" shall mean the New College Lot Owner, the Feinstein/Bobst Lot Owner, the North/South Tower Lot Owner and the HUH Lot Owner and their respective successors and assigns as the holder(s) of fee title to the Lots from time to time. If at any time a Lot is owned by more than one Person, then all such Persons collectively shall be the "Owner" of such Lot.

(s) "Permittees" means, with respect to any Lot or Building, the Owner thereof and its Mortgagees, tenants and subtenants and their respective customers, visitors, invitees, licensees and concessionaires, but only during such times and to such extent that such Persons are entitled and authorized by such Owner to occupy, access and utilize the facilities comprising the Entire Project.

(t) "Person" shall mean any natural person or any corporation, partnership, limited liability company, trust, joint venture, association or other legal entity.

(u) "Project Engineer" means (i) Pennoni Associates Inc., or any entity that directly or indirectly acquires or otherwise succeeds to all or substantially all of the business assets of Pennoni Associates Inc., so long as it is available and willing to serve in the capacity of the Project Engineer under this Agreement, or (ii) if Pennoni Associates Inc. (or such successor) is not available and willing to serve in the capacity of the Project Engineer under this Agreement, any other firm of licensed professional engineers that is reasonably selected by the Owner of the New College Lot.

(v) "Property" or "Properties" shall mean any, some or all of the Lots as improved from time to time, as the case may be and as the context may dictate.

(w) "Providing Owner" shall mean, with respect to any Shared Facility, the Owner upon whose Lot such Shared Facility is located.

(x) "Recorder's Office" means the Recorder of Deeds of Philadelphia, Pennsylvania.

(y) "Shared Facility" or "Shared Facilities" shall mean (i) the Helipad, (ii) the Shared Interior Accessways, (iii) the Shared Loading Dock, (iv) the Shared Parking Facilities, and (v) the Shared Utility Facilities.

(z) "Shared Interior Accessways" shall mean the interior doorways, hallways and passageways that currently provide interior access, circulation and passage ways (including emergency access and egress, to the extent required by applicable Legal Requirements) between adjoining Buildings located on adjacent Lots, substantially as the same are currently configured and available to and utilized by the Permittees of such Buildings on the Effective Date.

(aa) "Shared Parking Facilities" shall mean the surface [and subsurface?] vehicular parking areas located on the [HUH Lot], in the approximate locations and configuration depicted on the Site Plan, together with the drive aisles located therein and accessways providing access, ingress and egress from and to the adjacent public streets. The Shared Parking Facilities contain approximately [82] surface [and 40 subsurface] parking spaces, including approximately [__] handicap parking spaces.

(bb) "Shared Utility Facilities" shall mean any Utility Facilities that are located on one Lot and serve one or more other Lots.

(cc) "Shared Loading Dock" shall mean the underground loading dock and related facilities [(including trash and refuse compactors)] located [primarily] on the [Bobst/Feinstein Lot], together with the ramp providing short-term truck staging and vehicular and pedestrian access to such facilities from Race Street over and across the [HUH Lot], in the approximate locations depicted on the Site Plan, which currently serve and provide off-street loading, shipping and receiving facilities for the Buildings located on the _____ Lot , the _____ Lot and the _____ Lot.

(dd) "Unavoidable Delay" means delay in the performance of any non-monetary obligations hereunder, to the extent that such delay is not reasonably avoidable and is caused by fire, flood, windstorms or other casualty events, strikes or labor unrest, unavailability of required labor, service or materials, extraordinarily adverse weather conditions (but only to the extent that such weather would not be reasonably anticipated and accounted for in the use and Maintenance of Entire Project in accordance with the Operating Standard), interruption of required utilities by acts or occurrences outside the Project Parcel, and other similar acts and occurrences outside the reasonable control of the Owner or other party required to perform such duties or obligations, provided, however, that (i) in no event shall the unavailability of required funds constitute or justify a claim of Unavoidable Delay, (ii) the Owner or other Person that is required to perform the affected obligation shall notify each other Owner not later than five (5) business days after becoming aware of the Unavoidable Delay.

(ee) "Unity of Use Agreement" means that certain [Easement and Unity of Use Statement] by and among _____ dated as of _____ and recorded against the Project

Parcel immediately prior to the recordation of this Agreement (as amended from time to time), pursuant to which the parties thereto have agreed to treat and operate the parcels comprising the Project Parcel as a single, contiguous zoning lot under the Philadelphia Zoning Code[3].

(ff) "Utility Facilities" shall mean any facilities, fixtures, machinery, systems and equipment for the generation, delivery, distribution, collection, storage, circulation, measurement, metering, control, monitoring, inspection, management, Maintenance, exhaust and removal of electrical power, gas, oil, telecommunications, data transmission, heating, steam, ventilation, air conditioning, chilled water, potable water, storm water, sewage, fire sprinklers, alarms, enunciators and other life-safety systems and all other utilities and related facilities that serve any part of a Building or Lot, including the Common Utility Plant.

2.   Grant of Easements.

(a) Shared Parking Facilities. Each Owner upon whose Property Shared Parking Facilities are currently located hereby declares and grants, conveys and sets over unto each other Owner[4], for the use and benefit of their respective Permittees, the non-exclusive right, privilege and easement to access, enter upon and use such Shared Parking Facilities for the parking of passenger vehicles (subject to such reasonable rules and regulations which may be established from time to time by the Owner(s) of the Lots burdened by this easement right, consistent with the use and operation of the Shared Parking Facilities prior to the Effective Date) together with the right of vehicular and pedestrian ingress, egress and access from, to and across the Shared Parking Facilities.

(b) Shared Utility Facilities. Each Owner upon whose Property any Shared Utility Facilities are currently located hereby declares and grants, conveys and sets over unto the Owners of each other Lot that is currently served by such Shared Utility Facilities, for their respective use and benefit, the non-exclusive right, privilege and easement to Maintain, use, connect and tap into, operate and receive services from and through such Shared Utility Facilities, substantially as the Shared Utility Facilities are used on the Effective Date. If and to the extent that any Lot receives utility service through Shared Utility Facilities located on another Lot (such as domestic water, steam, chilled water, electricity, gas, oil, telecommunication services or other consumable utilities), the Benefited Owner shall pay for the costs of such utility consumption either (a) directly to the utility company that provides such utility service, if and to the extent that such utility consumption is metered or submetered and billed directly to such Benefited Owner by the utility provider, (b) to the Providing Owner of such utility service, if and to the extent that such utility consumption is not separately metered and billed by the utility provider to the Benefited Owner's Property, in which case (x) if the utility consumption is submetered to the Benefited Owner's Property, then the Benefited Owner's share of the utility consumption cost shall be determined by the actual quantity of utilities consumed and the actual costs per unit charged to the Providing Owner by the utility provider, or (y) if the utility

---

[3] Discuss deleting Article 1 of the draft Unity of Use Agreement. Article 1 is redundant of this Agreement.

[4] Confirm that each Lot is entitled to use the Shared Parking Facilities.

consumption is not submetered to the Benefited Owner's Property, then as soon as practicable after the date hereof the Providing Owner shall install (at its sole cost and expense) a meter or submeter to determine the actual amount of the applicable utility service that is consumed at the Benefited Owner's Property, and until such meter or submeter is installed and operating the actual utility consumption costs shall be allocated among the Properties receiving such utility service proportionately on the basis of the Lot Floor Area of each such Property.

(c) Shared Interior Accessways.  Each Owner upon whose Property any Shared Interior Accessways are currently located hereby declares and grants, conveys and sets over unto the Owner of each Building that currently connects to and utilizes such Shared Interior Accessways, for the use and benefit of the Permittees of such Building, the non-exclusive right, privilege and easement for ingress, egress and access over, upon, across and through the applicable Shared Interior Accessways.  The exercise of such easement rights shall not unreasonably disrupt or disturb the use and operation of the Properties burdened by such easement rights and otherwise shall be subject to such reasonable rules and regulations which may be established from time to time by the applicable Providing Owner, consistent with the use of the Shared Interior Accessways prior to the Effective Date.

(d) Helipad.  The New College Lot Owner hereby declares and grants, conveys and sets over unto the North/South Tower Lot Owner, the exclusive[5] right, privilege and easement to operate, use and Maintain the Helipad for the landing and take-off of helicopters transporting patients to the Hospital operated on the North/South Tower Lot, substantially in the manner and degree that the Helipad has been accessed, operated, used and Maintained prior to the Effective Date.  Notwithstanding anything to the contrary contained herein, (i) in no event shall the Owner or other Permittees of the North/South Tower Lot be permitted to use or Maintain the Helipad in any manner that injures or damages the Building located on the New College Lot, and (ii) without limiting clause (i), any Maintenance of the Helipad shall be coordinated with the New College Lot Owner and shall not involve or result in any borings into, penetrations of or attachments to the roof of the Building on the New College Lot unless the plans and specifications for such Maintenance and the contractor(s) performing such Maintenance are approved in writing by the New College Lot Owner.

(e) Shared Loading Dock.  Each Owner upon whose Property any portion or element of the Shared Loading Dock is currently located hereby declares and grants, conveys and sets over unto the respective Owners of the Feinstein/Bobst Lot, the _____ Lot and the _____ [6] Lot, for the use and benefit of the respective Permittees of such Lots, the non-exclusive right, privilege and easement to access, use and Maintain the Shared Loading Dock, for the delivery, receiving, loading and unloading of supplies, inventory and equipment to and the disposal, compaction and pick-up of garbage and refuse from the Buildings on such Lots, substantially in the same manner and to the same degree that the Shared Loading Dock has been used prior to the Effective Date.  Access to and use and Maintenance of the Shared Loading Dock shall be scheduled and coordinated by the Feinstein/Bobst Lot Owner in a reasonable, non-

---

[5] Confirm that the Helipad is used exclusively by Hahnemann in the North/South Tower.

[6] Identify Lots that currently use the Shared Loading Dock.

discriminatory manner and shall be further subject to such reasonable rules and regulations that may be established from time to time by the Feinstein/Bobst Lot Owner.

(f) <u>Easements for Existing Encroachments and Support Elements.</u> Each Owner upon whose Property any Existing Encroachments or Support Elements are currently located hereby declares and grants, conveys and sets over unto to the Owner of each Building that currently constitutes or relies upon such Existing Encroachments or Support Elements, the non-exclusive right, privilege and easement to access, use and Maintain such Existing Encroachments and Support Elements, substantially as they currently exist and function.

3. <u>Easements Generally.</u> The easements and other rights granted in Section 2 of this Agreement are intended to allow the continued operation and Maintenance of the Entire Project substantially as the Entire Project has been operated and Maintained prior to the Effective Date. The scope, extent and utilization of the easements granted pursuant this Agreement shall not exceed in any material respect how the applicable Shared Facilities, Existing Encroachments and Support Elements have been operated and Maintained prior to the Effective Date.

(a) Each Providing Owner of Shared Facilities shall have the right to relocate and/or reconfigure the Shared Facilities that are located upon its Property, at its sole cost and expense, provided that no such relocation or reconfiguration shall cause or result in any material interruption in the access to or use of the applicable Shared Facilities by the Benefited Owners, and provided further that the functionality of and access to the relocated Shared Facilities shall not be materially less than the functionality of and access to the applicable Shared Facilities as of the Effective Date and that the Maintenance Costs for such Shared Facilities will not be materially increased by the relocation thereof.

(b) In the event that a Benefited Owner redevelops or changes the use of its Property such that its Property no longer requires or relies on a Shared Facility or the Existing Encroachments and Support Elements, or in the event that a Benefited Owner otherwise abandons the use of any easement granted hereunder, then such easement (to the extent no longer required or relied upon) shall be deemed to be abandoned and terminated; <u>provided, however</u> that no easement granted hereunder shall be deemed abandoned by mere non-use, unless (x) the Benefited Owner and its Permittees cease to use the applicable easement for a continuous period in excess of one hundred eighty (180) days, other than by reason of repairs, restoration or redevelopment of its Property diligently prosecuted to completion, and (y) the applicable Benefited Owner and the Mortgagee(s) of the applicable Lot fail to object in writing to the abandonment and termination of the applicable easement within sixty (60) days after receiving written notice of abandonment and termination from the Providing Owner.

4. <u>Maintenance of Shared Facilities.</u>

(a) Each of the Shared Facilities shall be Maintained by the applicable Maintenance Party in accordance with the Operating Standard, as and when required to comply with the Operating Standard and the terms of this Agreement, subject to Unavoidable Delays. Except as otherwise expressly provided herein, each Maintenance Party shall perform and pay for its Maintenance obligations under this Agreement at it sole cost and expense.

(b) If any Maintenance Party shall fail to Maintain the Shared Facilities for which it is responsible under this Agreement as and when required, and if such failure is not cured within ten (10) days after written notice from any Benefited Owner or the Permittees of any Benefited Owner (provided that such cure period shall be extended so long as the Maintenance Party commences the cure within such 10-day period and thereafter diligently and continuously prosecutes the cure to completion in accordance with the Operating Standard), or if the failure to Maintain the Shared Facilities constitutes or results in an Emergency, then in either case (i) any Benefited Owner or its Permittees shall have the right (but not the obligation) to enter upon the affected Property and to perform the required Maintenance on behalf and at the sole cost and expense of the Maintenance Party, and (ii) the Maintenance Party shall reimburse the actual costs and expenses incurred by the Person performing the applicable Maintenance on its behalf within ten (10) days after written demand.

(c) Each Maintenance Party shall pay on demand, and shall indemnify and hold harmless each Benefited Owner and its Permittees from and against, any and all Claims that are incurred by or asserted against such Benefited Owner or its Permittees as consequence or result of any failure by such Maintenance Party to perform its Maintenance obligations as and when required under this Agreement.

(d) Any Maintenance Costs incurred by the Maintenance Party to Maintain Shared Facilities in accordance with this Agreement shall be allocated among the applicable Benefited Owners in accordance with the applicable Maintenance Cost Allocation. The Benefited Owners shall each pay their respective Shares of Maintenance Costs incurred by the Maintenance Party, in accordance with the applicable Maintenance Cost Allocation, within thirty (30) days after receiving from the Maintenance Party a written invoice for same with reasonable supporting documentation confirming the amount and prior payment thereof by the Maintenance Party.

(e) With respect to each of the Shared Facilities, on or before [November 1] of each year, the applicable Maintenance Party shall prepare and deliver to the Benefited Owner(s) thereof, a written notice for the upcoming calendar year (the "Projection Notice") setting forth (1) the Maintenance Party's reasonable estimate of the Maintenance Costs expected to be incurred by during the upcoming calendar year based on a detailed budget (collectively, the "Projections") of Maintenance Costs, with an explanation as to increases anticipated from the prior year's operations and (2) the Maintenance Cost Allocation applicable to each Benefited Owner based on such Projections. If the Maintenance Party incurs material unbudgeted Maintenance Costs, then it shall have the right, not more than once each calendar year, to deliver a mid-year Projection Notice with updated Projections to each Benefited Owner. If the Maintenance Party follows the foregoing procedures, then it may require each of the Benefited Owners to pay for Maintenance Costs in equal monthly installments equal to one-twelfth (1/12) of such Benefited Owner's Maintenance Cost Allocation of the Projections (as updated in accordance with this Agreement); and in such event the Maintenance Party shall deliver to the Benefited Owners a detailed reconciliation of the Projections and the actual Maintenance Costs incurred by the Maintenance Party (together with reasonable supporting documentation) not later than March 1 of the next following calendar year. If the reconciliation confirms that the monthly installment payments paid by a Benefited Owner is less than the Benefited Owner's Maintenance Cost Allocation of the Maintenance Costs actually incurred by

the Maintenance Party in the preceding calendar year, then the Benefited Owner shall pay the difference to the Maintenance Party within thirty (30) days after receiving the reconciliation; and if the reconciliation confirms that the monthly installment payments paid by a Benefited Owner exceed the Benefited Owner's Maintenance Cost Allocation of the Maintenance Costs actually incurred by the Maintenance Party in the preceding calendar year, then the Maintenance Party shall pay such excess, with interest at the Interest Rate, to the Benefited Owner within ten (10) days after completing the reconciliation. The reconciliation and amount of Maintenance Costs shall be subject to review and audit by the Benefited Parties, upon notice to the Maintenance Party not later than sixty (60) days after receiving the proposed reconciliation from the Maintenance Party. Each Maintenance Party shall keep detailed records of all Maintenance Costs, including detailed receipts, invoices and payment records, for at least three (3) years after the close of the calendar year in which the Maintenance Costs are incurred.

5. Operations and Maintenance; Compliance with Unity of Use Agreement.

(a) Subject to terms and conditions of Section 4 concerning the Maintenance of Shared Facilities, each Owner covenants and agrees that it and its Permittees shall use, develop, occupy and Maintain its Property, at such Owner's sole cost and expense, in accordance with the Operating Standard. Without limiting the foregoing but subject to Unavoidable Delays, each Owner shall be responsible for Maintaining, cleaning, keeping free from debris, removing snow and ice from (as it relates to surface areas which involve pedestrian or vehicular traffic) and otherwise keeping in first-class condition and repair and in compliance with the Operating Standard and all applicable Legal Requirements: (i) its respective Lot and the Buildings and other improvements located thereon from time to time; (ii) the sidewalks, walkways, driveways, parking areas and other exterior pedestrian areas and vehicular areas located on or immediately adjacent to such Owner's Lot; (iii) the landscaping located on such Owner's Lot; (iv) the lighting located on or serving such Owner's Lot; and (v) areas and facilities within such Owner's Lot over which another Owner has easement rights pursuant to this Agreement. Each Owner acknowledges and agrees that the Entire Project is intended to be a first class medical/educational/office real estate project and that the operation and Maintenance of each Property in accordance with the Operating Standard benefits the Entire Project and is essential to each other Owner.

(b) No Owner shall permit any light, noise, odor, vibration or other condition that, under the circumstances, is inconsistent with the Operating Standard or constitutes a nuisance, to exist upon or emanate from the Property owned by such Owner. This Section 5(b) shall not limit or apply to construction or reconstruction or Maintenance activities undertaken by or on behalf of any Owner on its Lot in accordance with the Operating Standard and the terms and conditions of this Agreement, provided that such Owner shall take all reasonable measures to mitigate the adverse impacts caused by such activities to each other affected Lot.

(c) No Owner shall permit or suffer the recordation or filing against its Lot or any other portion of the Entire Project of any mechanics', materialmen's or other enforcement lien arising by reason of any work performed or materials ordered by or on behalf of such Owner or the Permittees of its Lot. If any such lien is filed or recorded, then the responsible Owner shall, not later than thirty (30) days after the filing or recordation thereof, remove or release such

lien of record or bond over the enforcement of such lien in accordance with applicable Legal Requirements.

(d) Each Owner, at its sole cost and expense and without reimbursement or contribution from any other Owner (as Maintenance Costs or otherwise) shall pay prior to delinquency all taxes, assessments, levies and other charges imposed by any governmental authority upon the Property owned by such Owner.

(e) Each Owner covenants and agrees that it and its Permittees shall use, develop, occupy and Maintain its Lot and the Buildings and other improvements located thereon from time to time in compliance with the Unity of Use Agreement, so long as the Unity of Use Agreement remains in effect and applies to the applicable Lot. Notwithstanding the foregoing or anything herein to the contrary, if the "Zoning Permit/Use Registration Permit" identified in the Unity of Use Agreement is revoked, rescinded or determined to be invalid (by appeal or otherwise) and as a consequence thereof one or more of the Lots comprising the Project Parcel fails to comply with applicable zoning and/or subdivision Legal Requirements, then:

(1) The Owners shall take such actions and execute such instruments to address the noncompliance as the [New College Lot Owner] reasonably determines to be appropriate to cure, eliminate or address the noncompliance, which actions may include (without limitation) (w) appealing any decision, judgment or other determination resulting in the revocation, rescission or invalidity of such Zoning/Permit/Use Registration Permit, (x) reapplication for an appropriate Zoning Permit/Use Registration Permit and, if applicable, readjustment of the lot lines of the Lots as necessary or appropriate to obtain such Zoning Permit/Use Registration Permit, (y) submission of all or any of the Lots to the Pennsylvania Uniform Condominium Act, 68 Pa. C.S. §3101 et seq., the recordation of a condominium declaration wherein the affected Lots comprise separate units, and the creation of a governing board or owners' association in accordance with the requirement of such Act, and/or (z) seeking variances and other required approvals from the City of Philadelphia and other applicable governmental agencies so that each Lot complies with applicable Legal Requirements concerning zoning, land use and subdivision matters;

(2) Each Owner hereby irrevocably and unconditionally appoints the [New College Lot Owner] as its agent and attorney to act in its stead, and hereby irrevocably and unconditionally grants to the [New College Lot Owner] the unlimited power of attorney, to take all actions on its behalf and to execute and deliver on its behalf any and all applications, agreements and other instruments that the [New College Lot Owner] deems to be necessary or appropriate to cure, eliminate or address the noncompliance, including (without limitation) any one or more of the actions described in clause (1) above. The appointment and grant of power of attorney pursuant to this clause (2) are irrevocable and unconditional and coupled with the interest of each Owner in the Project Parcel.

(3) All costs and expenses arising from the revocation, rescission or invalidity of the Zoning Permit/Use Registration Permit, including (without limitation) any fines or penalties for noncompliance and all costs and expenses that are incurred by the New College Lot Owner and any other Owner in connection with clause (1) above (including, without limitation, any transfer taxes and filing fees), shall be borne exclusively by the North/South

Tower Lot Owner and the HUH Lot Owner.  The North/South Tower Lot Owner and the HUH Lot Owner, jointly and severally, shall indemnify and hold harmless each other Owner, and shall upon written request defend each other Owner with counsel satisfactory to such other Owner, from and against any and all Claims that arise from the revocation, rescission or invalidity of the Zoning Permit/Use Registration Permit.

Further, notwithstanding anything herein or in the Unity of Use Agreement to the contrary, with the prior written approval of the [New College Lot Owner] and not otherwise, any Owner may seek and obtain a variance or rezoning of its Lot so that such Lot complies on a stand-alone basis with applicable zoning, land use and subdivision Legal Requirements, and in such event the applicable Lot shall cease to be subject to the Unity of Use Agreement, provided, however, that such action shall not directly or indirectly create or increase any noncompliance (lawful or otherwise) under applicable Legal Requirements of any other Lot nor directly or indirectly limit or restrict the use or development of any other Lot, unless the Owner of such other Lot expressly consents in writing to such action.

      6.    Insurance; Indemnity.

(a) Insurance.  Each Owner, at its sole cost and expense and without reimbursement or contribution from any other Owner (as Maintenance Costs or otherwise), shall obtain and maintain at all times, the insurance required to be maintained by it pursuant to Exhibit D attached hereto and made a part.

(b) Indemnification.  Subject to Section 6(c), each Owner covenants and agrees to indemnify, defend (with counsel reasonably acceptable to the other Owner(s)) and hold harmless the other Owners, and such Owners' Permittees, officers, employees, direct and indirect owners, from and against any and all Claims for injury to persons or damage to property arising from (i) any use, occupancy, act, occurrence or condition on or about such indemnifying Owner's Property, (ii) from the use or enjoyment of any Shared Facility or other easement rights created hereunder by such Owner or its Permittees, (iii) any activity, work, or thing done, permitted or suffered by such indemnifying Owner, its agents, contractors or employees in or about the Project Parcel or due to any other negligent act or omission of such indemnifying Owner, its agents, contractors or employees, or (iv) from such Owner's failure to perform its obligations under this Agreement.  This Section 6(b) shall survive termination or expiration of this Agreement.

(c) Mutual Release and Waivers of Recovery.  Each Owner hereby releases and discharges each other Owner and the Permittees of such other Owner's Lot from any responsibility, right of recovery or claim (including, without limitation, any claims for contribution or indemnity), for that portion of any loss or damage paid or reimbursed by any fire, extended coverage or other property insurance policy maintained by the releasing party (or, if greater, the insurance proceeds that would be available if the releasing party maintained all insurance required of it hereunder), no matter how such loss or damage is caused (whether by negligence or otherwise). Any fire, extended coverage or property insurance policy maintained by any Owner with respect to its Property shall contain (by endorsement or otherwise) a waiver of subrogation provision or endorsement in favor of each other Owner and its Permittees or, in

the event that such provision is unavailable, then the applicable Owner shall obtain the express written approval and consent of their respective insurers to the terms of this Lease.

      7.     Alterations.

      (a) Subject to the other provisions of this Section 7, each Owner may, at any time and from time to time, at such Owner's sole cost and expense, make additions, alterations, deletions from or changes in the improvements located within such Owner's Property (collectively, "Alterations"), and in connection therewith such Owner may relocate Shared Facilities located upon its Property (subject to the conditions set forth in Section 3(b)).

      (b) Any Owner making Alterations (or demolishing or redeveloping improvements as contemplated in subsection (c) below) shall comply with the Operating Standard.  To the extent reasonably practicable, in such a manner as to minimize any noise, interference or vibration, dust, debris or other condition that would disturb or interfere with the use, occupancy or conduct of business of any other Property.

      (c) If an Owner undertakes Alterations which are reasonably expected to cost more than [50%] of the fair market value of its Property, or if the improvements on any Lot are damaged or destroyed by fire or other casualty to an extent greater than [50%] of the replacement cost of the improvements and the applicable Owner elects to restore or replace the affected improvements, then in either such event, to the extent reasonably practicable, the applicable Alterations, restorations and replacement work shall be designed and performed in a manner that eliminates (if reasonably practicable) or reduces the affected Property's use of and reliance on Shared Utility Facilities, Existing Encroachments and Support Elements.  Following completion of the applicable Alterations, restorations or replacement, if such Property no longer uses or relies on the Shared Utilities, Existing Encroachments or Support Elements (as the case may be), then the applicable Owner shall cease to be a Benefited Owner of the applicable easements created by Article 2 of this Agreement and the Owner's Maintenance Cost Allocation with respect to such easement shall be zero (0%).

      8.     Damage.

      (a) If any Building or other improvements upon any Lot is damaged by fire or other casualty, then the affected Building or other improvements shall, at the election of the Owner of the Lot upon which such improvements are located, be repaired and restored as promptly as is reasonably possible by the Owner such Lot at its sole cost and expense (subject to the right of such Owner to make Alterations in accordance with Section 7).  If such Owner elects not to perform such repair and restoration, such Owner shall promptly remove all damaged improvements and debris, leaving such Owner's Lot in a safe and slightly condition in accordance with the Operating Standard.

      (b) Notwithstanding the foregoing or anything in this Agreement to the contrary, if any Shared Utility Facilities, the Shared Loading Dock or Shared Parking Facilities are damaged or destroyed by fire or other casualty, then the Providing Owner on whose Lot such facilities are located shall be unconditionally obligated to repair and restore the affected facilities at its sole cost and expense (without regard to the amount of available insurance proceeds, if any)

to the condition that existed immediately prior to the applicable fair or other casualty (subject to the Owner's right to relocate Shared Facilities and to make Alterations in accordance with this Agreement). The repairs and restoration required under this Section 8(b) shall be commenced by the responsible Owner not later than thirty (30) days after the occurrence of the fire or other casualty and thereafter shall be diligently prosecuted to completion in accordance with the Operating Standard.

         9.     <u>Reasonable Rules and Regulations.</u>

        The exercise of all rights, responsibilities and obligations granted hereunder with regard to easements or other rights of access over any Owner's Property, shall in all cases be exercised in a commercially reasonable manner in accordance with the Operating Standard and shall be subject, to any reasonable rules and regulations and other standards which may be established from time to time by the Providing Owner (which may include, without limitation, limiting access to specifically authorized Persons and closing areas burdened by easements for access hereunder at night and on weekends and holidays, for security reasons, and/or to avoid the implied public dedication of such areas), <u>provided, however,</u> that no such closing will prevent or materially interfere with the use and operation of the Entire Project in accordance with the Operating Standard.

         10.     <u>Emergencies.</u>

        In the event of the occurrence of an Emergency, there shall immediately and automatically (a) be granted by and between all parties hereto such temporary easements as are reasonably necessary for the preservation of life and property, all such emergency easements to terminate automatically with the expiration of the Emergency in connection with which they arose, and (b) be temporarily suspended any rights and easements granted hereunder which are necessary to be suspended for the preservation of life and property, all of such rights and easements to return to full force and effect automatically with the expiration of the Emergency in connection with which they arose.

         11.     <u>Remedies; Self-Help.</u>

        (a) The Owners shall be entitled to all rights and remedies available at law or in equity including, without limitation, specific enforcement and injunctions, to enforce this Agreement.

        (b) In addition, if any Owner obtains judgment from a court of competent jurisdiction for money damages from any other Owner for any breach or other amounts due under this Agreement, and if such judgment is not paid in full within ten (10) days after becoming final and unappealable, then the Owner in whose favor the judgment is issued shall have the right to impose, record, maintain a lien (an "Enforcement Lien") against the defaulting Owner's Property in the amount due, plus interest at the Interest Rate in accordance with Section 11(d). Enforcement Liens may be foreclosed in the same manner as mortgage liens are foreclosed in the jurisdiction where the Project Parcel is located. Enforcement Liens shall arise from the date of recording, shall be subject and subordinate to all existing Mortgages against the defaulting Owner's Property as of the date the Enforcement Lien is recorded, and shall be

superior to all Mortgages and other liens against the defaulting Owner's Property that are recorded after the date of recordation of the Enforcement Lien.

(c)  The failure of any Owner to perform any of its obligations hereunder shall entitle the intended Benefited Owner to undertake the performance of such obligations if, after the expiration of thirty (30) days following the giving of notice as provided in Section 14 hereof (except in the case of an Emergency, in which event no notice shall be required), the Owner so obligated shall have failed to effect such cure (or, if effecting such cure would take in excess of thirty (30) days, shall have failed to commence such cure or shall have failed to proceed thereafter diligently to complete such cure), and the cost of effecting such cure shall be paid by the party so obligated within thirty (30) days of a presentation of a bill therefor.

(d)  If any amount payable by one Owner to another Owner under this Agreement is not paid within five (5) business days after the date due, the amount due shall bear interest at the Interest Rate until paid in full by the delinquent Owner.

(e)  In no event shall the failure of any Owner to perform any of its obligations hereunder entitle any other Owner to terminate this Agreement or any easements created hereunder because of such failure.

12.    Attorney's Fees.

Any Owner may enforce this Agreement by appropriate action and, in the event that it prevails in such action, shall recover as part of its cost a reasonable attorney's fee from such parties against whom such enforcement was successfully sought and obtained.

13.    Notices.

(a)  Any notice, demand, consent, approval, election or other communication which any Owner shall desire or be required to give pursuant to the provisions of this Agreement shall be in writing, shall be sent by electronic mail, certified U. S. mail return receipt requested, or by nationally recognized overnight courier service (such as FedEx), and shall be deemed to have been given, (a) if by mail as aforesaid, two (2) days after the time two counterparts of the same are deposited in the United States mail, one by certified mail return receipt requested, and the other by regular mail, with postage prepaid, enclosed in securely sealed envelopes, (b) if by courier as aforesaid, one (1) business day after deposit with such courier service, and (c) if by electronic mail, on the same business day as transmission with proof of transmission on or before 5:00pm Philadelphia time, addressed in either case as follows, or to such other address as such Owner, as the case may be, may hereafter designate by notice given pursuant to this Section 14, and with a copy, given as aforesaid, to any Mortgagee of a Property or any portion of a Property electing to receive a copy as provided in Section 14, below:

(i)    If to the New College Lot Owner:

_____

_____

_____

_____

Email: _____

With required copies to:

_____
_____
_____
Email: _____

    (ii)    If to the Feinstein/Bobst Lot Owner:

_____
_____
_____
Email: _____

With required copies to:

_____
_____
_____
Email: _____

    (iii)    If to the North/South Tower Lot Owner:

_____
_____
_____
Email: _____

With required copies to:

_____
_____
_____
Email: _____

    (iv)    If to the HUH Lot Owner:

_____
_____
_____
_____
Email: _____

With required copies to:

_____
_____
_____
_____
Email: _____

14.     Rights of Mortgagees.  This Agreement shall be superior to any and all mortgages now existing or hereafter recorded against any or all of the Project Parcel.  [NOTE – EXISTING MORTGAGEES MUST CONSENT AND SUBORDINATE TO THIS AGREEMENT.]  Notwithstanding the foregoing or anything herein to the contrary, any Enforcement Lien arising under this Agreement shall be subject and subordinate to any and all Mortgages that are recorded prior to the recordation of the Enforcement Lien.  In addition to the notices to the Owners under Section 13, each Mortgagee of any Lot shall also be entitled to receive copies of all notices given to the Owner of such Lot, provided that such Mortgagee notifies each other Owner in writing that it is the holder of a Mortgage and specifies in such notice the address(es) to which notices to such Mortgagee shall be sent.

15.     Estoppels.  Each Owner shall from time to time, within ten (10) business days after any other Owner's request or that of any Mortgagee of the other Owner, execute, acknowledge and deliver to the requesting Owner a written instrument in recordable form (the "Estoppel Certificate"), certifying (i) that this Agreement is in full force and effect and has not been modified, supplemented or amended (or, if there have been modifications, supplements or amendments, that it is in full force and effect as modified, supplemented or amended, and stating such modifications, supplements and amendments); (ii) the dates to which Maintenance Costs and any other charges arising hereunder, have been paid; (iii) the amount of any prepaid amounts or credits due Owner, if any; (iv) whether or not, to the best of the Owner's knowledge, all conditions under the Agreement to be performed by the requesting Owner prior thereto have been satisfied and whether or not the requesting Owner is then in default in the performance of any covenant, agreement or condition contained in this Agreement and specifying each, if any, unsatisfied condition and each, if any, default of which the certifying Owner may have knowledge; and (v) any other fact or condition related to the Agreement or the certifying Owner reasonably requested.  Any certification delivered pursuant to the provisions of this Section shall be intended to be relied upon by the requesting Owner and any mortgagee or prospective mortgagee or purchaser of the Property or of any interest therein.

16.     Arbitration by Project Engineer.  The Owners acknowledge and agree that certain disputes that may arise under this Agreement are not suitable for resolution by a court or jury and would be best resolved by the Project Engineer.  Accordingly, all disputes that arise

from time to time between two (2) or more Owners with respect to the Arbitration Matters expressly identified herein (and not other matters, unless the affected Owners expressly agree in writing) shall be resolved exclusively by the procedures set forth in this Section.

(a)  If any dispute arises between two (2) or more Owners with respect to any Arbitration Matter, then the affected Owners shall endeavor in good faith to resolve such dispute within thirty (30) days after notice thereof specifically initiating this Section 16 (the "Mediation Notice") is given by any Owner to the other affected Owners.   At the request of any Owner, the Project Engineer may be consulted and enlisted to mediate the dispute during such thirty (30) day.

(b)  If the dispute is not resolved and documented by written agreement within thirty (30) days after the date of the Mediation Notice (as such period may be extended by mutual written agreement of the affected Owners), then at the written request of any affected Owner (the "Arbitration Notice") the dispute shall be resolved by the following fast track arbitration process ("Fast Track Arbitration"), the result of which shall be binding upon all affected Owners.

(c)  The parties agree that the arbitrator for any Fast Track Arbitration shall be the Project Engineer.  In the event the then-current Project Engineer is unable or unwilling to serve as arbitrator consistent with the Fast Track Arbitration schedule set forth in this Section, then the arbitrator for the Fast Track Arbitration shall be a substitute Project Engineer selected by the New College Lot Owner.

(d)  Not later than forty-five (45) days after the Project Engineer is engaged as arbitrator pursuant to clause (i), the arbitrator shall hold a hearing in a format designated by the arbitrator to resolve each of the issues identified by the parties. The Fast Track Arbitration hearing shall take place at a location agreed upon by the parties. If the parties cannot agree, the arbitrator shall designate a location in Philadelphia Pennsylvania.

(e)  At least seven (7) days prior to the hearing, each party shall submit to the arbitrator and each other party, such documents and other information that the arbitrator requests, including (to the extent requested by the arbitrator) (A) all documents, affidavits, and other information on which such party intends to rely in any oral or written presentation to the arbitrator;  (B) a proposed specific ruling on each Arbitration Matter to be resolved; (C) a written memorandum or brief in support of such party's proposed rulings, provided that the memorandum or brief shall not exceed five (5) pages or, if applicable, such other page limit that is specified by the arbitrator.

(f)  Except as otherwise provided in this Section 16 or as otherwise agreed in writing by the parties or as determined by the arbitrator, the Fast Track Arbitration proceeding shall be conducted by the arbitrator in accordance with the then current American Arbitration Association Construction Industry Arbitration Rules using the Fast Track Procedures, but shall not be administered by the American Arbitration Association.

(g)  The arbitrator shall rule on each disputed Arbitration Matter as soon as reasonably possible after the initiation of the Fast Track Arbitration, and, in any event, within

fourteen (14) days following completion of the -hearing. The decision of the arbitrator shall be issued in writing. The arbitrator shall be paid its customary and reasonable fees plus expenses (including, if applicable, the fees and expenses of any attorneys or other advisors that the arbitrator deems necessary or appropriate to conduct the Fast Track Arbitration). The arbitrator shall award to the prevailing party its reasonable attorneys' fees, costs, expert witness costs, and expenses (including the arbitrator fees and expenses), incurred in the Fast Track Arbitration proceeding. For purposes of the award of attorneys' fees, costs, expert witness costs, and expenses, the arbitrator shall designate a party as the prevailing party if, in the judgment of the arbitrator, there is a prevailing party.

(h) The rulings of the arbitrator and the award of fees and expenses in any arbitration and Fast Track Arbitration shall be final, binding, non-reviewable, and non-appealable, and may be entered as a final judgment in any court having jurisdiction..

17.    Easement or License.

The parties hereto understand that all of the Shared Facilities with respect to which they have purported to grant easements hereunder constitute fixtures and are, therefore, real property. If, however, any of said equipment or Facilities at any time are not fixtures or real property, but are personal property, then the purported grant of an easement with respect thereto shall constitute the issuance of a license with respect thereto, irrevocable and subject to all of the other provisions of this Agreement applicable thereto.

18.    Burdens and Benefits; Successors and As. signs.

Each easement granted hereunder by any Owner shall burden all or part of such Owner's Property as described in the granting clause for such easement and shall benefit and be appurtenant to the Property or Properties expressly stated to be benefited thereby in such granting clause, and no other property. All the covenants, easements and other provisions of this Agreement (including, but not limited to, the benefits and burdens hereof) shall run with the land with respect to the Project Parcel and shall be binding upon, inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns. Upon the transfer of ownership of any area subject to any easement hereunder, the transferor thereof shall have no liability hereunder for any defaults hereunder occurring after the date of such transfer.

19.    Amendment.

(a) This Agreement and the easements hereby granted and the other provisions hereof shall become effective upon the date of recordation of this Agreement in the Recorder's Office.

(b) This Agreement may be amended only by a written instrument which shall be recorded in the Recorder's Office, and except as provided to the contrary in Section 19(c), shall be executed by:

(1) All the Owners; and

(2) Each Mortgagee under an existing Mortgage of record as of the date that such amendment is recorded.

Except as specifically provided above, the consent of no other Permittee of any Lot shall be required for any amendment of this Agreement to become effective, and except as specifically provided above.

(c) Notwithstanding Section 19(b), any specific easement created by this Agreement may be amended by a written instrument executed by the Providing Owner and the Benefited Owner(s) of such easement and their respective Mortgagees, without requiring the consent or approval of any other Owner that is not a Benefited Owner of such easement or any Mortgagee of such other Owner's Lot.

20.    Term of this Agreement.

Subject to the provisions of Sections 3(b), 7 and 8 hereof (regarding the termination of specific easements granted hereunder) and this Section 20, this Agreement shall remain in full force and effect for a period of ninety (90) years from the date hereof, and thereafter it shall be deemed to have been automatically renewed for successive terms of ten (10) years, except that at any time, and from time to time, this Agreement may be terminated by a unanimous written agreement of all Owners and Mortgagees. Such termination shall be effected by recordation in the Recorder's Office of a document executed by all of the Owners, stating that this Agreement shall be terminated as provided therein, which Agreement shall be joined in by each Mortgagee. If any of the options, privileges, covenants or rights created by this Agreement would otherwise be unlawful or void for violation of (i) the rule against perpetuities or some analogous statutory provisions, (ii) the rule restricting restraints on alienation, or (iii) any other statutory or common law rules imposing time limits, then such provision shall continue only until twenty-one (21) years after the death of the survivor of the now living lawful descendants of Her Royal Highness Queen Elizabeth II, the Queen of England.

21.    Severability.

If any provision of this Agreement shall be conclusively determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement shall not be affected thereby.

22.    Construction.

This Agreement shall be reasonably construed so as to carry out the intention to confer a commercially useable right of enjoyment on any grantee hereunder, without unreasonably burdening the Property subject to such easements.

23.    Unavoidable Delays.

If and to the extent that any Owner is delayed in the performance of any obligation hereunder, other than obligations that are to be or could be satisfied by the payment of money (including, without limitation, paying for Maintenance Costs and obtaining insurance required hereunder), and such delay constitutes Unavoidable Delay, then the time for

performance of such obligation shall be extended for so long as the Unavoidable Delay continues, provided, however, that (i) such Owner notifies each other Owner in writing not later than five (5) business days after first becoming aware of the Unavoidable Delay, and (ii) such Owner uses all commercially reasonable efforts to minimize the extent and duration of the Unavoidable Delay and to expedite its performance of the applicable obligation.

      24.    Limitation of Liability.

Notwithstanding anything contained herein to the contrary, each Owner agrees that no other Owner, nor any partner, officer, shareholder or director thereof, shall have any personal liability with respect to any provisions of this Agreement, and such Owner shall look solely to the estate and Property of such other Owner in the Entire Project for the collection of any judgment or the enforcement of any other judicial process requiring the payment or expenditure of money by such other Owner, in the event of any default by such other Owner with respect to any of such other Owner's obligations under this Agreement. No other assets of such other Owner or of any partner, officer, director or shareholder of such other Owner shall be subject to levy, execution or other judicial process for the satisfaction of an Owner's claims, and in the event a judgment is obtained against an Owner, the judgment docket shall be so noted. The provisions of this Section 24 shall inure to the benefit of each Owner's heirs, representatives, successors and assigns and their respective principals.

**IN WITNESS WHEREOF**, the parties here to, intending to be legally bound hereby, have duly executed and sealed this Agreement effective the date first above written.

### NEW COLLEGE LOT OWNER:

_____, a(n) _____
_____

By:_____
Name:_____
Its:_____


### FEINSTEIN/BOBST LOT OWNER:

_____, a(n) _____
_____

By:_____
Name:_____
Its:_____


### NORTH/SOUTH TOWER LOT OWNER:

_____, a(n) _____
_____

By:_____
Name:_____
Its:_____

**HUH LOT OWNER:**

_____, a(n) _____
_____

By:_____
Name:_____
Its:_____

COMMONWEALTH OF PENNSYLVANIA          :

                                              :          SS

COUNTY OF PHILADELPHIA          :

      On the _____ day of _____, ____, before me, a notary public in and for the notary public in and for the Commonwealth and County aforesaid, the undersigned officer, personally appeared_____, who acknowledged himself/herself to be _____ of _____, and that __he as such _____ executed the foregoing instrument for the purposes therein contained.

      IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

                    _____
                    Notary Public
                    My Commission Expires:

COMMONWEALTH OF PENNSYLVANIA          :

                                                :          SS

COUNTY OF PHILADELPHIA          :

      On the _____ day of _____, ____, before me, a notary public in and for the notary public in and for the Commonwealth and County aforesaid, the undersigned officer, personally appeared_____, who acknowledged himself/herself to be

_____ of _____, and that __he as such
_____ executed the foregoing instrument for the purposes therein contained.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

_____
Notary Public
My Commission Expires:

COMMONWEALTH OF PENNSYLVANIA        :

                                    :       SS

COUNTY OF PHILADELPHIA              :

        On the ____ day of _____, ____, before me, a notary public in and for the notary public in and for the Commonwealth and County aforesaid, the undersigned officer, personally appeared_____, who acknowledged himself/herself to be _____ of _____, and that __he as such _____ executed the foregoing instrument for the purposes therein contained.

        IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

                          _____

                          Notary Public
                          My Commission Expires:

COMMONWEALTH OF PENNSYLVANIA        :

                                    :       SS

COUNTY OF PHILADELPHIA              :

        On the ____ day of _____, ____, before me, a notary public in and for the notary public in and for the Commonwealth and County aforesaid, the undersigned officer, personally appeared_____, who acknowledged himself/herself to be _____ of _____, and that __he as such _____ executed the foregoing instrument for the purposes therein contained.

        IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

                          _____

                          Notary Public
                          My Commission Expires:

EXHIBIT A-1

NEW COLLEGE LOT

EXHIBIT A-2

FEINSTEIN/BOBST LOT

EXHIBIT A-3

NORTH/SOUTH TOWER LOT

EXHIBIT A-4

HUH LOT

## EXHIBIT B

## PROJECT PARCEL

EXHIBIT C

SITE PLAN

EXHIBIT D

**INSURANCE REQUIREMENTS [subject to confirmation/revision by insurance advisors]**

Each Owner, at its sole cost and expense, shall obtain and maintain (or cause to be maintained) during the entire term of this Agreement, insurance providing at least the following coverages, pursuant to formal policies of insurance complying with the requirements set forth below:

(1)    Property/Casualty Insurance

.  Each Owner shall (i) keep its Property insured against damage by fire, acts of domestic and foreign terrorism, any type of wind (including named storms) and such other hazards covered by a special form or all-risk insurance policy (A) for the full insurable value thereof on a replacement cost basis without any coinsurance (B) with a deductible not to exceed $25,000, except for wind/named storms and earthquake, which shall provide for a deductible of no more than five percent (5%) of the total insurable value of the applicable Property, (C) containing Law & Ordinance coverage if any Building or other improvements or the use of the Property shall at any time constitute legal non-conforming structures or uses, including coverage for loss to the undamaged portion of the Building (with a limit equal to replacement cost), the cost of demolition and the increased costs of construction and (D) shall maintain boiler and machinery insurance and such other property insurance as reasonably required to comply with the Operating Standard (and in any event providing adequate coverage over the obligation of the Owner thereof) Administrative Agent.    The full insurable value of the Buildings and other improvements on any Lot shall be re-determined from time to time (but not more frequently than once in any twelve (12) calendar months) at the request of any Owner, in consultation with the Project Engineer.

(2)    Business Interruption Insurance.  Each Owner shall maintain business interruption insurance, including rental income loss and extra expense, (A) covering all perils required herein to be insured against, (B) covering a period of restoration of eighteen (18) months and containing an extended period of indemnity endorsement which provides that after the physical loss to the Building and other improvements on such Owner's Lot has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of twelve (12) months from the date that the loss is repaired or the affected Building is replaced and operations are resumed, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period and (C) in an amount equal to one hundred percent (100%) of the projected gross revenue (less non-continuing expenses) from the such Owner's Property, as reasonably determined by such Owner.

(3)    Liability Insurance.  Each Owner shall maintain (i) commercial general liability insurance (with no exclusion for acts of domestic and foreign terrorism) with respect to its Property for both personal injury, bodily injury to or death of a person and for property damage providing for limits of liability not less than $3,000,000 per occurrence and $5,000,000 in the aggregate, (ii) umbrella liability coverage providing excess coverage up to $10,000,000 on terms consistent with the general liability insurance required hereinabove, and (iii) other liability insurance as reasonably required in accordance with the Operating Standard, including but limited to auto liability coverage.  Such liability insurance shall contain a broad form

endorsement and include, without limitation, coverage for premises and operations, collapse, explosion and underground hazard, products/completed operations, blanket contractual liability insurance specifically covering, but not limited to, for each Owner, the contractual obligations of such Owner pursuant to this Agreement, broad form property damage, personal injury, independent contractors, owner's protective liability coverage, employees as additional insureds, cross liability coverage. The fellow employee liability exclusion is to be deleted. In addition, each Owner maintain and cause its tenant and subtenants to maintain (A) worker's compensation insurance and employer's liability insurance covering employees at the applicable Property (in the amounts not less than the amounts required by applicable Legal Requirements), (B) Employer's liability insurance, (C) professional liability insurance, and (D) at any time while any Shared Parking Facilities or other parking areas are being operated, the Owner of the Lot(s) upon which such parking areas are being operated shall maintain Garage Keepers Legal Liability insurance insuring against claims for liability arising out of the operation of such parking areas and any improvements thereon, with a combined single limit for each occurrence of not less than One Million Dollars ($1,000,000.00).

(4)    Builder's Risk. At all times during which structural construction, repairs or alterations are being made with respect to any Building or other improvements located on a Lot, and only if the property or liability coverage forms do not otherwise apply, the applicable Owner shall also maintain (A) commercial general liability and umbrella liability insurance covering claims related to the construction, repairs or alterations being made which are not covered by or under the terms or provisions of the commercial general liability and umbrella liability insurance policy required in Paragraph 3 above; and (B) the insurance provided for in Paragraph 1 above written in a so-called builder's risk completed value form (1) on a non-reporting basis, (2) against all risks insured against pursuant to Paragraph 1, and (3) including permission to occupy the applicable Property.

(5)    Policy Requirements. All insurance policies shall be obtained under valid and enforceable policies. The liability insurance policies required hereunder shall be endorsed to name each other Owner and its Mortgagee(s) as additional insureds, without contribution, under a standard non-contributory mortgagee clause. The proceeds of insurance paid on account of any damage or destruction to any Property shall be paid to the applicable Owner or its Mortgagee, to be applied as provided in Section 8(b) of this Agreement.

(i)    All such insurance policies and endorsements shall be fully paid for by the applicable Owner and shall be issued by such insurance companies authorized to do business in the state in which the Project Parcel is located, with a rating of "A-X" or better as established by Best's Rating Guide or "A-" or better by Standard & Poor's Ratings Group.

(ii)    Each property insurance policy shall provide that such policy may not be canceled except upon thirty (30) days' prior written notice (except ten (10) days' prior notice for non-renewal or cancellation due to non-payment of premium) to each other Owner and that no act or negligence of the Owner, or any other insured under the policy, or failure to comply with the provisions of any policy which might otherwise result in a forfeiture of the insurance or any part thereof, shall in any way affect the validity or enforceability of the insurance insofar as the additional insured are concerned. If available using commercially

2

reasonable efforts, each liability insurance policy shall provide that such policy may not be canceled except upon thirty (30) days' prior written notice (except ten (10) days' prior notice for non-renewal or cancellation due to non-payment of premium) to each other Owner (provided that, if the insurer will not or cannot provide the required notice, Borrowers shall be obligated to provide such notice).

        (iii)    Blanket policies shall be permitted in satisfaction of the insurance required to be maintained by any Owner only if (i) any such policy shall in all other respects comply with the requirements of this Agreement and (ii) such policy is approved in advance in writing by the other Owners

        (iv)    Each insurance policy required to be maintained hereunder shall include a waiver of subrogation in favor of each other Owner and its Permittees, with respect to any insured loss or damage caused by the negligence or other fault of the applicable other Owners or their respective Permittees. .

    (6)    Any Owner may obtain additional insurance that is not expressly required hereunder; provided, however, that (i) such policies shall not be invalidated by the releases and waivers of subrogation contained in this Agreement, and (ii) no such party shall be entitled to exercise its right to maintain insurance coverage in such a way as to decrease the amount that may be realized under any insurance policy required hereunder.

    (7)    Upon the renewal or replacement of existing coverage or the obtaining of additional coverage and at any other time upon the request of the other party, each Owner shall provide to the other duplicate copies of the policies of insurance or certificates of its insurance agent, certifying to the other party the insurance coverage required, and including photocopies of all policies certified to by such agent to be true and correct, together with a receipted bill reflecting full payment of all premiums for such policies for at least one year.

    (8)    The coverages, amounts and forms of insurance required hereunder shall be updated from time by mutual agreement of the Owners (provided that, if the Owners disagree, then the reasonable determination of the New College Lot Owner shall govern).

3