# EXHIBIT I

eRecorded in Philadelphia PA   Doc Id: 53316753
01/18/2018 03:21 PM    Page 1 of 30    Rec Fee: $256.75
Receipt#: 18-05623
Records Department    Doc Code: DM

Prepared by and When Recorded Return to:
DLA Piper LLP (US)
444 West Lake Street, Suite 900
Chicago, Illinois 60606-0089
Attn: David B. Sickle, Esq.

OPA Numbers:

88-5-6202-42 (300-04 N. Broad St. – Park Owner)
88-3-4001-02 (306-20 N. Broad St. – Garage Owner)
88-1-0382-02 (325 N. 15th St. – 15th Street Owner)

PARKING, ACCESS AND UTILITIES EASEMENT AGREEMENT
(Wood Street Garage/Stiles)

THIS PARKING, ACCESS AND UTILITIES EASEMENT AGREEMENT (this "Agreement") is dated as of December 30, 2017, made effective as of this _11th_ day of January, 2018, by and among BROAD STREET HEALTHCARE PROPERTIES, LLC, a Delaware limited liability company ("15th Street Owner"), PAHH WOOD STREET GARAGE, LLC, a Delaware limited liability company ("Garage Owner"), and, solely for the purpose of joining in Section 6 hereof, BROAD STREET HEALTHCARE PROPERTIES II, LLC, a Delaware limited liability company ("Park Owner"). Except as used in Section 6 hereinafter, 15th Street Owner and Garage Owner are sometimes referred to herein and the exhibits hereto as an "Owner" and collectively as the "Owners." As used in Section 6 hereinafter, each of 15th Street Owner, Garage Owner and Park Owner are referred to herein as an "Owner" and collectively as "Owners."

BACKGROUND:

15th Street Owner is or is about to become the owner of certain land, together with certain of the buildings and improvements located thereon, in Philadelphia, Pennsylvania, as described on Exhibit A attached hereto (the "15th Street Premises"). Garage Owner is or is about to become the owner of certain land, together with the buildings and improvements located thereon, located immediately adjacent to the 15th Street Premises in Philadelphia, Pennsylvania as described on Exhibit B attached hereto (the "Garage Premises").

Park Owner is or is about to become the owner of certain land, together with the improvements thereon, located in Philadelphia, Pennsylvania described on Exhibit C attached hereto (the "Park Premises"). Except as used in Section 6 hereof, the 15th Street Premises and the Garage Premises are sometimes referred to herein individually as a "Property" and collectively as the "Properties." As used in Section 6 hereof, the 15th Street Premises, the Garage Premises and the Park Premises are referred to individually as a "Property" and collectively as the "Properties."

28

15th Street Owner and Garage Owner desire to enter into this Agreement for the purpose of providing certain easements to Garage Owner .

NOW, THEREFORE, in consideration of One Dollar ($1.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows:

1.    Driveway Area. 15th Street Owner hereby grants and conveys to Garage Owner for the use and benefit of Garage Owner and its mortgagees, tenants, licensees, invitees, successors and assigns (collectively, "Permittees"), an easement through, within, over and under (a) that portion of the 15th Street Premises identified as the "Driveway Area" on Exhibit D-1 attached hereto (the "Driveway Area") and (b) the Parking Area, as hereinafter defined. The easements granted hereby shall be, subject to the rights of Philadelphia Charitable Holdings Corporation, or its successor, pursuant to the Declaration, as hereinafter defined, exclusive, perpetual rights and easements appurtenant to the Garage Premises for the purpose of pedestrian and vehicular ingress, egress and regress to and from the Garage Premises and the Parking Area, as hereinafter defined, and to and from public rights of way adjacent to the 15th Street Premises, and for constructing, Maintaining, altering, replacing, repairing, removing, paving, striping and curbing the driveway area as necessary or desirable for use of the Driveway Area for pedestrian and vehicular ingress, egress and regress to and from the Garage Premises and Parking Area, as hereinafter defined. These easements set forth herein include, without limitation, the right to install, maintain, alter, repair, replace, and remove such traffic control devices, parking control devices, payment devices, signage, lighting and other equipment as currently exist or as Garage Owner shall desire, in its sole discretion, to install, replace or remove from time to time, reasonably related to access to the Garage Premises or the Parking Area, as hereinafter defined. Garage Owner has the right, easement and license to use, repair, replace or dispose of any existing traffic control devices, payment devices, signage, lighting and other equipment that currently exist on the Property.

2.    Parking Areas. 15th Street Owner hereby grants and conveys to Garage Owner, for the use and benefit of Garage Owner and its Permittees an easement through, within, over and under those areas located in the 15th Street Premises identified on Exhibit D-2 attached hereto identified as "Parking Area" (the "Parking Area"). The easements granted hereby shall be, subject to the rights of Philadelphia Charitable Holdings Corporation, or its successor, pursuant to the Declaration, as hereinafter defined, exclusive, perpetual rights and easements appurtenant to the Garage Premises for the purpose of parking and access within the Parking Area and for constructing, installing, altering, replacing, removing, repairing, Maintaining, paving, striping and curbing the Parking Area as necessary or desirable for the use of the Parking Area for parking and access. These easements set forth herein include, without limitation, the right to install, maintain, alter, repair, replace, and remove such traffic control devices, parking control devices, payment devices, signage, lighting and other equipment as currently exist or as Garage Owner shall desire, in its sole discretion, to install, replace or remove from time to time reasonably related to parking. 15th Street Owner shall not be entitled to any revenues from the Parking Area, Driveway Area, or any other area or property, real or personal, used by Garage Owner pursuant to this Agreement.

2

3.    Utility Easements. 15th Street Owner hereby grants and conveys to Garage Owner, for the use and benefit of Garage Owner and its Permittees an easement through, within, under and over the 15th Street Premises, as a non-exclusive perpetual right and easement appurtenant to the Garage Premises for the purpose of constructing, installing, Maintaining, altering, repairing, replacing and removing electric, telecommunications, water, storm water and other utility lines, conduits and other fixtures and equipment related to provision of service of electric, telecommunications, water, storm sewer and other utility services to the Garage, Driveway Area and Parking Area. Garage Owner shall have the non-exclusive right and easement to discharge stormwater into any stormwater facilities located in 15th Street Premises from time to time.

4.    Maintenance.

a.    Maintenance Generally. Except as expressly set forth herein to the contrary, subject to Unavoidable Delays, 15th Street Owner shall Maintain, at its sole cost and expense, the 15th Street Premises, and Garage Owner shall Maintain, at its sole cost and expense, the Garage Premises, in accordance with the Operating Standard.

As used herein, the following terms shall have the respective meanings set forth below:

"Maintenance" and "Maintain" shall mean the operation, maintenance, repair, reconditioning, refurbishing, reconfiguration, inspection, testing, cleaning, painting, installation, restoration, reconstruction and replacement (when necessary or desirable) of the applicable building or facility.

"Operating Standard" shall mean the standards of operations, cleanliness, security, appearance, repair and Maintenance generally applicable to similar facilities in the Center City, Philadelphia area, with due consideration to the age of the applicable buildings and facilities. At a minimum, the Operating Standard requires that the applicable buildings and facilities shall at all times be operated and Maintained in good working order and condition, ordinary wear and tear excepted, and in compliance with all applicable Legal Requirements.

"Legal Requirements" means all laws, rules, orders, ordinances, codes, regulations and requirements, now or hereafter enacted or promulgated, of the United States of America, the Commonwealth of Pennsylvania, the City of Philadelphia and of any other sovereign or municipality now or hereafter having jurisdiction over the any of the Properties or any portion thereof, and of any governmental or quasi-governmental agency thereof now or hereafter having such jurisdiction, and of any other lawful authority having such jurisdiction.

"Unavoidable Delay" means delay in the performance of any non-monetary obligations hereunder, to the extent that such delay is not reasonably avoidable and is caused by fire, flood, windstorms or other casualty events, strikes or labor unrest, unavailability of required labor, service or materials, extraordinarily adverse weather conditions (but only to the extent that such weather would not be reasonably anticipated and accounted for in the use and Maintenance in accordance with the Operating Standard), interruption of required utilities by acts or occurrences outside the Property of the Owner who is responsible for the applicable Maintenance, and other similar acts and occurrences outside the reasonable control of the Owner required to perform

EAST\149954104. 3

3

such duties or obligations, provided, however, that (i) in no event shall the unavailability of required funds constitute or justify a claim of Unavoidable Delay, (ii) the Owner that is required to perform the affected obligation shall notify the other Owner not later than five (5) business days after becoming aware of the Unavoidable Delay.

b.    Parking and Driveway Maintenance.  Garage Owner shall, subject to Unavoidable Delays, light, secure and Maintain, at its own expense, the Driveway Area and the Parking Area and all parking facilities, driveway facilities, traffic control devices, parking control devices, driveway and parking signage serving the Garage Premises, Driveway Area or Parking Area, and Garage Owner shall also Maintain other equipment and fixtures installed or constructed by Garage Owner.  Subject to Section 5(d) hereof, Garage Owner shall repair, at its own expense, any areas of the 15th Street Premises adjoining the Parking Area or Driveway Area damaged or altered in any way whatsoever directly or indirectly by the exercise of the easements set forth herein, and all such repair shall be as nearly as practicable to the condition that existed prior to such damage or alteration.

c.    Taxes.  Each Owner, at its sole cost and expense and without reimbursement or contribution from any other Owner shall pay all taxes, assessments, levies and other charges imposed by any governmental authority upon the Property owned by such Owner, not later than thirty (30) days prior to the earliest date that its Property or any portion thereof may be sold or forfeited for nonpayment thereof.

5.    Insurance and Indemnification; Waiver of Subrogation.

a.    Insurance. Each Owner, at its sole cost and expense and without reimbursement or contribution from any other Owner, shall obtain and maintain at all times, the insurance required to be maintained by it pursuant to Exhibit E attached hereto and made a part.

b.    Indemnification. As used herein, "Claim" means and includes any loss, cost, damage, demand, litigation, cause of action, fine, penalty, liability, lien, injury, obligation or expense (including reasonable attorneys' and witness fees, disbursements and court costs). Subject to Section 5(d) hereof, each Owner covenants and agrees to indemnify, defend (with counsel reasonably acceptable to the other Owner(s)) and hold harmless the other Owners, and such Owners' Permittees, officers, employees, direct and indirect owners (individually an "Indemnified Party" and more than one, collectively, "Indemnified Parties"), from and against any and all Claims for injury to persons or damage to property arising from (i) any use, occupancy, act, occurrence or condition on or about such indemnifying Owner's Property (other than the use of the easements granted under this Agreement by the Indemnified Parties), (ii) the use or enjoyment of any easement rights created hereunder by such indemnifying Owner or its Permittees, (iii) any activity, work, or thing done, permitted or suffered by such indemnifying Owner, its agents, contractors or employees in or about the Properties or due to any other negligent act or omission of such indemnifying Owner, its agents, contractors or employees, or (iv) from such indemnifying Owner's failure to perform its obligations under this Agreement; provided however, that no Indemnified Party shall be entitled to indemnity or defense for any Claim otherwise covered by this Section 5(b), if and to the extent that such Claim arises from the gross negligence or willful misconduct of the Indemnified Parties. This Section 5(b) shall survive termination or expiration of this Agreement.

EAST\149954104. 3

4

c.    Indemnification Protocol. The procedures set forth in this Section 5(c) are collectively referred to herein as the "Indemnification Protocol." Whenever any Claim arises for indemnification under this Agreement, the Indemnified Party must notify the party or parties from whom indemnification is being sought (in each such case, the "Indemnifying Party") of such Claim in writing promptly and in no case later than ten (10) Business Days after such Indemnified Party has actual knowledge of the facts constituting the basis for such claim. The failure of any Indemnified Party to give timely notice hereunder shall not affect rights to indemnification or defense hereunder, except to the extent that the Indemnifying Party has been damaged by such failure. Such notice will specify all material facts known to such Indemnified Party giving rise to the indemnification sought and (if known by the Indemnified Party) the amount or an estimate of the amount of the obligation or liability arising from such indemnifying event. If any lawsuit or enforcement action is filed by a third party against any Indemnified Party in connection with any Claim for which the Indemnified Party seeks indemnification and defense under this Agreement, written notice thereof shall be given to the Indemnifying Party as promptly as practicable (and in any event within fifteen (15) days after the service of the citation or summons). The failure of any Indemnified Party to give timely notice hereunder shall not affect rights to indemnification or defense hereunder, except to the extent that the Indemnifying Party has been damaged by such failure. After such notice, the Indemnifying Party shall at its own cost, risk and expense, (i) take control of the defense and investigation of such lawsuit or action, and (ii) employ and engage legal counsel of its own choice, but, in any event, reasonably acceptable to the Indemnified Party, to handle and defend the same. The Indemnifying Party shall not, without the written consent of the Indemnified Party, which shall not be unreasonably withheld, conditioned or delayed, settle or compromise any Claim or consent to the entry of any judgment which does not include an unconditional written release by the claimant or plaintiff of the Indemnified Party from all liability in respect of such Claim, or settle or compromise any Claim if the settlement imposes equitable remedies or material obligations on the Indemnified Party other than financial obligations for which such Indemnified Party will be indemnified hereunder. No Claim which is being defended in good faith by the Indemnifying Party in accordance with the terms of this Agreement shall be settled or compromised by the Indemnified Party without the written consent of the Indemnifying Party, which consent shall not be unreasonably withheld. If the Indemnifying Party fails to assume the defense of such lawsuit or action within thirty (30) days after receipt of the claim notice, the Indemnified Party against which such lawsuit or action has been asserted will (upon delivering notice to such effect to the Indemnifying Party) have the right to undertake, at the Indemnifying Party's cost and expense, the defense, compromise or settlement of such lawsuit or action on behalf of and for the account and risk of the Indemnifying Party; provided, however, that such lawsuit or action shall not be compromised or settled without the written consent of the Indemnifying Party, which consent shall not be unreasonably withheld, conditioned or delayed. If the Indemnified Party settles or compromises such lawsuit or action without the prior written consent of the Indemnifying Party, the Indemnifying Party will bear no liability hereunder for or with respect to such lawsuit or action. In the event either party assumes the defense of a particular lawsuit or action in the manner contemplated above, the party assuming such defense will keep the other party reasonably informed of the progress of any such defense, compromise or settlement. The indemnification obligations of Owners under this Section 5 shall survive the expiration of the term, or the termination, of this Agreement.

EAST\149954104. 3

5

    d.    <u>Mutual Release and Waivers of Recovery.</u> Each Owner hereby releases and discharges each other Owner and the Permittees of such other Owner's Property from any responsibility, right of recovery or claim (including, without limitation, any claims for contribution or indemnity), for that portion of any loss or damage paid or reimbursed by any fire, extended coverage or other property insurance policy maintained by the releasing party (or, if greater, the insurance proceeds that would be available if the releasing party maintained all insurance required of it hereunder), no matter how such loss or damage is caused (whether by negligence or otherwise). Any fire, extended coverage or property insurance policy maintained by any Owner with respect to its Property shall contain (by endorsement or otherwise) a waiver of subrogation provision or endorsement in favor of each other Owner and its Permittees or, in the event that such provision is unavailable, then the applicable Owner shall obtain the express written approval and consent of their respective insurers to the terms of this Agreement.

    6.    <u>Unity of Use Agreement.</u>

    a.    Each Owner covenants and agrees that it shall use, develop, occupy and Maintain its Property and the buildings and other improvements located thereon from time to time in compliance with the Unity of Use Agreement, so long as the Unity of Use Agreement remains in effect and applies to the applicable Property. Notwithstanding the foregoing or anything herein to the contrary, if the "Zoning Permit/Use Registration Permit" identified in the Unity of Use Agreement is revoked, rescinded or determined to be invalid (by appeal or otherwise) and as a consequence thereof one or more of the Properties fails to comply with applicable zoning and/or subdivision Legal Requirements, then:

    b.    The Owners shall take such actions and execute such instruments to address the noncompliance as Garage Owner reasonably determines to be appropriate to cure, eliminate or address the noncompliance, which actions may include (without limitation) (w) appealing any decision, judgment or other determination resulting in the revocation, rescission or invalidity of such Zoning Permit/Use Registration Permit, (x) reapplication for an appropriate Zoning Permit/Use Registration Permit and, if applicable, readjustment of the lot lines of the Property as necessary or appropriate to obtain such Zoning Permit/Use Registration Permit, (y) submission of all or any of the Properties to the Pennsylvania Uniform Condominium Act, 68 Pa. C.S. §3101 et seq. (the "Act"), the recordation of a condominium declaration wherein the affected Property comprise separate units, and the creation of a governing board or owners' association in accordance with the requirement of such Act, and/or (z) seeking variances and other required approvals from the City of Philadelphia and other applicable governmental agencies so that each Property complies with applicable Legal Requirements concerning zoning, land use and subdivision matters;

    c.    Each Owner hereby irrevocably and unconditionally appoints Garage Owner as its agent and attorney to act in its stead, and hereby irrevocably and unconditionally grants to Garage Owner the unlimited power of attorney, to take all actions on its behalf and to execute and deliver on its behalf any and all applications, agreements and other instruments that Garage Owner deems to be reasonably necessary or appropriate to cure, eliminate or address the noncompliance, including (without limitation) any one or more of the actions described in clause (1) above. The appointment and grant of power of attorney pursuant to this clause (2) are irrevocable and unconditional and coupled with the interest of each Owner in its Property.

d.    All costs and expenses arising from the revocation, rescission or invalidity of the Zoning Permit/Use Registration Permit, including (without limitation) any fines or penalties for noncompliance and all costs and expenses that are incurred by any Owner in connection with clause (1) above (including, without limitation, any transfer taxes and filing fees), shall be borne exclusively by the 15th Street Owner. The 15th Street Owner and Park Owner, shall jointly and severally indemnify and hold harmless Garage Owner, and shall upon written request defend the Garage Owner with counsel satisfactory to such Garage Owner, from and against any and all Claims that arise from the revocation, rescission or invalidity of the Zoning Permit/Use Registration Permit.

e.    Further, notwithstanding anything herein or in the Unity of Use Agreement to the contrary, with the prior written approval of Garage Owner (which shall not be unreasonably withheld, delayed or conditioned) and not otherwise, any Owner may seek and obtain a variance or rezoning of its Property so that such Property complies on a stand-alone basis with applicable zoning, land use and subdivision Legal Requirements, and in such event the applicable Property shall cease to be subject to the Unity of Use Agreement, provided, however, that such action shall not directly or indirectly create or increase any noncompliance (lawful or otherwise) under applicable Legal Requirements of any other Property nor directly or indirectly limit or restrict the use or development of any other Property, unless the Owner of such other Property expressly consents in writing to such action.

f.    The term "Unity of Use Agreement" means that certain [Easement and Unity of Use Statement] dated on or about the date hereof by and among the Owners and recorded against the Properties immediately prior to the recordation of this Agreement (as amended from time to time), pursuant to which the parties thereto have agreed to treat and operate the parcels bounded by 15th Street, Vine Street, Wood Street and Broad Street as a single, contiguous zoning lot under the Philadelphia Zoning Code.

7.    Subject to Declaration; Rights Under Declaration.

a.    The parties hereto acknowledge that the 15th Street Premises is subject to a certain Declaration of Air Space Parcel Easements, Covenants and Restrictions by and between Philadelphia Charitable Holdings Corporation and Tenet Healthsystems Hahnemann, L.L.C., dated as of October 7, 2003, and recorded October 16, 2003 in the Philadelphia Department of Records as instrument number 50782331 (the "Declaration"). The parties hereto shall comply with the Declaration; provided, however, that except to the extent directly related to the use and exercise of the easements set forth herein by Garage Owner, all costs and expenses related to such compliance, and all obligations to pay and perform under the Declaration, shall be paid and performed by 15th Street Owner. To the extent required to effectuate the purposes of this Agreement, 15th Street Owner hereby assigns to Garage Owner the rights of 15th Street Owner under the Declaration.

b.    In the event of any casualty or exercise of eminent domain related to the 15th Street Premises, 15th Street Owner shall have the obligation to perform all restoration required by and consistently with the Declaration. In addition and not in limitation thereof, 15th Street Owner shall restore, and Garage Owner shall have the right to require the owner of the 15th Street Premises to use all available insurance proceeds to restore, the 15th Street Premises,

EAST\149954104. 3

7

including, without limitation, the Parking Area and Driveway Area, to the condition as nearly as practicable to the condition immediately prior to such casualty or exercise of eminent domain, and Garage Owner shall have the right to approve all plans and specifications related to the restoration of the 15th Street Premises.   While such restoration is continuing, Garage Owner shall have the right to such vehicular and pedestrian access over the 15th Street Premises to the Garage Premises as shall be reasonable under the circumstances so that the Garage Premises may be operated as consistently with past practices as is reasonable under the circumstances.

8.     Damage. Except as set forth in Section 7 hereof, if any building or other improvements upon any Property is damaged by fire or other casualty, then the affected building or other improvements shall, at the election of the Owner of the applicable Property, be repaired and restored as promptly as is reasonably possible by the Owner such Property at its sole cost and expense (subject to the right of such Owner to make alterations in accordance with this Agreement). If such Owner elects not to perform such repair and restoration, such Owner shall promptly remove all damaged improvements and debris, leaving such Owner's Property in a safe and sightly condition in accordance with the Operating Standard.

9.     Remedies; Self-Help.

a.     Except for consequential, punitive, or speculative damages (which are hereby waived by each Owner with respect to any Claim arising under or in connection with this Agreement), the Owners shall be entitled to all rights and remedies available at law or in equity including, without limitation, specific enforcement and injunctions, to enforce this Agreement.

b.     The failure of any Owner to perform any of its obligations hereunder shall entitle each other Owner to undertake the performance of such obligations if, after the expiration of thirty (30) days following the giving of notice as provided in Section 10 hereof (except in the case of an Emergency, as hereinafter defined, in which event no notice shall be required), the Owner so obligated shall have failed to effect such cure (or, if effecting such cure would take in excess of thirty (30) days, shall have failed to commence such cure or shall have failed to proceed thereafter diligently to complete such cure) and the responsible Owner does not notify such other Owner in writing that it disputes the alleged failure to perform its obligations (which notice shall set forth in reasonable detail the basis for such dispute), and the cost of effecting such cure shall be paid by the party so obligated within thirty (30) days of a presentation of a bill therefor. The term "Emergency," as used herein, means a circumstance or condition that (A) causes or is likely to imminently cause bodily injury or death to persons or significant physical damage to any building or other improvement or any facility servicing any Property, (B) impairs or is likely to imminently impair, in any material respect, the structural integrity of any building or other facility serving any Property or any part thereof, or (C) interrupts or is likely to imminently interrupt, in any material respect any access to or utilities serving any Property, other than pursuant to Maintenance undertaken in accordance with this Agreement

c.     If any amount payable by one Owner to another Owner under this Agreement is not paid within five (5) business days after the date due, the amount due shall bear interest at the Interest Rate until paid in full by the delinquent Owner. The term "Interest Rate," as used herein, means the lesser of (i) the highest rate of interest that may be charged in accordance with applicable Legal Requirements, or (ii) the greater of (A) twelve percent (12%) per annum, or (B)

EAST\149954104. 3

the sum of (x) the prevailing "prime rate" as published from time to time in the Wall Street Journal (or if the Wall Street Journal ceases to publish such rate, the "prime rate" or other reference rate of interest as published by any other source reasonably selected by the Garage Owner), plus (y) five percent (5%) per annum.

      d.    In no event shall the failure of any Owner to perform any of its obligations hereunder entitle any other Owner to terminate this Agreement or any easements created hereunder because of such failure.

      e.    Any Owner may enforce this Agreement by appropriate action and, in the event that it prevails in such action, shall recover as part of its cost a reasonable attorney's fee from such parties against whom such enforcement was successfully sought and obtained.

      10.   <u>Notices.</u>  Notice whenever provided for herein shall be in writing. Any notice required or permitted to be delivered hereunder shall be addressed as below, and shall be deemed received when (i) personally delivered (including delivery via email, provided that such email specifically states that it is intended to be notice) or (ii) one (1) Business Day after being deposited with a nationally recognized overnight courier service, charges prepaid, and properly addressed for next-day delivery. Either party may change its address for notice from time to time by delivery of at least three (3) Business Days prior written notice of such change to the other party hereto in the manner prescribed herein, and with a copy, given as aforesaid, to any Mortgagee of a Property or any portion of a Property electing to receive a copy as provided in Section 11, below:

      i)    If to Garage Owner:

                PAHH WOOD STREET GARAGE, LLC
                c/o Harrison Street Real Estate, LLC
                444 West Lake Street, Suite 2100
                Chicago, IL 60606
                Attn: Mark Burkemper
                Email: mburkemper@harrisonst.com

          With required copies to:

                Harrison Street Real Estate, LLC
                444 West Lake Street, Suite 2100
                Chicago, IL 60606
                Attn: Michael Gershowitz, Deputy General Counsel
                Email: mgershowitz@harrisonst.com

      ii)    If to 15th Street Owner:

                BROAD STREET HEALTHCARE PROPERTIES, LLC
                222 N. Sepulveda Blvd., Suite 900
                El Segundo, CA 90245
                Attention: Joel Freedman and General Counsel
                Email: jfreedman@pldn.com and
                sattestatova@pldn.com

EAST\149954104.3

9

iii) If to Park Owner:

BROAD STREET HEALTHCARE PROPERTIES II, LLC
222 N. Sepulveda Blvd., Suite 900
El Segundo, CA 90245
Attention: Joel Freedman and General Counsel
Email: jfreedman@pldn.com and
sattestatova@pldn.com

11.    Rights of Mortgagees. This Agreement shall be superior to any and all
Mortgages now existing or hereafter recorded against any or all portion of either Property. In
addition to the notices to the Owners under Section 10 hereof, each Mortgagee of any Property,
or any portion thereof, shall also be entitled to receive copies of all notices given to the Owner of
such Property, provided that such Mortgagee notifies each other Owner in writing that it is the
holder of a Mortgage and specifies in such notice the address(es) to which notices to such
Mortgage shall be sent. The term "Mortgage," shall mean, with respect to any Property or
portion thereof, a duly recorded (and not released) mortgage, deed of trust or similar instrument
that creates and constitutes a lien upon such Property to secure repayment of a loan obtained by
the applicable Owner, and "Mortgagee" shall mean the holder(s) of record of such Mortgage;
provided (in each case) each other Owner has received actual written notice (and not merely
record notice or constructive notice) of such Mortgage and the name and address of each
Mortgagee.

12.    Estoppels. Each Owner shall, at any time and from time to time, within
ten (10) business days after any other Owner's request or that of any mortgagee of the other
Owner, execute, acknowledge and deliver to the requesting Owner a statement in writing (the
"Estoppel Certificate"), certifying (i) that this Agreement is unmodified and in full force and
effect (or if there have been any modifications, that the Agreement is in full force and effect as
modified and stating the modifications); and (ii) whether or not, to the best of the Owner's
knowledge, all terms and conditions under the Agreement to be performed by the requesting
Owner prior thereto have been satisfied and whether or not the requesting Owner is then in
default in the performance of any covenant, agreement or condition contained in this Agreement
and specifying each, if any, unsatisfied condition and each, if any, default of which the certifying
Owner may have knowledge; and (v) any other fact or condition related to the Agreement or the
certifying Owner reasonably requested. Any certification delivered pursuant to the provisions of
this Section 12 shall be intended to be relied upon by the requesting Owner and any mortgagee
or prospective mortgagee or purchaser of the Property or of any interest therein.

13.    Term; Burdens and Benefits; Successors and Assigns. The term of this
Agreement shall be perpetual; and the easements and other terms and conditions of this
Agreement shall not be terminated by damage or destruction of any easement facilities or other
improvements upon the Properties, or by abandonment or non-use. Each easement granted
hereunder shall burden all or part of the 15th Street Premises as described in the granting clause
for such easement and shall benefit and be appurtenant to the Property expressly stated to be
benefited thereby in such granting clause, and no other property. All the covenants, easements

and other provisions of this Agreement (including, but not limited to, the benefits and burdens hereof) shall run with the land with respect to the Properties and shall be binding upon, inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns. Upon the transfer of ownership of any area subject to any easement hereunder, the transferee shall be deemed to have assumed the obligations of the transferor arising from and after the date of transfer and the transferor thereof shall have no liability hereunder for any defaults hereunder occurring after the date of such transfer.

14.    <u>Recording; Amendment.</u> This Agreement is intended to be recorded in the Philadelphia Department of Records. This Agreement may be amended only by a written instrument which shall be recorded in the Department of Records of Philadelphia, Pennsylvania, and shall be executed by both the Owners and each Mortgagee under an existing Mortgage of record as of the date that such amendment is recorded.

15.    <u>Severability; Construction.</u> If any provision of this Agreement shall be conclusively determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement shall not be affected thereby. This Agreement shall be reasonably construed so as to carry out the intention to confer a commercially useable right of enjoyment on any grantee hereunder.

16.    <u>Unavoidable Delays.</u> If and to the extent that any Owner is delayed in the performance of any obligation hereunder, other than obligations that are to be or could be satisfied by the payment of money (including, without limitation, paying for Maintenance Costs and obtaining insurance required hereunder), and such delay constitutes Unavoidable Delay, then the time for performance of such obligation shall be extended for so long as the Unavoidable Delay continues, provided, however, that (i) such Owner notifies each other Owner in writing not later than five (5) business days after first becoming aware of the Unavoidable Delay, and (ii) such Owner uses all commercially reasonable efforts to minimize the extent and duration of the Unavoidable Delay and to expedite its performance of the applicable obligation.

17.    <u>Limitation of Liability.</u> Notwithstanding anything contained herein to the contrary, each Owner agrees that no other Owner, nor any partner, officer, shareholder or director thereof, shall have any personal liability with respect to any provisions of this Agreement, and such Owner shall look solely to the estate and Property of such other Owner in for the collection of any judgment or the enforcement of any other judicial process requiring the payment or expenditure of money by such other Owner, in the event of any default by such other Owner with respect to any of such other Owner's obligations under this Agreement. No other assets of such other Owner or of any partner, officer, director or shareholder of such other Owner shall be subject to levy, execution or other judicial process for the satisfaction of an Owner's claims, and in the event a judgment is obtained against an Owner, the judgment docket shall be so noted. The provisions of this Section 17 shall inure to the benefit of each Owner's heirs, representatives, successors and assigns and their respective principals.

18.    <u>Not a Public Dedication.</u> Nothing herein contained shall be deemed to be a gift or dedication of any portion of any Property or portion thereof to the general public, or for any public use or purpose whatsoever. Except as herein specifically provided, no right, privileges

or immunities of any Owner or Permittee shall inure to the benefit of any third party person, nor shall any third party be deemed to be a beneficiary of any of the provisions contained herein.

19.    Miscellaneous. This Agreement shall be binding upon the parties hereto and their respective successors and assigns. This Agreement shall be governed by the laws of the Commonwealth of Pennsylvania. The captions of the various sections are inserted solely for convenience of reference and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect. This Agreement, together with the Exhibits attached hereto, contains and embodies the agreement between the parties hereto regarding the subject matter hereof, and supersedes all prior agreements between the parties.

[Signatures Commence on the Following Pages]

IN WITNESS WHEREOF, the parties hereto have executed this Parking, Access and Utilities Easement Agreement, under seal, as of the day and year first above written.

**PAHH Wood Street Garage, LLC**, a
Delaware limited liability company

By: _____ (SEAL)

Name: Mark J. Burkemper

Title:   Authorized Signatory

[Acknowledgment on Next Page]

13

Acknowledgment – Garage Owner

State of *Illinois*

County of *Cook*

This record was acknowledged before me on _January 2, 2018_ by _Mark J. Burkemper_ as
Authorized Signatory _____ who represent that (he, she) is authorized to act on behalf of PAHH Wood
Street Garage, LLC.

Signature of notarial officer _____

Stamp
> "OFFICIAL SEAL"
> ZELNETTA K. BURROWS
> Notary Public, State of Illinois
> My Commission Expires 06/24/2018

My Commission
expires 6/24/2018

14

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, under seal, as of the day and year first above written.

15TH STREET OWNER:

**BROAD STREET HEALTHCARE PROPERTIES, LLC**, a Delaware limited liability company

By: _____
   Name: Joel Freedman
   Title:  Chief Executive Officer and President

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

*Signature page to Parking, Access and Utilities Easement Agreement*

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGEMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF _California_ )

COUNTY OF _Los Angeles_ )

On _December 30_, 2017, before me, _Larion Ayzman (Notary Public)_
　　　Date　　　　　　　　　　　　　　(Here Insert Name and Title Of the Officer)

personally appeared _Joel Freedman_
　　　　　　　　　　　　　　　Name(s) of Signers

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

LARION AYZMAN
COMM. #2115103
Notary Public · California
Ventura County
My Comm. Expires June 12, 2019

NRO1

Signature _____
　　　　　Signature of Notary Public

**Place Notary Seal Above**

_Acknowledgement page to Parking, Access and Utilities Easement Agreement_

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement, under seal, as of the day and year first above written for the limited purpose in joining in Section 6 of the Agreement.

PARK OWNER:

**BROAD STREET HEALTHCARE PROPERTIES II, LLC**, a Delaware limited liability company

By: _____
    Name: Joel Freedman
    Title: Chief Executive Officer and President

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

*Signature page to Parking, Access and Utilities Easement Agreement*

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGEMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF _California_ )

COUNTY OF _Los Angeles_ )

On _December 20_, 2017, before me, _Larion Ayzman (Notary Public)_
    Date                 (Here Insert Name and Title Of the Officer)

personally appeared _Neel Lawrence Freedman_
                            Name(s) of Signers

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
          Signature of Notary Public

LARION AYZMAN
COMM. #2115103
Notary Public - California
Ventura County
My Comm. Expires June 12, 2019

NRO1

*Place Notary Seal Above*

*Acknowledgement page to Parking, Access and Utilities Easement Agreement*

EXHIBIT A

15th Street Premises

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND SITUATE, LYING AND
BEGINNING IN THE CITY AND COUNTY OF PHILADELPHIA, COMMONWEALTH OF
PENNSYLVANIA, AS SHOWN ON A PLAN BY PENNONI ASSOCIATES ENTITLED
"HAHNEMANN UNIVERSITY HOSPITAL – EXISTING CONDITIONS / PROPOSED
SUBDIVISION PLAN" BOUNDED AND DESCRIBED AS FOLLOWS:
BEGINNING AT A POINT ON THE SOUTHERLY SIDE OF WOOD STREET (40' WIDE)
WHERE IT INTERSECTS WITH THE EASTERLY SIDE OF 15th STREET (72' WIDE) AND
RUNNING:
1)    THENCE: ALONG SAID SOUTHERLY SIDE OF WOOD STREET, S78°59'00"E, A
DISTANCE OF 197.920' TO A POINT COMMON TO LOT 2;
2)    THENCE: ALONG THE WESTERLY LINE OF LOT 2, S11°21'00"W, A DISTANCE
OF 54.327' TO A POINT;
3)    THENCE: CONTINUING ALONG SAME, N78°59'00"W, A DISTANCE OF 33.740'
TO A POINT;
4)    THENCE: CONTINUING ALONG SAME, S11°21'00"W, A DISTANCE OF 29.468'
TO A POINT;
5)    THENCE: CONTINUING ALONG SAME, N78°59'00"W, A DISTANCE OF 6.460'
TO A POINT;
6)    THENCE: CONTINUING ALONG SAME, S11°21'00"W, A DISTANCE OF 22.779'
TO A POINT COMMON TO THE NORTHERLY LINE OF LOT 1;
7)    THENCE: ALONG THE NORTHERLY LINE OF LOT 1, N78°59'00"W, A
DISTANCE OF 31.720' TO A POINT;
8)    THENCE: N11°21'00"E, A DISTANCE OF 20.325' TO A POINT ON THE
NORTHERLY SIDE OF PEARL STREET (18' WIDE);
9)    THENCE: ALONG THE SAID NORTHERLY SIDE OF PEARL STREET,
N78°59'00"W, A DISTANCE OF 126.000' TO A POINT ON THE SAID EASTERLY SIDE
OF 15th STREET;
10)    THENCE: ALONG THE SAID EASTERLY SIDE OF 15th STREET, N11°21'00"E, A
DISTANCE OF 86.250' TO THE FIRST MENTIONED POINT OF BEGINNING.
Containing 16,622 s.f. / 0.38159 acres of land.

EXCEPTING THEREOUT AND THEREFROM
ALL THAT CERTAIN lot or piece of ground lying above a horizontal plane 36.50 feet above
Philadelphia City Datum, said elevation being the top of the structural floor slab at the first floor
level.

BEGINNING at the point of intersection of the Southerly side of Wood Street (40 feet wide)
with the Easterly side of 15th Street (72 feet wide); thence from said point of beginning
extending the following four courses and distances:
    1.    Along the said side of Wood Street South 78 degrees 59 minutes 00 seconds East 197
    feet, 9 inches to a point;
    2.    South 11 degrees 21 minutes 00 seconds West 54 feet, 3-1/2 inches to a point;

EAST\149954104. 3
19

3. North 78 degrees 59 minutes 00 seconds West approximately along the Southerly face of a 16 story building 197 feet, 9 inches to a point on the Easterly side of 15th Street;
4. Along the said side of 15th Street North 11 degrees 21 minutes 00 seconds East 54 feet, 3-1/2 inches to the first mentioned point and place of beginning.

AND limited to all vertical area within the confines of the above horizontal boundaries up to an elevation of 205 feet above Philadelphia City Datum.

Exhibit B

Garage Premises

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND SITUATE, LYING AND
BEGINNING IN THE CITY AND COUNTY OF PHILADELPHIA, COMMONWEALTH OF
PENNSYLVANIA, AS SHOWN ON A PLAN BY PENNONI ASSOCIATES ENTITLED
"HAHNEMANN UNIVERSITY HOSPITAL – EXISTING CONDITIONS / PROPOSED
PLAN" BOUNDED AND DESCRIBED AS FOLLOWS:
BEGINNING AT A POINT ON THE SOUTHERLY SIDE OF WOOD STREET (40' WIDE)
WHERE IT INTERSECTS WITH THE WESTERLY SIDE OF BROAD STREET (113' WIDE)
AND RUNNING:
1)    THENCE: ALONG SAID WESTERLY SIDE OF BROAD STREET, S11°21'00"W, A
DISTANCE OF 106.575' TO A POINT COMMON TO LOT 1;
2)    THENCE: ALONG THE NORTHERLY LINE OF LOT 1, N78°59'00"W, A
DISTANCE OF 237.947' TO A POINT COMMON TO LOT 3;
3)    THENCE: ALONG THE EASTERLY LINE OF LOT 3, N11°21'00"E, A DISTANCE
OF 22.779' TO A POINT;
4)    THENCE: CONTINUING ALONG SAME, S78°59'00"E, A DISTANCE OF 6.460' TO
A POINT;
5)    THENCE: CONTINUING ALONG SAME, N11°21'00"E, A DISTANCE OF 29.468'
TO A POINT;
6)    THENCE: CONTINUING ALONG SAME, S78°59'00"E, A DISTANCE OF 33.740'
TO A POINT;
7)    THENCE: CONTINUING ALONG SAME, N11°21'00"E, A DISTANCE OF 54.327'
TO A POINT ON THE SOUTHERLY LINE OF SAID WOOD STREET;
8)    THENCE: ALONG THE SAID SOUTHERLY LINE OF WOOD STREET,
S78°59'00"E, A DISTANCE OF 197.747' TO THE FIRST MENTIONED POINT OF
BEGINNING.

Containing 22,984 s.f. / 0.52764 acres of land.

Exhibit C

Park Premises

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND SITUATE, LYING AND
BEGINNING IN THE CITY AND COUNTY OF PHILADELPHIA, COMMONWEALTH OF
PENNSYLVANIA, AS SHOWN ON A PLAN BY PENNONI ASSOCIATES ENTITLED
"HAHNEMANN UNIVERSITY HOSPITAL – EXISTING CONDITIONS / PROPOSED
SUBDIVISION PLAN" BOUNDED AND DESCRIBED AS FOLLOWS:
BEGINNING AT A POINT ON THE NORTHERLY SIDE OF VINE STREET (VARIABLE
WIDTH) WHERE IT INTERSECTS WITH THE WESTERLY SIDE OF BROAD STREET
(113' WIDE) AND RUNNING:
1)      THENCE: ALONG SAID NORTHERLY SIDE OF VINE STREET, N78°59'00"W, A
DISTANCE OF 269.667' TO A POINT;
2)      THENCE: N11°21'00"E, A DISTANCE OF 122.675' TO A POINT COMMON TO LOT
3;
3)      THENCE: ALONG THE SOUTHERLY LINE OF LOT 3 AND LOT 2, S78°59'00"E, A
DISTANCE OF 269.667' TO A POINT ON THE SAID WESTERLY SIDE OF BROAD
STREET;
4)      THENCE: ALONG THE SAID WESTERLY SIDE OF BROAD STREET,
S11°21'00"W, A DISTANCE OF 122.675' TO THE FIRST MENTIONED POINT OF
BEGINNING.

Containing 33,081 s.f. / 0.75944 acres of land.

EAST\149954104. 3

22

EXHIBIT D

Plan Showing Driveway Area and Parking Area

[PAGES D-1 and D-2 FOLLOW]

EAST\149954104. 3



# EXHIBIT D-1

POB
PROPOSED
LOT 3

**WOOD STREET**
**(40' WIDE)**
*(LEGALLY OPEN - ON CITY PLAN)*
*(10' - 20' - 10')*

ACCESS DRIVE    36.8'

RAMP

BUILDING ON LINE    164.6'    197.920'    *(BLOCK DISTANCE)*    S 78°59'00" E   395.667'    196.9'   197.747'

12'    17.1' BLD    10.1'

**STILES HALL**

13.8' BLDG

13.2'    *"DREXEL UNIVERSITY - STILES HALL"*    **WOOD STREET**
5.1'    16 STORY BRICK AND MASONRY BUILDING    **PARKING GARA**
4.5'    10.7'    BUILDING HEIGHT = 160'    AIR SPACE
5.2'    AREA = 3632± SQ. FT.    PARCEL    **PROPOSED LOT 2**
13.2'    **PROPOSED LOT 3**    *(SEE DREXEL AIR SPACE DETAIL)*    *"HAHNEM*
**16622 SF / 0.38159 AC**    PROPOSED LINE OF    **22984 SF / 0.52764 AC**    *W*
146.9'    SUBDIVISION    12.

N 78°59'00" W   33.740'

**15TH STREET**
**(72' WIDE)**
*(LEGALLY OPEN-ON CITY PLAN)*
*(14' - 44' - 17')*

4.2" WALL
OVER

N 78°59'00" W
10.38' BASE
5.2'

PROPOSED LINE
OF SUBDIVISION

ACCESS
DRIVE

N 78°59'00" W   126.000'

N 78°59'00" W
6.460'

**ARL STREET**
**(18' WIDE)**
5.75'    *(LEGALLY OPEN-ON CITY PLAN)*    TITLE VAULT
*(5'0" - 6'8" - 5'5")*    227.947'
N 78°59'00" W   269.667'

305 NORTH 15TH STREET
PARCEL NOT INCLUDED

143.000'

CONCRETE PAVING

*MULTI-STORY BRICK AND*
*MASONRY BUILDING*    **PROPOSED LOT 1**
**33081 SF / 0.75944 AC**    SESQU

N/F DREXEL UNIVERSITY    6' METAL FENCE    ASPHALT
*(PARCEL NOT INCLUDED)*    ON BRICK WALL    *PAVING*

BRICK



LIMITS OF BELOW GRADE PARKING AREA

POB
PROPOSED
LOT 3

WOOD STREET
(40' WIDE)
(LEGALLY OPEN - ON CITY PLAN)
(10' - 20' - 10')

ACCESS DRIVE

(BLOCK DISTANCE)
S 78°59'00" E    395.667'

STILES HALL

"DREXEL UNIVERSITY - STILES HALL"
16 Story Brick and Masonry Building
BUILDING HEIGHT = 149'
AREA = 9,633± SQ. FT.

PROPOSED LOT 3

16622 SF / 0.38159 AC

AIR SPACE
PARCEL
(SEE DREXEL AIR SPACE DETAIL)

PROPOSED LINE OF
SUBDIVISION

PROPOSED LINE OF
SUBDIVISION

WOOD STREET
PARKING GARA

"HAHNEM
WO
12

PROPOSED LOT 2
22984 SF / 0.52764 AC

15TH STREET
(72' WIDE)
(LEGALLY OPEN - ON CITY PLAN)
(14' - 48' - 13')

N 21°00" E   86.250'

ACCESS
DRIVE

RAMP LEADING TO
UNDERGROUND PARKING

PROPOSED GARAGE
ACCESS EASEMENT
3297 SF / 0.07569 AC

VEHICULAR EASEMENT FOR
ACCESS TO GARAGE

N 78°59'00" W   35.740'

PROPOSED LINE
OF SUBDIVISION

N 78°59'00" W   126.000'

S 78°59'00" E   15.78' EASE.

PEARL STREET
(18' WIDE)
(LEGALLY OPEN - ON CITY PLAN)
(5'-8" - 6'-6" - 5'-9")

MULTI-STORY BRICK AND
MASONRY BUILDING

N/F DREXEL UNIVERSITY
(PARCEL NOT INCLUDED)

N/F 305 NORTH 15TH STREET LP
(PARCEL NOT INCLUDED)

143.000'

N 78°59'00" W   6.460'

PROPOSED LOT 1
33081 SF / 0.75944 AC

N 78°59'00" W   269.667'

ASPHALT
PAVING

SESQU

CONCRETE PAVING

6' METAL FENCE
ON BRICK WALL

BRICK

EXHIBIT E

Insurance Requirements

     (a)    <u>Policies to Maintain.</u> Each Owner, at its sole cost and expense, shall provide and keep in force (or cause to keep in force) during the entire term of this Agreement, insurance providing at least the following coverages, pursuant to formal policies of insurance complying with the requirements set forth below:

     (i)    commercial general liability insurance and (if applicable) professional liability insurance, (including owner's protective liability coverage on operations of such Owner's Property, and/or their respective independent contractors engaged in construction, personal injury, and blanket contractual liability insurance) with a limit for each occurrence not less than $3,000,000 and general aggregate limits of not less than $5,000,000 for each policy year, protecting and indemnifying the Owner and the additional insureds identified below against all claims for damages to person or property or for loss of life or of property occurring upon, in, or about the Property, written on a claims made or occurrence basis. The Owner of each other Property and each Mortgagee of which the applicable Owner has received notice shall be named insureds under the liability insurance policies set forth in this Paragraph. In addition, such coverage shall be written on an occurrence basis and shall contain endorsements: (i) deleting any liquor liability exclusion (if alcohol is sold on the Property); (ii) including cross-liability; and (iii) waiving the insurer's rights of subrogation against any other Owner;

     (ii)    property insurance on such Owner's Property and all buildings and other installations, additions and improvements which may now or hereafter be erected thereon against "Special Causes" of loss or damage in an amount sufficient to prevent Permittees from becoming co-insurers and in any event, including loss or damage from earthquakes and windstorm, in an amount not less than one hundred percent (100%) of the actual replacement value thereof (i.e., including the cost of debris removal) as determined by Owner in its reasonable discretion from time to time consistent with the Operating Standard and coverages for similarly situated properties. Such coverage shall contain an agreed amount endorsement reasonably acceptable to the Owner;

     (iii)    At all times during which structural construction, repairs or alterations are being made with respect to any building or other improvements located on a Property, and only if the property or liability coverage forms do not otherwise apply, the applicable Owner shall also maintain (A) commercial general liability and umbrella liability insurance covering claims related to the construction, repairs or alterations being made which are not covered by or under the terms or provisions of the commercial general liability and umbrella liability insurance policy required in Paragraph 3 above; and (B) the insurance provided for in Paragraph 1 above written in a so-called builder's risk completed value form (1) on a non-reporting basis, (2) against all risks insured against pursuant to Paragraph (ii), and (3) including permission to occupy the applicable Property.

     (iv)    business interruption insurance with coverage in a face amount of not less than the aggregate amount, for a period of twelve (12) months following

24

the insured-against peril, of 100% of the projected operating expenses of the Owner (including rental obligations and all taxes and other impositions); such coverage shall contain an agreed amount endorsement acceptable to Owner in accordance with the Operating Standard;

(v)    workers' compensation insurance (including employers' liability insurance), with a waiver of subrogation satisfactory to Owner in its reasonable discretion in accordance with the Operating Standard, covering all persons employed on the Owner's Property to the extent required by applicable laws and requirements of the state in which the Property is located, including, without limitation, during the course of work to the Property;

(vi)    mechanical breakdown insurance, if applicable, in an amount not less than one hundred percent (100%) of the actual replacement value thereof and of any improvements in which any such boiler is located (including the cost of debris removal but excluding foundations and excavations) as determined by Owner in its reasonable discretion from time to time;

(vii)    if sprinkler systems are located in th building, sprinkler leakage insurance in amounts approved by Owner in its reasonable discretion;

(viii)    flood insurance (if the Property is located in whole or in part within a special flood hazard area as designated by any department or agency of the United States government having jurisdiction);

(ix)    equipment coverage and elevator liability coverage, if applicable, in amounts approved by Owner in its reasonable discretion;

(x)    motor vehicle liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence, including umbrella coverage, of One Million and No/100 Dollars ($1,000,000) (if applicable);

(xi)    Garage keeper's Legal Liability Coverage, as reasonably required by Owner;

(xii)    if during the term of this Agreement, any Property is covered by general liability, professional liability, patient healthcare professional malpractice or other liability insurance on a "claims made" basis, then the applicable Owner shall cause, whether directly or indirectly, Tenant to procure and maintain, "tail" insurance coverage, with such coverage limits and such deductible amounts as shall be reasonably acceptable to Owner for general liability, professional liability, patient healthcare professional malpractice or other liability claims reported after the termination of Tenant's applicable lease or expiration of the claims made policy, but concerning services provided during the term of such applicable lease. Tenant shall provide Owner with a certificate evidencing that such insurance coverage is in effect for a period of no less than one (1) year subsequent to the termination of the applicable lease no later than ninety (90) days prior to the termination of the applicable lease;

(b)    Insurance Company Requirements. All of the above-mentioned insurance policies and/or certificates evidencing such policies shall be written by insurance companies: (i) rated "A:VIII" or better in "Best's Insurance Guide" and at least "A" by Standard & Poor's Ratings Group; and (ii) authorized to do business in the state where the Property is located.

EAST\149954104. 3

25

(c)     Evidence of Insurance, Renewal. Owner shall renew such insurance and shall deliver to the other Owners certificates of insurance, promptly following the renewal of any such policy of insurance.

(d)     No Violation of Policies. Owner shall not permit any Permittee to violate, in any material respect, any of the conditions of any of the said policies of insurance..

(e)     Blanket/Umbrella. The insurance required by this Agreement, at the option of each Owner, may be effected by blanket and/or umbrella policies issued to Owner and covering the Property, provided that the policies otherwise comply with the provisions of this Agreement and allocate to the different properties comprising the Property the specified coverage, without possibility of reduction or coinsurance by reason of, or damage to, any other Property.

(f)     Complying with Mortgagee. Each owner shall comply (and shall cause its Permittees to comply) with the insurance requirements of any Mortgagee under the Mortgage or any other loan document in connection therewith if they (a) require any insurance coverage not otherwise required under this Agreement or (b) provide for more stringent coverages, terms, conditions or provisions with respect to insurance coverage required under this Agreement for coverage customarily maintained on similar facilities in Philadelphia, Pennsylvania.

(g)     Compliance with Declaration. If and to the extent the Declaration applies to any Property, the coverage obtained by the parties hereto shall obtain, in each case, the greater of the coverage required by this Agreement or that required by the Declaration, and in each case, the higher of the limits required by this Agreement or those required by the Declaration.

| | BOOK NO. | PAGE NO. |
|---|---|---|

# PHILADELPHIA REAL ESTATE TRANSFER TAX CERTIFICATION

DATE RECORDED

CITY TAX PAID

Complete each section and file in duplicate with Recorder of Deeds when (1) the full consideration/value is/is not set forth in the deed, (2) when the deed is with consideration, or by gift, or (3) a tax exemption is claimed. If more space is needed, attach additional sheet(s).

**A.  CORRESPONDENT — All inquiries may be directed to the following person:**

NAME
**Eileen M. Christian**

TELEPHONE NUMBER:
AREA CODE **(484) 885-2899**

STREET ADDRESS Land Services USA, Inc. c/o 1835 Market
**St, Suite 420**

CITY
**Philadelphia**

STATE
**PA**

ZIP CODE
**19103**

**B.  TRANSFER DATA**

DATE OF ACCEPTANCE OF DOCUMENT: **January 11, 2018**

| GRANTOR(S)/LESSOR(S) | GRANTEE(S)/LESSEE(S) |
|---|---|
| **see attached** | **see attached** |

| STREET ADDRESS | STREET ADDRESS |
|---|---|
| **see attached** | **see attached** |

| CITY | STATE | ZIP CODE | CITY | STATE | ZIP CODE |
|---|---|---|---|---|---|

**C.  PROPERTY LOCATION**

| STREET ADDRESS | CITY, TOWNSHIP, BOROUGH |
|---|---|
| **see attached** | **Philadelphia** |

| COUNTY | SCHOOL DISTRICT | TAX PARCEL NUMBER |
|---|---|---|
| **Philadelphia** | **Philadelphia** | **see attached** |

**D.  VALUATION DATA**

| 1. ACTUAL CASH CONSIDERATION | 2. OTHER CONSIDERATION | 3. TOTAL CONSIDERATION |
|---|---|---|
| **0.00** | + **0.00** | = **0.00** |

| 4. COUNTY ASSESSED VALUE | 5. COMMON LEVEL RATIO FACTOR | 6. FAIR MARKET VALUE |
|---|---|---|
| **see attached** | X **1.01** | = **see attached** |

**E.  EXEMPTION DATA**

| 1A. AMOUNT OF EXEMPTION | 1B. PERCENTAGE OF INTEREST CONVEYED |
|---|---|
| **0.00** | **100%** |

2. Check Appropriate Box Below for Exemption Claimed

☐ Will or intestate succession _____
   *(NAME OF DECEDENT)                                    (ESTATE FILE NUMBER)*

☐ Transfer to Industrial Development Agency.

☐ Transfer to agent or straw party. (Attach copy of agency/straw party agreement).

☐ Transfer between principal and agent. (Attach copy of agency/straw trust agreement). Tax paid prior deed $ _____.

☐ Transfers to the Commonwealth, the United States, and Instrumentalities by gift, dedication, condemnation or in lieu of condemnation. (Attach copy of resolution).

☐ Transfer from mortgagor to a holder of a mortgage in default. Mortgage Book Number _____ , Page Number _____ . Mortgagee (grantor) sold property to Mortgagor (grantee) (Attach copy of prior deed).

☐ Corrective deed (Attach copy of the prior deed).

☐ Other (Please explain exemption claimed, if other than listed above.) _____
_____
_____

*Under penalties of law or ordinance, I declare that I have examined this Statement, including accompanying information, and to the best of my knowledge and belief, it is true, correct and complete.*

| SIGNATURE OF CORRESPONDENT OR RESPONSIBLE PARTY | DATE |
|---|---|
| **Land Services USA, Inc., By:** | **January 11, 2018** |

*(SEE REVERSE)*

82-127 (Rev. 6/93)

**Grantors/Grantees:**

BROAD STREET HEALTHCARE PROPERTIES II, LLC (Lot 1), 222 N. Sepulveda Boulevard, Suite 900, El Segundo, CA  90245

PAHH WOOD STREET GARAGE, LLC (Lot 2), c/o Harrison Street Real Estate, LLC. 444 W. Lake Street, Suite 210, Chicago, IL 60606

BROAD STREET HEALTHCARE PROPERTIES, LLC (Lot 3), 222 N. Sepulveda Boulevard, Suite 900, El Segundo, CA  90245

| New Addresses | New OPA Numbers | Assessed Values | Computed Value |
|---|---|---|---|
| Lot 1: 300-04 N. Broad St. | 88-5-6202- 42 | Not yet assessed | Not yet assessed |
| Lot 2: 306-20 N. Broad St. | 88-3-4001-02 | Not yet assessed | Not yet assessed |
| Lot 3: 325 N. 15th St. | 88-1-0382-02 | Not yet assessed | Not yet assessed |

Parking Agreement – HUH North