# EXHIBIT K

Prepared by and When Recorded Return to:
DLA Piper LLP (US)
444 West Lake Street, Suite 900
Chicago, Illinois 60606-0089
Attn: David B. Sickle, Esq.

OPA Numbers:
88 3 4008 00 (120 E. Erie Avenue - Garage)
77 7 0117 35 (160 E. Erie Avenue – Garage)
88 3 0011 00 (3647-69 N. Front St. – Medical Ofc. Bldg.)
77-7011725 (3645 N. Front Street Property)

## PARKING, ACCESS AND UTILITIES EASEMENT AGREEMENT
(Erie Garage/St. Christopher's Hospital)

THIS PARKING, ACCESS AND UTILITIES EASEMENT AGREEMENT (this "Agreement") is dated as of December 30, 2017, made effective as of this _11th_ day of January, 2018 (the "Effective Date"), by and among (i) PAHH Erie Street Garage, LLC, a Delaware limited liability company ("Garage Owner"), (ii) Front Street Healthcare Properties, LLC, a Delaware limited liability company ("Hospital Owner"), and (iii) Front Street Healthcare Properties II, LLC, a Delaware limited liability company ("MOB Owner;" Garage Owner, Hospital Owner and MOB Owner are sometimes referred to herein and the exhibits hereto as an "Owner" and collectively as the "Owners").

## BACKGROUND:

A.    Garage Owner owns fee title to that certain parcel of real estate located in Philadelphia, Pennsylvania and legally described on <u>Exhibit A-1</u> attached hereto and made a part hereof (the "Garage Parcel"), which is currently improved with (among other things) a multi-story parking garage (the "Garage;" the Garage Parcel as improved from time to time is referred to herein as the "Garage Property").

B.    Hospital Owner owns fee title to that certain parcel of real estate located in Philadelphia, Pennsylvania and legally described on <u>Exhibit A-2</u> attached hereto and made a part hereof (the "Hospital Parcel"), which is currently improved with (among other things) a multi-story hospital known as St. Christopher's Hospital (the "Hospital;" the Hospital Parcel as improved from time to time is referred to herein as the "Hospital Property").

C.    MOB Owner (i) owns fee title to that certain parcel of real estate located in Philadelphia, Pennsylvania and legally described on <u>Exhibit A-3</u> attached hereto and made a part hereof ( the "MOB Parcel"), which is currently improved with (among other things) a two-story medical office building (the "MOB;" the MOB Parcel as improved from time to time is referred to herein as the "MOB Property"), and (ii) has certain rights in, and may in the future acquire title to, that certain parcel of real estate located in Philadelphia, Pennsylvania and legally described on <u>Exhibit A-4</u> attached hereto and made a part hereof (the "3645 N. Front Street Parcel"), which is currently improved with a two-story building (the 3645 Front Street Parcel as improved from time to time is referred to herein as the "3645 N. Front Street Property") and is adjacent to the MOB Property and the Hospital Property.

37

KLEHR_001541

D.     The Garage Property, the Hospital Property and the MOB Property (each a "Property" and collectively the "Properties") are contiguous to each other and collectively comprise all of the real property described in <u>Exhibit B</u> attached hereto and made a part hereof (the "Project Parcel").

E.     A site plan showing the Project Parcel, as currently improved, is attached hereto and made a part hereof as <u>Exhibit C</u> (the "Site Plan"). The Project Parcel, together with the Buildings and other improvements now or hereafter constructed within or upon the Project Parcel, is herein referred to as the "Entire Project."

F.     The Entire Project was previously owned and operated by a single entity ("Tenet") as an integrated hospital/medical complex containing (without limitation) medical office, hospital, parking and related uses. Immediately prior to the execution and delivery of this Agreement, Tenet conveyed each Parcel to the respective Owners identified above.

G.     The Properties are in certain respects physically and functionally dependent on one another and the parties hereto desire to declare and grant certain easements to one another, and to set forth certain other agreements, for the purpose of facilitating the harmonious use and operation of the Entire Project, all as more particularly set forth herein.

NOW, THEREFORE, in consideration of One Dollar ($1.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows:

1)  <u>Driveway Area.</u> Hospital Owner and, subject to Section 25 hereof, MOB Owner, hereby grant and convey to Garage Owner for the use and benefit of Garage Owner and the mortgagees, tenants, customers, licensees, invitees, successors and assigns (individually and collectively, "Permittees") of Garage Owner, an easement through, within, over, across and under (a) that portion of the Hospital Property and the 3645 N. Front Street Property identified as the "Driveway Area" on Exhibit C-1 of the Site Plan (the "Driveway Area") and (b) the drive aisles located within Exterior Parking Area, as hereinafter defined. The easements granted under this Section 1 shall be non-exclusive, perpetual rights and easements appurtenant to the Garage Property for the purpose of pedestrian and vehicular access, ingress, egress and regress to, from and between the Garage Property, the Exterior Parking Area, as hereinafter defined, and the adjacent public rights of way, and for constructing, Maintaining (as hereinafter defined), removing, paving and curbing the driveway area as necessary or desirable for use of the Driveway Area for pedestrian and vehicular ingress, egress and regress to and from the Garage Premises and Exterior Parking Area, as hereinafter defined. These easements set forth herein include, without limitation, the right to install, Maintain (as hereinafter defined), alter, and remove such traffic control devices, parking control devices, revenue control devices, payment devices, signage, lighting and other equipment owned by the Garage Owner as currently exist or as Garage Owner shall desire, in its sole discretion, to install, replace or remove from time to time, reasonably related to access to the Garage Premises or the Parking Area, as hereinafter defined. Garage Owner has the right, easement and license to use, repair, replace or dispose of any existing traffic control devices, payment devices, signage, lighting and other equipment owned by Garage Owner that currently exist on the Property reasonably related to access to the Garage Premises or the Exterior Parking Area, as hereinafter defined. Without the prior written

KLEHR_001542

consent of Garage Owner (which shall not be unreasonably withheld, delayed or conditioned), Hospital Owner and MOB Owner shall not install or permit any gates, traffic control devices or other obstructions that would impede or interfere with the use of the easements granted under this Section 1, other than such gates, devices or other obstructions that exist as of the Effective Date hereof.

2) <u>Exterior Parking Areas.</u> The Garage Parcel and the Hospital Parcel are currently improved with certain outdoor at-grade, uncovered paved parking areas, as shown on Exhibit C-1 of the Site Plan (the "Exterior Parking Areas"). Garage Owner and Hospital Owner hereby declare, grant and convey to each other and to MOB Owner, for the mutual use and benefit of Garage Owner, Hospital Owner and MOB Owner and their respective Permittees, an easement through, within, over and across the Exterior Parking Areas. The easements granted under this Section 2 shall be non-exclusive, perpetual rights and easements appurtenant to the Garage Property, the Hospital Property and the MOB Parcel, for the purpose of parking passenger vehicles and light trucks within the Exterior Parking Area and for pedestrian and vehicular access, ingress, egress and regress to and from the Exterior Parking Area. The parking spaces within the Exterior Parking Area shall be available to each Owner and their respective Permittees on an unreserved, non-exclusive, first-come, first-served basis, subject to reasonable rules and regulations established by Hospital Owner from time to time with the prior written consent of Garage Owner (not to be unreasonably withheld, delayed or conditioned), including (without limitation): (i) the right to charge parking fees for the use of or access to all or part of the Exterior Parking Areas and to control access to such portions of the Exterior Parking Areas, (ii) the right to designate certain parking spaces within the Exterior Parking Areas as "handicap only" and/or for limited hours of use, and (iii) the right to remove unauthorized vehicles from the Exterior Parking Areas at the sole cost and expense of the Owner thereof. These easements set forth herein include, without limitation, the right to install, Maintain, alter, and remove such traffic control devices, parking control devices, payment devices, signage, lighting and other equipment as currently exist or as otherwise approved in writing by Garage Owner (not to be unreasonably withheld, delayed or conditioned). Any revenue from the use and operation from the use and operation of the Exterior Parking Areas shall be allocated between Garage Owner and Hospital Owner as they mutually agree in writing, acting reasonably and in good faith. For avoidance of doubt, the easements granted under this Section 2 shall not encumber or otherwise apply to the Garage or any parking spaces or drive aisles within the Garage, which shall remain the exclusive property of Garage Owner.

3) <u>Utility Easements.</u> Each Owner hereby declares, grants and conveys to each other Owner, for the mutual use and benefit of each Owner and its respective successors and assigns, a perpetual, non-exclusive right and easement through, within, under and over the Project Parcel, for the purpose of (i) accessing, using, tapping into, constructing, installing, maintaining, altering, repairing, maintaining, replacing and removing the underground electric, telecommunications, domestic water, storm water, storm and sanitary sewers and other utility lines, conduits and other fixtures and equipment related to provision of service or use of electric, telecommunications, water, storm and sanitary sewers and other utility services to the Properties ("Utility Facilities"), substantially as such Utility Facilities are located and utilized as of the Effective Date, and (ii) surface drainage over and across the Project Parcel, substantially as exists on the Effective Date. Each Owner shall have the right to relocate and/or reconfigure the Utility Facilities that are located upon its Property, at its sole cost and expense, provided that no such

KLEHR_001543

relocation or reconfiguration shall cause or result in any material interruption in the access to or use of the applicable Utility Facilities by any other Owner, and provided further that the functionality of and access to the relocated Utility Facilities shall not be materially less than the functionality of and access to the applicable Utility Facilities as of the Effective Date. The easements created under this Section 3 are not intended to be "blanket easements" over the entire Project Parcel or any particular Property. The location and scope of the easements created under this Section 3 are intended to be limited in all material respects to the location and function of the applicable Utility Facilities and surface drainage as of the Effective Date (subject to the right of each Owner to relocate Utility Facilities in accordance with this Agreement), together with reasonable access thereto. At the request of any Owner, the location of the Utility Facility easements created under this Section 3 shall be confirmed by a surveying or engineering firm that is approved in writing by the affected Owners, at the sole cost and expense of the requesting Owner, and shall be set forth in a recorded supplement or modification of this Agreement that is executed by the affected Owners.

4) <u>Pedestrian Bridge.</u> Pedestrian access, ingress, egress and regress to, from and between the Garage and the Hospital building is provided as of the Effective Date by a covered walkway over the Driveway Area, in the location depicted on Exhibit C-2 of the Site Plan (the "Pedestrian Bridge"). Garage Owner and Hospital Owner hereby declare, grant and convey to each other, for the mutual use and benefit of Garage Owner and Hospital Owner and their respective Permittees, an easement through, within, over and across the Pedestrian Bridge. The easements granted under this Section 4 shall be non-exclusive, perpetual rights and easements appurtenant to the Garage Property and the Hospital Property, for the purpose of (i) providing pedestrian access, ingress, egress and regress to, from and between the Garage and the Hospital, and (ii) Maintaining the Pedestrian Bridge and the support and weather-tight attachment of the Pedestrian Bridge to the Garage and the Hospital, substantially in the same manner as exists on the Effective Date. If the Hospital building or the Garage is destroyed and not restored or rebuilt, then the easements created under this Section 4 shall be suspended and shall be reinstated (if at all) when the Garage or the Hospital building (as the case may be) is restored or replaced. The Garage Owner and the Hospital Owner shall mutually establish reasonable rules and regulations for the access to and use of the Pedestrian Bridge. The Hospital Owner shall be responsible for providing security and monitoring and all lighting, heat and other utility services to the Pedestrian Bridge.

5) <u>Pay Stations.</u> Automated remote pay stations for use by Garage patrons are currently located in the Hospital and in the MOB in the approximate locations depicted on Exhibit C-2 of the Site Plan ("Pay Stations"). MOB Owner and Hospital Owner hereby declare, grant and convey to Garage Owner, for the use and benefit of Garage Owner and its Permittees, the right and easement to use, Maintain and access the Pay Stations in their current locations or as otherwise agreed by the Garage Owner and the MOB Owner (with respect to the Pay Station within the MOB) or by the Garage Owner and the Hospital Owner (with respect to the Pay Station within the Hospital). The easements granted under this Section 4 shall be exclusive, perpetual rights and easements appurtenant to the Garage Property, and shall include (without limitation) the right to Maintain, use, install and access electrical power and data communications for the use and operation of the Pay Stations. The Garage Owner shall be solely responsible for the Maintenance of the Pay Stations. If the Hospital building or the MOB is destroyed and not restored or rebuilt, then the easements created under this Section 5 shall be

KLEHR_001544

suspended and shall be reinstated (if at all) when the Hospital or the MOB (as the case may be) is restored or replaced.

6) <u>Maintenance</u>. Except as expressly set forth herein to the contrary, subject to Unavoidable Delays, each Owner shall Maintain its Property (including, without limitation, the easement facilities located thereon), at its sole cost and expense, in accordance with the Operating Standard.

    a) As used herein, the following terms shall have the respective meanings set forth below:

        i) "Emergency" means a circumstance or condition that (A) causes or is likely to imminently cause bodily injury or death to persons or significant physical damage to any Building or other improvement or any facility servicing the Entire Project or any part thereof, (B) impairs or is likely to imminently impair, in any material respect, the structural integrity of any Building or other facility serving the Entire Project or any part thereof, or (C) interrupts or is likely to imminently interrupt, in any material respect any access to or utilities serving any Property, other than pursuant to Maintenance undertaken in accordance with this Agreement.

        ii) "Maintenance" and "Maintain" shall mean the operation, maintenance, repair, reconditioning, refurbishing, reconfiguration, inspection, testing, lighting, securing, cleaning, painting, installation, restoration, reconstruction and replacement (when necessary or desirable) of the applicable building or facility.

        iii) "Operating Standard" shall mean the standards of operations, cleanliness, security, appearance, repair and Maintenance generally applicable to similar facilities in the Center City, Philadelphia area, with due consideration to the age of the applicable buildings and facilities. At a minimum, the Operating Standard requires that the applicable buildings and facilities shall at all times be operated and Maintained in good working order and condition, ordinary wear and tear excepted, and in compliance with all applicable Legal Requirements.

        iv) "Legal Requirements" means all laws, rules, orders, ordinances, codes, regulations and requirements, now or hereafter enacted or promulgated, of the United States of America, the Commonwealth of Pennsylvania, the City of Philadelphia and of any other sovereign or municipality now or hereafter having jurisdiction over the Project Parcel or any portion thereof, and of any governmental or quasi-governmental agency thereof now or hereafter having such jurisdiction, and of any other lawful authority having such jurisdiction.

        v) "Unavoidable Delay" means delay in the performance of any non-monetary obligations hereunder, to the extent that such delay is not reasonably avoidable and is caused by fire, flood, windstorms or other casualty events,

KLEHR_001545

strikes or labor unrest, unavailability of required labor, service or materials, extraordinarily adverse weather conditions (but only to the extent that such weather would not be reasonably anticipated and accounted for in the use and Maintenance in accordance with the Operating Standard), interruption of required utilities by acts or occurrences outside the Property of the Owner who is responsible for the applicable Maintenance, and other similar acts and occurrences outside the reasonable control of the Owner required to perform such duties or obligations, provided, however, that (i) in no event shall the unavailability of required funds constitute or justify a claim of Unavoidable Delay, (ii) the Owner that is required to perform the affected obligation shall notify the other Owner not later than five (5) business days after becoming aware of the Unavoidable Delay.

b) Hospital Owner shall be solely responsible for the Maintenance of the Driveway Area, the Exterior Parking Areas and the Pedestrian Bridge.

c) Garage Owner shall be solely responsible for the Maintenance of the Pay Stations.

d) If any Owner shall fail to perform any Maintenance obligations which it is responsible under this Agreement as and when required, and if such failure is not cured within ten (10) days after written notice from any other Owner or its Permittees (provided that such cure period shall be extended so long as the responsible Owner commences the cure within such 10-day period and thereafter diligently and continuously prosecutes the cure to completion in accordance with the Operating Standard), or if the failure to Maintain constitutes or results in an Emergency, then in either case (i) such other Owner or its Permittees shall have the right (but not the obligation) to enter upon the affected Property and to perform the required Maintenance on behalf and at the sole cost and expense of the responsible Owner, and (ii) the responsible Owner shall reimburse the actual costs and expenses incurred by the person performing the applicable Maintenance on its behalf within ten (10) days after written demand.

7) Operations and Maintenance; Compliance with Unity of Use Agreement.

a) Subject to terms and conditions of Section 6 concerning the Maintenance of easement facilities, each Owner covenants and agrees that it and its Permittees shall use, develop, occupy and Maintain its Property, at such Owner's sole cost and expense, in accordance with the Operating Standard. Without limiting the foregoing but subject to Unavoidable Delays, each Owner shall be responsible for Maintaining, cleaning, keeping free from debris, removing snow and ice from (as it relates to surface areas which involve pedestrian or vehicular traffic) and otherwise keeping in compliance with the Operating Standard and all applicable Legal Requirements: (i) its respective Property, including the buildings and other improvements located thereon from time to time; (ii) the sidewalks, walkways, driveways, parking areas and other exterior pedestrian areas and vehicular areas located on or immediately adjacent to such Owner's Property; (iii) the landscaping located on such Owner's Property; (iv) the lighting located on or

EAST\149624846. 66

serving such Owner's Property; and (v) areas and facilities within such Owner's Property over which another Owner has easement rights pursuant to this Agreement. Each Owner acknowledges and agrees that the Entire Project is intended to be a first class medical/office real estate project and that the operation and Maintenance of each Property in accordance with the Operating Standard benefits the Entire Project and is essential to each other Owner.

b) No Owner shall permit any excessive light, noise, odor, vibration or other condition that, under the circumstances, is inconsistent with the Operating Standard or constitutes a nuisance under common law, to exist upon or emanate from the Property owned by such Owner. This Section 7(b) shall not limit or apply to any condition existing at the Effective Date that would otherwise be subject to this Section 7(b), or the construction or reconstruction or Maintenance activities undertaken by or on behalf of any Owner on its Property in accordance with the Operating Standard and the terms and conditions of this Agreement, provided that such Owner shall take all reasonable measures to mitigate the adverse impacts caused by such activities to each other affected Property.

c) No Owner shall permit or suffer the recordation or filing against any portion of the Entire Project, other than such Owner's Property, of any mechanics', materialmen's or other enforcement lien arising by reason of any work performed or materials ordered by or on behalf of such Owner or the Permittees of its Property. If any such lien is filed or recorded, then the responsible Owner shall, not later than thirty (30) days after the filing or recordation thereof, remove or release such lien of record or bond over the enforcement of such lien in accordance with applicable Legal Requirements.

d) Each Owner, at its sole cost and expense and without reimbursement or contribution from any other Owner shall pay all taxes, assessments, levies and other charges imposed by any governmental authority upon the Property owned by such Owner, not later than thirty (30) days prior to the earliest date that its Property or any portion thereof may be sold or forfeited for nonpayment thereof.

e) As used herein, the term "Unity of Use Agreement" means that certain [Easement and Unity of Use Statement] dated on or about the date hereof by and among the Owners and recorded against the Project Parcel immediately prior to the recordation of this Agreement (as amended from time to time), pursuant to which the parties thereto have agreed to treat and operate the parcels comprising the Project Parcel as a single, contiguous zoning lot under the Philadelphia Zoning Code. Each Owner covenants and agrees that it and its Permittees shall use, develop, occupy and Maintain its Property, including the improvements located thereon from time to time, in compliance with the Unity of Use Agreement, so long as the Unity of Use Agreement remains in effect and applies to the applicable Property. Notwithstanding the foregoing or anything herein to the contrary, if the "Zoning Permit/Use Registration Permit" identified in the Unity of Use Agreement is revoked, rescinded or determined to be invalid (by appeal or otherwise) and as a consequence thereof one or more of the Properties comprising

KLEHR_001547

the Project Parcel fails to comply with applicable zoning and/or subdivision Legal Requirements, then:

i) The Owners shall take such actions and execute such instruments to address the noncompliance as the Garage Owner reasonably determines to be appropriate to cure, eliminate or address the noncompliance, which actions may include (without limitation) (w) appealing any decision, judgment or other determination resulting in the revocation, rescission or invalidity of such Zoning/Permit/Use Registration Permit, (x) reapplication for an appropriate Zoning Permit/Use Registration Permit and, if applicable, readjustment of the lot lines of the Properties as necessary or appropriate to obtain such Zoning Permit/Use Registration Permit, (y) submission of all or any of the Properties to the Pennsylvania Uniform Condominium Act, 68 Pa. C.S. §3101 et seq., the recordation of a condominium declaration wherein the affected Properties comprise separate units, and the creation of a governing board or owners' association in accordance with the requirement of such Act, and/or (z) seeking variances and other required approvals from the City of Philadelphia and other applicable governmental agencies so that each Property complies with applicable Legal Requirements concerning zoning, land use and subdivision matters.

ii) Each Owner hereby irrevocably and unconditionally appoints the Garage Owner as its agent and attorney to act in its stead, and hereby irrevocably and unconditionally grants to the Garage Owner the unlimited power of attorney, to take all actions on its behalf and to execute and deliver on its behalf any and all applications, agreements and other instruments that the Garage Owner reasonably deems to be necessary or appropriate to cure, eliminate or address the noncompliance, including (without limitation) any one or more of the actions described in clause (i) above. The appointment and grant of power of attorney pursuant to this clause (ii) are irrevocable and unconditional and coupled with the interest of each Owner in the Project Parcel.

iii) All costs and expenses arising from the revocation, rescission or invalidity of the Zoning Permit/Use Registration Permit, including (without limitation) any fines or penalties for noncompliance and all costs and expenses that are incurred by the Garage Owner and any other Owner in connection with clause (i) above (including, without limitation, any transfer taxes and filing fees), shall be borne exclusively by the MOB Owner and the Hospital Owner. The MOB Owner and the Hospital Owner, jointly and severally, shall indemnify and hold harmless each other Owner, and shall upon written request defend each other Owner with counsel satisfactory to such other Owner, from and against any and all Claims (defined below) that arise from the revocation, rescission or invalidity of the Zoning Permit/Use Registration Permit.

Further, notwithstanding anything herein or in the Unity of Use Agreement to the contrary, with the prior written approval of the Garage Owner (which shall not be unreasonably withheld, delayed or conditioned) and not otherwise, any Owner may seek

EAST\149624846. 68

KLEHR_001548

and obtain a variance or rezoning of its Property so that such Property complies on a stand-alone basis with applicable zoning, land use and subdivision Legal Requirements, and in such event the applicable Property shall cease to be subject to the Unity of Use Agreement, provided, however, that such action shall not directly or indirectly create or increase any noncompliance (lawful or otherwise) under applicable Legal Requirements of any other Property nor directly or indirectly limit or restrict the use or development of any other Property, unless the Owner of such other Property expressly consents in writing to such action.

8) <u>Insurance; Indemnity.</u>

   a) <u>Insurance.</u> Each Owner, at its sole cost and expense and without reimbursement or contribution from any other Owner, shall obtain and maintain at all times, the insurance required to be maintained by it pursuant to <u>Exhibit D</u> attached hereto and made a part.

   b) <u>Indemnification.</u> As used herein, "Claim" means and includes any loss, cost, damage, demand, litigation, cause of action, fine, penalty, liability, lien, injury, obligation or expense (including reasonable attorneys' and witness fees, disbursements and court costs). Subject to Section 8(d), each Owner covenants and agrees to indemnify, defend (with counsel reasonably acceptable to the other Owner(s)) and hold harmless the other Owners, and such Owners' Permittees, officers, employees, direct and indirect owners (individually and collectively, "Indemnified Parties"), from and against any and all Claims for injury to persons or damage to property arising from (i) any use, occupancy, act, occurrence or condition on or about such indemnifying Owner's Property (other than the use of the easements granted under this Agreement by the Indemnified Parties), (ii) the use or enjoyment of any easement rights created hereunder by such indemnifying Owner or its Permittees, (iii) any activity, work, or thing done, permitted or suffered by such indemnifying Owner, its agents, contractors or employees in or about the Project Parcel or due to any other negligent act or omission of such indemnifying Owner, its agents, contractors or employees, or (iv) from such indemnifying Owner's failure to perform its obligations under this Agreement; provided however, that no Indemnified Party shall be entitled to indemnity or defense for any Claim otherwise covered by this Section 8(b), if and to the extent that such Claim arises from the gross negligence or willful misconduct of the Indemnified Parties. This Section 8(b) shall survive termination or expiration of this Agreement.

   c) <u>Indemnification Protocol.</u> The procedures set forth in this Section 8(c) are collectively referred to herein as the "Indemnification Protocol." Whenever any Claim arises for indemnification under this Agreement, the Indemnified Party must notify the party or parties from whom indemnification is being sought (in each such case, the "Indemnifying Party") of such Claim in writing promptly and in no case later than ten (10) Business Days after such Indemnified Party has actual knowledge of the facts constituting the basis for such claim. The failure of any Indemnified Party to give timely notice hereunder shall not affect rights to

KLEHR_001549

indemnification or defense hereunder, except to the extent that the Indemnifying Party has been damaged by such failure. Such notice will specify all material facts known to such Indemnified Party giving rise to the indemnification sought and (if known by the Indemnified Party) the amount or an estimate of the amount of the obligation or liability arising from such indemnifying event. If any lawsuit or enforcement action is filed by a third party against any Indemnified Party in connection with any Claim for which the Indemnified Party seeks indemnification and defense under this Agreement, written notice thereof shall be given to the Indemnifying Party as promptly as practicable (and in any event within fifteen (15) days after the service of the citation or summons). The failure of any Indemnified Party to give timely notice hereunder shall not affect rights to indemnification or defense hereunder, except to the extent that the Indemnifying Party has been damaged by such failure. After such notice, the Indemnifying Party shall at its own cost, risk and expense, (i) take control of the defense and investigation of such lawsuit or action, and (ii) employ and engage legal counsel of its own choice, but, in any event, reasonably acceptable to the Indemnified Party, to handle and defend the same. The Indemnifying Party shall not, without the written consent of the Indemnified Party, which shall not be unreasonably withheld, conditioned or delayed, settle or compromise any Claim or consent to the entry of any judgment which does not include an unconditional written release by the claimant or plaintiff of the Indemnified Party from all liability in respect of such Claim, or settle or compromise any Claim if the settlement imposes equitable remedies or material obligations on the Indemnified Party other than financial obligations for which such Indemnified Party will be indemnified hereunder. No Claim which is being defended in good faith by the Indemnifying Party in accordance with the terms of this Agreement shall be settled or compromised by the Indemnified Party without the written consent of the Indemnifying Party, which consent shall not be unreasonably withheld. If the Indemnifying Party fails to assume the defense of such lawsuit or action within thirty (30) days after receipt of the claim notice, the Indemnified Party against which such lawsuit or action has been asserted will (upon delivering notice to such effect to the Indemnifying Party) have the right to undertake, at the Indemnifying Party's cost and expense, the defense, compromise or settlement of such lawsuit or action on behalf of and for the account and risk of the Indemnifying Party; provided, however, that such lawsuit or action shall not be compromised or settled without the written consent of the Indemnifying Party, which consent shall not be unreasonably withheld, conditioned or delayed. If the Indemnified Party settles or compromises such lawsuit or action without the prior written consent of the Indemnifying Party, the Indemnifying Party will bear no liability hereunder for or with respect to such lawsuit or action. In the event either party assumes the defense of a particular lawsuit or action in the manner contemplated above, the party assuming such defense will keep the other party reasonably informed of the progress of any such defense, compromise or settlement. The indemnification obligations of Owners under this Section shall survive the expiration of the term, or the termination, of this Agreement.

d) <u>Mutual Release and Waivers of Recovery.</u> Each Owner hereby releases and

10

KLEHR_001550

discharges each other Owner and the Permittees of such other Owner's Property from any responsibility, right of recovery or claim (including, without limitation, any claims for contribution or indemnity), for that portion of any loss or damage paid or reimbursed by any fire, extended coverage or other property insurance policy maintained by the releasing party (or, if greater, the insurance proceeds that would be available if the releasing party maintained all insurance required of it hereunder), no matter how such loss or damage is caused (whether by negligence or otherwise). Any fire, extended coverage or property insurance policy maintained by any Owner with respect to its Property shall contain (by endorsement or otherwise) a waiver of subrogation provision or endorsement in favor of each other Owner and its Permittees or, in the event that such provision is unavailable, then the applicable Owner shall obtain the express written approval and consent of their respective insurers to the terms of this Agreement.

9) <u>Damage.</u> If any paving or other improvements to the Driveway Areas is damaged or destroyed by fire or other casualty, then the Owner on whose Property the affected improvements are located shall, at its sole cost and expense and as promptly as is reasonably possible, repair and restore the affected improvements to substantially the same (or better) condition and utility that existed immediately prioer to the damage or destruction.  Except as provided above with respect to the Driveway Areas, if any building or other improvements upon any Property is damaged by fire or other casualty, then the affected building or other improvements shall, at the election of the Owner of the applicable Property, be repaired and restored as promptly as is reasonably possible by the Owner such Property at its sole cost and expense (subject to the right of such Owner to make alterations in accordance with this Agreement). If such Owner elects not to perform such repair and restoration, such Owner shall promptly remove all damaged improvements and debris, leaving such Owner's Property in a safe and sightly condition in accordance with the Operating Standard.   No damage to or destruction or any easement faciliites or other improvements on the Project Parcel shall terminate or otherwise impair the easements or other terms and conditions of this Agreement.

10) <u>Reasonable Rules and Regulations.</u> The exercise of all rights, responsibilities and obligations granted hereunder with regard to easements or other rights of access over any Owner's Property, shall in all cases not unreasonably interfere with the conduct of business at the Property and be exercised in a commercially reasonable manner in accordance with the Operating Standard and shall be subject, to any reasonable rules and regulations and other standards which may be established from time to time by the Owner of the applicable Property (which may include, without limitation (a) directional and way finding signage, and (b) limiting access to specifically authorized Persons and closing areas burdened by easements for access hereunder at night and on weekends and holidays, for security reasons, and/or to avoid the implied public dedication of such areas), <u>provided, however,</u> that no such closing will prevent or materially interfere with the use and operation of the Entire Project in accordance with the Operating Standard.

11) <u>Emergencies.</u> In the event of the occurrence of an Emergency, there shall immediately and automatically (a) be provided prompt notice to all affected Owners, (b) be granted by and between all parties hereto such temporary easements as are reasonably necessary for the preservation of life and property, all such emergency easements to terminate automatically with

KLEHR_001551

the expiration of the Emergency in connection with which they arose, and (c) be temporarily suspended any rights and easements granted hereunder which are necessary to be suspended for the preservation of life and property, all of such rights and easements to return to full force and effect automatically with the expiration of the Emergency in connection with which they arose.

12) Remedies; Self-Help.

    a) Except for consequential, punitive, or speculative damages (which are hereby waived by each Owner with respect to any Claim arising under or in connection with this Agreement), the Owners shall be entitled to all rights and remedies available at law or in equity including, without limitation, specific enforcement and injunctions, to enforce this Agreement.

    b) The failure of any Owner to perform any of its obligations hereunder shall entitle each other Owner to undertake the performance of such obligations if, after the expiration of thirty (30) days following the giving of notice as provided in Section 14 hereof (except in the case of an Emergency, in which event no notice shall be required), the Owner so obligated shall have failed to effect such cure (or, if effecting such cure would take in excess of thirty (30) days, shall have failed to commence such cure or shall have failed to proceed thereafter diligently to complete such cure) and the responsible Owner does not notify such other Owner in writing that it disputes the alleged failure to perform its obligations (which notice shall set forth in reasonable detail the basis for such dispute), and the cost of effecting such cure shall be paid by the party so obligated within thirty (30) days of a presentation of a bill therefor.

    c) If any amount payable by one Owner to another Owner under this Agreement is not paid within five (5) business days after the date due, the amount due shall bear interest at the Interest Rate until paid in full by the delinquent Owner. The term "Interest Rate," as used herein, means the lesser of (i) the highest rate of interest that may be charged in accordance with applicable Legal Requirements, or (ii) the greater of (A) twelve percent (12%) per annum, or (B) the sum of (x) the prevailing "prime rate" as published from time to time in the Wall Street Journal (or if the Wall Street Journal ceases to publish such rate, the "prime rate" or other reference rate of interest as published by any other source reasonably selected by the Garage Owner), plus (y) five percent (5%) per annum.

    d) In no event shall the failure of any Owner to perform any of its obligations hereunder entitle any other Owner to terminate this Agreement or any easements created hereunder because of such failure.

13) Attorney's Fees. Any Owner may enforce this Agreement by appropriate action and, in the event that it prevails in such action, shall recover as part of its cost a reasonable attorney's fee from such parties against whom such enforcement was successfully sought and obtained.

14) Notices. Notice whenever provided for herein shall be in writing. Any notice required or permitted to be delivered hereunder shall be addressed as below, and shall be deemed received

EAST\149624846. 6 12

KLEHR_001552

when (i) personally delivered (including delivery via email, provided that such email specifically states that it is intended to be notice) or (ii) one (1) Business Day after being deposited with a nationally recognized overnight courier service, charges prepaid, and properly addressed for next-day delivery. Either party may change its address for notice from time to time by delivery of at least three (3) Business Days prior written notice of such change to the other party hereto in the manner prescribed herein, and with a copy, given as aforesaid, to any Mortgagee of a Property or any portion of a Property electing to receive a copy as provided in Section 14, below:

    i)   If to the Garage Owner:

        PAHH Erie Street Garage, LLC
        c/o Harrison Street Real Estate, LLC
        444 West Lake Street, Suite 2100
        Chicago, IL 60606
        Attn: Mark Burkemper
        Email: mburkemper@harrisonst.com

        With required copies to:

        Harrison Street Real Estate, LLC
        444 West Lake Street, Suite 2100
        Chicago, IL 60606
        Attn: Michael Gershowitz, Deputy General Counsel
        Email: mgershowitz@harrisonst.com

    ii)   If to the Hospital Owner:

        Front Street Healthcare Properties, LLC
        222 N. Sepulveda Blvd., Suite 900
        El Segundo, CA 90245
        Attention: Joel Freedman and General Counsel
        Email: jfreedman@pldn.com and
        sattestatova@pldn.com

    iii)  If to the MOB Owner:

        Front Street Healthcare Properties II, LLC
        222 N. Sepulveda Blvd., Suite 900
        El Segundo, CA 90245
        Attention: Joel Freedman and General Counsel
        Email: jfreedman@pldn.com and
        sattestatova@pldn.com

    15) <u>Rights of Mortgagees.</u> This Agreement shall be superior to any and all Mortgages now existing or hereafter recorded against any or all portion of either Property. In addition to the notices to the Owners under Section 14 hereof, each Mortgagee of any Property, or any portion thereof, shall also be entitled to receive copies of all notices given to the Owner of such Property,

KLEHR_001553

provided that such Mortgagee notifies each other Owner in writing that it is the holder of a Mortgage and specifies in such notice the address(es) to which notices to such Mortgagee shall be sent. The term "Mortgage," shall mean, with respect to any Property or portion thereof, a duly recorded (and not released) mortgage, deed of trust or similar instrument that creates and constitutes a lien upon such Property to secure repayment of a loan obtained by the applicable Owner, and "Mortgagee" shall mean the holder(s) of record of such Mortgage; provided (in each case) each other Owner has received actual written notice (and not merely record notice or constructive notice) of such Mortgage and the name and address of each Mortgagee.

16) <u>Estoppels.</u> Each Owner shall, at any time and from time to time, within ten (10) business days after any other Owner's request or that of any mortgagee of the other Owner, execute, acknowledge and deliver to the requesting Owner a statement in writing (the "Estoppel Certificate"), certifying (i) that this Agreement is unmodified and in full force and effect (or if there have been any modifications, that the Agreement is in full force and effect as modified and stating the modifications); and (ii) whether or not, to the best of the Owner's knowledge, all terms and conditions under the Agreement to be performed by the requesting Owner prior thereto have been satisfied and whether or not the requesting Owner is then in default in the performance of any covenant, agreement or condition contained in this Agreement and specifying each, if any, unsatisfied condition and each, if any, default of which the certifying Owner may have knowledge; and (v) any other fact or condition related to the Agreement or the certifying Owner reasonably requested. Any certification delivered pursuant to the provisions of this Section shall be intended to be relied upon by the requesting Owner and any mortgagee or prospective mortgagee or purchaser of the Property or of any interest therein.

17) <u>Burdens and Benefits; Successors and Assigns.</u> Each easement granted hereunder by any Owner shall burden all or part of such Owner's Property as described in the granting clause for such easement and shall benefit and be appurtenant to the Property or Properties expressly stated to be benefited thereby in such granting clause, and no other property. All the covenants, easements and other provisions of this Agreement (including, but not limited to, the benefits and burdens hereof) shall run with the land with respect to the Project Parcel and shall be binding upon, inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns. Upon the transfer of ownership of any area subject to any easement hereunder, the transferee shall be deemed to have assumed the obligations of the transferor arising from and after the date of transfer and the transferor thereof shall have no liability hereunder for any defaults hereunder occurring after the date of such transfer.

    a) The easements and other rights granted in this Agreement are intended to allow the continued operation and Maintenance of the Entire Project substantially as the Entire Project has been operated and Maintained prior to the Effective Date. The scope, extent and utilization of the easements granted pursuant this Agreement shall not exceed in any material respect how the applicable facilities have been operated and Maintained prior to the Effective Date.

    b) No easement granted hereunder shall be deemed abandoned by mere non-use, unless (x) the benefited Owner of such easement and its Permittees cease to use the applicable easement for a continuous period in excess of one hundred eighty (180) days, other than by reason of repairs, restoration or redevelopment of its

14

Property diligently prosecuted to completion, <u>and</u> (y) the benefited Owner and the Mortgagee(s) of its Property fail to object in writing to the abandonment and termination of the applicable easement within sixty (60) days after receiving written notice of purported abandonment and termination from the Owner of the servient Property.

18) <u>Amendment.</u>

    a)  This Agreement and the easements hereby granted and the other provisions hereof shall become effective on the Effective Date.

    b)  This Agreement may be amended only by a written instrument which shall be recorded in the Recorder's Office, and except as provided to the contrary in Section 18(c), shall be executed by:

        (1)  All the Owners; and

        (2)  Each Mortgagee under an existing Mortgage of record as of the date that such amendment is recorded.

Except as specifically provided above, the consent of no other Permittee of any Property shall be required for any amendment of this Agreement to become effective.

    c)  Notwithstanding Section 18(b), any specific easement created by this Agreement may be amended by a written instrument executed by the Owner of the servient Property and the Owner(s) directly benefited by such easement and their respective Mortgagees, without requiring the consent or approval of any other Owner or any Mortgagee of such other Owner's Property.

19) <u>Term of this Agreement.</u> Subject to the provisions of Section 17(b), and this Section 19, this Agreement shall remain in full force and effect for a period of ninety (90) years from the date hereof, and thereafter it shall be deemed to have been automatically renewed for successive terms of ten (10) years, except that at any time, and from time to time, this Agreement may be terminated by a unanimous written agreement of all Owners and Mortgagees. Such termination shall be effected by recordation in the Recorder's Office of a document executed by all of the Owners, stating that this Agreement shall be terminated as provided therein, which Agreement shall be joined in by each Mortgagee.

20) <u>Severability.</u> If any provision of this Agreement shall be conclusively determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement shall not be affected thereby.

21) <u>Construction.</u> This Agreement shall be reasonably construed so as to carry out the intention to confer a commercially useable right of enjoyment on any grantee hereunder, without unreasonably burdening the Property subject to such easements.

22) <u>Unavoidable Delays.</u> If and to the extent that any Owner is delayed in the performance of any obligation hereunder, other than obligations that are to be or could be satisfied by the

15

payment of money (including, without limitation, paying for Maintenance Costs and obtaining insurance required hereunder), and such delay constitutes Unavoidable Delay, then the time for performance of such obligation shall be extended for so long as the Unavoidable Delay continues, provided, however, that (i) such Owner notifies each other Owner in writing not later than five (5) business days after first becoming aware of the Unavoidable Delay, and (ii) such Owner uses all commercially reasonable efforts to minimize the extent and duration of the Unavoidable Delay and to expedite its performance of the applicable obligation.

23) Limitation of Liability. Notwithstanding anything contained herein to the contrary, each Owner agrees that no other Owner, nor any partner, officer, shareholder or director thereof, shall have any personal liability with respect to any provisions of this Agreement, and such Owner shall look solely to the estate and Property of such other Owner in the Entire Project for the collection of any judgment or the enforcement of any other judicial process requiring the payment or expenditure of money by such other Owner, in the event of any default by such other Owner with respect to any of such other Owner's obligations under this Agreement. No other assets of such other Owner or of any partner, officer, director or shareholder of such other Owner shall be subject to levy, execution or other judicial process for the satisfaction of an Owner's claims, and in the event a judgment is obtained against an Owner, the judgment docket shall be so noted. The provisions of this Section 24 shall inure to the benefit of each Owner's heirs, representatives, successors and assigns and their respective principals.

24) Ronald McDonald House Deed. The Property is encumbered by that certain Deed from Tenet HealthSystem St. Christopher's Hospital for Children, L.L.C. to Philadelphia Ronald McDonald House, Inc. recorded December 29, 2006, as Document 51601262 (the "RMH Deed"). The Owners agree that Garage Owner is not responsible for any costs, obligations, and liabilities of the "Grantor" arising under the RMH Deed. Hospital Owner shall indemnify defend, and hold harmless the Indemnified Parties from any Claims arising out of or with respect to the RMH Deed and the obligations thereunder in accordance with the provisions of Article 8 of this Agreement.

25) Acquisition of 3645 N. Front Street Property by MOB Owner. The easements and other terms of this Agreement shall not benefit or burden the 3645 N. Front Street Property unless and until the MOB Owner acquires title to the 3645 N. Front Street Property or any portion thereof. Upon acquisition of title to the 3645 N. Front Street Property (or any portion thereof) by the MOB Owner, MOB Owner shall promptly notify Garage Owner thereof and (i) the 3645 N. Front Street Property (or the applicable portion thereof) automatically shall be encumbered by this Agreement, the same as though MOB Owner held fee title to the 3645 N. Front Street Property as of the Effective Date hereof, and (ii) the MOB Parcel as referenced herein shall be deemed to include the 3645 N. Front Street Parcel, and the Project Parcel and Entire Project as referenced herein shall be deemed to include the 3645 N. Front Street Property, and (iii) at the request of Garage Owner, the Owners shall enter into a recordable amendment or supplement to this Agreement to confirm the inclusion of the 3645 N. Front Street Property as contemplated herein, the form of which shall be reasonably satisfactory to each Owner. (Clauses (i), (ii) and (iii) above shall become effective immediately and automatically upon acquisition of title to the 3645 N. Front Street Property (or any portion thereof) by the MOB Owner, without the necessity of a separate amendment to this Agreement or other instrument to confirm the same.) MOB Owner and Garage Owner shall not cause or induce any of their affiliates (other than MOB

KLEHR_001556

Owner) or any third party to acquire any interest in the 3645 N. Front Street Property.

26) Not a Public Dedication. Nothing herein contained shall be deemed to be a gift or dedication of any portion of the Property or portion thereof to the general public, or for any public use or purpose whatsoever. Except as herein specifically provided, no right, privileges or immunities of any Owner or Permittee hereunder shall inure to the benefit of any third party Person, nor shall any third party be deemed to be a beneficiary of any of the provisions contained herein.

27) Miscellaneous. This Agreement shall be binding upon the parties hereto and their respective successors and assigns. This Agreement shall be governed by the laws of the Commonwealth of Pennsylvania. The captions of the various sections are inserted solely for convenience of reference and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect. This Agreement, together with the Exhibits attached hereto, contains and embodies the agreement between the parties hereto regarding the subject matter hereof, and supersedes all prior agreements between the parties.

*[Signature on the Next Page]*

EAST\149624846. 6 17

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement, under seal, as of the day and year first above written.

HOSPITAL:

**FRONT STREET HEALTHCARE PROPERTIES, LLC**, a Delaware limited liability company

By: _____

    Name: Joel Freedman

    Title:  Chief Executive Officer and President

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

*Signature page to Parking, Access and Utilities Easement Agreement*

KLEHR_001558

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGEMENT

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF _California_ )

COUNTY OF _Los Angeles_ )

On _December 30_, 2017, before me, _Larion Ayzman (Notary Public)_
　　　Date　　　　　　　　　　　　　*(Here Insert Name and Title Of the Officer)*

personally appeared _Joel Lawrence Freedman_
　　　　　　　　　　　　　　*Name(s) of Signers*

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

LARION AYZMAN
COMM. #2115103
Notary Public - California
Ventura County
My Comm. Expires June 12, 2019

WITNESS my hand and official seal.

Signature _____
　　　　　*Signature of Notary Public*

*Place Notary Seal Above*

*Acknowledgement page to Parking, Access and Utilities Easement Agreement*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, under seal, as of the day and year first above written.

NELSON PAVILION:

FRONT STREET HEALTHCARE PROPERTIES II, LLC, a Delaware limited liability company

By: _____
Name: Joel Freedman
Title: Chief Executive Officer and President

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

*Signature page to Parking, Access and Utilities Easement Agreement*

KLEHR_001560

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGEMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF *California* )

COUNTY OF *Los Angeles*

On *December 30*, 2017, before me, *Larion Ayzman (Notary Public)*
   *Date*                    *(Here Insert Name and Title Of the Officer)*

personally appeared *Joel Lawrence Freedman*
                           *Name(s) of Signers*

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
            *Signature of Notary Public*

LARION AYZMAN
COMM. #2115103
Notary Public - California
Ventura County
My Comm. Expires June 12, 2019

***Place Notary Seal Above***

*Acknowledgement page to Parking, Access and Utilities Easement Agreement*

PAHH ERIE STREET GARAGE, LLC

_____(SEAL)
By: Mark J. Burkemper
Its: Authorized Signatory

[Signature page to Parking, Access and Utilities Easement Agreement –
PAHH Erie Street Garage, LLC]

EAST\149624846.4

KLEHR_001562

STATE OF _Illinois_      :
                         : SS
COUNTY OF _Cook_         :

     On this, the 2nd day of _January_____, 2016, before me, the undersigned Notary Public, personally appeared Mark J. Burkem (known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument, and acknowledge that she executed the same in the capacity therein stated for the purposes therein contained.

     IN WITNESS WHEREOF, I hereunto set my hand and official seal.

"OFFICIAL SEAL"
ZELNETTA K. BURROWS
Notary Public, State of Illinois
My Commission Expires 08/24/2019

_Zelnetta K. Burrows_
Notary Public
My Commission Expires:

[Acknowledgement page to Parking, Access and Utilities Easement Agreement – PAHH Erie Street Garage, LLC]

EAST\149624846.4

EXHIBIT A-1

Garage Parcel

All that Certain Parcel or Tract of Land Situate in the 7th Ward of the City and County of Philadelphia, Commonwealth of Pennsylvania, as shown on a Plan prepared by Pennoni Associates Inc. entitled "Proposed Lot Line Adjustment Plan", Drawing Number V-0812, project number PALHC 17002, dated 10/20/2017. Being more particularly described as follows.

Beginning at a point of the Southerly line of Erie Avenue (S.R. 1004) (100' wide), said point being a distant 579.719' from the intersection of the said Southerly line of Erie Avenue and the Westerly line of B Street (S.R. 1003) (80' wide as shown on the aforementioned Plan in the 7th Ward of the City of Philadelphia as follows:

Thence from said Point of Beginning, S 11°09'34" W, along the westerly face of curb of a drive aisle, being the line of Proposed Lots 1 and 2, the distance of 464.986' to a point on the northerly face of curb of drive aisle, thence continuing;

N 78° 50'26" W, along a face of curb of a drive aisle, a distance of 50.550' to a point; thence continuing,

N 11°09'34" E, along the face of curb of a drive aisle, a distance of 157.396' to a point of curvature; thence continuing,

Northwesterly along a curve to the left having a radius of 24.193', an arc length of 32.463', a central angle of 76°52'56", along a chord bearing N 58°48'39" W and a distance of 30.082', to a point of tangency; thence continuing,

N 78°46'23" W, along the face of curb of a drive aisle, a distance of 205.398' to a point; thence continuing,

N 11°03'30 E, a distance of 46.989' to a point; thence continuing,

N 78°51'07 W, a distance of 27.138' to a point; thence continuing,

N 11°08'30 E, partially along the common line of Proposed Lot 2 and Proposed Lot 3 and partially along the common line of said lands of Tenet Healthcare and lands now and formerly of Philadelphia Ronald McDonald House, Inc, the distance of 169.431' to a point; thence continuing,

S 78°51'30" E, a distance of 227.063' to a point; thence continuing,

N 11°03'30" E, a distance of 70.935' to a point in the said line of Erie Avenue; thence continuing,

S 78°39'00" E, along the said line of Erie Avenue, a distance of 78.364 to the point and place of beginning, containing within these metes and bounds 79,485 square feet, (DS) or 1.825 acres of land, more or less.

KLEHR_001564

EXHIBIT A-2

Hospital Parcel

All that Certain Parcel or Tract of Land Situate in the 7th Ward of the City and County of Philadelphia, Commonwealth of Pennsylvania, as shown on a Plan prepared by Pennoni Associates Inc. entitled "Proposed Lot Line Adjustment Plan", Drawing Number V-0812, project number PALHC 17002, dated 10/20/2017. Being more particularly described as follows.

Beginning at the intersection of the Southerly line of Erie Avenue (S.R. 1004) (100' wide) and the Westerly line of B Street (S.R. 1003) (80' wide as shown on the aforementioned Plan in the 7th Ward of the City of Philadelphia as follows:

Thence from said Point of Beginning, S 11°08'30" W, along the westerly right-of-way line of B Street, 403.042' to a point on the said common line of land now or formerly of Tenet Health System St. Christopher's Hospital for Children, LLC and land now or formerly of Conrail; thence continuing,

Leaving B Street along the arc of a circle curving southwesterly and said curve being concave to the northwest a distance of 96.719', with a radius of 1838.031', a central angle of 3°00'54", along a chord bearing of S 61°10'31" W and distance of 96.708' to a point of compound curvature; thence continuing,

Along the arc of a circle curving southwesterly and said curve being concave to the northwest a distance of 442.875', with a radius of 1838.031', a central angle of 13°48'20", along a chord bearing of S 69°34'32" W and distance of 441.804' to a point of tangency; thence continuing,

S 76°28'42" W, a distance of 21.854' to a point of curvature; thence continuing,

Along the arc of a circle curving southwesterly and said curve being concave to the north a distance of 154.010', with a radius of 1892.229', a central angle of 4°39'48", along a chord bearing of S 78°48'36" W and distance of 153.967' to a point of compound curvature; thence continuing,

Along the arc of a circle curving northwesterly and said curve being concave to the north a distance of 266.542', with a radius of 763.583', a central angle of 20°00'00", along a chord bearing of S 88°51'30" W and distance of 265.191' to a point of tangency; thence continuing,

N 78°51'30" W, a distance of 142.000' to a point in the said easterly right-of-way line of Front Street; thence continuing,

N 11°08'30" E, along the easterly right-of-way line of Front Street, a distance of 49.556' to a point; thence continuing,

S 78°51'30" E, leaving said easterly right-of-way line of Front Street and continuing along the southerly line of land of the MOB Parcel, a distance of 194.080' to a point; thence continuing,

N 11°08'30" E, a distance of 104.052' to a point; thence continuing,

S 78°50'30" E, a distance of 40.597' to a point; thence continuing,

N 11°09'30" E, a distance of 85.949' to a point; thence continuing,

S 78°50'30" E, a distance of 11.347' to a point; thence continuing,

N 11°09'30" E, a distance of 30.265' to a point; thence continuing,

S 78°50'30" E, a distance of 20.049' to a point; thence continuing,

N 11°09'30" E, a distance of 32.263' to a point; thence continuing,

N 78°50'30" W, a distance of 78.611' to a point; thence continuing,

S 11°09'30" W, a distance of 19.632' to a point; thence continuing,

N 78°50'30" W, a distance of 90.044' to a point in the line of the Proposed Lot 3; thence

KLEHR_001565

continuing,

N 11°09'30" E, along the common line of Proposed Lot 3 and Proposed Lot 1, the distance of 338.134' to a point in the common line of said lands of Tenet Healthcare and lands now and formerly of Philadelphia Ronald McDonald House, Inc; thence continuing,

S 78°51'30" E, along the said common line, a distance of 33.301' to a point in the line of Proposed Lot 2, thence continuing;

S 11°08'30 W, along the common line of Proposed Lot 2 and Proposed Lot 1, the distance of 48.472' to a point; thence continuing;

S 78°51'07 E, a distance of 27.138' to a point; thence continuing,

S 11°03'30 W, a distance of 46.989' to a point; thence continuing,

S 78°46'23" E, along the face of curb of a drive aisle, a distance of 205.398' to a point of curvature; thence continuing,

Southeasterly along a curve to the right having a radius of 24.193', an arc length of 32.463', a central angle of 76°52'56", along a chord bearing S 58°48'39" E and a distance of 30.082', to a point of tangency; thence continuing,

S 11°09'34" W, a distance of 157.396' to a point in the face of curb of a drive aisle' thence continuing,

S 78° 50'26" E, a distance of 50.550' to a point in the extension of the face of curb of a drive aisle; thence continuing;

N 11°09'34" E, a distance of 464.986 feet to a point in the southerly right-of-way line of Erie Avenue, also being known as S.R. 1004, (100' wide); thence continuing,


S 78°39'00" E, along the southerly right-of-way line of said Erie Avenue, a distance of 579.719' to a point along the westerly right-of-way line of B Street, also being known as S.R. 1003, (80' wide), said point also being the point and place of beginning, containing within these metes and bounds 491,347 square feet, (DS) or 11.280 acres of land, more or less.

√

KLEHR_001566

EXHIBIT A-3

MOB Parcel

All that Certain Parcel or Tract of Land Situate in the 7th Ward of the City and County of Philadelphia, Commonwealth of Pennsylvania, as shown on a Plan prepared by Pennoni Associates Inc. entitled "Proposed Lot Line Adjustment Plan", Drawing Number V-0812, project number PALHC 17002, dated 10/20/2017. Being more particularly described as follows.

Beginning at a point on the Easterly Side of Front Street (80' wide), said point being a distant 121.267 feet from the southwesterly end of a curve with a 50.00' radius connecting the easterly side of Front Street with the Southerly side of Erie Avenue (S.R. 1004) (100' wide) as shown on the aforementioned Plan in the 7th Ward of the City of Philadelphia as follows:

Thence from said Point of Beginning, S 78°51'30" E, along the common line of said lands of Tenet Healthcare and lands now and formerly of Philadelphia Ronald McDonald House, 97.554' feet to a point on the common line of Proposed Lot 2 and Proposed Lot 3, thence continuing;

S 11°09'30" W, a distance of 466.979' to a point; thence continuing,

S 78°50'30" E, continuing along the southerly line of land of the MOB Parcel, a distance of 63.245' to a point; thence continuing,

S 11°08'30" W, a distance of 74.137' to a point; thence continuing,

N 78°51'30" W, a distance of 160.663' to a point on the easterly right-of-way line of Front Street; thence continuing,

N 11°08'30" E, along the easterly right-of-way line of Front Street, a distance of 541.135' to the point and place of beginning, containing within these metes and bounds 57,347 square feet, (DS) or 1.319 acres of land, more or less.

KLEHR_001567

EXHIBIT A-4
3645 N. Front Street Parcel

ALL THAT CERTAIN lot or piece of ground, with the improvements thereon, SITUATE in the 7th Ward of the City of Philadelphia, County of Philadelphia and Commonwealth of Pennsylvania, and described according to a Lot Line Adjustment Plan made by Pennoni Associates Inc., dated January 11, 2013 and revised April 12, 2013 being now more particularly described as follows, to wit:

BEGINNING at a point, said point being 49.556' Northerly of the intersection of the Easterly right of way line of Front Street (80' wide) with the common line of the lands now or formerly of Tenet Health System St. Christopher's Hospital for Children, LLC and the land now or formerly of Conrail as shown on the aforementioned Plan in the 7th Ward of the City of Philadelphia the following sixteen (16) courses and distances, as follows, to wit;

North 11 degrees 08 minutes 30 seconds East, along the Easterly line of said Front Street, a distance of 29.925' to a point; thence continuing,

South 78 degrees 51 minutes 30 seconds East, leaving said Easterly line of Front Street a distance of 160.663' to a point; thence continuing,

North 11 degrees 08 minutes 30 seconds East, a distance of 74.137' to a point; thence continuing,

North 78 degrees 50 minutes 30 seconds West, a distance of 63.245' to a point; thence continuing,

North 11 degrees 09 minutes 30 seconds East, a distance of 128.845' to a point; thence continuing,

South 78 degrees 50 minutes 30 seconds East, a distance of 90.044' to a point; thence continuing,

North 11 degrees 09 minutes 30 seconds East, a distance of 19.632' to a point; thence continuing,

South 78 degrees 50 minutes 30 seconds East, a distance of 78.611' to a point; thence continuing,

South 11 degrees 09 minutes 30 seconds West, a distance of 32.263' to a point; thence continuing,

North 78 degrees 50 minutes 30 seconds West, a distance of 20.049' to a point; thence continuing,

South 11 degrees 09 minutes 30 seconds West, a distance of 30.265' to a point; thence continuing,

North 78 degrees 50 minutes 30 seconds West, a distance of 11.347' to a point; thence continuing,

South 11 degrees 09 minutes 30 seconds West, a distance of 85.949' to a point; thence

continuing,

North 78 degrees 50 minutes 30 seconds West, a distance of 40.597' to a point; thence continuing,

South 11 degrees 08 minutes 30 seconds West, a distance of 104.052' to a point; thence continuing,

North 78 degrees 51 minutes 30 seconds West, a distance of 194.080' to a point and place of beginning.

KLEHR_001569

Exhibit B

Project Parcel

That certain property described in Exhibit A, generally bounded by Front Street to the west, Erie Avenue to the north, "B" Street to the east, and that property now or formerly owned by N/F SD Real Estate Developers, LLC to the south.

EAST\149624846.6

KLEHR_001570

Exhibit C

Site Plan

KLEHR_001571

KLEHR_001572

# EXHIBIT C (SITE PLAN)



GARAGE PARCEL

HOSPITAL PARCEL

MOB PARCEL

3645 N. FRONT STREET PARCEL

\* APPROXIMATE LOCATIONS

KLEHR_001573

# EXHIBIT C-1 (DRIVEWAY AREA; EXTERIOR PARKING AREAS)



**✳ APPROXIMATE LOCATIONS**

☐ = DRIVEWAY AREA    ◩ = EXTERIOR PARKING AREAS

KLEHR_001574

# EXHIBIT C-2 (OVERHEAD PED. BRIDGE AND PAY STATIONS)



APPROXIMATE LOCATION OF OVERHEAD PEDESTRIAN BRIDGE

= APPROX. LOC. OF PAY STATIONS

EXHIBIT D

## INSURANCE REQUIREMENTS

(a)  Policies to Maintain. Each Owner, at its sole cost and expense, shall provide and keep in force (or cause to keep in force) during the entire term of this Agreement, insurance providing at least the following coverages, pursuant to formal policies of insurance complying with the requirements set forth below:

(i)  commercial general liability insurance and (if applicable) professional liability insurance, (including owner's protective liability coverage on operations of such Owner's Property, and/or their respective independent contractors engaged in construction, personal injury, and blanket contractual liability insurance) with a limit for each occurrence not less than $3,000,000 and general aggregate limits of not less than $5,000,000 for each policy year, protecting and indemnifying the Owner and the additional insureds identified below against all claims for damages to person or property or for loss of life or of property occurring upon, in, or about the Property, written on a claims made or occurrence basis. The Owner of each other Property and each Mortgagee of which the applicable Owner has received notice shall be named insureds under the liability insurance policies set forth in this Paragraph. In addition, such coverage shall be written on an occurrence basis and shall contain endorsements: (i) deleting any liquor liability exclusion (if alcohol is sold on the Property); (ii) including cross-liability; and (iii) waiving the insurer's rights of subrogation against any other Owner;

(ii)  property insurance on such Owner's Property and all buildings and other installations, additions and improvements which may now or hereafter be erected thereon against "Special Causes" of loss or damage in an amount sufficient to prevent Permittees from becoming co-insurers and in any event, including loss or damage from earthquakes and windstorm, in an amount not less than one hundred percent (100%) of the actual replacement value thereof (i.e., including the cost of debris removal) as determined by Owner in its reasonable discretion from time to time consistent with the Operating Standard and coverages for similarly situated properties. Such coverage shall contain an agreed amount endorsement reasonably acceptable to the Owner;

(iii)  At all times during which structural construction, repairs or alterations are being made with respect to any Building or other improvements located on a Property, and only if the property or liability coverage forms do not otherwise apply, the applicable Owner shall also maintain (A) commercial general liability and umbrella liability insurance covering claims related to the construction, repairs or alterations being made which are not covered by or under the terms or provisions of the commercial general liability and umbrella liability insurance policy required in Paragraph 3 above; and (B) the insurance provided for in Paragraph 1 above written in a so-called builder's risk completed value form (1) on a non-reporting basis, (2) against all risks insured against pursuant to

KLEHR_001575

Paragraph (ii), and (3) including permission to occupy the applicable Property.

(iv)  business interruption insurance with coverage in a face amount of not less than the aggregate amount, for a period of twelve (12) months following the insured-against peril, of 100% of the projected operating expenses of the Owner (including rental obligations and all taxes and other impositions); such coverage shall contain an agreed amount endorsement acceptable to Owner in accordance with the Operating Standard;

(v)  workers' compensation insurance (including employers' liability insurance), with a waiver of subrogation satisfactory to Owner in its reasonable discretion in accordance with the Operating Standard, covering all persons employed on the Owner's Property to the extent required by applicable laws and requirements of the state in which the Property is located, including, without limitation, during the course of work to the Property;

(vi)  mechanical breakdown insurance, if applicable, in an amount not less than one hundred percent (100%) of the actual replacement value thereof and of any improvements in which any such boiler is located (including the cost of debris removal but excluding foundations and excavations) as determined by Owner in its reasonable discretion from time to time;

(vii)  if sprinkler systems are located in the Building, sprinkler leakage insurance in amounts approved by Owner in its reasonable discretion;

(viii)  flood insurance (if the Property is located in whole or in part within a special flood hazard area as designated by any department or agency of the United States government having jurisdiction);

(ix)  equipment coverage and elevator liability coverage, if applicable, in amounts approved by Owner in its reasonable discretion;

(x)  motor vehicle liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence, including umbrella coverage, of One Million and No/100 Dollars ($1,000,000) (if applicable);

(xi)  Garage keeper's Legal Liability Coverage, as reasonably required by Owner;

(xii)  if during the term of this Agreement, any Property is covered by general liability, professional liability, patient healthcare professional malpractice or other liability insurance on a "claims made" basis, then the applicable Owner shall cause, whether directly or indirectly, Tenant to procure and maintain, "tail" insurance coverage, with such coverage limits and such deductible amounts as shall be reasonably acceptable to Owner for general liability, professional liability, patient healthcare professional malpractice or other liability claims reported after the termination of Tenant's applicable lease or expiration of the

KLEHR_001576

claims made policy, but concerning services provided during the term of such applicable lease. Tenant shall provide Owner with a certificate evidencing that such insurance coverage is in effect for a period of no less than one (1) year subsequent to the termination of the applicable lease no later than ninety (90) days prior to the termination of the applicable lease;

(b)    Insurance Company Requirements. All of the above-mentioned insurance policies and/or certificates evidencing such policies shall be written by insurance companies: (i) rated "A:VIII" or better in "Best's Insurance Guide" and at least "A" by Standard & Poor's Ratings Group; and (ii) authorized to do business in the state where the Property is located.

(c)    Evidence of Insurance, Renewal. Owner shall renew such insurance and shall deliver to the other Owners certificates of insurance, promptly following the renewal of any such policy of insurance.

(d)    No Violation of Policies. Owner shall not permit any Permittee to violate, in any material respect, any of the conditions of any of the said policies of insurance..

(e)    Blanket/Umbrella. The insurance required by this Agreement, at the option of each Owner, may be effected by blanket and/or umbrella policies issued to Owner and covering the Property, provided that the policies otherwise comply with the provisions of this Agreement and allocate to the different properties comprising the Property the specified coverage, without possibility of reduction or coinsurance by reason of, or damage to, any other Property.

(f)    Complying with Mortgagee. Each owner shall comply (and shall cause its Permittees to comply) with the insurance requirements of any Mortgagee under the Mortgage or any other loan document in connection therewith if they (a) require any insurance coverage not otherwise required under this Agreement or (b) provide for more stringent coverages, terms, conditions or provisions with respect to insurance coverage required under this Agreement for coverage customarily maintained on similar facilities in Philadelphia, Pennsylvania.

(g)    Waiver of Subrogation. No Owner shall be liable to another Owner or to any insurance company (by way of subrogation or otherwise) insuring the other party for any loss or damage to any building, structure or other tangible property, or any resulting loss of income, or losses under worker's compensation laws and benefits, even though such loss or damage might have been occasioned by the negligence of such party, its agents or employees if, and to the extent, that any such loss or damage is covered by insurance benefiting the party suffering such loss or damage or was required to be covered by insurance pursuant to this Agreement.

(h)    The coverages, amounts and forms of insurance required hereunder shall be updated from time by mutual agreement of the Owners (provided that, if the Owners disagree, then the reasonable determination of the Garage Owner shall govern).