# EXHIBIT KK

DocuSign Envelope ID: E9255FDE-2ACB-42E2-B7BF-8C260C4712CE

# LEASE

between

# IS BBFB LLC

(Landlord)

and

# THE PHILADELPHIA MUNICIPAL AUTHORITY

(Tenant)

(with contemporaneous sublease to the City of Philadelphia, as Subtenant)

## 216-220 NORTH BROAD STREET
(Approximately 45,837 Rentable Square Feet)

## LEASE

THIS LEASE ("**Lease**") dated March 1, 2024 (the "**Effective Date**") is made and entered into by and between **IS BBFB LLC**, a Pennsylvania limited liability company ("**Landlord**") and the **PHILADELPHIA MUNICIPAL AUTHORITY**, a municipal authority organized under the Act of May 2, 1945 (P.L. 382, No. 164), known as the Municipality Authorities Act of 1945, which Act has since been replaced by the Act of June 19, 2001 (P.L. 287, No. 22) §§ 1 et seq. (53 Pa. C. S. §§ 5601 et seq.), known as the Municipality Authorities Act (the "**Authority**" or "**Tenant**"), upon the following terms and conditions (Landlord and Tenant are sometimes referred herein individually as "**Party**" and collectively as "**Parties**").

## BACKGROUND

**A.**     Landlord owns two adjacent buildings at that certain property with an address of 216-220 North Broad Street, Philadelphia, Pennsylvania (collectively, the "**Property**"). The buildings are commonly referred to as the Feinstein (the "**Building**") and the Race Street Lab (the "**Race Street Lab**").

**B.**     Landlord desires to lease the Premises (defined below) to Tenant and Tenant desires to lease the Premises from Landlord, subject to the terms and conditions set forth in this Lease.

**C.**     Tenant then desires to enter into a contemporaneous sublease, in form and substance as attached in **Exhibit A** (as may be amended, the "**Sublease**") with the City of Philadelphia, acting through its Department of Public Property (the "**City**" or "**Subtenant**"). The City desires to sublease space in the Building in order to provide governmental services, among other things, temporary shelter as part of Tenant's municipal disaster and emergency response services and to provide emergency housing and other services to people who are homeless and to those at risk of homelessness.

**D.**     Landlord acknowledges that securing an appropriate space to serve vulnerable populations is a material inducement to Tenant to enter into this Lease and for Subtenant to enter into the Sublease.

**E.**     Accordingly, Tenant desires to accept occupancy of the Premises subject to the terms and conditions set forth in this Lease.

**F.**     The City Council of the City, by ordinance (Bill No. 230832), adopted on December 14, 2023, and approved by the Mayor on December 20, 2023, has authorized the execution and delivery of the Sublease by the City.

**G.**     By resolution dated February 28, 2024, the Board of Directors of the Authority has authorized the execution of this Prime Lease and the Sublease by the Authority.

**NOW THEREFORE**, in consideration of the rents, covenants, and agreements contained in this Lease, and intending to be legally bound, the parties hereby agree as follows:

# ARTICLE I
## INCORPORATION OF BACKGROUND; EXHIBITS

**1.1** **Background.** The preamble and background set forth above are hereby incorporated by reference as if fully restated within the main body of this Lease.

**1.2** **Exhibits.** Whether or not attached to this Lease, the following exhibits, as they may be amended or revised in accordance with this Lease, are incorporated into this Lease by reference and made a part of this Lease as if fully restated within the main body of this Lease:

| | |
|---|---|
| **Exhibit A** | Sublease |
| **Exhibit B** | INTENTIONALLY OMITTED |
| **Exhibit C** | Memorandum of Critical Dates |
| **Exhibit D** | Base Rent Payment Schedule |
| **Exhibit E** | Final Space Plans |
| **Exhibit F** | Construction Plans |
| **Exhibit G** | Existing Lenders (if any) |

# ARTICLE II
## DEFINITIONS

Unless the context otherwise specifies or requires, the following terms shall have the meanings specified in this Article II:

- **"Applicable Laws"** is defined in Section 9.1 (Compliance With Laws and Other Requirements).

- **"Base Rent"** is defined in Section 5.1 (Base Rent).

- **"Base Rent Payment Schedule"** is defined in Section 5.1 (Base Rent).

- **"Building"** is defined in Background Section A.

- **"Building Services"** is defined in Section 8.4 (Building Services).

- **"Casualty"** is defined in Section 12.1 (Total Destruction).

- **"City"** is defined in Background Paragraph C.

- **"City Provider"** is defined in Section 3.2 (Permitted Use).

- **"Code"** is defined in Section 18.3(a) (Gifts, Loans and Favors to City Personnel; Prohibited Gifts).

2

- **"Commission"** is defined in <u>Section 18.6(b) (Chapter 17-400 of The Philadelphia Code: Nondiscrimination)</u>.

- **"Common Areas"** is defined in <u>Section 3.3 (Common Areas)</u>.

- **"Condemnation"** is defined in <u>Section 13.1 (Taking)</u>.

- **"Construction Liquidated Damages"** is defined in <u>Section 6.7 (Landlord's Delay)</u>.

- **"Construction Plans"** is defined in <u>Section 6.2 (Landlord's Work)</u>.

- <u>**Definitions of Critical Dates:**</u>

  - **"Effective Date"** is defined in the Preamble of this Lease.

  - **"Occupancy Date"** means the date Landlord tenders possession of the Premises to Tenant with Landlord's Work (defined below) Substantially Completed (defined below). The Occupancy Date, Rent Commencement Date, beginning and ending dates of Lease Year 1, Initial Term, and the Renewal Term (if any), shall, promptly following the Occupancy Date, be set forth in a Memorandum of Critical Dates, the form of which is attached to this Lease as **<u>Exhibit C</u>**, and the dates set forth in the Memorandum of Critical Dates shall be incorporated by reference into this Lease as though fully set forth in this Lease.

  - **"Rent Commencement Date"** shall mean that date on which the first Base Rent payment is due (as prorated for any partial month) which shall be (i) thirty (30) days following the Occupancy Date for the Original Premises, and (ii) thirty (30) days following the Occupancy Date or July 1, 2024, whichever is later, for the Additional Premises.

- **"Environmental Damages"** is defined in <u>Section 9.2(f) (Environmental Laws and Hazardous Materials)</u>.

- **"Environmental Laws"** is defined in <u>Section 9.2(a)(i) (Environmental Laws and Hazardous Materials)</u>.

- **"Environmental Release"** is defined in <u>Section 9.2(a)(ii) (Environmental Laws and Hazardous Materials)</u>.

- **"Event of Default by Landlord"** is defined in <u>Section 15.3 (Event of Default by Landlord)</u>.

- **"Event of Default by Tenant"** is defined in <u>Section 15.1 (Event of Default by Tenant)</u>.

- **"Existing Lenders"** is defined in <u>Section 16.1(b) (Subordination to Existing Liens)</u>.

3

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

- **"Final Space Plans"** is defined in <u>Section 6.1 (Final Space Plans)</u>.

- **"Force Majeure Event"** is defined in <u>Section 21.4 (Force Majeure)</u>.

- **"Future Lender"** is defined in <u>Section 16.1(c) (Subordination to Future Liens)</u>.

- **"Future Lien"** is defined in <u>Section 16.1(c) (Subordination to Future Liens)</u>.

- **"Handle"** is defined in <u>Section 9.2(a)(iv) (Environmental Laws and Hazardous Materials)</u>.

- **"Hazardous Materials"** is defined in <u>Section 9.2(a)(iii) (Environmental Laws and Hazardous Materials)</u>.

- **"HVAC"** is defined in <u>Section 7.2 (Utilities Services)</u>.

- **"Initial Term"** is defined in <u>Section 4.1 (Initial Term)</u>.

- **"Landlord's Delay"** is defined in <u>Section 6.7(a) (Landlord's Delay)</u>.

- **"Landlord Delay Cure Period"** is defined in <u>Section 6.7(a) (Landlord's Delay)</u>.

- **"Landlord's Work"** is defined in <u>Section 6.2(a) (Landlord's Work)</u>.

- **"Lease Term"** is defined in <u>Section 4.2 (Renewal Term)</u>.

- **"Lease Year"** means each consecutive twelve (12) month period following the Rent Commencement Date for the Original Premises, except that Lease Year 1 shall also include the period of time from the Occupancy Date through the Rent Commencement Date. The Initial Term will consist of Lease Years 1 through 15, and the Renewal Term (if any) will consist of Lease Years 16 through 25.

- **"Management Fee"** is defined in <u>Section 5.2(b)(vi) (Additional Rent)</u>.

- **"Non-Structural Alterations"** is defined in <u>Section 10.1 (Non-Structural Alterations)</u>.

- **"Notice of Default"** is defined in <u>Section 15.1 (Event of Default By Tenant)</u>.

- **"OIG"** is defined in <u>Section 18.2 (Executive Order 7-14)</u>.

- **"Partial Destruction"** is defined in <u>Section 12.2 (Partial Destruction of Premises)</u>.

- **Premises Definitions:**

  - **"Premises"** means the entirety of the Building, i.e., the Original Premises together with the Additional Premises, consisting of approximately 45,837 rentable square feet, with a street address of 216 N. Broad Street, Philadelphia, Pennsylvania,

4

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

19102.  The terms "Premises" and "Building" are used interchangeably in this Lease.

- o   **"Original Premises"** means 36,767 rentable square feet on the 1st, 3rd, 4th, and 5th floors of the Building.

- o   **"Additional Premises"** means 9,070 rentable square feet on the 1st and 2nd floors of the Building.

- o   **"Rentable Area of the Premises"** shall mean 45,837 rentable square feet.

- **"Property"** is defined in <u>Background Section A</u>.

- **"Proportionate Share"** shall mean Twenty-Four and Ninety-Four/100 Percent (24.94%), which has been computed by dividing the 45,837 rentable square feet of the Premises by the 183,799 total square feet of the Property, subject to <u>Section 5.2(c) (Subdivision)</u>.

- **"Punch List"** is defined in <u>Section 6.6 (Punch List)</u>.

- **"Punch List Completion Deadline"** is defined in <u>Section 6.6 (Punch List)</u>.

- **"Race Street Lab"** is defined in <u>Background Section A</u>.

- **"Real Estate Taxes"** means all real estate property taxes and assessments (general, extraordinary, special or otherwise) and any Center City District taxes, assessments or costs (if any), levied or assessed upon or with respect to the Property, which Landlord shall become obligated to pay with respect to the Property during any calendar year, any portion of which occurs during the Lease Term (without regard to any different fiscal year by the respective governmental or municipal authority).  Real Estate Taxes shall not include gift, inheritance, estate, unincorporated business, excise, excess profit, capital, foreign ownership, gross receipts, mortgage, capital stock, income, or franchises taxes or such other taxes imposed directly upon Landlord's net income from the operation of the Property or recordation and transfer taxes.  Tenant represents that it is exempt from use and occupancy taxes, provided, however, that if during this Term, Tenant is no longer so exempt, then Tenant shall be responsible for paying all such use and occupancy taxes arising out of Tenant's use and occupancy of the Premises.

In determining the amount of Real Estate Taxes for any year, the amount of special assessments to be included shall be limited to the amount properly allocable to the applicable calendar year, based on the amount of the installment (plus any interest payable thereon) of such special assessment required to be paid during such year as if Landlord had elected to have such special assessment paid over the maximum period of time permitted by law; if the authority to whom such assessment is to be paid shall not permit such assessment to be paid in installments, the amount of such assessment shall be treated as being amortized over such number of calendar years, beginning with the calendar year in which the assessment is payable, as Landlord shall reasonably determine, with such

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

amortization for each calendar year being included in Taxes for that calendar year.

- **"Rebuild Construction Date"** is defined in Section 12.2 (Partial Destruction of Premises).

- **"Reminder Notice"** is defined in Section 4.2 (Renewal Term).

- **"Renewal Term"** is defined in Section 4.2 (Renewal Term).

- **"Rent"** is defined in Section 5.2 (Additional Rent).

- **"Structural Alterations"** is defined in Section 10.2 (Structural Alterations).

- **"Subdivision"** is defined in Section 5.2(c) (Subdivision).

- **"Sublease"** is defined in Background Paragraph C.

- **"Substantial Completion"** and **"Substantially Completed"** are defined in Section 6.5 (Substantially Completed).

- **"Subtenant"** is defined in Background Paragraph C.

- **"Tenant Alterations"** is defined in Section 10.2 (Structural Alterations).

- **"Tenant's Contractors"** is defined in Section 3.2 (Permitted Use).

- **"Tenant's Permitted Use"** is defined in Section 3.2 (Permitted Use).

- **"Tenant's Work"** is defined in Section 6.3 (Tenant Improvement Allowance; Tenant's Work).

- **"Work"** is defined in Section 6.3 (Tenant Improvement Allowance; Tenant's Work).

## ARTICLE III
## PREMISES

**3.1.    Lease of Premises.**  Landlord hereby leases the Premises to Tenant, and Tenant hereby leases the Premises from Landlord, upon all of the terms, covenants, and conditions contained in this Lease. On the Occupancy Date, Landlord shall deliver exclusive possession of the Premises to Tenant. During the Lease Term, Tenant is entitled, along with Tenant's employees, contractors, and invitees, to have free, uninterrupted, and exclusive access to and from the Premises and non-exclusive access to the Common Areas (defined below) of the Property, twenty-four hours a day and seven days a week.

**3.2.    Permitted Use.**  The Premises may be used solely for the following uses, or for any other use with Landlord's prior written consent, which consent Landlord shall not unreasonably

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

withhold, condition, or delay (collectively, "**Tenant's Permitted Use**"): governmental offices; public-facing social and emergency services; operating one or more daytime and/or overnight shelters for persons, along with related services; and all accessory uses customarily incidental to each of these. Under no circumstances may the Premises be used as a safe-injection site or a methadone clinic. Tenant may contract with one or more service providers (whether contracted by Tenant or Subtenant, each a "**City Provider**") to occupy the Premises, perform Tenant's Permitted Use in the Premises, and to perform some of Tenant's obligations under this Lease. Any other Tenant or Subtenant contractors that do not occupy the Premises, or any City Provider contractors, are referred to as the "**Tenant's Contractors**."

      **3.3.**   **Common Areas.** Tenant shall have the non-exclusive right to use exterior common areas on the Property, together with use of all related land, improvements, common areas, driveways, sidewalks and landscaping, if any (the "**Common Areas**").

      **3.4.**   **Covenants, Conditions, Restrictions, Easements, Rights of Way, Encroachments and any other Matters and Documents of Record.** Landlord represents and warrants that Landlord is presently the fee owner of the Premises, the Building, and the Property. Landlord further represents and warrants that there are no liens, judgments, or encumbrances against the Premises, the Building, or the Property that would interfere with Tenant's Permitted Use.

**ARTICLE IV**
**LEASE TERM; HOLDING OVER**

      **4.1.**   **Initial Term.** The initial term of this Lease (the "**Initial Term**") begins on the Effective Date and expires at 11:59pm on the day before the fifteen-year anniversary of the Rent Commencement Date for the Original Premises.

      **4.2.**   **Renewal Term.**

      (a)    If at the time of the exercise of Tenant's option under this <u>Section 4.2(a)</u>, and at the expiration of the Initial Term, (i) Tenant is not in default under this Lease and (ii) the Original Premises is not being used as a shelter for single men or single women, then Tenant shall have the right to extend the Initial Term for an additional ten (10) years (the "**Renewal Term**"). In order to exercise its right to extend the Lease Term for the Renewal Term, Tenant shall provide Landlord with written notice of its exercise of such extension not later than one-hundred eighty (180) days prior to the expiration of the Initial Term, except that if Tenant fails to provide such written notice, the option to renew shall be extended until thirty (30) days after Landlord provides written notice (the "**Reminder Notice**") to Tenant that the option to renew the Lease will, if not exercised, expire in thirty (30) days after Tenant's receipt of the Reminder Notice. If Tenant fails to exercise such renewal option in writing within thirty (30) days after the Reminder Notice, then Tenant's option to extend the Lease Term shall expire.

      (b)    During the Renewal Term, all of the terms and conditions of this Lease shall continue to be in full force and effect, except that the Base Rent shall be as set forth in the Base

7

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

Rent Payment Schedule (defined below) and no further renewal options under this paragraph shall be available for purposes of extending the Renewal Term.

(c)     The Initial Term together with the Renewal Term (if any) are referred to in this Lease as the "**Lease Term**."

**4.3.**    **Holding Over.**  If Tenant remains in possession of all or any part of the Premises after (a) expiration of the Initial Term, where either an option to renew is not available or Tenant fails to exercise the option to renew under Section 4.2(a) (Renewal Term), (b) after expiration of the Renewal Term, or (c) any earlier termination of the Lease as provided for in this Lease, then Tenant shall be deemed a tenant of the Premises from month to month, subject to all terms and conditions of this Lease, except that Base Rent for any holdover term shall be equal to the previous Lease Year's Base Rent. Notwithstanding the foregoing, however, nothing herein shall excuse any unauthorized holding over and an unauthorized holding over by Tenant shall be considered an Event of Default by Tenant (defined below), and Landlord may exercise all of its rights and remedies under this Lease.

## ARTICLE V
## RENT

**5.1.**    **Base Rent.**  The term "**Base Rent**" shall mean the amounts listed in the payment schedule ("**Base Rent Payment Schedule**") set forth on **Exhibit D**.  Base Rent shall be paid to Landlord either, at Tenant's option, by electronic funds transfer to an account designated by Landlord or by check mailed to Landlord's address under Section 19.1 (Notices) (or to another address as designated by Landlord with at least thirty (30) days prior written notice) in advance in equal monthly installments as set forth on the Base Rent Payment Schedule, without any prior demand therefore, and without deduction or setoff whatsoever, except as expressly permitted under this Lease, beginning on the Rent Commencement Date and continuing on the first (1st) day of each month thereafter (subject to Section 18.4 (Non-Indebtedness to City) and Section 18.7 (End of City Fiscal Year; Delay in Payments)).  If the Rent Commencement Date occurs on a day other than the first day of a calendar month, or if this Lease expires or earlier terminates on a day other than the last day of a calendar month, the Base Rent for such partial month shall be prorated on a per diem basis in the proportion that the number of days this Lease is in effect during such partial month bears to the total number of days in that calendar month.

**5.2.**    **Additional Rent.**

(a)     For purposes of this Lease, all amounts that Tenant pays to Landlord pursuant to this Lease in addition to Base Rent, whether or not denominated as such, constitutes additional rent (the "**Additional Rent**"). Such Additional Rent, together with the Base Rent, shall sometimes be referred to in this Lease as "**Rent**."

(b)     Tenant shall be responsible for the payment to Landlord of Additional Rent for the Premises as follows, except to the extent that any such costs arise out of the negligent acts or negligent omissions of Landlord or Landlord's employees, contractors, or invitees:

8

       (i)    In accordance with Section 8.12(b) (Responsibility for Costs), One Hundred Percent (100%) of

       (1) the costs designated as Tenant expenses under Section 8.1 (Building Maintenance, Repair, and Replacement);

       (2) the costs of Building security services under Section 8.4(c) (Building Services);

       (3) the costs of any requested in-suite janitorial, cleaning, and/or pest control services under Section 8.4(d) (Janitorial/Trash Collection/Pest Control) and the costs of any other requests for services pursuant to Section 8.7 (Services Request); and

       (4) the costs of any maintenance, repairs, and replacements required in connection with Tenant's furniture, furnishings and equipment, and any other personal property used by Tenant in conjunction with Tenant's Permitted Use of the Premises;

       (ii)    One hundred percent (100%) of Tenant's utilities costs under Section 7.1 (Utility Maintenance and Charges), if paid by Landlord and billed to Tenant;

       (iii)    Tenant's Proportionate Share (as defined in Article II (Definitions) of the exterior maintenance costs for the Property under Section 8.2 (Maintenance, Repair, and Replacement of Exterior Areas), subject to Section 5.2(c) (Subdivision);

       (iv)    Tenant's Proportionate Share (as defined in Article II (Definitions) of Landlord's premiums for property, casualty, and liability insurance, subject to Section 5.2(c) (Subdivision), except that if Landlord is able to obtain, prior to the Subdivision, any insurance that provides coverage solely with respect to the Premises, i.e. insurance that does not also provide coverage for the Race Street Lab, then Tenant's Proportionate Share as to any such insurance shall be deemed to mean one-hundred percent (100%) of those insurance costs that provide coverage solely with respect to the Premises;

       (v)    with respect to each calendar year, Tenant's Proportionate Share (as defined in Article II (Definitions)) of Real Estate Taxes, subject to Section 5.2(c) (Subdivision); and

       (vi)    the management fee paid by Landlord in connection with the operation of the Building, not to exceed 2.5% multiplied by the then-current annual Base Rent (the "**Management Fee**").

       (c)    Subdivision.  Landlord has disclosed to Tenant that Landlord intends to subdivide into separate legal parcels the Building and the Race Street Lab (the "**Subdivision**").

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

Upon the Subdivision, Tenant shall no longer be responsible for payment of any Additional Rent incurred in connection with the Race Street Lab. Accordingly, following the Subdivision, and the payment by Tenant of its Proportionate Share of the exterior maintenance costs for the Property (Section 5.2(b)(iii)), Landlord's premiums for property, casualty, and liability insurance (Section 5.2(b)(iv)), and Real Estate Taxes (Section 5.2(b)(v)), due and payable on the Property prior to the Subdivision, the references to Proportionate Share under this Lease shall be deemed to mean one-hundred percent (100%) of those costs for the Premises and each reference to the Property shall be deemed a reference solely to the Premises. Except as expressly specified above in this Section 5.2(c), following the Subdivision, all of the provisions of this Lease remain unmodified and in full force and effect.

(d)     Proration of Additional Rent. If this Lease expires or earlier terminates on a day other than the end of a calendar year, the amount of Additional Rent to be paid pursuant to this Section 5.2 (Additional Rent) that is applicable to the calendar year in which such expiration or termination occurs shall be prorated on the basis that the number of days from January 1 of the calendar year to the expiration or termination date bears to 365.

**ARTICLE VI**
**LANDLORD'S WORK**

**6.1.**     **Final Space Plans.** Landlord at its sole expense has prepared space plans, accepted by Tenant, for the Premises, as set forth on **Exhibit E** (as may be revised from time to time with Tenant's consent, the "**Final Space Plans**").

**6.2.**     **Landlord's Work.**

(a)     Landlord shall perform and provide on a turnkey basis the following interior improvements to the Premises and certain furniture, fixtures and equipment for use in the Premises (collectively, "**Landlord's Work**"): (i) that work required under the Final Space Plans, and (ii) that work required under the final construction drawings prepared by Landlord and approved by Tenant that are attached hereto as **Exhibit F** (the "**Construction Plans**"), including the build out of a commercial kitchen that includes purchase and installation of the following items: prep sink, slop sink, oven, stove, hood, dishwasher, refrigerator, freezer, countertops, and kitchen shelves. All Landlord's Work shall be performed at Landlord's sole expense. Landlord and Tenant shall not be permitted to make any changes to the Final Space Plans or the Construction Plans without the other party's written consent on terms and conditions agreed to by both parties.

(b)     Landlord and Tenant acknowledge that Landlord's Work will become a part of the Premises and be owned by Landlord.

**6.3.**     **Tenant Improvement Allowance; Tenant's Work.**

(a)     Landlord shall provide Tenant with an improvement allowance in an amount not to exceed $102,038 (that is, $11.25 per square foot for 9,070 square feet) (the "**Tenant Improvement Allowance**") for furniture, fixtures, and equipment to be utilized at the Premises or

10

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

for other purchases for or Tenant-requested work at the Premises, including Tenant's Work (defined below). At Tenant's request, Landlord shall draw down on the Tenant Improvement Allowance to make purchases on behalf of Tenant.

(b)    In addition to and separate from Landlord's Work, Tenant shall provide plans for improvements to, installation of interior fixtures on, and purchases for the Additional Premises (collectively, "**Tenant's Work**"). All Tenant's Work shall be performed by Landlord at Tenant's sole expense upon approval by Tenant. At Tenant's request, Landlord shall draw down on the Tenant Improvement Allowance as needed to perform Tenant's Work, provided that if Landlord's cost of performing Tenant's Work exceeds the Tenant Improvement Allowance, Landlord shall be entitled to reimbursement for any commercially reasonable costs and expenses arising from Tenant's Work that exceed the Tenant Improvement Allowance. Tenant shall reimburse Landlord such excess costs not later than forty-five (45) days following the date that Landlord provides Tenant with an invoice for such costs. Landlord shall make commercially reasonable efforts to keep Tenant informed of the current Tenant Improvement Allowance balance, to what extent funds are anticipated to be available after completion of Tenant's Work, or, alternatively, whether and when funds are anticipated to be exhausted and the extent to which additional funds will be required from Tenant to complete Tenant's Work or any other purchases or work.

(c)    Landlord shall cause the Landlord's Work and, if performed by Landlord, the Tenant's Work (collectively, along with any other work or services to be performed by Landlord under this Lease, the "**Work**") to be performed in a good and workmanlike manner, and shall take all reasonably necessary and prudent measures to safely perform all work to ensure the safety of persons and property in, on, and about the Premises.

**6.4.    Contracts to Perform Landlord's Work.** Any and all contracts or subcontracts entered into by Landlord or Landlord's contractors for the performance of the Work must specify that:

(a)    Landlord's Work shall be performed in conformity with the Final Space Plans, the Construction Plans, and Tenant's Work, as the case may be, provided, however, that in cases of conflict between the Construction Plans, on the one hand, and the Final Space Plans and/or Tenant's Work, on the other hand, the Construction Plans shall prevail;

(b)    nothing contained in such contracts or subcontracts, or under this Lease, shall be construed to impair the rights of Tenant under this Lease, or to create any obligation of Tenant to any contractor or subcontractor;

(c)    Tenant shall be expressly designated as a third-party beneficiary of all such contracts and subcontracts; and

(d)    each contractor or subcontractor shall be appropriately licensed and insured.

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

**6.5.**   **Substantially Completed.**

(a)   The terms "**Substantial Completion**" or "**Substantially Completed**" shall mean the date on which all of the following conditions have been met: (i) Landlord completes Landlord's Work in accordance with the Final Space Plans and the Construction Plans, as certified in writing by Landlord's architect, and as accepted by Tenant, subject to minor defective items and minor incomplete items identified in the Punch List (defined below); (ii) Landlord delivers to Tenant a temporary or permanent certificate occupancy (but, if Landlord obtains a temporary certificate of occupancy, Landlord shall work diligently to obtain a permanent certificate of occupancy within a reasonable amount of time) or, if applicable, a certificate of approval issued by the Department of Licenses and Inspections of the City of Philadelphia for Tenant's Permitted Use of the Premises; (iii) Tenant, its employees, contractors, and invitees, have ready, safe, and unobstructed access to the Premises; (iv) the Building is in good condition, operation, and repair, including the Building's roof, exterior walls, interior walls, foundation, floors, windows (including glass), structural frame, plumbing and sewage disposal systems, mechanical systems, utility systems, HVAC, elevator, fire suppression, and electrical systems, with all applicable certifications and/or certificates of inspection current and posted up-to-date; (v) the Premises, as improved, are in compliance with Applicable Laws (defined below); and (vi) the Premises are vacant and broom clean. The date of Substantial Completion is currently estimated to be June 1, 2024.

(b)   On the Occupancy Date, Landlord shall deliver the Premises to Tenant warranting that Landlord's Work is Substantially Complete, subject only to Punch List items.

**6.6.**   **Punch List.** A punch list shall be prepared by Tenant based upon a walk-through inspection of the Premises, which shall be conducted within ten (10) business days of Landlord's and Landlord's Architect's written certification of Substantial Completion of Landlord's Work, provided, however, that (i) Tenant shall have the right to dispute the certification of Substantial Completion by providing written notice to Landlord of such dispute not later than five (5) days after the walk-through following the delivery of written certification of Substantial Completion, and (ii) if Tenant's assertion is correct that the Landlord's Work is not Substantially Complete, then a 2nd walk-through shall take place following Landlord's and Landlord's Architect's re-certification of Substantial Completion, with said 2nd walk-through to be conducted within five (5) business days following Landlord's delivery of the re-certification. The foregoing procedure shall be repeated until Tenant does not object to the certification of Substantial Completion within the 5-day period following a walk-through. Within fifteen (15) business days after the walk-through for which Tenant does not timely dispute the written certification of Substantial Completion, Tenant shall provide to Landlord a written notice of the defects and incomplete items (the "**Punch List**"), which Landlord shall correct and repair, to the reasonable satisfaction of Tenant, within forty-five (45) business days of the date of Landlord's receipt of Tenant's written notice, provided that if such Punch List items cannot be completed within said 45-day period, the parties shall come to agreement on (and memorialize in writing) the time-frame within which those items will be completed, and Landlord shall thereafter diligently prosecute to completion any such Punch List items (the "**Punch List Completion Deadline**"). Landlord's failure to meet the Punch List Completion Deadline will automatically (a) permit Tenant to exercise Tenant's rights and

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

remedies under Section 15.6 (Tenant's Right of Self-Help), without regard to the time periods stated in that section; and (b) be deemed an Event of Default by Landlord without the requirement for Tenant to provide additional Notice of Default.

### 6.7. Landlord's Delay.

(a)    Landlord shall make commercially reasonable efforts to complete Landlord's Work and deliver the Premises in Substantially Completed condition on or before four (4) months from the date on which the building permits necessary for Landlord's completion of Landlord's Work are issued, and Landlord shall keep Tenant informed about the status of the Landlord's Work and projected date of Substantial Completion. Landlord shall apply for building permits immediately upon the Effective Date and, within five (5) business days after Landlord's receipt of the building permits (not including any ancillary permits such as electrical), shall provide written notice to Tenant that Landlord has received such permits. If, for any reason within the control of Landlord (or within the control of Landlord's contractors or subcontractors performing Landlord's Work), Landlord is unable to deliver possession of the Premises Substantially Completed on or before that date which is one hundred eighty (180) days following the issuance of the building permits for Landlord's Work, and such failure continues for sixty (60) days after Tenant provides notice to Landlord of such failure (the "**Landlord Delay Cure Period**"), then as Tenant's sole and exclusive remedy, except as provided below with respect to Tenant's termination right under this Section 6.7(a) following the expiration of the additional 180-day cure period without cure following the Landlord Delay Cure Period, Landlord shall be liable to Tenant for such delay ("**Landlord's Delay**") in an amount equal to the Base Rent due under this Lease for the portions of the Premises not so delivered for one (1) day multiplied by the number of days following said 60-day period that Landlord's Work is not Substantially Completed as a result of Landlord's Delay ("**Construction Liquidated Damages**"), which amount shall be provided as a credit against Base Rent on a go-forward basis until such credit is exhausted, at which point Tenant shall be obligated to pay all Base Rent due and payable under the terms of this Lease. The parties agree that the actual amount of damages to Tenant in the event of Landlord's Delay is extremely difficult, if not impossible, to ascertain given the nature of Tenant's Permitted Use and the per diem amount of the Base Rent is a reasonable estimate thereof for the delay. If Landlord's Delay extends beyond that date which is one hundred eighty (180) days following the expiration of the Landlord Delay Cure Period, then Tenant shall have the right, exercisable at Tenant's sole and absolute discretion, and as Tenant's sole and exclusive remedy, to terminate this Lease without liability to Landlord for any costs or other damages. If Tenant exercises the option to terminate the Lease under this provision, then Landlord's obligation to pay Construction Liquidated Damages will end on the date that the Lease terminates. Landlord's Delay does not constitute an Event of Default by Landlord, and Tenant's remedies in the event of Landlord's Delay are governed exclusively by this Section 6.7(a) (Landlord's Delay).

(b)    If Landlord is asked to perform Tenant's Work prior to the Occupancy Date, Landlord shall make commercially reasonable efforts to complete Tenant's Work on or before the Occupancy Date. Landlord's failure to timely complete Tenant's Work, however, shall not delay the determination of Substantial Completion of the Premises and shall not be counted towards Landlord's Delay.

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

## ARTICLE VII
## UTILITIES

**7.1.    Utility Maintenance and Charges.**  Landlord, at Landlord's expense, shall provide and maintain the mains and conduits necessary to supply all utilities to the Premises as required by Tenant's Permitted Use, including installing meters or sub-meters to accurately measure utility consumption by Tenant in the Premises.  Based on the metering or sub-metering, utilities supplied solely to the Premises and consumed by Tenant during the Lease Term shall be paid either (a) directly by Tenant though Tenant's own direct contracts with utility providers, or (b) if Tenant is not billed directly by utility providers, Tenant shall reimburse Landlord for the cost of utilities that are paid by Landlord on Tenant's behalf not later than forty-five (45) days after Landlord provides an invoice to Tenant specifying such charges.  Landlord must allow Tenant to pay any and all utility providers directly at Tenant's option, and if Tenant does not elect to directly pay any utility provider, Landlord shall continue to pay the utility provider, with Tenant to reimburse Landlord in accordance with the preceding terms of this <u>Section 7.1</u>.  If Landlord makes payments to utility providers for Tenant's utility charges then, from time to time, at Tenant's request, Landlord shall provide evidence of the accuracy of the utility charges (including documentation of meter or sub-meter readings) and of payments made to utility providers.

**7.2.    Utilities Services.**  Landlord agrees to furnish or cause to be furnished to the Premises the following utilities twenty-four hours a day and seven days a week:

(i)    such heating, ventilation and air conditioning ("**HVAC**"), whether provided through gas, electric, wind or solar energy, or a combination thereof, as is required for the comfortable use and occupancy of the Premises for Tenant's Permitted Use;

(ii)    electric current as required for Tenant's Permitted Use; and

(iii)    water and sewer for drinking, restroom/bathroom, kitchen, and other associated purposes as required for Tenant's Permitted Use.

**7.3.    Interruption of Utility Service.**  In the event of any failure or delay in utility supply, whether or not by a Force Majeure Event, Landlord shall use all due diligence to restore such utilities as soon as possible so as to minimize any interruption in Tenant's Permitted Use of the Premises.  Notwithstanding the foregoing, if any interruption of utility services continues for more than forty-eight (48) consecutive hours, Tenant may exercise its rights and remedies under <u>Section 15.6 (Tenant's Right of Self-Help)</u>, without regard to the time periods stated in that section.

## ARTICLE VIII
## MAINTENANCE AND REPAIRS; BUILDING SERVICES/COVENANTS

**8.1.    Building Maintenance, Repair, and Replacement.**  Landlord shall be responsible for the following maintenance, repair, and replacement obligations for the Building:

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

(a)      maintenance, repair and replacement of all structural elements, including roof, floor slab, building footings, foundations, and structural columns;

(b)      maintenance, repair and replacement of all interior and exterior walls, ceilings, brickwork, metal work and woodworking, flooring, downspouts, gutters, elevated roof water tanks, and water storage tanks, and, at Tenant's expense, cleaning and maintenance of wall, ceiling, and flooring finishes (e.g., paint) and coverings (e.g., carpet);

(c)      replacement of all windows, doors (including keys and locks), and partitions, and, at Tenant's expense, maintenance and repair of the same;

(d)      maintenance, repairs, and replacement of the roof;

(e)      replacement of all HVAC systems and their appurtenant facilities serving the Premises, including replacing any units or facilities that are no longer functional, and, at Tenant's expense, maintenance (including replacing air filters quarterly) and repair of the same;

(f)      maintenance, repair, and replacement of all plumbing systems and their appurtenant facilities serving the Premises, including maintaining these systems free of leaks and blockages, and, at Tenant's expense, maintenance and repair of sink and shower faucets and toilets;

(g)      repair and replacement of all elevator systems and, at Tenant's expense, maintenance of the same, including obtaining and maintaining all required inspections and licenses;

(h)      maintenance, repair, and replacement of all water and sewer systems and their appurtenant facilities serving the Premises (including the fire suppression systems);

(i)      maintenance, repair and replacement of all electrical distribution lines, plumbing/water distribution lines, and gas distribution lines, which serve the Premises;

(j)      removal of all graffiti from the exterior of the Premises within five (5) days of the date Landlord is so notified by Tenant;

(k)      at Tenant's expense, exterior window cleaning;

(l)      at Tenant's expense, maintenance, repair, and replacement of all identifying or directional signage relating to the Premises, Tenant, Tenant's Permitted Use, or the Premises;

(m)      replacement of all fire suppression systems in the Building, including the fire alarm system and sprinklers, and, at Tenant's expense, maintenance and repair of the same (excluding the plumbing system infrastructure for the fire suppression systems); and

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

(n)      any structural or capital maintenance, repair, or replacement not specified in this Section 8.1.

**8.2.    Maintenance, Repair, and Replacement of Exterior Areas.** Without limiting any other provision of this Lease, Landlord shall properly maintain and operate the exterior areas of the Property, including adjacent public sidewalks, and shall keep the same in good order and condition and properly lighted and cleaned.  Maintenance, repair, and replacement by Landlord shall include routine sweeping, prompt removal of snow and ice, prompt repair of all sidewalk areas, landscaping (if any), and lighting. Tenant shall reimburse as Additional Rent Tenant's Proportionate Share (as defined in Article II (Definitions)) of Landlord's exterior maintenance costs, and Landlord at Landlord's expense is responsible for exterior repair and replacement costs.

**8.3.    Landlord's Performance Standard.**    Landlord shall perform its repair, maintenance, and replacement obligations under this Article in a good and workmanlike manner, in compliance with all Applicable Laws, and employing best practices applicable to buildings that are comparable to the Property.

**8.4.    Building Services.**  Landlord agrees to furnish or cause to be furnished to the Premises the following building services ("**Building Services**"), subject to the terms, conditions and standards set forth below:

(a)      Passenger Elevator Service.  Non-attended automatic elevator service for passengers available twenty-four hours a day and seven days a week.

(b)      Signage.  A listing for Tenant on any directory and directional signs maintained by Landlord in or on the Building, and such additional Tenant identification signage as Landlord and Tenant shall mutually agree on.

(c)      Security.  Landlord has disclosed to Tenant that the Building does not contain, and Landlord has no obligation to install or provide, building security services, including alarm systems, access card readers, video surveillance, etc. Tenant may install security equipment as deemed necessary by Tenant, subject to Landlord's approval, not to be unreasonably withheld, conditioned or delayed.

(d)      Janitorial/Trash Collection/Pest Control.  Landlord shall provide a bulk receptacle for commercial trash removal.  Tenant shall be responsible for the disposal of all trash in the designated trash receptacle.  At Tenant's request, Landlord shall provide to Tenant, at Tenant's sole expense, and with contractors subject to Tenant's approval, in-suite janitorial, cleaning, and weekly pest control services, the costs for which shall be invoiced to Tenant and added to Tenant's Additional Rent due for the immediately succeeding month.

(e)      Property Management.  Property management services twenty-four hours a day and seven days a week, including a property management representative available to enter the Premises to review and address issues as requested during reasonable hours.

**8.5.    Interruption of Building Services.**  If any of the Building Services described

16

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

above (or requested pursuant to <u>Section 8.7 (Services Request)</u>) are interrupted, whether or not by a Force Majeure Event, Landlord shall use all due diligence to eliminate the cause of the interruption and to effect restoration of service. Notwithstanding the foregoing, if the interruption exists for more than three (3) consecutive days after Tenant has provided written notice of the interruption to Landlord, then Rent shall abate for each day thereafter that the interruption persists.

     **8.6.**    <u>**Access and Information.**</u>  From time to time, upon Tenant's request, Landlord shall provide Tenant access and information regarding the following:

        (a)    the current mechanical system servicing the Premises;

        (b)    the Building's existing telecommunications and data communications infrastructure if installed by Tenant in the future, subject to Tenant's understanding that the Building does not contain any such infrastructure as of the Effective Date; and

        (c)    the Building's existing security systems including alarm systems, access card readers, video surveillance, etc., if installed by Tenant in the future, subject to Tenant's understanding that the Building does not contain any of the foregoing as of the Effective Date.

     **8.7.**    <u>**Services Request.**</u>  Tenant can also request any services to be performed by Landlord at Tenant's expense, including additional maintenance, repair, and replacement obligations, improvements to the Premises, any additional building services, and any purchasing of furniture, fixtures, and equipment or personal property, to be performed by and billed through Landlord, subject to Tenant's approval of any vendor selected by Landlord to provide the service. Tenant shall be billed for said services with the next invoice for the cost of service, to be paid as Additional Rent.

     **8.8.**    <u>**Landlord's Refurbishment Obligation.**</u>  Following Tenant's written request, to be made no earlier than the first day of Lease Year 9, Landlord, at Landlord's expense, shall diligently perform the following refurbishment to the Premises:

        (a)    Repaint the walls as reasonably required;

        (b)    Re-carpet carpeted areas and, with respect to non-carpeted floor areas, replace or refinish such floors as reasonably required by Tenant due to deterioration by wear and tear; and

        (c)    Refurbish the restrooms in the Premises as reasonably required.

     **8.9.**    <u>**Emergency Repairs.**</u>  Without limiting any other provision of this Lease, Landlord agrees to commence emergency repairs within two (2) days after receiving oral or written notice from Tenant of the emergency, with Landlord diligently prosecuting such repairs to completion thereafter.

     **8.10.**  <u>**Landlord's Entry.**</u>

        (a)    Landlord and its contractors shall have the right, at reasonable times, with Tenant's prior consent, to enter upon the Premises to make repairs, replacements or improvements to the Premises reasonably required under this Lease or deemed reasonably necessary by Landlord and to erect such equipment, including scaffolding, as is reasonably necessary to effectuate such

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

repairs, replacements or improvements.  Landlord shall use its best efforts to ensure that all such work shall be done as promptly as possible and that such work shall be performed in a manner so as not to interfere with Tenant's business and/or the privacy of Tenant and its invitees. Given the sensitive nature of Tenant's Permitted Use, Landlord acknowledges that Tenant may set reasonable conditions for entry for both Landlord and Landlord's contractors.  Landlord shall, and shall cause its contractors to, cooperate with Tenant and coordinate scheduling to avoid inconvenience to Tenant.

      (b)     Notwithstanding the foregoing, Landlord shall have the right to enter the Premises in the case of an emergency without obtaining Tenant's prior consent and without regard to any reasonable conditions otherwise set for non-emergency entry; however, in such an emergency, Landlord shall use reasonable efforts to notify Tenant prior to entry onto the Premises and shall use reasonable efforts to comply with any such conditions.  Promptly after any such emergency entry, Landlord shall provide notice to Tenant explaining the circumstances of the entry.  For purposes of this Lease, "emergency" occurs (i) when Landlord determines that a condition exists in the Premises that presents or appears to present imminent danger to the health and safety of persons inside or outside of the Premises or to the Premises itself or (ii) when Tenant requests emergency repairs in accordance with Section 8.9 (Emergency Repairs).

      (c)     Landlord shall not, and shall not permit Landlord's contractors to, under any circumstances, review or access Tenant's records stored in the Premises.

### 8.11.  Tenant's Obligations.

      (a)     Tenant, at Tenant's expense, shall:

          (i)     maintain or cause to be maintained, and keep or cause to be kept, the Premises in a clean, good, safe, orderly, and sanitary condition;

          (ii)     comply with all reasonable recommendations of Landlord's casualty insurer(s) and other applicable insurance rating organization now or hereafter in effect; and

          (iii)     provide or cause to be provided all security within the Premises as Tenant deems appropriate; and

          (iv)     use commercially reasonable efforts to prevent criminal activity by Tenant's invitees within the Premises.

      (b)     Tenant may also request such services to be billed through the Landlord, in accordance with Section 8.7 (Services Request).

### 8.12.  Responsibility for Costs.

      (a)     Landlord shall be responsible at its own expense for the costs of the maintenance, repair, and replacement obligations described in Section 8.1 (Building Maintenance, Repair, and Replacement), Section 8.2 (Maintenance, Repair, and Replacement of Exterior Areas),

18

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

and Section 8.4 (Building Services), except where such obligations are expressly designated as Tenant's expenses or to the extent that any of these costs arise out of the negligent acts or negligent omissions of Tenant or Tenant's employees, contractors, or invitees, in which cases Landlord may bill Tenant for Landlord's reasonable costs, and Tenant shall be responsible for reimbursing Landlord for the same, in the manner described in Section 8.7 (Services Request). Notwithstanding any other provision in this Lease, Landlord at Landlord's expense is responsible for any maintenance, repair, or replacement costs that arise out of the negligent acts or negligent omissions of Landlord or Landlord's employees, contractors, or invitees.

(b)     Tenant is responsible for the costs designated in this Lease as Tenant expenses, as well as for the costs of any maintenance, repairs, and replacements required in connection with Tenant's furniture, furnishings and equipment, and any other personal property used by Tenant in conjunction with Tenant's Permitted Use of the Premises, except to the extent that any of the foregoing costs arise out of the negligent acts or negligent omissions of Landlord or Landlord's employees, contractors, or invitees, including Landlord's failure to perform Landlord's obligations under this Lease. Notwithstanding the foregoing, Landlord is not authorized to invoice Tenant for any of the above-referenced costs unless the maintenance, repair, or replacement obligation to be performed at Tenant's expense (i) costs less than Ten Thousand Dollars ($10,000), (ii), if a routine expense, is being performed in accordance with a maintenance, repair, or replacement schedule that Tenant has approved and at a cost (including costs of supplies) that Tenant has approved after Landlord has provided quotes to Tenant for the same, and/or (iii) is an emergency repair. If the costs are $10,000 or more, and are not incurred in connection with the foregoing clauses (ii) and/or (iii), then Tenant's consent shall be required prior to Landlord incurring such costs.

## ARTICLE IX
## APPLICABLE LAWS

### 9.1.    Compliance With Laws and Other Requirements.

(a)     Definition of Applicable Laws. The term **"Applicable Laws"** shall mean all present and future federal, state and municipal laws (including common law), statutes, ordinances, codes, notices, orders, judgments, rules, regulations, manuals, standards, administrative or judicial determinations, and requirements, as each may be amended from time to time, of every governmental or quasi-governmental authority, court or agency claiming jurisdiction over the Premises and the Property, now or hereafter enacted or in effect. Without limiting the immediately preceding sentence, the term "Applicable Laws" includes: (i) the American with Disabilities Act, (ii) all Environmental Laws (as defined in Section 9.2 (Environmental Laws and Hazardous Materials), (iii) the "Fair Practices Ordinance" (codified in The Philadelphia Code at Chapter 9-1100), (iv) The Philadelphia Code, (v) all laws and regulations related to fire suppression mechanisms and plans, (vi) all current and future applicable laws regarding the removal or covering of graffiti from the Property, (vii) the Child Protective Services Law, 23 Pa. C.S. § 6301 et seq., and (viii) the Standard City Provisions stated in Article 18 (Standard City Provisions).

19

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

(b)     <u>Tenant's Compliance with Applicable Laws</u>. Tenant shall comply with all Applicable Laws relating to Tenant's Permitted Use of the Premises.  Tenant shall not use the Premises, or permit the Premises to be used, in any manner which: (i) violates any Applicable Laws; (ii) causes or is reasonably likely to cause damage to the Premises; or (iii) violates a requirement or condition of any property or fire and extended insurance policy covering the Premises, or increases the cost of such policy.

(c)     <u>Landlord's Compliance with Applicable Laws</u>. Landlord shall comply with all Applicable Laws relating to the Work, the Premises, the Building, and the Property.

**9.2.    <u>Environmental Laws and Hazardous Materials</u>.**

(a)     <u>Definitions</u>.

(i)     **"Environmental Laws"** means and includes all now and hereafter existing statutes, laws, ordinances, codes, regulations, rules, rulings, orders, decrees, directives, policies, and requirements by any federal, state, or local governmental authority regulating, relating to, or imposing liability or standards of conduct concerning public health and safety or the environment.

(ii)     **"Environmental Release"** means any intentional or unintentional releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, migrating, disposing, abandoning, discarding or dumping of any Hazardous Materials (defined below) during Tenant's occupancy of the Premises from, on, into, or about the land, water, or air of the Premises or the real property surrounding the Premises in violation of any Environmental Laws.

(iii)     **"Hazardous Materials"** means any material or substance: (A) which is defined or becomes defined as a "hazardous substance," "hazardous waste," "infectious waste," "chemical mixture or substance," or "air pollutant" under Environmental Laws; (B) containing petroleum, crude oil or any fraction thereof; (C) containing polychlorinated biphenyls (PCB's); (D) containing asbestos; (E) which is radioactive; (F) which is infectious; or (G) any other material or substance displaying toxic, reactive, ignitable or corrosive characteristics, as all such terms are used in their broadest sense, and are defined, or become defined by Environmental Laws.

(iv)     **"Handle," "Handled,"** or **"Handling"** shall mean any installation, handling, generation, storage, treatment, use, disposal, discharge, release, manufacture, refinement, presence, migration, emission, abatement, removal, transportation, or any other activity of any type in connection with or involving Hazardous Materials.

(b)     <u>Compliance with Environmental Laws</u>.  In their respective operation, management, use, and occupancy of the Premises and Building, as applicable, Landlord and Tenant shall comply with all Environmental Laws and other applicable laws, ordinances and regulations of all governmental authorities, as now or hereafter enacted, including, without limitation, all laws, ordinances, and regulations governing Hazardous Materials.

(c)    Landlord's Representation and Warranties.  Landlord hereby warrants and represents to Tenant that, to the best of Landlord's knowledge, there is not present in, on, or about the Premises or the real estate surrounding the Premises any Hazardous Materials or violations of Environmental Law such as would require remediation or notice to any governmental authority under applicable Environmental Laws, including, without limitation, any asbestos containing materials or PCBs.

(d)    Landlord's Environmental Responsibilities.  Landlord shall be solely responsible for all conditions existing in, on, under or about the Premises prior to the Occupancy Date, including, without limitation, any and all Hazardous Materials and Environmental Releases. Landlord further acknowledges and warrants that Tenant shall not be liable for, or required to remove, remediate, Handle and/or manage any Hazardous Materials emanating from any portion of the Premises, or coming into, onto, under or upon the Premises from sources outside the Premises, unless caused by the gross negligence or willful misconduct of Tenant. Notwithstanding anything to the contrary herein, any Environmental Release related to or otherwise emanating from any Hazardous Materials, toxic substance, or contamination in, on, under the Premises or from sources outside the Premises existing prior to the Occupancy Date, or related to, arising from, or otherwise emanating from a condition subsequently caused by, whether in whole or in part, the act or omission of Landlord, its employees, agent, contractors, subcontractors, invitees or licensees, shall be Landlord's sole responsibility.

(e)    Landlord's Environmental Covenant.  Landlord covenants that, other than in the ordinary course of business activities, and in accordance with Environmental Laws, it shall not cause or permit any substance or material to be used, generated, Handled, possessed or stored within, on, at, or under the Premises or any parts thereof, in a manner so that such substance or material poses a material danger of bodily harm to those that enter the Premises or pose a threat of an Environmental Release to any portion of the Premises or results in an Environmental Release.

(f)    Landlord's Environmental Indemnification.  Landlord shall indemnify, defend, and save harmless Tenant and Tenant's officials, officers, agents, boards, commissions, employees, successors and assigns, from and against any and all claims (environmental or otherwise), causes of action, cost recovery actions, liabilities, damages to persons or property, impairments, penalties, fines or losses (civil or criminal), including, but not limited to, any penalty or fine imposed by any governmental agency, the expense of remediating, cleaning up, or disposing of any Hazardous Materials or regulated materials and all reasonable legal expenses and fees incidental to the investigation and defense thereof (including, but not limited to legal fees, litigation fees, expert witness, and/or consultant fees) (collectively, "**Environmental Damages**"), which arise directly or indirectly by reason of the presence of any Hazardous Materials at, on, in, or under the Premises (1) prior to the Occupancy Date, and/or (2) during the Lease Term, to the extent relating to or arising from any act or omission of Landlord, its employees, agent, contractors, subcontractors, invitees or licensees.  Notwithstanding anything to the contrary herein, the foregoing indemnity, covenants, representations, and warranties provided in this Section 9.2 (Environmental Laws and Hazardous Materials) shall survive the expiration or earlier termination of this Lease.

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

(g)     Tenant's Environmental Covenant.  Tenant agrees that it shall not Handle Hazardous Materials or permit the Handling of Hazardous Materials on behalf of Tenant, its subtenants or its assignees, or their respective contractors, clients, officers, directors, employees, agents, or invitees in amounts exceeding Environmental Law in, at, or on the Premises or any portion of the Premises.  Notwithstanding the foregoing, normal quantities of those Hazardous Materials customarily used in the conduct of general administrative and executive office activities (e.g., copier fluids and cleaning supplies) may be used and stored at the Premises without Landlord's prior written consent, but only in compliance with all applicable Environmental Laws. In the event that Tenant, its City Providers, or their respective employees, contractors, or invitees, Handle or permit the Handling of Hazardous Materials in, at, or on the Premises in amounts exceeding Environmental Laws, Tenant shall remove or cause the removal of such Hazardous Materials at its sole expense and shall be solely responsible for any and all fines and penalties directly relating to its Handling of Hazardous Materials.

(h)     Tenant's Environmental Indemnification.  Tenant shall cause each City Provider to indemnify, defend, and save harmless Landlord and Landlord's officers, members, partners, agents, employees, successors and assigns, from and against any and all Environmental Damages, which arise directly or indirectly by reason of the presence of any Hazardous Materials in violation of Section 9.2(g) (Tenant's Environmental Covenant) at, on, in, or under the Premises during the Lease Term to the extent relating to or arising from any act of Tenant, its employees, agent, contractors, subcontractors, invitees or licensees.  Notwithstanding anything to the contrary herein, the foregoing indemnity, covenants, representations, and warranties provided in this Section 9.2 (Environmental Laws and Hazardous Materials) shall survive the expiration or earlier termination of this Lease.

(i)     Survival.  Notwithstanding anything to the contrary in this Lease, the foregoing indemnity, covenants, representations, and warranties provided in this Section shall survive the expiration or earlier termination of this Lease.

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

## ARTICLE X
## ALTERATIONS

10.1.    **Non-Structural Alterations.**  During the Lease Term, Tenant shall have the right to make or permit to be made any interior, non-structural alteration or improvement, in and to the Premises, (the "**Non-Structural Alterations**"). Landlord's approval of Non-Structural Alterations shall not be required provided that (a) any proposed Non-Structural Alteration does not affect the structure or the exterior of the Building and/or the mechanical, electrical or plumbing systems servicing the Building and/or the Property; (b) the work is performed at Tenant's sole expense; (c) the work is performed in compliance with Applicable Law, including obtaining all permits and approvals required by Applicable Law; and (d) the work is performed by insured and licensed contractors.  Non-Structural Alterations belong to Tenant and Tenant may, but is not required to, remove all or any of the Temporary Alterations at the expiration or earlier termination of the Lease. To the extent that Tenant does not remove the Temporary Alterations at the expiration or earlier termination of the Lease, then the Temporary Alterations remaining at the Premises become the property of Landlord to be retained or disposed of by Landlord.

10.2.    **Structural Alterations.**  If Tenant proposes alterations and improvements which will affect the structure or exterior of the Building and/or the mechanical, electrical or plumbing systems servicing the Building and/or the Property (the "**Structural Alterations**" and, together with the Non-Structural Alterations, the "**Tenant Alterations**"), then in addition to compliance with Section 10.1(b), (c), and (d) above, Tenant shall first submit the plans for such Structural Alterations to Landlord for its approval, which approval may be withheld by Landlord in its sole and exclusive discretion.  Structural Alterations, without compensation to Tenant, become the property of Landlord upon installation and remain at the Premises upon the expiration or earlier termination of this Lease.

## ARTICLE XI
## INSURANCE & LIABILITY

**11.1.    Landlord Insurance.**

(a)    General Liability.  At all times during the Lease Term, Landlord shall procure and maintain, at its sole expense, but reimbursable under Section 5.2 (Additional Rent), general liability insurance on the Premises against claims for personal injury, death, and property damage in or about the Premises.  Such insurance shall have a minimum combined single limit of liability of at least $1,000,000.00 in respect to any one occurrence causing bodily injury or death or property damage, and at least $2,000,000 policy aggregate for all claims.

(b)    Workers' Compensation Insurance.  At all times during the Lease Term, Landlord shall procure and maintain, at is sole expense, Workers' Compensation Insurance in accordance with the laws of the Commonwealth of Pennsylvania if Landlord has any employees or is required by statute.

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

(c)    Property Insurance. At all times during the Lease Term, Landlord shall procure and maintain, at its sole expense, but reimbursable under Section 5.2 (Additional Rent), insurance on the Premises against loss by fire and those risks covered by what is commonly known as "Fire and Extended Coverage," malicious mischief and vandalism in an amount not less than the full replacement value of the Premises, including coverage during any construction or reconstruction period.

The general liability coverage shall be endorsed to name Tenant and Subtenant as additional insureds for Landlord's acts or omissions other than for liability arising from the occupancy, maintenance or use of the Premises by Tenant, Subtenant, any City Providers, or any Tenant's Contractors. The property insurance shall be endorsed to name the Tenant and Subtenant as Loss Payees as their interests may appear at the time of the loss. All coverage shall be primary to and not require contribution from the additional insureds/loss payees or their insurance. All such coverage shall be endorsed to waive the insurance companies' rights of recovery or subrogation against the additional insureds/loss payees. Landlord shall provide Certificates of Insurance showing all of these coverages to Tenant upon request.

**11.2.**   **Tenant Insurance.** Tenant and Subtenant are self-insured against claims to persons or property. At all times during the Lease Term, Tenant shall cause its City Providers and Tenant's Contractors (if any) to carry the following types of insurance at no expense to Landlord:

(a)    General Liability. General liability insurance on the Premises and all operations against claims for personal injury, death, and property damage in or about the Premises on an ISO CG 0001 form or its equivalent including coverage for Contractual Liability without modification of the definition of an Insured Contract. Such insurance shall have a minimum combined single limit of liability of at least $1,000,000 for Tenant's Contractors and $5,000,000 for City Providers in respect to any one occurrence causing bodily injury or death or property damage, which may be achieved with primary and excess insurance.

(b)    Workers' Compensation Insurance. Workers' Compensation Insurance in accordance with the laws of the Commonwealth of Pennsylvania with Employers Liability Limits of no less than, for Tenant's Contractors, $100,000 each accident – bodily injury by accident, $100,000 disease each employee – bodily injury by disease, and $500,000 policy limit bodily injury by disease and, for City Providers, $1,000,000 each accident – bodily injury by accident, $1,000,000 disease each employee – bodily injury by disease, and $1,000,000 policy limit bodily injury by disease, which may be achieved with primary and excess insurance.

(c)    Commercial Automobile Insurance. Commercial Automobile Liability insurance covering any owned, leased, operated hired or non-owned autos for all claims for personal injury, death, or property damage with a minimum limit of $1,000,000 each accident for Tenant's Contractors and $5,000,000 each accident for City Providers, which may be achieved with primary and excess insurance.

(d)      Professional Liability Insurance. Professional Liability insurance covering errors and omissions including liability assumed under contract with a limit of at least $1,000,000 per occurrence and policy aggregate.  Coverage may be written on a claims-made basis provided that coverage for occurrences happening during the performance of the services required under this Contract shall be maintained in full force and effect under the policy or "tail" coverage for a period of at least two (2) years after completion of the services.

All of the above coverage (except Workers Compensation and Professional Liability) shall be endorsed to name Landlord and its property manager as Additional Insureds for liability arising from the acts or omissions of the City Providers and Tenant's Contractors or the acts or omissions of those acting on behalf of the City Providers and Tenant's Contractors.  All coverage shall be primary to and not require contribution from the Additional Insureds or their insurance. All such coverage shall be endorsed to waive the insurance companies' rights of recovery or subrogation against the Additional Insureds. Tenant shall require City Providers to provide Certificates of Insurance showing all of these coverages to Landlord for approval prior to the City Provider beginning any work or entering the Premises.

**11.3.   Insurance Requirements.** Each of the above-listed policies of insurance required of Landlord or Tenant's City Providers or contractors must: (i) provide that it shall not be materially changed, cancelable, or non-renewable without at least thirty (30) days' prior written notice to the other party for reasons other than non-payment and at least ten (10) days' prior written notice in case of non-payment of premium, and (ii) be issued by reputable insurers permitted to do business on a direct basis in the Commonwealth of Pennsylvania.

**11.4.   Tort Claims Act.** Nothing in this Lease shall waive or be construed to waive Tenant's immunities, rights, and defenses under the Tort Claims Act, 42 Pa. C.S.A. §§ 8501 et seq., nor as a limitation on the rights or defenses available to Tenant under the Tort Claims Act.

**11.5.   Waiver of Subrogation.** Landlord hereby waives, and Tenant shall cause each City Provider to waive, any right of recovery against the other for injury or loss due to hazards covered by insurance maintained by either of them, to the extent of the injury or loss covered thereby.  Any policy of insurance to be maintained by Landlord or a City Provider pursuant to this Article XI must contain a clause denying the applicable insurer any right of subrogation against the other.  Notwithstanding anything to the contrary contained in this Lease, in the event the Premises is damaged or suffers casualty arising from the risks insured under the above all-risk Property insurance or Fire and Extended Coverage insurance to be maintained by Landlord, Landlord shall look solely to the insurer for recovery and the insurer and Landlord shall not seek to recover from Tenant, and/or their contractors or subtenants, any loss or damage sustained to the Premises.

**11.6.   Release.** Tenant agrees that Landlord and its property manager shall not be liable for and hereby releases Landlord and its property manager from (a) any injury to Tenant's business or any loss of income therefrom or for damage to any machinery or equipment or other property of Tenant, Tenant's employees, invitees, customers, or any other person in or about the Premises; (b) the loss of or damage to any property of Tenant by theft or otherwise; or (c) any injury or

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

damage to persons or property resulting from fire, steam, electricity, gas, water, rain or snow, or from the breakage, leakage, obstruction or other defects of pipes, sprinklers, wires, appliances, plumbing, air conditioning or HVAC systems or lighting fixtures, or from any other cause whatsoever (whether similar or dissimilar to those above specified), whether the said damage or injury results from conditions arising in the Premises or in, at, or on other portions of the Building, or from other sources or places, except to the extent caused by Landlord's gross negligence or intentional misconduct or that of Landlord's employees, agents, or contractors, or breach of Landlord's obligations under this Lease.

     **11.7.**   **Tenant Indemnification.**   Tenant shall cause each City Provider to indemnify, defend, and save harmless Landlord and its property manager from, and reimburse Landlord and its property manager for, all liabilities, charges, damages, claims, losses, suits, costs and expenses (including, without limitation, reasonable counsel fees) resulting from any injury or damage to any person or property occurring in, on, or around the Premises caused by (a) any act or neglect of Tenant or any City Provider or Tenant's Contractors or any of their respective contractors, employees, licensees, or invitees, or anyone else claiming under or through Tenant or any City Providers or Tenant's Contractors, (b) Tenant's or City Provider's use of the Premises in the conduct of its business; or (c) Tenant's failure to perform or comply with any terms, covenants or conditions of this Lease.  Notwithstanding anything contained in this Lease, Tenant shall not be required to require each City Provider to indemnify Landlord and its property manager for and against any acts of sole negligence, gross negligence, or willful misconduct by Landlord and its property manager.

     **11.8.**   **Landlord Indemnification.**   Landlord shall indemnify, defend with counsel reasonably acceptable to Tenant (counsel of an insurance carrier obligated to resist or defend claims is deemed acceptable), and save harmless Tenant and Subtenant from and reimburse Tenant and Subtenant for, all liabilities, charges, damages, claims, losses, suits, costs and expenses (including, without limitation, reasonable counsel fees) resulting from any injury or damage to any person or property occurring in, on or around the Property caused by (a) any act or neglect of Landlord, or Landlord's contractors, employees, agents, or anyone else claiming under or through Landlord, (b) the use of the remainder of the Building by other tenants of Landlord (if any) or the conduct of such tenants' business, or (c) Landlord's failure to perform or comply with any of its obligations under this Lease.  Notwithstanding anything contained in this Section, Landlord shall not be required to indemnify Tenant or Subtenant for and against any acts of sole negligence, gross negligence, or willful misconduct by Tenant or Subtenant.

     **11.9.**   **Timely Notice of Claims.**   The indemnified party shall give the indemnifying party prompt and timely notice of the filing of any claim.  If the defense of such Claim is materially prejudiced by a delay in providing such notice, the purported indemnifying party shall be relieved from providing such indemnity to the extent of the delay's impact on the defense.  The indemnifying party shall assume have sole control of the defense of any indemnified Claim and all negotiations for its settlement or compromise, provided that such indemnifying party shall not enter into any settlement which imposes any obligations or restrictions on the indemnified party without the prior written consent of the other party. The indemnified party shall cooperate fully, at the indemnifying party's request and expense, with the indemnifying party in the defense, settlement, or compromise of any such action. The indemnified party shall at its option and at its

26

sole expense (and the indemnity provisions above shall not be construed to apply to any costs incurred by the indemnified party pursuant to this sentence) be entitled to participate in the defense, settlement, and all other matters pertaining to that claim and, in such case, any settlement of that claim shall be subject to the prior written approval of the indemnified party, not to be unreasonably withheld, conditioned, or delayed.

**11.10. Survival.** The Parties' defense, indemnification, hold harmless, and release obligations under this Article 11 survive the expiration or earlier termination of this Lease.

## ARTICLE XII
## DAMAGE OR DESTRUCTION

**12.1.    Total Destruction.** If, as the result of a fire, earthquake, or any other identifiable event of a sudden, unexpected, or unusual nature (each, a "**Casualty**"), in Tenant's reasonable judgment, the Premises or access to the Premises is (a) totally destroyed or damaged, or (b) substantially destroyed or damaged so that, in Tenant's reasonable judgment, the Premises is unsuitable for Tenant's Permitted Use, then Tenant may, upon written notice delivered to Landlord within thirty (30) days after the date of the Casualty, terminate this Lease. In the event this Lease is terminated under this provision, all Rent shall be apportioned and paid to the date of the Casualty and abated from and after the date of the Casualty, and any Rent paid in advance for or on account of any period subsequent to the Casualty shall be promptly refunded to Tenant.

**12.2.    Partial Destruction of Premises.**

(a)    If as the result of a Casualty, the Premises is partially damaged or destroyed ("**Partial Destruction**"), and the rebuilding, repairs, construction, restoration, and replacement of such damage and/or destruction can, in Tenant's reasonable judgment, be completed by Landlord within three hundred sixty-five (365) calendar days from the date of the Casualty (the "**Rebuild Construction Date**"), then this Lease shall not terminate and Landlord, at its sole expense, shall proceed with due diligence to rebuild and repair the partially damaged or destroyed Premises, including access to the Premises and the Property, to the condition in which the Premises and access thereto existed immediately prior to the Casualty. If, in the case of Partial Destruction due to a Casualty, such repairs cannot, in the reasonable judgment of Tenant, be completed within said three hundred sixty-five (365) day period, then Tenant shall have the right, by written notice given to Landlord, within forty-five (45) days after the date of the Partial Destruction, to terminate this Lease as of the date of the Partial Destruction in which case Rent shall be apportioned and abated as provided in Section 12.1 (Total Destruction).

(b)    If, in the case of Partial Destruction, the Premises, including access thereto, is to be rebuilt, restored, repaired and/or replaced pursuant to Section 12.2(a) above, and any portion of the Premises is, in Tenant's reasonable judgment, not suitable for Tenant's Permitted Use during such rebuilding, reconstruction, repair or replacement (and which Tenant does, in fact, stop using), then until the rebuilding, reconstruction, repairs or replacement are completed, Rent shall be reduced pro rata based on the remaining rentable square footage of the Premises, if any, which is suitable and capable of being occupied and used for Tenant's Permitted Use over the total

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

Rentable Area of the Premises. If Tenant cannot reasonably access all or a portion of the Premises for Tenant's Permitted Use (and in fact does not do so), then Rent shall be reduced as provided in the immediately preceding sentence until reasonable access to all or a portion of the Premises is restored.

       **12.3.**  **Abatement of Rent.**  If Landlord and Tenant cannot agree on the amount of the Rent abatement during the period of any rebuilding, reconstruction, repair or replacement of the Premises (and which Tenant does, in fact, stop using), until the rebuilding, reconstruction, repairs or replacement are completed, then the difference in Rent between Tenant's and Landlord's estimates of such abatement shall be paid into escrow by Tenant. Landlord may proceed by law to prove Landlord's estimate of such rentable square footage and recover the amount paid into escrow; provided, however, that if Landlord does not bring such an action within six (6) months from Tenant's commencement of escrow payments, all such payments shall be deemed waived by Landlord. In the event of Partial Destruction, Tenant's payment of Rent based upon Tenant's reasonable estimate of rentable square footage shall continue until the rebuilding and repairs are complete in accordance with Section 12.2 (Partial Destruction).

       **12.4.**  **Insurance Claims.**  Landlord shall timely file all insurance claims arising from damage or destruction to the Premises and shall pursue those claims diligently to final adjustment and payment, including reasonable settlement, and Landlord shall use all insurance proceeds available to repair and restore the damage and destruction.

       **12.5.**  **Waiver.**  The provisions contained in this Lease shall supersede any contrary laws now or hereafter in effect relating to damage or destruction.

**ARTICLE XIII**
**CONDEMNATION**

       **13.1**  **Taking.**  If during the Lease Term, all or a substantial portion of the Premises, or access to the Premises, or so much of the Premises as to render the balance unusable by Tenant shall be taken by condemnation, sale in lieu of condemnation or in any other manner for any public or quasi-public purpose (collectively, "**Condemnation**"), this Lease shall terminate on the date that title or possession to the applicable portion of the Premises is taken by the condemning authority, whichever is earlier. In the case of a partial Condemnation of the Premises, if a portion of the Premises remains usable for Tenant's Permitted Use as reasonably determined by Landlord and Tenant, upon Tenant's written request, Landlord shall restore the Premises and access to the Premises, or what remains thereof, to as nearly as possible their condition prior to the partial Condemnation, and in any case, to a condition suitable for Tenant's Permitted Use of the Premises. In such event there shall be an abatement of Rent provided in the same manner as Rent is abated in the case of Partial Destruction under Section 12.2 (Partial Destruction of Premises). Notwithstanding anything stated herein to the contrary, in the event Landlord shall fail within three (3) months from the date of such partial Condemnation to restore the Premises, and access to the Premises, to a condition suitable for Tenant's Permitted Use, Tenant may elect to terminate

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

this Lease by written notice to Landlord and this Lease shall automatically terminate as of the date of such notice, and Rent shall be abated from and after the date of such notice of termination.

**13.2**    **Award.**  In the event of any Condemnation, the entire award for such taking shall belong to Landlord, except that Tenant shall be entitled to independently pursue a separate award relating to the loss of, or damage to, Tenant's personal property and trade fixtures and Tenant's relocation costs directly associated with the Condemnation.

**ARTICLE XIV**
**ASSIGNMENT AND SUBLETTING**

**14.1.**    **Assignment.**  Landlord agrees and consents to Tenant's assignment and sublease of Tenant's rights, remedies, obligations, and liabilities and all interests under this Lease to the City by Tenant executing the contemporaneous Sublease with the City.  Landlord acknowledges and agrees the City, acting as Subtenant under the Sublease, may exercise and directly enforce all of Tenant's rights and remedies under this Lease.  Accordingly, even where it is not expressly stated in this Lese, Each reference in this Lease to Tenant is deemed to be a reference to Subtenant. Notwithstanding the assignment to the City of Philadelphia under the Sublease, without the prior written consent of Landlord, Tenant shall not, either voluntarily or by operation of law, assign, encumber, or otherwise transfer this Lease.  Tenant shall not modify or amend the Sublease without Landlord's prior written approval.  Landlord agrees that the occupancy, management, and operation of the Premises by one or more City Providers as described in Section 3.2 (Permitted Use) does not violate this provision.

**14.2.**    **Notice to Landlord.**  Except as provided in Section 14.1 (Assignment) with regard to the Sublease to the City as Subtenant, if Tenant desires to assign this Lease or any interest in this Lease, or to sublet all or any part of the Premises, except as provided for in Section 14.1 (No Assignment), then at least twenty (20) business days prior to the effective date of the proposed assignment or sublease, Tenant shall submit to Landlord in connection with Tenant's request for Landlord's consent, a statement containing: (a) the name and address of the proposed assignee or subtenant; (b) such financial information with respect to the proposed assignee or subtenant as Landlord shall reasonably require; (c) the type of use proposed for the Premises; and (d) all of the principal terms of the proposed assignment or subletting.

**14.3.**    **Landlord's Consent; Standards.**  In the event that Tenant requests Landlord's consent to an assignment or sublease under Section 14.2 (Notice to Landlord), above, Landlord's consent shall not be unreasonably withheld; but, in addition to any other grounds for denial, Landlord's consent shall be deemed reasonably withheld if, in Landlord's good faith judgment, the proposed assignee or subtenant does not have the financial strength to perform Tenant's obligations under this Lease or any proposed sublease.

**14.4.**    **Non-Waiver.**  The consent by Landlord to any assignment or subletting shall not relieve Tenant, or any person claiming through or by Tenant, of the obligation to obtain the consent of Landlord, pursuant to this Article XIV, to any further assignment or subletting.

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

## ARTICLE XV
## DEFAULT AND REMEDIES

**15.1.  Event of Default By Tenant.**  The occurrence of any of the following shall constitute an "**Event of Default by Tenant**" and breach of this Lease by Tenant:

(a)    The failure by Tenant to pay Rent, or to make any other payment required to be made by Tenant hereunder, within forty-five (45) days after Tenant receives written notice from Landlord of any such failure, except as provided in <u>Section 18.4 (Non-Indebtedness to City)</u> and <u>Section 18.7 (End of City Fiscal Year; Delay in Payments)</u>.

(b)    The failure by Tenant to observe or perform any other provision of this Lease to be observed or performed by Tenant, if such failure continues for thirty (30) days after written notice thereof (the "**Notice of Default**") by Landlord to Tenant; provided, however, that if the nature of the default is such that it cannot be cured within the thirty (30) day period, no default shall exist if Tenant commences the curing of the default within the thirty (30) day period and thereafter diligently prosecutes the same to completion.  To be effective, the Notice of Default from Landlord must give in reasonable detail the nature and extent of the failure and must identify the Lease provision(s) containing the obligation(s).

**15.2.  Remedies – Event of Default by Tenant.**  At any time after any Event of Default by Tenant shall occur, Landlord, at its option, may, in addition to exercising any of its other rights and remedies under law or in equity, (a) bring legal action to recover all unpaid Rent, if any; or (b) bring a legal action for breach of any of Tenant's covenants. All of the remedies given to Landlord by this Lease and all the rights and remedies given to Landlord by law or in equity shall be cumulative and concurrent.

**15.3.  Event of Default by Landlord.**  Landlord's failure to perform or observe any of its obligations under this Lease shall constitute a default by Landlord under this Lease ("**Event of Default by Landlord**") if such failure continues for period of thirty (30) days after Landlord receives a Notice of Default from Tenant; provided, however, that if the nature of the default is such that it cannot be cured within the thirty (30) day period, no default shall exist if Landlord commences the curing of the default with the thirty (30) day period and thereafter diligently prosecutes the same to completion.  To be effective, the Notice of Default from Tenant must give in reasonable detail the nature and extent of the failure and must identify the Lease provision(s) containing the obligation(s).

**15.4.  Remedies - Event of Default by Landlord.**  If an Event of Default by Landlord should occur, then, in addition to exercising any of its other rights and remedies under law and in equity, Tenant shall have the right to set off against Rent payments any damages suffered by Tenant as a result of such Event of Default by Landlord.  All of the remedies given to Tenant by this Lease and all the rights and remedies given to Landlord by law or in equity shall be cumulative and concurrent.

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

**15.5.  Waiver.**  No term, provision, covenant, condition, or Event of Default by Landlord or Event of Default by Tenant shall be deemed waived by the other Party except by written agreement of the Parties.  No waiver by Landlord or Tenant of any term, provision, covenant, condition, or the other Party's Event of Default in any specific case shall be deemed to be a waiver of prior or subsequent compliance with such term, provision, covenant, or condition, or of any subsequent Event of Default of the other Party.

**15.6.  Tenant's Right of Self-Help.**  In the event that Landlord fails to perform its obligations under this Lease within a reasonable amount of time (and where the provision at issue sets forth a time period for Landlord to perform such obligation, that time period is deemed to be a reasonable amount of time), but not to exceed seven (7) business days after Landlord's receipt of written notice from Tenant or, if such failure causes an emergency, then within two (2) business days of Landlord's receipt of oral or written notice from Tenant of the emergency (provided that the foregoing 7-business-day time period in instances where an emergency does not exist shall be extended by any delays incurred in connection with Landlord obtaining Tenant's consent to Landlord's and its Contractors' entry into the Premises to perform any such obligations and/or any conditions imposed by Tenant in connection thereof under Section 8.10 (Landlord's Entry)), then Tenant, without liability, shall, in addition to and not limited by any rights and remedies available to Tenant under Section 15.3 (Event of Default by Landlord) and Section 15.4 (Remedies – Event of Default by Landlord), have the right to either: (a) equitably abate the Rent retroactively from the first day of such failure until such failure is completely cured by Landlord, or (b) perform, or cause to be performed, the repair, replacement, maintenance, or services (but nothing in this paragraph or anywhere else in the Lease shall make it Tenant's obligation to cure Landlord failure). In the event that Tenant performs or causes the performance of any repair, replacement, or maintenance, Landlord shall reimburse Tenant for any and all actual costs and expenses incurred within twenty (20) days from the date that Landlord receives written demand from Tenant, or at Tenant's option, any funds expended by Tenant in this regard shall be deemed prepaid Rent and the subsequent monthly payment(s) of Rent owed by Tenant shall be reduced by said amount. Notwithstanding the foregoing, Tenant shall not exercise its right of self-help, if within the times stated herein for Tenant's notice of Landlord's failure, Landlord has commenced to cure such failure, and if Landlord diligently and continuously takes such actions as are necessary to cure such failure to the reasonable satisfaction of Tenant.

**ARTICLE XVI**
**SUBORDINATION; NON-DISTURBANCE**

**16.1.  Subordination; Non-Disturbance.**

(a)  Landlord Warranties of Title.  Landlord represents and warrants that it holds such title to or other interest in the Premises, the Building, and the Property as is necessary to Tenant's access to the Premises and full use and enjoyment thereof in accordance with the provisions of this Lease.

(b)  Subordination to Existing Liens.  Landlord represents and warrants that the holders of any and all existing mortgages, deeds of trust, or other liens encumbering any part

of the Premises on the Effective Date (collectively, the "**Existing Lenders**"), if any, are listed on **Exhibit G**. If there are any Existing Lenders, the agreement by each of the Existing Lenders to enter into a non-disturbance agreement with Tenant was a material inducement for Tenant to enter into this Lease and an executed copy of each such non-disturbance agreement is attached in Exhibit G.

(c) <u>Subordination to Future Liens</u>. If Landlord desires Tenant to subordinate this Lease to the lien of any mortgage, deed of trust, or other encumbrance entered into or created on or after the Effective Date that affects any part of the Premises (each, a "**Future Lien**"), Tenant agrees to do so if the holder(s) of any such Future Liens (each, a "**Future Lender**") enter into a satisfactory subordination, non-disturbance, and attornment agreement with Tenant pursuant to which the Future Lender agrees (i) not to disturb or interfere with the enjoyment and possession by Tenant of the Premises; (ii) not to name Tenant as a defendant in any foreclosure, sale, or other proceeding instituted because of a default of Landlord or any other third party in connection with any Future Liens; and (iii) that Tenant possesses and enjoys its leasehold interest in and to the Premises with the same force and effect as if this Lease were a real property interest in the Premises prior to such Future Lien.

**16.2. Attornment.** In the event of any sale by Landlord of all or any portion of the Premises, Tenant is deemed to have attorned to the purchaser of the Premises or any portion thereof, and their successors and assigns, and any such purchaser assumes an interest in the Premises subject to this Lease and all rights held by Tenant under this Lease, and any such purchaser assumes all obligations of Landlord under this Lease, so as to establish direct privity of estate and contract between Tenant and such purchaser; provided, further that Tenant and such purchaser shall, with reasonable promptness following any such sale, execute all writings as satisfactory and agreed to by Tenant in order to document the foregoing relationship.

**16.3. Estoppel Certificates.** Tenant will, within thirty (30) calendar days following Tenant's receipt of a written request from the Landlord, execute and deliver to Landlord a letter stating that the letter is being issued subject to this section and that (a) this Lease is in full force and effect; (b) the date to which the Rent has been paid in advance, if any; and (c) whether any Notice of Default has been issued, and (d) such other customary objective factual statements regarding the status of the Lease requested by a Future Lender.

<u>**ARTICLE XVII**</u>
**LANDLORD'S COVENANTS, REPRESENTATIONS, AND WARRANTIES**

Landlord covenants, represents, and warrants the following:

**17.1. Quiet Enjoyment.** Provided that there is no Event of Default by Tenant, Tenant shall have and peaceably enjoy the Premises during the Lease Term and Landlord shall defend Tenant's right to the same.

**17.2. Compliance With Applicable Laws.** As of the date of Substantial Completion, the Premises shall be in compliance with Applicable Laws; there are no restrictions or other matters

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

which would adversely affect, prohibit, or limit Tenant's Permitted Use of the Premises; and there are no outstanding violations of any applicable zoning, building, electrical, fire code, or other code of any applicable governing or authoritative body. Landlord shall, at its sole expense, promptly comply with all Applicable Laws of which Landlord or Tenant receives a notice of violation.

**17.3.** **Taxes and Assessments**. No taxes or assessments for taxes are presently due as of the date of the Effective Date and Tenant shall not be liable for any past due taxes or assessments accruing before the Rent Commencement Date.

**17.4.** **Work in Accordance with Plans.** As of the Occupancy Date, Landlord's Work shall have been Substantially Completed in accordance with the Final Space Plans and the Construction Plans. Landlord shall maintain copies of all warranty and guaranty documents provided by Landlord's Contractors for both Landlord's Work and Tenant's Work, and any other work done under this Lease, and the documents shall be made available to Tenant upon Tenant's written request to Landlord.

**17.5.** **Building in Good Condition.** As of the Occupancy Date, the Building shall be in good condition, operation, and repair, including the Building's roof, exterior walls, interior walls, foundation, floors, windows (including glass), structural frame, plumbing and sewage disposal systems, mechanical systems, utility systems, heating, air conditioning, elevator, fire suppression, and electrical systems.

**ARTICLE XVIII**
**STANDARD CITY PROVISIONS**

**18.1.** **Audit Rights.** Whether or not expressly stated, for any costs that Tenant is charged, either directly or indirectly, by Landlord under this Lease, Tenant may request, and Landlord shall promptly provide for Tenant's review, all invoices and any other backup documentation, including contracts and subcontracts, substantiating the costs at issue.

**18.2.** **Executive Order 7-14: Office of the Inspector General and Duties of Those Involved in Transactions with the City**. In the performance of this Lease, Landlord shall:

(a) report to the City's Office of Inspector General (the "**OIG**") knowledge of violations subject to investigation by the OIG pursuant to Executive Order 7-14;

(b) cooperate fully with representatives of the OIG by providing complete and accurate information as well as the necessary assistance in matters under investigation;

(c) keep conversations and contact with the OIG confidential, except and to the extent the OIG may authorize disclosure; and

(d) instruct its employees and contractors that under no circumstances shall any employee or contractor take or threaten to take any action of any sort in an attempt to prevent

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

anyone from providing to a City official information regarding conduct that is the subject of Section 3 of Executive Order 7-14, or providing any information to, or cooperating with, the OIG, or retaliate against anyone for doing so or against anyone who is about to do so.

### 18.3. <u>Gifts, Loans and Favors to City Personnel; Prohibited Gifts.</u>

(a)     Landlord shall comply with Section 20-604 of the Philadelphia Code (the "**Code**").

(b)     Pursuant to Executive Order 10-16, no official or employee in the Executive and Administrative branch of City government shall solicit or accept, directly or indirectly, a "Gift" (as defined below) from a person who, at the time or within twelve (12) months preceding the time a Gift is received:

(i) is seeking, or has sought, official action from that officer or employee;

(ii) has operations or activities regulated by the officer's or employee's department, agency, office, board or commission, or, in the case of members of the Mayor's Cabinet, has operations or activities that are regulated by any department, agency, office, board or commission within the Executive and Administrative branch;

(iii) has a financial or other substantial interest in acts or omissions taken by that officer or employee, which the officer or employee is able to affect through official action; or

(iv) is a "Registered Lobbyist" (as defined below).

As used in this provision, "**Gift**" means a payment, subscription, advance, forbearance, rendering or deposit of money, services entertainment, invitation, food, drink, travel or lodging or anything of value given to, or for the benefit of, a City officer or employee, unless consideration of equal or greater value is received. "Gift" shall not include a political contribution otherwise reportable as required by law, a commercially reasonable loan made in the ordinary course of business, such as a home mortgage loan, or a gift received from a family member of the officer or employee.

As used in this provision, "**Registered Lobbyist**" means any person that engages in lobbying on behalf of a principal for economic consideration, and is registered as such, pursuant to the requirements of Section 20-1202 of The Philadelphia Code, including an attorney at law while engaged in lobbying.

(c)     Landlord understands and agrees that if Landlord offers anything of value to any City official or employee under circumstances where the receipt of such item would violate the provisions of Section 20-604 or the Executive Order, Landlord shall be subject to sanctions, including disqualification from participation in a particular contract to debarment or loss of financial assistance.

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

(d)    Furthermore, Landlord's breach of Section 20-604 of the Code or of Executive Order 10-16 will constitute a default by Landlord and entitle Tenant to exercise any rights or remedies available to it under this Lease or otherwise available at law and in equity.

**18.4.    Non-Indebtedness to City.**

(a)    By executing this Lease, Landlord hereby certifies and represents and warrants to Tenant that Landlord and Landlord's parent company(ies), subsidiary(ies), and affiliate(s), if any, are not currently indebted to the City, and covenants that Landlord will not during the Lease Term be indebted to the City, for or on account of any delinquent taxes (including, but not limited to, taxes collected by the City on behalf of the School District of Philadelphia), liens, judgments, fees or other debts for which no payment plan satisfactory to the City has been established.

(b)    Prior to commencing Landlord's Work or other improvements to the Premises, or selecting contractors to provide the Building Services or any other services to be performed on behalf of Tenant, Landlord agrees to provide to Tenant a list of the contractors and subcontractors, including its architects, that Landlord will utilize to perform such work or services, so that Tenant can confirm that such contractors, subcontractors, and architects are not indebted to the City or, if indebted to the City, that they have entered or will enter into a payment plan satisfactory to the City in its municipal capacity.

(c)    Without limiting subsection (b), above, Landlord shall require all contractors and subcontractors performing Landlord's Work or performing any work for which Tenant will be responsible for payment to sign a certification of non-indebtedness in favor of the City, which certification must include the following provisions, and Landlord shall cooperate with the City in exercising the City's rights and remedies described below or otherwise available at law or in equity:

_____ ("Contractor") hereby certifies and represents that Subcontractor and Subcontractor's parent company(ies) and their subsidiary(ies), are not currently indebted to the City of Philadelphia (the "City"), and will not at any time during the Term of this contract be indebted to the City, for or on account of any delinquent taxes (including, but not limited to, taxes collected by the City on behalf of the School District of Philadelphia), liens, judgments, fees or other debts for which no written payment plan satisfactory to the City has been established.

In addition to any other rights or remedies available at law or in equity, Contractor acknowledges that any breach or failure to conform to this certification may, at the option and direction of the City, result in the withholding of payments otherwise due to Contractor for services rendered in connection with this contract and, if such breach or failure is not resolved to the City's satisfaction within a reasonable time frame specified by the City in writing, may result in the offset of any such indebtedness against said payments otherwise due to Subcontractor and/or the

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

termination of this contract for default (in which case Contractor will be liable for all excess costs and other damages resulting from the termination).

(d)     Landlord acknowledges that if the City, in its municipal capacity, determines that a tax account is delinquent, the City will place a "tax hold" on the applicable account and no payment can be made to or for that payee's account by the City until that tax hold is resolved. Any failure of Tenant to pay Rent or to make any other payment required under this Lease as a result of the placement of a tax hold will not be deemed a breach of this Lease or an Event of Default by Tenant.

(e)     In addition to any other rights or remedies available to Tenant under this Lease or at law and in equity, Landlord acknowledges that any breach or failure to conform to the representation and warranty, at the option and direction of the City may result in the withholding of Rent or other payments otherwise due to Landlord in connection with the Lease, and, if such breach or failure is not resolved to the City's satisfaction within a reasonable time frame specified by the City in writing, may result in the offset of any such indebtedness against said payments otherwise due to Landlord, along with all rights and remedies provided in this Lease or otherwise available at law or in equity.

**18.5.    Chapter 9-1100 of The Philadelphia Code: Fair Practices.** In performing under this Lease, Landlord shall comply with the terms of the Philadelphia Home Rule Charter, the Fair Practices Ordinance (Chapter 9-1100 of the Code), and the Mayor's Executive Order No. 04-86, as each may be amended from time to time, which together articulate policies against discrimination which have been adopted by the City. In addition, to the extent those provisions do not explicitly prohibit or cover certain types of discriminatory conduct, in performing under this Lease, Landlord acknowledges that Landlord has a broader obligation under this Lease. Therefore, in connection with providing any service or fulfilling any duty under this Lease, as well as in Landlord's employment, housing, or real estate practices, Landlord shall not discriminate or permit discrimination, whether by direct or indirect practice of exclusion, distinction, restriction, segregation, limitation, refusal, denial, differentiation, or preference, against any individual on the basis of actual or perceived race, ethnicity, color, sex (including pregnancy, childbirth, or a related medical condition), sexual orientation, gender identity, religion, national origin, ancestry, age, disability, marital status, source of income, familial status, genetic information, domestic or sexual violence victim status; or Acquired Immune Deficiency Syndrome status, or engage in any other act or practice made unlawful under the Home Rule Charter, Chapter 9-1100 of the Code, the Executive Order, or under the nondiscrimination laws of the United States or the Commonwealth of Pennsylvania. Landlord's breach of this section constitutes an Event of Default by Landlord and entitles Tenant to all rights and remedies provided in this Lease or otherwise available at law or in equity.

**18.6.    Chapter 17-400 of The Philadelphia Code: Nondiscrimination.**

(a)     In accordance with Chapter 17-400 of the Code, Landlord's payment or reimbursement of membership fees or other expenses associated with participation by its employees in an exclusionary private organization, insofar as such participation confers an employment advantage or constitutes or results in discrimination with regard to hiring, tenure of

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

employment, promotions, terms, or privileges or conditions of employment on the basis of race, color, sex, sexual orientation, religion, age, national origin or ancestry, constitutes a breach of this Lease entitling Tenant to all rights and remedies provided in this Lease or otherwise available at law or in equity.

(b)     Landlord shall cooperate with the Philadelphia Commission on Human Relations (the "**Commission**") in any manner which the Commission deems reasonable and necessary for the Commission to carry out its responsibilities under Chapter 17-400 of the Code. Landlord's failure to cooperate with the Commission is a default under this Lease that entitles the City to all rights and remedies provided in this Lease or otherwise available at law or in equity.

**18.7.    End of City Fiscal Year; Delay in Payments.**  The City operates on a fiscal year that runs from July 1 through June 30 of each year.  Due to the City's budget and contract reconciliation process at the end of each fiscal year, payments that become due at the end of one fiscal year (June) and in the beginning of the next succeeding fiscal year (July and August) will be delayed by several weeks, with such delayed payments normally made by August 15 of the same calendar year.   In acknowledgement of this reconciliation process, Landlord agrees, notwithstanding anything to the contrary stated elsewhere in this Lease, that any payments that become due from the City, as Tenant, under this Lease, including Base Rent, Additional Rent, and any other payments, if any, during June, July, or August of any given calendar year will not be deemed to be late, delinquent, or an Event of Default by Tenant if such delayed payments are made by August 15th of the same calendar year.  Except as provided in this Section, Tenant's payment obligations remain subject to all other provisions of this Lease.

**18.8.    Sovereign Immunity.**  Notwithstanding other provisions of this Lease or the Authority's status as Tenant under this Lease or the City's status as Subtenant under the Sublease, this Lease does not waive any of the rights, remedies, and defenses of the Authority or the City under the Tort Claims Act, 42 Pa. C.S.A. §§ 8501 et seq.

**ARTICLE XIX**
**NOTICES**

**19.1.    Notices.**  All notices which Landlord or Tenant may be required, or may desire, to serve on the other, must be in writing and must be sent by (a) personal service, receipt obtained, or (b) United States registered or certified mail, postage prepaid, return receipt requested, addressed as follows or (c), for any written notice other than Landlord's Reminder Notice under Section 4.2 (Renewal Term), any notice of termination of this Lease, and any notice of default under Section 15.1 (Event of Default by Tenant) and 15.3 (Event of Default by Landlord), by electronic mail at addresses to be designated among the parties:

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

**Landlord's Address For Notices**

> IS BBFB LLC
> 2929 Walnut Street, Suite 1540
> Philadelphia, PA 19104
> Attention:  Matthew Canno

> **with a copy to:**

> Eckert Seamans Cherin & Mellott, LLC
> Two Liberty Place, 22nd Floor
> 50 S. 16th Street
> Philadelphia, PA  19102
> Attention:  Daniel N. Reisman, Esquire

**Tenant's Address For Notices**

> Philadelphia Municipal Authority
> One Parkway Building, 9th Floor
> 1515 Arch Street
> Philadelphia, PA 19102
> Attn:  Executive Director

> **with a copy to:**

> Department of Public Property
> City of Philadelphia
> City Hall, Room 790
> Philadelphia, PA 19107
> Attn: Commissioner

> **and a copy to:**

> City of Philadelphia Law Department
> One Parkway Building, 17th Floor
> 1515 Arch Street
> Philadelphia, PA  19102
> Attn: Divisional Deputy Solicitor of Real Estate

 **19.2.**   **Change of Address.**  Each party may change its respective address or address(es) to which the other party must provide notice, or copies of notice, by giving written notice to the other in accordance with Section 19.1 (Notices) or as otherwise agreed to by the parties.

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

**ARTICLE XX**
**BROKERS**

**20.1.    Broker Representation and Warranties**.  Each party represents and warrants to the other that such party has dealt with no broker, agent, or other person to whom any fee or commission is payable in connection with this transaction; that no broker, agent, or other person brought about this transaction; and that no broker, agent, or other person is entitled to a fee or commission as a result of this transaction.  Each Party shall be liable for any claims for that party's breach of representations and warranties contained in this section.  The provisions of this Section shall survive the termination of this Lease.

**ARTICLE XXI**
**MISCELLANEOUS**

**21.1.    Entire Agreement**.  This Lease contains all of the agreements and understandings relating to the leasing of the Premises and the obligations of Landlord and Tenant in connection with such leasing.  Landlord and Tenant are not relying upon any warranties, representations, promises, or statements made by the other party or anyone on behalf of that party, except as expressly set forth in this Lease.  This Lease supersedes any and all prior agreements and understandings between Landlord and Tenant and alone expresses the agreement of the parties.

**21.2.    Amendments**.  This Lease shall not be amended, changed, or modified in any way unless in a writing that is (a) identified as an amendment to this Lease and (b) signed by Landlord, Tenant, and Subtenant.  No Party shall be deemed to have waived or released any of its rights under this Lease unless in writing and executed by such Party.

**21.3.    Third Party Beneficiaries; Enforcement of Lease by Subtenant**.  This Lease does not directly, indirectly, contingently, or otherwise confer any rights or benefits on any person or party that is not named as a party to this Lease, except the City as Subtenant.  Landlord and Tenant acknowledge and consent to the right of Subtenant to directly enforce the terms of this Lease and the Sublease by pursuing all remedies available to Tenant in this Lease, or available to Subtenant pursuant to the Sublease, including legal and equitable proceedings against Landlord to compel performance by Landlord of its obligations under this Lease.

**21.4.    Force Majeure.**

(a)    If a Force Majeure Event prevents a party from complying with any one or more obligations under this Lease, that inability to comply will not constitute breach of this Lease if (i) that party uses reasonable efforts to perform those obligations, (ii) that party's inability to perform those obligations is not due to its failure to (A) take reasonable measures to protect itself against events or circumstances of the same type as that Force Majeure Event or (B) develop and maintain a reasonable contingency plan to respond to events or circumstances of the same type as

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

that Force Majeure Event, and (iii) that party complies with its obligations under Section 21.4(c), below.

(b)     For purposes of this Lease, "**Force Majeure Event**" means, with respect to a party, any event or circumstance, whether or not foreseeable, that was not caused by that party, or any operating under the control of that party, and any consequences of that event or circumstance.

(c)     If a Force Majeure Event occurs, the noncomplying party shall promptly notify the other party of occurrence of that Force Majeure Event, its effect on performance, and how long the noncomplying party expects it to last.  Thereafter the noncomplying party shall update that information as reasonably necessary. During a Force Majeure Event, the noncomplying party shall use reasonable efforts to limit damages to the other party and to resume its performance under this Lease.

**21.5.**    **Survival of Obligations.**  Any obligations of Landlord or Tenant accruing prior to the expiration of this Lease shall survive the termination of this Lease, and Landlord or Tenant shall promptly perform all such obligations whether or not this Lease has expired.

**21.6.**    **Authorized Signatory.**  Each party represents and warrants that this Lease has been duly authorized, executed, and delivered by that party and constitutes the legal, valid, and binding obligation of that party, enforceable against that party in accordance with the terms of this Lease. Each party further represents and warrants that the person or persons executing this Lease on behalf of that party has (or have) the full power and authority to execute this Lease on behalf of that party.

**21.7.**    **Interpretation.**

(a)     The parties acknowledge that each has read and reviewed this Lease and that each has had the opportunity to confer with counsel in the negotiation of this Lease. Accordingly, this Lease shall be construed neither for nor against Landlord or Tenant, but shall be given a fair and reasonable interpretation in accordance with the meaning of its terms and the intent of the parties.

(b)     The parties agree that in the event two different interpretations may be given to any provision hereunder, one of which will render the provision unenforceable, and one of which will render the provision enforceable, the interpretation rendering the provision enforceable shall be adopted.

(c)     All terms and words used in this Lease, regardless of the number or gender in which they are used, shall be deemed to include the appropriate number and gender, as the context may require.

(d)     As used in this Lease, the word "person" means and includes, where appropriate, an individual, corporation, partnership or other entity.

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

(e)     In certain instances in this Lease, the words "include," "includes," and "including" are followed by the phrase "but not limited to" or "without limitation" or similar. Unless expressly stated otherwise, where the words "include," "includes," and "including" are used in this Lease and are not followed by the phrase "but not limited to" or "without limitation" or similar, those words nevertheless have the same meaning as "includ[e][s][ing] but not limited to" and "include[e][s][ing] without limitation."

(f)     All captions, headings, titles, and numerical references are for convenience only and shall have no effect on the interpretation of this Lease.

(g)     Each reference to the Property includes a reference to the Building and the Premises, and each reference to the Building includes a reference to the Premises, whether or not expressly stated.

**21.8.   Independent Covenants.**   Each covenant, agreement, obligation, or other provision of this Lease to be performed by either Party are separate and independent covenants of such Party, and not dependent on any other provision of this Lease.

**21.9.   Severability.**   In the event two different interpretations may be given to any provision in this Lease, one of which will render the provision unenforceable, and one of which will render the provision enforceable, the interpretation rendering the provision enforceable shall be adopted. If any provision in this Lease or the application thereof, to any extent, are held to be invalid, illegal, or otherwise unenforceable by a court of competent jurisdiction, the remainder of this Lease, and the application of any such provision other than to the extent determined to be invalid, illegal, or unenforceable, will not be affected or impaired, and such remaining provisions in this Lease will be valid and enforceable to the fullest extent permitted by law. Notwithstanding the previous sentences, to the extent any provision of this Lease is declared unenforceable by a court of competent jurisdiction, then the parties shall negotiate in good faith a substitute provision that, to the extent possible, (a) is enforceable and (b) accomplishes the original purpose of the unenforceable provision.

**21.10.  Time Is Of The Essence.**   Time is of the essence of this Lease and the performance of all obligations hereunder.

**21.11.  Approvals.**   Any review, approval, and/or inspection by Tenant of the Final Space Plans or Construction Plans or Landlord's Work, or any other plans or work by Landlord or any of Landlord's contractors, shall not constitute any representation, warranty, or guaranty by Tenant as to the quality, substance, or compliance with Applicable Laws. No person or entity shall rely on such review and approval. At all times, Landlord shall use Landlord's own independent judgment as to the substance, accuracy, and quality of all such matters. Review, approval, and/or inspection under this Lease by Tenant or any representative of Tenant shall not constitute approval otherwise required by any and all departments, boards, and commissions of the City of Philadelphia in connection with Landlord's obligations under this Lease.

**21.12.  No Relationship.**   Notwithstanding anything to the contrary contained in this Lease, nothing in this Lease shall be construed to infer or imply that Tenant is a partner, joint

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

venturer, agent, employee, or otherwise acting by or at the direction of Landlord, nor shall anything in this Lease nor any act of the Parties be deemed to create any relationship between Landlord and Tenant other than the relationship of landlord and tenant.

21.13. **Consequential Damages.** Neither Party shall be liable for any consequential damages suffered by the other Party.

21.14. **Recording.** The Parties acknowledge that recording of this Lease is prohibited. At the request of either Party, the Parties shall promptly execute and record, at the cost of the requesting party, a short-form memorandum describing the Premises and stating the Occupancy Date, the Lease Term, and any other information required under 21 P.S. § 405. Upon the termination or expiration of this Lease, each party shall promptly execute a Memorandum of Termination stating that the Lease has so terminated or expired.

21.15. **Counterparts.** The parties may execute this Lease in one or more counterparts, each of which is an original and all of which, when taken together, constitute a single agreement as though all parties had executed the same document. The parties may execute this Lease by electronic means, including email delivery of scanned or other facsimile signatures (e.g., PDF format) and use of electronic signature programs (e.g., DocuSign). Copies of this Lease signed and exchanged by electronic means are considered originals for all purposes.

21.16. **Governing Law.** This Lease is made in Philadelphia, Pennsylvania. This Lease and all matters arising out of or in any way related to this Lease are governed by the laws of the Commonwealth of Pennsylvania, without giving effect to its principles of conflicts of laws.

21.17. **Consent to Jurisdiction.** The parties to this Lease shall submit to the jurisdiction of courts, whether federal or state, located in Philadelphia, Pennsylvania. The parties shall not raise any objection to any legal proceeding that is bought in these courts on the grounds of lack of personal jurisdiction.

21.18. **Venue.** The parties to this Lease shall bring any legal proceeding involving, directly or indirectly, any matter arising out of or in any way related to this Lease in the United States District Court for the Eastern District of Pennsylvania or the Court of Common Pleas of Philadelphia County. It is the express intent of the parties that jurisdiction over any legal proceeding lies exclusively in either of these two forums, and the parties shall not raise any objection to any legal proceeding that is brought in either of these two forums on the grounds of venue or forum non conveniens.

21.19. **Waiver of Trial By Jury.** **LANDLORD AND TENANT HEREBY WAIVE TRIAL BY JURY IN ANY LEGAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT, OR OTHERWISE) ARISING OUT OF OR IN ANY WAY RELATED TO THIS LEASE. THIS PROVISION IS A MATERIAL INDUCEMENT FOR TENANT TO ENTER INTO THIS LEASE.**

*[The remainder of this page is left intentionally blank. Signature page to follow.]*

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

**IN WITNESS OF THE MUTUAL PROMISES SET FORTH ABOVE,** and intending to be legally bound by this Lease, Landlord and Tenant have caused this Lease to be executed by their duly authorized representatives and officers as of the day and year first above written.

**LANDLORD:**

IS BBFB LLC

By: _____

        Matthew Canno

        Authorized Representative


**TENANT:**

PHILADELPHIA MUNICIPAL AUTHORITY

By: _____

        Lorna Gallman

        Executive Director

43

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

**EXHIBIT A**

**Sublease**

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

# SUBLEASE

between

## THE PHILADELPHIA MUNICIPAL AUTHORITY

(Sublandlord)

and

## THE CITY OF PHILADELPHIA,
### acting through its Department of Public Property

(Subtenant)

## <u>216-220 NORTH BROAD STREET</u>
(Approximately 45,837 Rentable Square Feet)

City Contract # 24-6438

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

## SUBLEASE

THIS SUBLEASE ("**Sublease**") dated _____ (the "**Effective Date**") is made and entered into by and between the **PHILADELPHIA MUNICIPAL AUTHORITY**, a municipal authority organized under the Act of May 2, 1945 (P.L. 382, No. 164), known as the Municipality Authorities Act of 1945, which Act has since been replaced by the Act of June 19, 2001 (P.L. 287, No. 22) §§ 1 et seq. (53 Pa. C. S. §§ 5601 et seq.), known as the Municipality Authorities Act (the "**Authority**" or "**Sublandlord**") and **THE CITY OF PHILADELPHIA**, acting through its Department of Public Property (the "**City**" or "**Subtenant**"), upon the following terms and conditions. (Sublandlord and Subtenant are sometimes referred to in this Sublease individually as "**Party**" and collectively as "**Parties**.")

## BACKGROUND

**A.** The Authority, as tenant, has entered into a lease, a copy of which is attached to this Sublease as **Exhibit A** (as may be amended, the "**Prime Lease**") with IS BBFB LLC ("**Landlord**") for approximately 45,837 rentable square feet in that certain building located at 216 North Broad Street, Philadelphia, Pennsylvania 19136 (as defined more particularly in the Prime Lease, the "**Premises**").

**B.** The Prime Lease contemplates the subleasing of the Premises by the Authority to the City.

**C.** The Authority and the City wish to set forth in writing their agreements as to the subleasing of the Premises.

**D.** The City Council of the City, by ordinance (Bill No. 230832), adopted on December 14, 2023, and approved by the Mayor on December 20, 2023, has authorized the execution and delivery of this Sublease.

**A.** By resolution dated February 28, 2024, the Board of Directors of the Authority has authorized the execution of the Prime Lease and this Sublease.

**NOW THEREFORE**, in consideration of the rents, covenants, and agreements contained in this Sublease and the Prime Lease, and intending to be legally bound, the parties hereby agree as follows:

1. **Incorporation of Background; Exhibits.**

   **a.** The preamble and background set forth above are hereby incorporated by reference as if fully restated within the main body of this Sublease.

   **b.** Whether or not attached to this Sublease, the following exhibits, as they may be amended or revised in accordance with this Sublease, are incorporated into this Sublease by reference and made a part of this Sublease as if fully restated within the main body of this Sublease:

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

|          |                          |
|----------|--------------------------|
| **Exhibit A** | Prime Lease         |
| **Exhibit B** | Standard City Provisions |

**2.**    **Sublease.**

The Authority does hereby sublease to the City, and the City hereby accepts from the Authority, the Premises for the Term (defined below) in accordance with the terms and conditions of this Sublease. The City hereby assumes all rights and responsibilities of the Authority, as Tenant, under the Prime Lease.

**3.**    **Term.**

The term (the "**Term**") of this Sublease is concurrent with the Lease Term of the Prime Lease. This Sublease is only subject to termination upon termination of the Prime Lease.

**4.**    **Possession.**

Subject to the terms and conditions of this Sublease, the City shall have possession of the Premises during all periods in which the Authority is entitled to possession under the Prime Lease.

**5.**    **Rent and Other Payments.**

The City shall pay to the Authority, or its designee (including directly to the Landlord), at the address of the Authority set forth in Section 6 (Notices) of this Sublease, or at such other place as the Authority may from time to time designate in writing, all amounts required to be paid under the terms of the Prime Lease, whether designated as Base Rent, Additional Rent, or Rent, or otherwise designated during the Term without any setoff or deduction whatsoever except as permitted under the Prime Lease.

**6.**    **Use of the Premises.**

The City shall use the Premises in accordance with the requirements of the Prime Lease.

**7.**    **Notices.**

**a.**    All notices which Sublandlord or Subtenant may be required, or may desire, to serve on the other or on Landlord under this Sublease must be given in the same manner as in the Prime Lease at the addresses below:

**If to the Authority:**

Philadelphia Municipal Authority
One Parkway Building, 9th Floor
1515 Arch Street
Philadelphia, PA 19102
Attn: Executive Director

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

**If to the City:**

Department of Public Property
City of Philadelphia
City Hall, Room 790
Philadelphia, PA 19107
Attn:  Commissioner

**with a copy to:**

City of Philadelphia Law Department
One Parkway Building, 17th Floor
1515 Arch Street
Philadelphia, PA 19102
Attn:  Divisional Deputy City Solicitor, Real Estate

**and a copy to Landlord:**

IS BBFB LLC
2929 Walnut Street, Suite 1540
Philadelphia, PA 19104
Attention:   Matthew Canno

**and a copy to Landlord's counsel:**

Eckert Seamans Cherin & Mellott, LLC
Two Liberty Place, 22nd Floor
50 S. 16th Street
Philadelphia, PA  19102
Attention:  Daniel N. Reisman, Esquire

     **b.**     Each party may change its respective address or address(es) to which the other party must provide notice, or copies of notice, by giving written notice to the other in accordance with the Prime Lease.

**8.**     **Sublease Subordinate to Prime Lease.**

     This Sublease is subject to and subordinate to the Prime Lease.  Every term, covenant, and condition of the Prime Lease binding on or inuring to the benefit of Landlord shall, in respect of this Sublease, be binding on or inure to the benefit of Sublandlord and every term, covenant, and condition of the Prime Lease binding on or inuring to the benefit of Sublandlord, as tenant under the Prime Lease, shall, in respect of this Sublease, be binding on and inure to the benefit of Subtenant.  Subtenant shall in no case have any rights under this Sublease greater than Sublandlord's rights as tenant under the Prime Lease.  In furtherance of the foregoing, the consent of Landlord shall be required in connection with any act which requires the consent of Landlord

pursuant to the terms of the Prime Lease, notwithstanding that a particular provision herein may not require Sublandlord's consent or states that only Sublandlord's consent is required.

Without limiting the previous sentences, the obligations of Sublandlord, as tenant under the Prime Lease, are incorporated into this Sublease as the obligations of Subtenant, and Subtenant agrees that Subtenant is bound by and shall perform all obligations of Sublandlord as tenant under the Prime Lease. Notwithstanding any other provision of this Sublease, Sublandlord has no obligation to perform any of the terms and conditions required to be performed by Landlord under the terms of the Prime Lease and Subtenant hereby agrees that Landlord is solely responsible for the performance of the foregoing obligations.

9.      **Consent of Prime Lease Landlord; Enforcement by Landlord and Subtenant.**

By way of its acknowledgement of the Sublease, Landlord consents to this Sublease. In consideration of this consent, Sublandlord and Subtenant acknowledge and consent to the right of Landlord to directly enforce the terms of the Prime Lease and this Sublease by pursuing all remedies available to Landlord in the Prime Lease, or available to Sublandlord pursuant to this Sublease, including legal and equitable proceedings against Subtenant, to compel performance by Subtenant of its obligations under this Sublease. For avoidance of doubt, in instances of an Event of Default by Tenant under the Prime Lease, regardless of whether such Event of Default results from the acts or omissions of Sublandlord or Subtenant, Landlord may pursue any and all remedies available to Landlord under the Prime Lease, and may join Sublandlord or Subtenant or both in any such action brought by Landlord.

10.     **Standard City Provisions.**

Subject to the provisions of Section 8 (Consent of Prime Lease Landlord; Enforcement by Landlord), the Authority agrees that in its performance under this Sublease and the Prime Lease, the Authority shall comply with all applicable laws, including without limitation, the Standard City Provisions attached to this Sublease as **Exhibit B**. The Authority's failure to comply with the Standard City Conditions shall constitute a substantial breach of this Sublease entitling the City to all rights and remedies provided in this Sublease or otherwise available in law or equity.

11.     **Indemnification.**

In consideration of the Authority's undertakings pursuant to this Sublease, the City shall indemnify, defend, and hold harmless the Authority for any and all losses, claims, suits, administrative or enforcement actions, public or private cost recovery actions, demands, liabilities, damages and/or expenses (including but not limited to reasonable attorneys' fees and litigation costs), in law or in equity arising out of the City's use of the Premises during the Term (each a "Claim" and, collectively, the "Claims"), including but not limited to Claims in connection with loss of life, bodily and personal injury, or damage to property (real or personal regardless of ownership), which may be imposed upon or incurred by or asserted against any the Authority by reason, in whole or in part, of (i) any act or omission of the City with respect to the transaction contemplated herein; (ii) the condition of the Premises or any part(s) thereof whether or not caused by the City; and/or (iii) any act or omission by or on behalf of the Authority with respect to the

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

Premises; provided, however, that the City shall not be obligated to indemnify the Authority for Claims that have resulted from the Authority's willful misconduct or indemnify the Authority for Claims that have resulted from the Authority's gross negligence; provided that if a court determines that the Authority has been grossly negligent or acted with willful misconduct, the Authority shall pay the City for its costs of defending such portion of the Claim. The City hereby acknowledges and agrees that it is indemnifying the Authority for its own negligence. The obligation of the City to indemnify the Authority contained in this Section 11 (Indemnification) shall not be limited by any limitation on the amount or type of damages, compensation or benefits payable by or for the City under workers' or workman's compensation acts, disability benefit acts or other employee benefits acts, or under any other insurance coverage the City may obtain (including self-insurance).

Notwithstanding the foregoing, the City has no obligation under this Section 11 (Indemnification) unless the City has been given prompt and timely written notice of the filing of the Claim and has been able to participate as a party in any litigation and/or settlement of the Claim, in its sole discretion, with counsel of its own choosing.

Nothing herein shall be construed as a waiver of those rights, defenses, immunities, and limitations on damages available to the City and/or the Authority pursuant to the Pennsylvania Political Subdivision Tort Claims Act, Act of October 5, 1980, P.L. 693, No. 142 (42 Pa.C.S.A. §§ 8501 *et. seq.*) and the indemnification provided herein shall be limited as provided in the Act.

The provisions of this Section 11 (Indemnification) survive the expiration or earlier termination of this Sublease.

12.    **Amendments.**

This Sublease shall not be amended, changed, or modified in any way unless in a writing that is (a) identified as an amendment to this Sublease and (b) signed by Landlord, Sublandlord, and Subtenant. No Party shall be deemed to have waived or released any of its rights under this Lease unless in writing and executed by such Party.

13.    **Third Party Beneficiaries.**

This Sublease does not directly, indirectly, contingently, or otherwise confer any rights or benefits on any person or party that is not either named as a party to this Sublease, except Landlord.

14.    **Authorized Signatory.**

Each party represents and warrants that this Sublease has been duly authorized, executed, and delivered by that party and constitutes the legal, valid, and binding obligation of that party, enforceable against that party in accordance with the terms of this Sublease. Each party further represents and warrants that the person or persons executing this Sublease on behalf of that party has (or have) the full power and authority to execute this Sublease on behalf of that party.

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

**15.**    **Interpretation.**

    **a.**    The parties acknowledge that each has read and reviewed this Sublease and that each has had the opportunity to confer with counsel in the negotiation of this Sublease. Accordingly, this Sublease shall be construed neither for nor against Sublandlord or Subtenant, but shall be given a fair and reasonable interpretation in accordance with the meaning of its terms and the intent of the parties.

    **b.**    The parties agree that in the event two different interpretations may be given to any provision hereunder, one of which will render the provision unenforceable, and one of which will render the provision enforceable, the interpretation rendering the provision enforceable shall be adopted.

    **c.**    All terms and words used in this Sublease, regardless of the number or gender in which they are used, shall be deemed to include the appropriate number and gender, as the context may require.

    **d.**    As used in this Sublease, the word "person" means and includes, where appropriate, an individual, corporation, partnership or other entity.

    **e.**    In certain instances in this Sublease, the words "include," "includes," and "including" are followed by the phrase "but not limited to" or "without limitation" or similar. Unless expressly stated otherwise, where the words "include," "includes," and "including" are used in this Lease and are not followed by the phrase "but not limited to" or "without limitation" or similar, those words nevertheless have the same meaning as "includ[e][s][ing] but not limited to" and "include[e][s][ing] without limitation."

    **f.**    All captions, headings, titles, and numerical references are for convenience only and shall have no effect on the interpretation of this Sublease.

    **g.**    Any capitalized terms used and not specifically defined in this Sublease have the meanings given to them in the Prime Lease.

**16.**    **No Relationship.**

    Notwithstanding anything to the contrary contained in this Sublease, nothing in this Sublease shall be construed to infer or imply that Subtenant is a partner, joint venturer, agent, employee, or otherwise acting by or at the direction of Sublandlord, nor shall anything in this Sublease nor any act of the Parties be deemed to create any relationship between Subandlord and Subtenant other than the relationship of landlord and tenant.

**17.**    **Counterparts.**

    The parties may execute this Sublease in one or more counterparts, each of which is an original and all of which, when taken together, constitute a single agreement as though all parties had executed the same document.  The parties may execute this Sublease by electronic means,

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

including email delivery of scanned or other facsimile signatures (e.g., PDF format) and use of electronic signature programs (e.g., DocuSign). Copies of this Sublease signed and exchanged by electronic means are considered originals for all purposes.

18.    **Governing Law.**

   This Sublease is made in Philadelphia, Pennsylvania. This Sublease and all matters arising out of or in any way related to this Sublease are governed by the laws of the Commonwealth of Pennsylvania, without giving effect to its principles of conflicts of laws.

19.    **Consent to Jurisdiction.**

   The parties to this Sublease shall submit to the jurisdiction of courts, whether federal or state, located in Philadelphia, Pennsylvania. The parties shall not raise any objection to any legal proceeding that is bought in these courts on the grounds of lack of personal jurisdiction.

20.    **Venue.**

   The parties to this Sublease shall bring any legal proceeding involving, directly or indirectly, any matter arising out of or in any way related to this Lease in the United States District Court for the Eastern District of Pennsylvania or the Court of Common Pleas of Philadelphia County. It is the express intent of the parties that jurisdiction over any legal proceeding lies exclusively in either of these two forums, and the parties shall not raise any objection to any legal proceeding that is brought in either of these two forums on the grounds of venue or forum non conveniens.

21.    **Waiver of Trial By Jury.**

   **SUBLANDLORD AND SUBTENANT HEREBY WAIVE TRIAL BY JURY IN ANY LEGAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT, OR OTHERWISE) ARISING OUT OF OR IN ANY WAY RELATED TO THIS SUBLEASE. THIS PROVISION IS A MATERIAL INDUCEMENT FOR SUBTENANT TO ENTER INTO THIS SUBLEASE.**

   *[The remainder of this page is left intentionally blank. Signature page to follow.]*

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

**IN WITNESS OF THE MUTUAL PROMISES SET FORTH ABOVE,** and intending to be legally bound by this Sublease, Sublandlord and Subtenant have caused this Sublease to be executed by their duly authorized representatives and officers as of the day and year first above written.

**SUBLANDLORD:**

PHILADELPHIA MUNICIPAL AUTHORITY

By: _____
       Lorna Gallman
       Executive Director

**SUBTENANT:**

APPROVED AS TO FORM        THE CITY OF PHILADELPHIA, acting by and
City Solicitor                    through the Department of Public Property

By:_____     By: _____
      Renee Garcia                 [NAME]
      Acting City Solicitor          [TITLE]

**ACKNOWLEDGMENT AND CONSENT BY LANDLORD**

IS BBFB LLC

By: _____
       Matthew Canno
       Authorized Representative

Date: _____

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

# EXHIBIT A

**PRIME LEASE**
[attachment]

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

# [EXHIBIT INTENTIONALLY OMITTED IN LEASE]

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

# EXHIBIT B

## Standard City Provisions

1. **Defined Terms**

      Capitalized terms used in this Exhibit and not defined herein shall have the meanings ascribed to them in the Prime Lease or this Sublease. Reference in this Exhibit to the "**City**" shall mean the City of Philadelphia in its municipal capacity.

2. **Executive Order 7-14: Office of the Inspector General and Duties of Those Involved in Transactions with the City.**  In the performance of this Sublease, Sublandlord shall:

      (a)    report to the City's Office of Inspector General (the "**OIG**") knowledge of violations subject to investigation by the OIG pursuant to Executive Order 7-14;

      (b)    cooperate fully with representatives of the OIG by providing complete and accurate information as well as the necessary assistance in matters under investigation;

      (c)    keep conversations and contact with the OIG confidential, except and to the extent the OIG may authorize disclosure; and

      (d)    instruct its employees and contractors that under no circumstances shall any employee or contractor take or threaten to take any action of any sort in an attempt to prevent anyone from providing to a City official information regarding conduct that is the subject of Section 3 of Executive Order 7-14, or providing any information to, or cooperating with, the OIG, or retaliate against anyone for doing so or against anyone who is about to do so.

3. **Gifts, Loans and Favors to City Personnel; Prohibited Gifts.**

      (a)    Sublandlord shall comply with Section 20-604 of the Philadelphia Code (the "**Code**").

      (b)    Pursuant to Executive Order 10-16, no official or employee in the Executive and Administrative branch of City government shall solicit or accept, directly or indirectly, a "Gift" (as defined below) from a person who, at the time or within twelve (12) months preceding the time a Gift is received:

      (i)    is seeking, or has sought, official action from that officer or employee;

      (ii)    has operations or activities regulated by the officer's or employee's department, agency, office, board or commission, or, in the case of members of the Mayor's Cabinet, has operations or activities that are regulated by any department, agency, office, board or commission within the Executive and Administrative branch;

**SUBLEASE - Page 12 of 14**

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

(iii) has a financial or other substantial interest in acts or omissions taken by that officer or employee, which the officer or employee is able to affect through official action; or

(iv) is a "Registered Lobbyist" (as defined below).

As used in this provision, "**Gift**" means a payment, subscription, advance, forbearance, rendering or deposit of money, services entertainment, invitation, food, drink, travel or lodging or anything of value given to, or for the benefit of, a City officer or employee, unless consideration of equal or greater value is received. "Gift" shall not include a political contribution otherwise reportable as required by law, a commercially reasonable loan made in the ordinary course of business, such as a home mortgage loan, or a gift received from a family member of the officer or employee.

As used in this provision, "**Registered Lobbyist**" means any person that engages in lobbying on behalf of a principal for economic consideration, and is registered as such, pursuant to the requirements of Section 20-1202 of The Philadelphia Code, including an attorney at law while engaged in lobbying.

(c)     Landlord understands and agrees that if Landlord offers anything of value to any City official or employee under circumstances where the receipt of such item would violate the provisions of Section 20-604 or the Executive Order, Landlord shall be subject to sanctions, including disqualification from participation in a particular contract to debarment or loss of financial assistance.

(d)     Furthermore, Landlord's breach of Section 20-604 of the Code or of Executive Order 10-16 will constitute a default by Landlord and entitle the City to exercise any rights or remedies available to it under this Lease or otherwise available at law and in equity.

4.     **Non-Indebtedness to City.**

By executing this Sublease, Sublandlord hereby certifies and represents and warrants to the City that Sublandlord and Sublandlord's parent company(ies), subsidiary(ies), and affiliate(s), if any, are not currently indebted to the City, and covenants that Sublandlord will not during the Term be indebted to the City, for or on account of any delinquent taxes (including, but not limited to, taxes collected by the City on behalf of the School District of Philadelphia), liens, judgments, fees or other debts for which no payment plan satisfactory to the City has been established.

5.     **Audit of Affairs.**  During the Term of the Sublease, the City Controller may audit the affairs of the Authority to the extent required under Section 6-400 of the Home Rule Charter.  In order to facilitate such an audit, upon prior reasonable notice, the Authority shall provide the Controller with reasonable access to the Authority's books and financial records.

6.    **Chapter 9-1100 of The Philadelphia Code: Fair Practices.**

In performing under this Sublease, Sublandlord shall comply with the terms of the Philadelphia Home Rule Charter, the Fair Practices Ordinance (Chapter 9-1100 of the Code), and the Mayor's Executive Order No. 04-86, as each may be amended from time to time, which together articulate policies against discrimination which have been adopted by the City. In addition, to the extent those provisions do not explicitly prohibit or cover certain types of discriminatory conduct, in performing under this Sublease, Sublandlord acknowledges that Sublandlord has a broader obligation under this Sublease. Therefore, in connection with providing any service or fulfilling any duty under this Sublease, as well as in Sublandlord's employment, housing, or real estate practices, Sublandlord shall not discriminate or permit discrimination, whether by direct or indirect practice of exclusion, distinction, restriction, segregation, limitation, refusal, denial, differentiation, or preference, against any individual on the basis of actual or perceived race, ethnicity, color, sex (including pregnancy, childbirth, or a related medical condition), sexual orientation, gender identity, religion, national origin, ancestry, age, disability, marital status, source of income, familial status, genetic information, domestic or sexual violence victim status; or Acquired Immune Deficiency Syndrome status, or engage in any other act or practice made unlawful under the Home Rule Charter, Chapter 9-1100 of the Code, the Executive Order, or under the nondiscrimination laws of the United States or the Commonwealth of Pennsylvania. Sublandlord's breach of this section constitutes an event of default and entitles Tenant to all rights and remedies provided in this Lease or otherwise available at law or in equity.

7.    **Chapter 17-400 of The Philadelphia Code: Nondiscrimination.**

(a)    In accordance with Chapter 17-400 of the Code, Sublandlord's payment or reimbursement of membership fees or other expenses associated with participation by its employees in an exclusionary private organization, insofar as such participation confers an employment advantage or constitutes or results in discrimination with regard to hiring, tenure of employment, promotions, terms, or privileges or conditions of employment on the basis of race, color, sex, sexual orientation, religion, age, national origin or ancestry, constitutes a breach of this Sublease entitling the City to all rights and remedies provided in this Sublease or otherwise available at law or in equity.

(b)    Sublandlord shall cooperate with the Philadelphia Commission on Human Relations (the "**Commission**") in any manner which the Commission deems reasonable and necessary for the Commission to carry out its responsibilities under Chapter 17-400 of the Code. Sublandlord's failure to cooperate with the Commission is a default under this Sublease that entitles the City to all rights and remedies provided in this Sublease or otherwise available at law or in equity.

8.    **Sovereign Immunity.**

Notwithstanding other provisions of this Lease or the City of Philadelphia's status as a Tenant under this Lease, this Lease does not waive any of the rights, remedies, and defenses of the City of Philadelphia under the Political Subdivision Tort Claims Act, 42 Pa. C.S.A. §§ 8541 et seq.

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

**EXHIBIT B**

**INTENTIONALLY OMITTED**

**EXHIBIT C**

**Memorandum of Critical Dates**

**MEMORANDUM OF CRITICAL DATES**

This Memorandum confirms critical dates under the Lease, dated _____, between IS BBFB LLC ("**Landlord**") and the PHILADELPHIA MUNICIPAL AUTHORITY ("**Tenant**") with contemporaneous Sublease to THE CITY OF PHILADELPHIA, by and through its Department of Public Property ("**Subtenant**").  The undersigned hereby stipulate to the following dates:

- **"Occupancy Date"** is _____

- **"Rent Commencement Date"** for the Original Premises is _____.

- **"Rent Commencement Date"** for the Additional Premises is _____.

- **Lease Year 1** begins at 12:01am on the Occupancy Date and ends at 11:59pm on _____.

- The **"Initial Term"** (i.e., the fit-out period and Lease Years 1 – 15) begins at 12:01am on the Effective Date and ends at 11:59pm on _____.

- The **"Renewal Term"** (i.e., Lease Years 16 – 25, if Tenant exercises its option to renew) begins at 12:01am on _____ and ends at 11:59pm on _____

LANDLORD
**IS BBFB LLC**


By: _____
         Matthew Canno
         Authorized Representative


APPROVED AS TO FORM
City Solicitor

SUBTENANT (on Subtenant and Tenant's behalf)
**THE CITY OF PHILADELPHIA**, acting by and through the Department of Public Property,


By:_____

By: _____
         [NAME]
         Commissioner

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

## EXHIBIT D

## Base Rent Payment Schedule

| Lease Period | Base Rent Per RSF | Annual Base Rent | Monthly Base Rent |
|---|---|---|---|
| **Initial Term** | | | |
| **Lease Year 1*** | $20.50 | $939,658.50 | $78,304.88 |
| **Lease Year 2** | $20.50 | $939,658.50 | $78,304.88 |
| **Lease Year 3** | $20.50 | $939,658.50 | $78,304.88 |
| **Lease Year 4** | $20.50 | $939,658.50 | $78,304.88 |
| **Lease Year 5** | $20.50 | $939,658.50 | $78,304.88 |
| **Lease Year 6** | $22.55 | $1,033,624.35 | $86,135.36 |
| **Lease Year 7** | $22.55 | $1,033,624.35 | $86,135.36 |
| **Lease Year 8** | $22.55 | $1,033,624.35 | $86,135.36 |
| **Lease Year 9** | $22.55 | $1,033,624.35 | $86,135.36 |
| **Lease Year 10** | $22.55 | $1,033,624.35 | $86,135.36 |
| **Lease Year 11** | $24.81 | $1,136,986.79 | $94,748.90 |
| **Lease Year 12** | $24.81 | $1,136,986.79 | $94,748.90 |
| **Lease Year 13** | $24.81 | $1,136,986.79 | $94,748.90 |
| **Lease Year 14** | $24.81 | $1,136,986.79 | $94,748.90 |
| **Lease Year 15** | $24.81 | $1,136,986.79 | $94,748.90 |
| **Renewal Term (if any)** | | | |
| **Lease Year 16** | $28.53 | $1,307,534.80 | $108,961.23 |
| **Lease Year 17** | $28.53 | $1,307,534.80 | $108,961.23 |
| **Lease Year 18** | $28.53 | $1,307,534.80 | $108,961.23 |
| **Lease Year 19** | $28.53 | $1,307,534.80 | $108,961.23 |
| **Lease Year 20** | $28.53 | $1,307,534.80 | $108,961.23 |
| **Lease Year 21** | $32.80 | $1,503,665.02 | $125,305.42 |
| **Lease Year 22** | $32.80 | $1,503,665.02 | $125,305.42 |

| Lease Year 23 | $32.80 | $1,503,665.02 | $125,305.42 |
|---|---|---|---|
| Lease Year 24 | $32.80 | $1,503,665.02 | $125,305.42 |
| Lease Year 25 | $32.80 | $1,503,665.02 | $125,305.42 |

**\*NOTE:** Tenant's Rent payments begin on the Rent Commencement Date for the Original Premises and the Additional Premises, respectively. If the Rent Commencement Date for the Original Premises is earlier than the Rent Commencement Date for the Additional Premises, in accordance with the definition of Rent Commencement Date under Article II (Definitions), above, then the Base Rent for that period of time following the Rent Commencement Date for the Original Premises and prior to the Rent Commencement Date for the Additional Premises shall equal $62,810.29 per month (i.e., $20.50 multiplied by 36,767 RSF, divided by 12) until such time as the Rent Commencement Date occurs for the Additional Premises, to be prorated for any partial month.

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

## EXHIBIT E

## FINAL SPACE PLANS

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

**FIT-OUT DATA:**

LEASE AREA:
FIRST FLOOR: 4,863 RSF
THIRD FLOOR: 11,114 RSF
FOURTH FLOOR: 11,261 RSF
FIFTH FLOOR: 9,529 RSF

TOTAL LEASE AREA: 36,767 RSF

TOTAL ROOMS: 44

TOTAL BEDS: 120

# ELIZA SHIRLEY



DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

**PROGRAM:**

| | | | | | |
|---|---|---|---|---|---|
| | CIRCULATION | | CAFETERIA | | BEDROOMS |
| | ADMINISTRATION | | KITCHEN | | STORAGE |
| | BATHROOMS/ JANITOR CLOSET | | AMENITY | | NOT IN SCOPE |

*THIS PLAN IS WAS DRAWN WITHOUT THE AID OF A SITE SURVEY DONE BY A CERTIFIED SURVEYOR AND MAY CONTAIN ERRORS OR INCONSISTENCIES. PLAN IS FOR FEASIBILITY PURPOSES ONLY AND IS NOT FOR USE IN CONSTRUCTION





STOR. | STAFF/ BREAK | OFFICE 3 | OFFICE 2 | OFFICE 1 | LOUNGE

BATH

ELEVATOR

RECEPTION/ WAITING

BROAD ST ENTRY

DIRECTOR'S OFFICE | OFFICE 4 | CONFERENCE ROOM

STUDIO C ARCHITECTURE

# ELIZA SHIRLEY LEASE PLANS

PROPOSED
FIRST FLOOR PLAN
SCALE: 1/16"=1'-0"

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

**PROGRAM:**

| | | |
|---|---|---|
| CIRCULATION | CAFETERIA | BEDROOMS |
| ADMINISTRATION | KITCHEN | STORAGE |
| BATHROOMS/ JANITOR CLOSET | AMENITY | NOT IN SCOPE |

*THIS PLAN IS WAS DRAWN WITHOUT THE AID OF A SITE SURVEY DONE BY A CERTIFIED SURVEYOR AND MAY CONTAIN ERRORS OR INCONSISTENCIES. PLAN IS FOR FEASIBILITY PURPOSES ONLY AND IS NOT FOR USE IN CONSTRUCTION





# ELIZA SHIRLEY LEASE PLANS

STUDIO C ARCHITECTURE

PROPOSED THIRD FLOOR PLAN
SCALE: 1/16"=1'-0"

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

**PROGRAM:**

| | | |
|---|---|---|
| CIRCULATION | CAFETERIA | BEDROOMS |
| ADMINISTRATION | KITCHEN | STORAGE |
| BATHROOMS/ JANITOR CLOSET | AMENITY | NOT IN SCOPE |

*THIS PLAN IS WAS DRAWN WITHOUT THE AID OF A SITE SURVEY DONE BY A CERTIFIED SURVEYOR AND MAY CONTAIN ERRORS OR INCONSISTENCIES. PLAN IS FOR FEASIBILITY PURPOSES ONLY AND IS NOT FOR USE IN CONSTRUCTION





**ELIZA SHIRLEY LEASE PLANS**

PROPOSED
FOURTH FLOOR PLAN
SCALE: 1/16"=1'-0"

STUDIO C
ARCHITECTURE

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

**PROGRAM:**

| | | | | | |
|---|---|---|---|---|---|
| ☐ | CIRCULATION | ☐ | CAFETERIA | ☐ | BEDROOMS |
| ☐ | ADMINISTRATION | ☐ | KITCHEN | ☐ | STORAGE |
| ☐ | BATHROOMS/ JANITOR CLOSET | ☐ | AMENITY | ☐ | NOT IN SCOPE |

*THIS PLAN IS WAS DRAWN WITHOUT THE AID OF A SITE SURVEY DONE BY A CERTIFIED SURVEYOR AND MAY CONTAIN ERRORS OR INCONSISTENCIES. PLAN IS FOR FEASIBILITY PURPOSES ONLY AND IS NOT FOR USE IN CONSTRUCTION





**ELIZA SHIRLEY LEASE PLANS**

STUDIO C ARCHITECTURE

PROPOSED
FIFTH FLOOR PLAN
SCALE: 1/16"=1'-0"

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

**PROGRAM:**

| | | |
|---|---|---|
| CIRCULATION | DINING AREA | BEDROOMS |
| ADMINISTRATION | STORAGE | NOT IN SCOPE |
| BATHROOMS/ JANITOR CLOSET | AMENITY | |

*THIS PLAN IS WAS DRAWN WITHOUT THE AID OF A SITE SURVEY DONE BY A CERTIFIED SURVEYOR AND MAY CONTAIN ERRORS OR INCONSISTENCIES. PLAN IS FOR FEASIBILITY PURPOSES ONLY AND IS NOT FOR USE IN CONSTRUCTION





**OEM TEST-FIT PLAN**

PROPOSED
FIRST FLOOR PLAN
SCALE: 1/16"=1'-0"

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

**PROGRAM:**

- CIRCULATION
- ADMINISTRATION
- BATHROOMS/ JANITOR CLOSET
- DINING AREA
- STORAGE
- AMENITY
- BEDROOMS
- NOT IN SCOPE

*THIS PLAN IS WAS DRAWN WITHOUT THE AID OF A SITE SURVEY DONE BY A CERTIFIED SURVEYOR AND MAY CONTAIN ERRORS OR INCONSISTENCIES. PLAN IS FOR FEASIBILITY PURPOSES ONLY AND IS NOT FOR USE IN CONSTRUCTION





**OEM TEST-FIT PLAN**

PROPOSED
SECOND FLOOR PLAN
SCALE: 1/16"=1'-0"

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

**EXHIBIT F**

**Construction Plans**



**ARCHITECT:**

C ARCHITECTURE, LLC
422 DUDLEY AVENUE
NARBERTH, PA 19072
P: 610-580-7964
E: CHRIS.CARICKHOFF@GMAIL.COM

**DEVELOPER:**
IRONSTONE

2929 WALNUT STREET, SUITE 1540
PHILADELPHIA, PA 19104

# ELIZA SHIRLEY/OEM FIT-OUT

216-20 N BROAD STREET
PHILADELPHIA PA 19102





## SITE MAP

## SHEET INDEX

| SHEET NO. | SHEET TITLE | | | |
|---|---|---|---|---|
| G-1 | COVER SHEET, CODE REVIEW & WALL TYPES | ● | | |
| G-2 | GENERAL NOTES | ● | | |
| G-3 | ADA DETAILS | ● | | |
| G-4 | PROPOSED EGRESS PLANS | ● | | |
| EX-100 | EXISTING FIRST FLOOR PLAN | ● | | |
| EX-101 | EXISTING SECOND FLOOR PLAN | ● | | |
| EX-102 | EXISTING THIRD FLOOR PLAN | ● | | |
| EX-103 | EXISTING FOURTH FLOOR PLAN | ● | | |
| EX-104 | EXISTING FIFTH FLOOR PLAN | ● | | |
| D-100 | PROPOSED FIRST FLOOR DEMOLITION PLAN | ● | | |
| D-101 | PROPOSED SECOND FLOOR DEMOLITION PLAN | ● | | |
| D-102 | PROPOSED THIRD FLOOR DEMOLITION PLAN | ● | | |
| D-103 | PROPOSED FOURTH FLOOR DEMOLITION PLAN | ● | | |
| D-104 | PROPOSED FIFTH FLOOR DEMOLITION PLAN | ● | | |
| A-100 | PROPOSED FIRST FLOOR CONSTRUCTION PLAN | ● | | |
| A-101 | PROPOSED SECOND FLOOR CONSTRUCTION PLAN | ● | | |
| A-102 | PROPOSED THIRD FLOOR CONSTRUCTION PLAN | ● | | |
| A-103 | PROPOSED FOURTH FLOOR CONSTRUCTION PLAN | ● | | |
| A-104 | PROPOSED FIFTH FLOOR CONSTRUCTION PLAN | ● | | |
| A-200 | DOOR SCHEDULE | ● | | |
| ID-500 | ENLARGED KITCHEN AND SHOWER PLANS | ● | | |



1. FULL HEIGHT PARTITION (NON-RATED)
2. WALL TYPE 2 — PLUMBING PARTITION (NON-RATED)
3. 1-HOUR STEEL STUD WALL — UL U419 - NON LOAD BEARING — SITE 50
4. EXISTING 1-HOUR STEEL STUD WALL — UL U419 - NON LOAD BEARING — SITE 50

ELIZA SHIRLEY/OEM FIT-OUT
216-20 N BROAD STREET
PHILADELPHIA PA 19102

COVER SHEET, CODE REVIEW & WALL TYPES

G-1

## GENERAL CONDITIONS

## INTERIOR DOORS

### GYPSUM BOARD ASSEMBLIES

### WINDOWS

### FINISH CARPENTRY

## ROUGH CARPENTRY

### FLOORING

### PAINTING

## HARDWARE

### INSULATION





ARCHITECTURE, LLC

1425 RACE STREET - FIRST , THIRD, FOURTH & FIFTH FLOOR

1425 RACE STREET
PHILADELPHIA PA 19102

PROJECT NOTES

G-2






EXTERIOR ARCHITECTURE, LLC

1425 RACE STREET - FIRST, THIRD, FOURTH & FIFTH FLOOR

1425 RACE STREET
PHILADELPHIA, PA 19102

ADA DETAILS

G-3



TOTAL TENANT 'A' OCCUPANT LOAD = 144
TOTAL TENANT 'B' OCCUPANT LOAD = 66
TOTAL OCCUPANT LOAD = 210

ELIZA SHIRLEY/OEM FIT-OUT

PROPOSED EGRESS PLANS

G-4



ARCHITECTURE, LLC

ELIZA SHIRLEY/OEM FIT-OUT
214-30 N. BROAD STREET
PHILADELPHIA, PA 19102

KEY PLAN

G-5

**FLOOR PLAN LEGEND:**

EXISTING WALLS          EXISTING DOOR







1425 RACE STREET - 1ST-5TH FLOOR RENOVATIONS

1425 RACE STREET
PHILADELPHIA, PA 19102

ARCHITECTURE, LLC

EXISTING FIRST FLOOR PLAN

EX-100



**FLOOR PLAN LEGEND:**

EXISTING WALLS          EXISTING DOOR







EXISTING SECOND FLOOR PLAN

1425 RACE STREET - 1ST-5TH FLOOR RENOVATIONS

1425 RACE STREET
PHILADELPHIA PA 19102

EXISTING
SECOND
FLOOR PLAN

EX-101





**FLOOR PLAN LEGEND:**

EXISTING WALLS          EXISTING DOOR



EX-101  EXISTING THIRD FLOOR PLAN

1425 RACE STREET - 1ST-5TH FLOOR RENOVATIONS

1425 RACE STREET
PHILADELPHIA, PA 19102

ARCHITECTURE, LLC

EX-102

FLOOR PLAN LEGEND:

EXISTING WALLS          EXISTING DOOR



1/EX-103  EXISTING FOURTH FLOOR PLAN



1425 RACE STREET - 1ST-5TH FLOOR RENOVATIONS

1425 RACE STREET
PHILADELPHIA, PA 19102

ARCHITECTURE, LLC

EXISTING
FOURTH FLOOR
PLAN

EX-103

**FLOOR PLAN LEGEND:**

EXISTING WALLS    EXISTING DOOR



EX-104

ARCHITECTURE, LLC

1425 RACE STREET - 1ST-5TH FLOOR RENOVATIONS

1425 RACE STREET
PHILADELPHIA, PA 19102

EXISTING FIFTH
FLOOR PLAN

EXISTING FIFTH FLOOR PLAN

**RCP LEGEND:**

**RCP NOTES:**

**GENERAL NOTES:**



ARCHITECTURE, LLC



1425 RACE STREET - 1ST-5TH FLOOR RENOVATIONS

1425 RACE STREET
PHILADELPHIA, PA 19102

EXISTING FIRST FLOOR POWER/DATA PLAN



EX-130

RCP LEGEND:

RCP NOTES:

GENERAL NOTES:





ARCHITECTURE, LLC

1425 RACE STREET - 1ST-5TH FLOOR RENOVATIONS

1425 RACE STREET
PHILADELPHIA PA 19102

EXISTING 2ND FLOOR POWER/DATA PLAN

EX-131



**RCP LEGEND:**

**RCP NOTES:**

**GENERAL NOTES:**







1/EX-132  EXISTING 3RD FLOOR POWER/DATA PLAN

ARCHITECTURE, LLC

1425 RACE STREET - 1ST-5TH FLOOR RENOVATIONS

1425 RACE STREET
PHILADELPHIA PA 19102

EXISTING 3RD FLOOR POWER/DATA PLAN

EX-132

RCP LEGEND:

RCP NOTES:

GENERAL NOTES:



ARCHITECTURE, LLC

1EX-133 EXISTING 4TH FLOOR POWER/DATA PLAN



1425 RACE STREET - 1ST-5TH FLOOR RENOVATIONS

1425 RACE STREET
PHILADELPHIA PA 19102

EXISTING 4TH
FLOOR
POWER/DATA
PLAN

EX-133





**RCP LEGEND:**

**RCP NOTES:**

**GENERAL NOTES:**

EXISTING 5TH FLOOR POWER/DATA PLAN

1425 RACE STREET - 1ST-5TH FLOOR RENOVATIONS

1425 RACE STREET,
PHILADELPHIA PA, 19102

ARCHITECTURE, LLC

EXISTING 5TH
FLOOR
POWER/DATA
PLAN

EX-134



RCP LEGEND:



EXISTING 2X2 LED LAY-IN LIGHT FIXTURE

EXISTING 2X2 LAY-IN VENT

EXISTING 1X2 LAY-IN VENT

SURFACE MOUNTED PENDANT

EXHAUST FAN

WALL MOUNTED UP-LIGHT

LINEAR TROUGH LIGHT

ARCHITECTURE, LLC

1425 RACE STREET - 1ST-5TH FLOOR RENOVATIONS

1425 RACE STREET
PHILADELPHIA PA 19102

EXISTING 1ST FLOOR RCP

EXISTING 1ST
FLOOR
REFLECTED
CEILING PLAN

EX-700



RCP LEGEND:

EXISTING 2X2 LED LAY-IN LIGHT FIXTURE

EXISTING 2X2 LAY-IN VENT

EXISTING 1X2 LAY-IN VENT

SURFACE MOUNTED PENDANT

EXHAUST FAN

WALL MOUNTED UP-LIGHT

LINEAR TROUGH LIGHT



1 EXISTING 2ND FLOOR RCP
EX-701

ARCHITECTURE, LLC

1425 RACE STREET - 1ST-5TH FLOOR RENOVATIONS
1425 RACE STREET
PHILADELPHIA, PA 19102

EXISTING 2ND FLOOR REFLECTED CEILING PLAN

EX-701

**RCP LEGEND:**

EXISTING 2X2 LED LAY-IN LIGHT FIXTURE

EXISTING 2X2 LAY-IN VENT

EXISTING 1X2 LAY-IN VENT

SURFACE MOUNTED PENDANT

EXHAUST FAN

WALL MOUNTED UP-LIGHT

LINEAR TROUGH LIGHT

ARCHITECTURE, LLC

1425 RACE STREET - 1ST-5TH FLOOR RENOVATIONS

1425 RACE STREET
PHILADELPHIA PA 19102

EX-702

EXISTING 3RD FLOOR RCP



**RCP LEGEND:**

| | | | |
|---|---|---|---|
| EXISTING 2X2 LED LAY-IN LIGHT FIXTURE | EXISTING 1X2 LAY-IN VENT | EXHAUST FAN | LINEAR TROUGH LIGHT |
| EXISTING 2X2 LAY-IN VENT | SURFACE MOUNTED PENDANT | WALL MOUNTED UP-LIGHT | |



ARCHITECTURE, LLC

1425 RACE STREET - 1ST-5TH FLOOR RENOVATIONS

1425 RACE STREET
PHILADELPHIA PA 19102

EXISTING 4TH
FLOOR
REFLECTED
CEILING PLAN

EX-703

1/EX-703 EXISTING 4TH FLOOR RCP



**RCP LEGEND:**

| | | | |
|---|---|---|---|
| ⊠ | EXISTING 2X2 LED LAY-IN LIGHT FIXTURE | ▪ | EXHAUST FAN |
| ▦ | EXISTING 2X2 LAY-IN VENT | ⊕ | SURFACE MOUNTED PENDANT |
| ▪ | EXISTING 1X2 LAY-IN VENT | ▭ | WALL MOUNTED UP-LIGHT |
| | | — — | LINEAR TROUGH LIGHT |

EX-704 EXISTING 5TH FLOOR RCP

1425 RACE STREET - 1ST-5TH FLOOR RENOVATIONS

1425 RACE STREET
PHILADELPHIA, PA 19102

EXISTING 5TH FLOOR REFLECTED CEILING PLAN

ARCHITECTURE, LLC

EX-704

**FLOOR PLAN LEGEND:**

EXISTING WALLS

TO BE REMOVED

EXISTING DOOR

**KEYED NOTES:**

1. REMOVE (E) DOOR, FRAME AND HARDWARE.
2. REMOVE (E) PLUMBING AT THIS LOCATION.
3. REMOVE (E) MILLWORK AT THIS LOCATION.
4. REMOVE (E) FLOORING AS REQUIRED.
5. REMOVE (E) WALL AS INDICATED ON PLAN. G.C. TO PROVIDE TEMPORARY SUPPORT AS REQUIRED PRIOR TO REMOVAL OF BEARING WALLS.
6. INFILL EXISTING FLOOR FIT WITH NEW CONCRETE FLUSH WITH ADJACENT FLOOR.

**GENERAL NOTES:**

1. DEMOLITION CONTRACTOR TO PROVIDE TEMPORARY BRACING, SHORING, AND PROTECTION AS REQUIRED DURING THE DEMOLITION AND NEW CONSTRUCTION PHASES.

2. DEMOLITION CONTRACTOR TO VERIFY ALL EXISTING FIELD CONDITIONS PRIOR TO DEMOLITION AND IS TO NOTIFY THE ARCHITECT OF ANY CONFLICTS. DO NOT COMMENCE WORK UNTIL CONDITION IS RESOLVED AND MODIFICATION IS APPROVED BY THE ARCHITECT.

3. THE ARCHITECT IS NOT RESPONSIBLE FOR UNFORESEEN CONDITIONS FOUND DURING DEMOLITION PHASE OF CONSTRUCTION. DEMOLITION CONTRACTOR REQUIRED TO NOTIFY OWNER, THE ARCHITECT AND STRUCTURAL ENGINEER OF EXISTING CONDITIONS THAT DIFFER FROM RESPONSIBLY ASSUMED CONDITIONS.

4. DEMOLITION CONTRACTOR TO PROVIDE PROTECTIVE FENCING DURING DEMOLITION AND CONSTRUCTION AT PROJECT EXTENTS.

5. DEMOLITION CONTRACTOR TO REVERIFY/COORDINATE WITH STRUCTURAL ENGINEERING DRAWINGS.

6. THE STRUCTURE IS DESIGNED TO BE SELF-SUPPORTING AND STABLE AFTER CONSTRUCTION IS COMPLETE. IT IS THE CONTRACTOR'S SOLE RESPONSIBILITY TO DETERMINE CONSTRUCTION PROCEDURES AND SEQUENCE TO INSURE THE SAFETY OF THE BUILDING AND ITS COMPONENT PARTS DURING CONSTRUCTION. THIS INCLUDES THE ADDITION OF NECESSARY SHORING, SHEATING, TEMPORARY BRACING, GUYS OR TIE-DOWNS, PROVIDE ALL SHORING AND BRACING REQUIRED TO STABILIZE AND PROTECT EXISTING AND ADJACENT STRUCTURES AND SYSTEMS DURING COURSE OF DEMOLITION AND CONSTRUCTION. SUCH MATERIAL SHALL REMAIN THE PROPERTY OF THE CONTRACTOR AFTER COMPLETION OF THE PROJECT.





C

ARCHITECTURE, LLC

ELIZA SHIRLEY/OEM FIT-OUT

215-20 S. BROAD STREET
PHILADELPHIA PA 19102

FIRST FLOOR DEMOLITION PLAN

D-100



**FLOOR PLAN LEGEND:**

EXISTING WALLS    EXISTING DOOR

TO BE REMOVED

**KEYED NOTES:**

1. REMOVE (E) DOOR, FRAME AND HARDWARE
2. REMOVE (E) PLUMBING AT THIS LOCATION.
3. REMOVE (E) MILLWORK AT THIS LOCATION.
4. REMOVE (E) FLOORING AS REQUIRED.
5. REMOVE (E) WALL AS INDICATED ON PLAN. G.C. TO PROVIDE TEMPORARY SUPPORT AS REQUIRED PRIOR TO REMOVAL OF BEARING WALLS

**GENERAL NOTES:**

1. DEMOLITION CONTRACTOR TO PROVIDE TEMPORARY BRACING, SHORING, AND PROTECTION AS REQUIRED DURING THE DEMOLITION AND NEW CONSTRUCTION PHASE.

2. DEMOLITION CONTRACTOR TO VERIFY ALL EXISTING FIELD CONDITIONS PRIOR TO DEMOLITION AND IS TO NOTIFY THE ARCHITECT OF ANY CONFLICTS. DO NOT COMMENCE WORK UNTIL CONDITION IS RESOLVED AND MODIFICATION IS APPROVED BY THE ARCHITECT.

3. THE ARCHITECT IS NOT RESPONSIBLE FOR UNFORESEEN CONDITIONS FOUND DURING DEMOLITION PHASE OF CONSTRUCTION. DEMOLITION CONTRACTOR REQUIRED TO NOTIFY OWNER, THE ARCHITECT AND STRUCTURAL ENGINEER OF EXISTING CONDITIONS THAT DIFFER FROM RESPONSIBLY ASSURED CONDITION.

4. DEMOLITION CONTRACTOR TO PROVIDE PROTECTIVE FENCING DURING DEMOLITION AND CONSTRUCTION AT PROJECT EXTENTS.

5. DEMOLITION CONTRACTOR TO REFER/COORDINATE WITH STRUCTURAL ENGINEERING DRAWINGS.

6. THE STRUCTURE IS DESIGNED TO BE SELF-SUPPORTING AND STABLE AFTER CONSTRUCTION IS COMPLETE. IT IS THE CONTRACTOR'S SOLE RESPONSIBILITY TO DETERMINE CONSTRUCTION PROCEDURES AND SEQUENCE AND TO INSURE THE SAFETY OF THE BUILDING AND ITS COMPONENTS DURING CONSTRUCTION. THIS INCLUDES THE ADDITION OF NECESSARY SHORING, SHEETING, TEMPORARY BRACING, GUYS OR TIE-DOWNS. PROVIDE ALL SHORING AND BRACING REQUIRED TO STABILIZE AND PROTECT EXISTING AND ADJACENT STRUCTURES AND SYSTEMS DURING COURSE OF DEMOLITION AND CONSTRUCTION. SUCH MATERIAL SHALL REMAIN THE PROPERTY OF THE CONTRACTOR AFTER COMPLETION OF THE PROJECT.





ARCHITECTURE, LLC

RA406747

1425 RACE STREET - 1ST-5TH FLOOR RENOVATIONS

1425 RACE STREET
PHILADELPHIA PA 19102

SECOND FLOOR DEMOLITION PLAN

D-101

SECOND FLOOR DEMOLITION PLAN



**FLOOR PLAN LEGEND:**

EXISTING WALLS

TO BE REMOVED

EXISTING DOOR

**KEYED NOTES:**

① REMOVE (E) DOOR, FRAME AND HARDWARE.

② REMOVE (E) PLUMBING AT THIS LOCATION.

③ REMOVE (E) MILLWORK AT THIS LOCATION.

④ REMOVE (E) FLOORING AS REQUIRED.

⑤ REMOVE (E) WALL AS INDICATED ON PLAN. (I.E. TO PROVIDE TEMPORARY SUPPORT AS REQUIRED PRIOR TO REMOVAL OF BEARING WALLS)

**GENERAL NOTES:**

1. DEMOLITION CONTRACTOR TO PROVIDE TEMPORARY BRACING, SHORING, AND PROTECTION AS REQUIRED DURING THE DEMOLITION AND NEW CONSTRUCTION PHASES.

2. DEMOLITION CONTRACTOR TO VERIFY ALL EXISTING FIELD CONDITIONS PRIOR TO DEMOLITION AND IS TO NOTIFY THE ARCHITECT OF ANY CONFLICTS. DO NOT COMMENCE WORK UNTIL CONDITION IS RESOLVED AND MODIFICATION IS APPROVED BY THE ARCHITECT.

1. DEMOLITION CONTRACTOR IS NOT RESPONSIBLE FOR UNFORESEEN CONDITIONS FOUND DURING DEMOLITION PHASE OF CONSTRUCTION. DEMOLITION CONTRACTOR REQUIRED TO NOTIFY OWNER. THE ARCHITECT AND STRUCTURAL ENGINEER OF EXISTING CONDITIONS THAT DIFFER FROM RESPONSIBLY ASSUMED CONDITIONS.

4. DEMOLITION CONTRACTOR TO PROVIDE PROTECTIVE FENCING DURING DEMOLITION AND CONSTRUCTION AT PROJECT EXTENTS.

5. DEMOLITION CONTRACTOR TO REFER/COORDINATE WITH STRUCTURAL ENGINEERING DRAWINGS.

6. THE STRUCTURE IS DESIGNED TO BE SELF-SUPPORTING AND STABLE AFTER CONSTRUCTION IS COMPLETE. IT IS THE CONTRACTOR'S SOLE RESPONSIBILITY TO DETERMINE CONSTRUCTION PROCEDURES AND SEQUENCE TO INSURE THE SAFETY OF THE BUILDING AND ITS COMPONENTS DURING CONSTRUCTION. THIS INCLUDES THE ADDITION OF NECESSARY SHORING, SHEETING, TEMPORARY BRACING, GUYS OR TIE-DOWNS. PROVIDE ALL SHORING AND BRACING REQUIRED TO STABILIZE AND PROTECT EXISTING AND ADJACENT STRUCTURES AND SYSTEMS DURING COURSE OF DEMOLITION AND CONSTRUCTION. SUCH MATERIAL SHALL REMAIN THE PROPERTY OF THE CONTRACTOR AFTER COMPLETION OF THE PROJECT.





**ARCHITECTURE, LLC**

RA406747

THIRD FLOOR DEMOLITION PLAN
1/D-102



SHEET SIZE - ARCH D _ 24" x 36"

**ELIZA SHIRLEY/OEM FIT-OUT**

216-30 N. BROAD STREET
PHILADELPHIA PA 19102

THIRD FLOOR
DEMOLITION
PLAN

**D-102**





**FLOOR PLAN LEGEND:**

EXISTING WALLS — EXISTING DOOR

TO BE REMOVED

**KEYED NOTES:**

① REMOVE (E) DOOR, FRAME AND HARDWARE

② REMOVE (E) PLUMBING AT THIS LOCATION

③ REMOVE (E) MILLWORK AT THIS LOCATION

④ REMOVE (E) FLOORING AS REQUIRED

⑤ REMOVE (E) WALL AS INDICATED ON PLAN. G.C. TO PROVIDE TEMPORARY SUPPORT AS REQUIRED PRIOR TO REMOVAL OF BEARING WALLS

**GENERAL NOTES:**

1. DEMOLITION CONTRACTOR TO PROVIDE TEMPORARY BRACING, SHORING AND PROTECTION AS REQUIRED DURING THE DEMOLITION AND NEW CONSTRUCTION PHASES.

2. DEMOLITION CONTRACTOR TO VERIFY ALL EXISTING FIELD CONDITIONS PRIOR TO DEMOLITION AND IS TO NOTIFY THE ARCHITECT OF ANY CONFLICTS. DO NOT COMMENCE WORK UNTIL CONDITIONS RESOLVED AND MODIFICATION IS APPROVED BY THE ARCHITECT.

3. THE ARCHITECT IS NOT RESPONSIBLE FOR UNFORESEEN CONDITIONS FOUND DURING DEMOLITION PHASE OF CONSTRUCTION. DEMOLITION CONTRACTOR REQUIRED TO NOTIFY OWNER. THE ARCHITECT AND STRUCTURAL ENGINEER OF EXISTING CONDITIONS THAT DIFFER FROM RESPONSIBLY ASSURED CONDITIONS.

4. DEMOLITION CONTRACTOR TO PROVIDE PROTECTIVE FENCING DURING DEMOLITION AND CONSTRUCTION AT PROJECT EXTENTS.

5. DEMOLITION CONTRACTOR TO REFER/COORDINATE WITH STRUCTURAL ENGINEERING DRAWINGS.

6. THE STRUCTURE IS DESIGNED TO BE SELF-SUPPORTING AND STABLE AFTER CONSTRUCTION IS COMPLETE. IT IS THE CONTRACTORS SOLE RESPONSIBILITY TO DETERMINE CONSTRUCTION PROCEDURES AND SEQUENCE TO INSURE THE SAFETY OF THE BUILDING AND ITS COMPONENTS DURING CONSTRUCTION. THIS INCLUDES THE ADDITION OF NECESSARY SHORING, SHEETING, TEMPORARY BRACING, GUYS OR TIE-DOWNS. PROVIDE ALL SHORING AND BRACING REQUIRED TO STABILIZE AND PROTECT EXISTING AND ADJACENT STRUCTURES AND SYSTEMS DURING COURSE OF DEMOLITION AND CONSTRUCTION. SUCH MATERIAL SHALL REMAIN THE PROPERTY OF THE CONTRACTOR AFTER COMPLETION OF THE PROJECT.

D-103  FOURTH FLOOR DEMOLITION PLAN

**ELIZA SHIRLEY/OEM FIT-OUT**
2146-50 N BROAD STREET
PHILADELPHIA PA 19102

FOURTH FLOOR
DEMOLITION
PLAN

D-103







**FLOOR PLAN LEGEND:**

EXISTING WALLS          EXISTING DOOR

TO BE REMOVED

**KEYED NOTES:**

① REMOVE (E) DOOR, FRAME AND HARDWARE
② REMOVE (E) PLUMBING AT THIS LOCATION
③ REMOVE (E) MILLWORK AT THIS LOCATION
④ REMOVE (E) FLOORING AS REQUIRED
⑤ REMOVE (E) WALL AS INDICATED ON PLAN. G.C. TO PROVIDE TEMPORARY SUPPORT AS REQUIRED PRIOR TO REMOVAL OF BEARING WALLS

**GENERAL NOTES:**

1. DEMOLITION CONTRACTOR TO PROVIDE TEMPORARY BRACING, SHORING, AND PROTECTION AS REQUIRED DURING THE DEMOLITION AND NEW CONSTRUCTION PHASES.

2. DEMOLITION CONTRACTOR TO VERIFY ALL EXISTING FIELD CONDITIONS PRIOR TO DEMOLITION AND IS TO NOTIFY THE ARCHITECT OF ANY CONFLICTS. DO NOT COMMENCE WORK UNTIL CONDITION IS RESOLVED AND MODIFICATION IS APPROVED BY THE ARCHITECT.

3. THE ARCHITECT IS NOT RESPONSIBLE FOR UNFORESEEN CONDITIONS FOUND DURING DEMOLITION PHASE OF CONSTRUCTION. DEMOLITION CONTRACTOR REQUIRED TO NOTIFY OWNER. THE ARCHITECT AND STRUCTURAL ENGINEER OF EXISTING CONDITIONS THAT DIFFER FROM RESPONSIBLY ASSUMED COVERAGE.

4. DEMOLITION CONTRACTOR TO PROVIDE PROTECTIVE FENCING DURING DEMOLITION AND CONSTRUCTION AT PROJECT EXTENTS.

5. DEMOLITION CONTRACTOR TO REFER/ COORDINATE WITH STRUCTURAL ENGINEERING DRAWINGS.

6. THE STRUCTURE IS DESIGNED TO BE SELF-SUPPORTING AND STABLE AFTER CONSTRUCTION IS COMPLETE. IT IS THE CONTRACTOR'S SOLE RESPONSIBILITY TO DETERMINE CONSTRUCTION PROCEDURES AND SEQUENCE TO ASSURE THE SAFETY OF THE BUILDING AND ITS COMPONENTS DURING CONSTRUCTION. THIS INCLUDES THE ADDITION OF NECESSARY SHORING, SHEETING, TEMPORARY BRACING, GUYS OR TIE-DOWNS. PROVIDE ALL SHORING AND BRACING REQUIRED TO STABILIZE AND PROTECT EXISTING AND ADJACENT STRUCTURES AND SYSTEMS DURING COURSE OF DEMOLITION AND CONSTRUCTION. SUCH MATERIAL SHALL REMAIN THE PROPERTY OF THE CONTRACTOR AFTER COMPLETION OF THE PROJECT.

ARCHITECTURE, LLC

ELIZA SHIRLEY/OEM FIT-OUT
2134-36 N BROAD STREET
PHILADELPHIA PA 19102

FIFTH FLOOR
DEMOLITION
PLAN

D-104

FIFTH FLOOR DEMOLITION PLAN






**FLOOR PLAN LEGEND:**

EXISTING WALLS
NEW WALLS
NEW DOOR
WALL TAG

**KEYED NOTES:**

① XXX   ④ XXX
② XXX   ⑤ XXX
③ XXX   ⑥ XXX

**GENERAL NOTES:**

1. ELECTRICAL CONTRACTOR TO COORDINATE FINAL LOCATION OF POWER AND DATA CONNECTIONS WITH OWNER'S PRIOR TO INSTALLATION

2. G.C. TO PROVIDE BLOCKING FOR WALL MOUNTED TVS AND OTHER AREAS WHERE REQUIRED

3. G.C. TO COORDINATE WITH ALL ELECTRICAL APPLIANCES / EQUIPMENT PRIOR TO INSTALLATION

4. ALL EXISTING WINDOWS TO BE REPLACED BY NEW WINDOWS. NEW WINDOWS TO MATCH EXISTING SILL HEIGHTS, WINDOW HEIGHTS AND WINDOW WIDTHS.

LOUNGE/BED SPACE 118
STOR 118
PLAY AREA 112
OFFICE 3 111
RAMP UP
WORK STATION 108
HALL 108
OFFICE 1 100
JAN.

BEDROOM 119
HALL 136
STOR 112
STOR 116
ROOM 109
BATH 110
OFFICE 4 107
STAFF BREAK ROOM 105
MEDICAL SERVICE/ ASSESSMENT OFFICE 104
OFFICE 2 102
RECEPTION/WAITING 135

BEDROOM 115
BEDROOM 114
STAFF BATH 127
OFFICE 3 128
OFFICE 2 129
OFFICE 1 130
LOUNGE 131
BATH
BATH
RECEPTION/WAITING 134

STOR 122
HALL 138
ELEVATORS
JAN.

ROOM 121
DIRECTOR'S OFFICE 124
OFFICE 4 125
CONFERENCE ROOM 126
UP

PROPOSED FIRST FLOOR CONSTRUCTION PLAN

ELIZA SHIRLEY/OEM FIT-OUT
215-20 N BROAD STREET
PHILADELPHIA PA 19102

PROPOSED FIRST FLOOR CONSTRUCTION PLAN

A-100





ARCHITECTURE, LLC



**FLOOR PLAN LEGEND:**

EXISTING WALLS

NEW DOOR

NEW WALLS

WALL TAG

**KEYED NOTES:**

① XXX  ④ XXX
② XXX  ⑤ XXX
③ XXX  ⑥ XXX

**GENERAL NOTES:**

1. ELECTRICAL CONTRACTOR TO COORDINATE FINAL LOCATION OF POWER AND DATA CONNECTIONS WITH OWNER/S PRIOR TO INSTALLATION

2. G.C. TO PROVIDE BLOCKING FOR WALL MOUNTED TV'S AND OTHER AREAS WHERE REQUIRED

3. G.C. TO COORDINATE WITH ALL ELECTRICAL APPLIANCES + EQUIPMENT PRIOR TO INSTALLATION.

4. ALL EXISTING WINDOWS TO BE REPLACED BY NEW WINDOWS. NEW WINDOWS TO MATCH EXISTING SILL HEIGHTS, WINDOW HEIGHTS AND WINDOW WIDTHS.

Floor plan showing second floor construction with rooms labeled: BEDROOM 214, BEDROOM 213, BEDROOM 212, BEDROOM 211, BEDROOM 210, BEDROOM 209, DINING AREA 205, LACTATION ROOM 204, BEDROOM 203, BEDROOM 202, BEDROOM 201, BEDROOM 200, P.R., LAUNDRY 216, BEDROOM 221, WOMEN SHOWER 222, BEDROOM 208, LOUNGE 206, BEDROOM 207, BATH 248, BATH 247, JAN. 250, CL 249, CL 244, BEDROOM 243, STOR., BEDROOM 220, BEDROOM 223, WOMEN SHOWER 246, MEN SHOWER 245, CL 238, CL 236, JAN., BEDROOM 227, CL 227.1, BEDROOM 226, BEDROOM 225, BEDROOM 224, BEDROOM 234, BATHROOM 235, BATHROOM 236, ELEV., BEDROOM 237, STORAGE 239, STORAGE 240, CL 241, BEDROOM 242, BEDROOM 228, BEDROOM 229, BEDROOM 230, BEDROOM 231, BEDROOM 232, BATH, DN, UP

**1/A-101 PROPOSED SECOND FLOOR CONSTRUCTION PLAN**





ELIZA SHIRLEY/OEM FIT-OUT
215-01 N BROAD STREET
PHILADELPHIA PA 19102

PROPOSED SECOND FLOOR CONSTRUCTION PLAN

A-101




FLOOR PLAN LEGEND:

EXISTING WALLS · NEW DOOR
NEW WALLS · WALL TAG

KEYED NOTES:
① XXX  ④ XXX
② XXX  ⑤ XXX
③ XXX  ⑥ XXX

GENERAL NOTES:
1. ELECTRICAL CONTRACTOR TO COORDINATE FINAL LOCATION OF POWER AND DATA CONNECTIONS WITH OWNERS PRIOR TO INSTALLATION.

2. G.C. TO PROVIDE BLOCKING FOR WALL MOUNTED TVS AND OTHER AREAS WHERE REQUIRED.

3. G.C. TO COORDINATE WITH ALL ELECTRICAL APPLIANCES + EQUIPMENT PRIOR TO INSTALLATION.

4. ALL EXISTING WINDOWS TO BE REPLACED BY NEW WINDOWS, NEW WINDOWS TO MATCH EXISTING SILL HEIGHTS, WINDOW HEIGHTS AND WINDOW WIDTHS.

ARCHITECTURE, LLC

ELIZA SHIRLEY/OEM FIT-OUT
214-20 N BROAD STREET
PHILADELPHIA, PA 19102

PROPOSED THIRD FLOOR CONSTRUCTION PLAN

A-102

1/A-102 — PROPOSED THIRD FLOOR CONSTRUCTION PLAN

BEDROOM 314
BEDROOM 313
BEDROOM 311
BEDROOM 310
BEDROOM 310.1
BEDROOM 209
BEDROOM 308
BEDROOM 307
BEDROOM 306
ROOM 312
SUITE 315
STOR. 316
STOR. 317
LAUNDRY 318
JAN.
BATH 502
STORAGE 331
MENS SHOWER 330
WOMENS SHOWER 329
BATH 328
ELEC. 333
ELEC. 334
STOR. 336
BATH 327
ELEVATOR LOBBY 335
STOR. 305
LOUNGE 304
DAY ROOM 303
STOR. 300
BATH 302
BATH 301
HALL 324
BATH 326
ROOM 319
BEDROOM 320
BATH 321
BEDROOM 322
BEDROOM 323
BEDROOM 325







ELIZA SHIRLEY/OEM FIT-OUT
215-20 N. BROAD STREET
PHILADELPHIA PA 19102

PROPOSED FOURTH-FLOOR CONSTRUCTION PLAN

A-103









RCP NOTES:

GENERAL NOTES:

1. ELECTRICAL CONTRACTOR TO
TERMINATE EXISTING ELECTRICAL
WITHIN DEMISED WALLS FOR CODE

P&D LEGEND:



RAMP
UP

RAMP
UP

UP

UP

UP

1/A-130   PROPOSED FIRST FLOOR POWER/DATA PLAN



ELIZA SHIRLEY/OEM FIT-OUT
2141 N BROAD STREET
PHILADELPHIA PA 19132

ARCHITECTURE, LLC

PROPOSED 1ST
FLOOR
POWER/DATA
PLAN

A-130

**RCP LEGEND:**

**RCP NOTES:**

**GENERAL NOTES:**





ARCHITECTURE, LLC

**ELIZA SHIRLEY/OEM FIT-OUT**
215-501 N BROAD STREET
PHILADELPHIA PA 19102

1/A-131  PROPOSED 2ND FLOOR POWER/DATA PLAN



A-131

RCP LEGEND:

RCP NOTES:

GENERAL NOTES:

1. ELECTRICAL CONTRACTOR TO
TERMINATE EXISTING ELECTRICAL
WITHIN DEVICED WALLS PER CODE



ARCHITECTURE, LLC

ELIZA SHIRLEY/OEM FIT-OUT
2146-30 N BROAD STREET
PHILADELPHIA, PA 19132

PROPOSED
3RD FLOOR
POWER/DATA
PLAN

10A-132  PROPOSED 3RD FLOOR POWER/DATA PLAN



A-132

RCP LEGEND:

RCP NOTES:

GENERAL NOTES:





ARCHITECTURE, LLC

ELIZA SHIRLEY/OEM FIT-OUT
216-30 N BROAD STREET
PHILADELPHIA, PA 19102

PROPOSED 4TH FLOOR POWER/DATA PLAN

PROPOSED 4TH
FLOOR
POWER/DATA
PLAN

A-133



RCP LEGEND:

GENERAL NOTES:

1. ELECTRICAL CONTRACTOR TO TERMINATE EXISTING ELECTRICAL WITHIN DEVICES/WALLS PER CODE

2. ELECTRICAL CONTRACTOR TO CONFIRM CONNECTION REQUIREMENTS WITH EQUIPMENT SPECIFICATIONS






UP    DN

UP    DN

VA-134  PROPOSED 5TH FLOOR POWER/DATA PLAN

ELIZA SHIRLEY/OEM FIT-OUT

ARCHITECTURE, LLC

PROPOSED 5TH FLOOR POWER/DATA PLAN

A-134

DOOR TYPES:



| MARK | ELEVATION TYPE | NOMINAL SIZE | | | DOOR MATERIAL | FRAME MATERIAL | FIRE RATING | HARDWARE TYPE | NOTES |
|---|---|---|---|---|---|---|---|---|---|
| | | WIDTH | HEIGHT | THICKNESS | | | | | |
| **FIRST FLOOR** | | | | | | | | | |
| INT-100 | A | 3'-0" | 7'-0" | 1 3/4" | METAL | KNOCK-DOWN MTL | 0 | 1 | |
| INT-101 | A | 3'-0" | 7'-0" | 1 3/4" | METAL | KNOCK-DOWN MTL | 0 | 1 | |
| INT-102 | A | 3'-0" | 7'-0" | 1 3/4" | METAL | KNOCK-DOWN MTL | 0 | 1 | |
| INT-103 | C | 3'-0" | 7'-0" | 1 3/4" | METAL | KNOCK-DOWN MTL | 1 | 3 | |
| INT-104 | A | 3'-0" | 7'-0" | 1 3/4" | METAL | KNOCK-DOWN MTL | 0 | 2 | |
| INT-105 | A | 3'-0" | 7'-0" | 1 3/4" | METAL | KNOCK-DOWN MTL | 0 | 1 | |
| INT-106 | A | 3'-0" | 7'-0" | 1 3/4" | METAL | KNOCK-DOWN MTL | 0 | 1 | |
| INT-107 | A | 3'-0" | 7'-0" | 1 3/4" | METAL | KNOCK-DOWN MTL | 0 | 1 | |
| INT-108 | EXISTING | 6'-0" | 7'-0" | 1 3/4" | METAL | KNOCK-DOWN MTL | 1 | E | |
| INT-109 | EXISTING | 3'-0" | 7'-0" | 1 3/4" | METAL | KNOCK-DOWN MTL | 1 | E | BOLT 2ND DOOR LEAF; KEYED DOOR, ACCESS FOR ADA ELEVATOR ACCESS |
| **SECOND FLOOR** | | | | | | | | | |
| INT-200 | C | 3'-0" | 7'-0" | 1 3/4" | METAL | KNOCK-DOWN MTL | 0 | 1 | |
| INT-201 | C | 3'-0" | 7'-0" | 1 3/4" | METAL | KNOCK-DOWN MTL | 0 | 1 | |
| INT-202 | C | 3'-0" | 7'-0" | 1 3/4" | METAL | KNOCK-DOWN MTL | 0 | 1 | |
| INT-203 | C | 3'-0" | 7'-0" | 1 3/4" | METAL | KNOCK-DOWN MTL | 0 | 1 | |
| INT-204 | C | 3'-0" | 7'-0" | 1 3/4" | METAL | KNOCK-DOWN MTL | 0 | 1 | |
| INT-205 | C | 3'-0" | 7'-0" | 1 3/4" | METAL | KNOCK-DOWN MTL | 0 | 1 | |
| INT-206 | C | 3'-0" | 7'-0" | 1 3/4" | METAL | KNOCK-DOWN MTL | 0 | 4 | |
| **THIRD FLOOR** | | | | | | | | | |
| INT-300 | C | 3'-0" | 7'-0" | 1 3/4" | METAL | KNOCK-DOWN MTL | 0 | 1 | |
| INT-301 | C | 3'-0" | 7'-0" | 1 3/4" | METAL | KNOCK-DOWN MTL | 0 | 1 | |
| **FOURTH FLOOR** | | | | | | | | | |
| INT-400 | C | 3'-0" | 7'-0" | 1 3/4" | METAL | KNOCK-DOWN MTL | 0 | 1 | |
| INT-401 | C | 3'-0" | 7'-0" | 1 3/4" | METAL | KNOCK-DOWN MTL | 0 | 1 | |
| INT-402 | C | 3'-0" | 7'-0" | 1 3/4" | METAL | KNOCK-DOWN MTL | 0 | 1 | |
| INT-403 | C | 3'-0" | 7'-0" | 1 3/4" | METAL | KNOCK-DOWN MTL | 0 | 1 | |
| INT-404 | C | 3'-0" | 7'-0" | 1 3/4" | METAL | KNOCK-DOWN MTL | 0 | 1 | |
| INT-405 | C | 3'-0" | 7'-0" | 1 3/4" | METAL | KNOCK-DOWN MTL | 0 | 1 | |
| INT-406 | C | 3'-0" | 7'-0" | 1 3/4" | METAL | KNOCK-DOWN MTL | 60 MIN. | 1 | |
| INT-407 | C | 3'-0" | 7'-0" | 1 3/4" | METAL | KNOCK-DOWN MTL | 0 | 1 | |
| INT-408 | C | 3'-0" | 7'-0" | 1 3/4" | METAL | KNOCK-DOWN MTL | 0 | 1 | |
| INT-409 | C | 3'-0" | 7'-0" | 1 3/4" | METAL | KNOCK-DOWN MTL | 0 | 1 | |
| INT-410 | C | 3'-0" | 7'-0" | 1 3/4" | METAL | KNOCK-DOWN MTL | 0 | 4 | |
| **FIFTH FLOOR** | | | | | | | | | |
| INT-500 | C | 3'-0" | 7'-0" | 1 3/4" | METAL | KNOCK-DOWN MTL | 0 | 1 | |
| INT-501 | C | 3'-0" | 7'-0" | 1 3/4" | METAL | KNOCK-DOWN MTL | 0 | 1 | |
| INT-502 | C | 3'-0" | 7'-0" | 1 3/4" | METAL | KNOCK-DOWN MTL | 0 | 1 | |
| INT-503 | C | 3'-0" | 7'-0" | 1 3/4" | METAL | KNOCK-DOWN MTL | 0 | 1 | |
| INT-504 | C | 3'-0" | 7'-0" | 1 3/4" | METAL | KNOCK-DOWN MTL | 0 | 1 | |




ARCHITECTURE, LLC

RA406747

1425 RACE STREET - 1ST-5TH FLOOR RENOVATIONS

1425 RACE STREET
PHILADELPHIA PA, 19102

DOOR TYPES
AND SCHEDULE

A-200

**RCP LEGEND:**

EXISTING 2X2 LED LAY-IN LIGHT FIXTURE

PROPOSED 2X2 LED LAY-IN LIGHT FIXTURE

RELOCATED 2X2 LAY-IN VENT

EXISTING 1X2 LAY-IN VENT

EXHAUST FAN

EXISTING 2X2 LAY-IN VENT

RELOCATED 2X2 LED LAY-IN LIGHT FIXTURE

EXISTING 2X2 LAY-IN FAN VENT

WALL MOUNTED UP-LIGHT

PROPOSED RECESSED LIGHT FIXTURE

SURFACE MOUNTED PENDANT

RELOCATED RECESSED LIGHT FIXTURE

LINEAR TROUGH LIGHT

**RCP NOTES:**

1. REPLACE EXISTING SINU AS REQUIRED AT NEW WALL LOCATION

2. RELOCATE EXISTING VENT AS INDICATED

3. RELOCATE EXISTING LIGHT FIXTURE AS INDICATED

4. NEW LIGHT FIXTURE AS INDICATED

5. REPLACE EXISTING WHERE LIGHTS WERE REMOVED

**GENERAL NOTES:**

1. G.C. TO REPLACE ALL DAMAGED/MISSING CEILING TILES

2. G.C. TO REPLACE EXISTING ROOM DEVICES AS WHERE DAMAGED WITH DAMPER SWITCHES (TYP AT. BEDROOMS)

ARCHITECTURE, LLC

RA406747

ELIZA SHIRLEY/OEM FIT-OUT

214-20 N BROAD STREET
PHILADELPHIA PA 19102

PROPOSED 1ST FLOOR REFLECTED CEILING PLAN

A-700

PROPOSED 1ST FLOOR RCP







**ELIZA SHIRLEY/OEM FIT-OUT**
215 SOUTH BROAD STREET
PHILADELPHIA PA 19102

ARCHITECTURE, LLC

A-701

**RCP LEGEND:**

**RCP NOTES:**

**GENERAL NOTES:**



ARCHITECTURE, LLC

ELIZA SHIRLEY/OEM FIT-OUT
216-30 N BROAD STREET
PHILADELPHIA PA 19102

1/A-702  PROPOSED 3RD FLOOR RCP



A-702





**RCP LEGEND:**

**RCP NOTES:**

**GENERAL NOTES:**



ARCHITECTURE, LLC

ELIZA SHIRLEY/OEM FIT-OUT

A-703

**RCP LEGEND:**

- EXISTING 2X2 LED LAY-IN LIGHT FIXTURE
- PROPOSED 2X2 LED LAY-IN LIGHT FIXTURE
- RELOCATED 2X2 LAY-IN VENT
- EXISTING 1X2 LAY-IN VENT
- EXHAUST FAN
- EXISTING 2X2 LAY-IN VENT
- RELOCATED 2X2 LED LAY-IN LIGHT FIXTURE
- SURFACE MOUNTED PENDANT
- WALL MOUNTED UP-LIGHT
- LINEAR TRICOLH LIGHT

**RCP NOTES:**

1. PATCH/REPAIR CEILING GRID AT WALL REMOVAL LOCATIONS.
2. UNSURVEYED AREA, G.C. TO CONFIRM IF NEW GRID IS REQUIRED PRIOR TO PRICING.
3. EXISTING/NEW GRID TRANSITION.
4. NEW GRID TO REPLACE EXISTING DUE TO EXTENT OF WALL REMOVAL/REINSTALL EXISTING LIGHTS & VENTS
5. REMOVE EXISTING CEILING GRID AS REQUIRED FOR NEW HOOD INSTALLATION
6. REMOVE EXISTING GRID AND PROVIDE NEW PAINTED GWB & RECESSED LIGHTING

**GENERAL NOTES:**

1. G.C. TO REPLACE ALL DAMAGED/MISSING CEILING TILES
2. G.C. TO REPLACE EXISTING ROOFER LIGHT/VENT W/TH DESIGN SPEC (TYP ALL BEDROOMS)





ARCHITECTURE, LLC

ELIZA SHIRLEY/OEM FIT-OUT
216-20 N BROAD STREET
PHILADELPHIA PA 19102

PROPOSED 5TH FLOOR REFLECTED CEILING PLAN

A-704

PROPOSED 5TH FLOOR RCP





FINISH SCHEDULE:

| | | | | | |
|---|---|---|---|---|---|
| TER-1 | EXISTING TERRAZZO FLOORING | | | | CLEAN/REPAIR EXISTING GROUT AND POLISH/RESEAL AS REQUIRED |
| LVT-1 | VINYL COMPOSITE TILE | AVA | 25TYL BALTIC OAK | TAUPE | ELIZA SHIRLEY |
| LVT-2 | VINYL COMPOSITE TILE | AVA | 25TYL BALTIC OAK | TIN | PHILA OEM |
| LVT-3 | VINYL COMPOSITE TILE | METROFLOR | SMOOTH CONCRETE WITH ATTRAXION | ZINC | VESTIBULE |
| TILE-1 | FLOOR TILE WITH MATCHING TILE BASE | FLORIDA TILE | HIGH RIDGE | DEEP TAUPE | ALL SHOWER ROOMS |
| FLR-1 | STAINLESS FLOORING - COMMERCIAL KITCHEN | ALTRO | STRONGHOLD 30 | CANNON | PROVIDE 4" FLASH COVING DETAIL PER ALTRO SPECS; INCLUDE 1" COVE STICK-30R & CAP STRIP CB |
| ACT-1 | 2X2 CONCEALED SPLINE CEILING TILE | ARMSTRONG | MATCH EXISTING, ADJACENT | | USED IN LOCATIONS WHERE MISSING/DAMAGED; MATCH EXISTING ADJACENT COLOR/STYLE |
| PT-1 | GENERAL PUBLIC AREA WALL COLOR FOR ELIZA SHIRLEY | SHERWIN WILLIAMS | | | |
| PT-2 | ACCENT WALL COLOR FOR ELIZA SHIRLEY | SHERWIN WILLIAMS | | | |
| PT-3 | BEDROOM WALL COLOR FOR ELIZA SHIRLEY | SHERWIN WILLIAMS | | | |
| PT-4 | GENERAL PUBLIC AREA WALL COLOR FOR OEM | SHERWIN WILLIAMS | | | |
| PT-5 | ACCENT WALL COLOR FOR OEM | SHERWIN WILLIAMS | | | |
| PT-6 | BEDROOM WALL COLOR FOR OEM | SHERWIN WILLIAMS | | | |
| PT-7 | TRIM/DOOR PAINT | SHERWIN WILLIAMS | SEMI-GLOSS FINISH | | |
| WT-1 | WALL TILE | | | | FULL HEIGHT WALL TILE OVER HARDI BACKER WITH RED-GUARD |
| VB-1 | VINYL BASE TO PAIR WITH LVT-1 | ROPPE | | | |
| VB-2 | VINYL BASE TO PAIR WITH LVT-2 | ROPPE | | | |
| TB-1 | TILE BASE IN SHOWERS | | | | |
| ERP-1 | KITCHEN WALLS | | | | |

C ARCHITECTURE, LLC

ELIZA SHIRLEY/OEM FIT-OUT
2136-2130 N BROAD STREET
PHILADELPHIA PA 19102

PROPOSED 1ST
FLOOR FINISH
PLAN

ID-100

MD-100  PROPOSED 1ST FLOOR FINISH PLAN



LEGEND:



ARCHITECTURE, LLC

ELIZA SHIRLEY/OEM FIT-OUT
215-20 N BROAD STREET
PHILADELPHIA, PA 19102

ID-101  PROPOSED 2ND FLOOR FINISH PLAN



ID-101



ARCHITECTURE, LLC





LEGEND:

| ID-102 | PROPOSED 3RD FLOOR FINISH PLAN |

ELIZA SHIRLEY/OEM FIT-OUT

215-20 N BROAD STREET
PHILADELPHIA PA 19102

PROPOSED
3RD FLOOR
FINISH PLAN

ID-102

LEGEND:





ARCHITECTURE, LLC

ELIZA SHIRLEY/OEM FIT-OUT
215-20 N BROAD STREET
PHILADELPHIA, PA 19102

PROPOSED 4TH
FLOOR FINISH
PLAN

ID-103



LEGEND:





ARCHITECTURE, LLC

ELIZA SHIRLEY/OEM FIT-OUT
215-20 N BROAD STREET
PHILADELPHIA PA 19102

PROPOSED 5TH
FLOOR FINISH
PLAN

ID-104

PROPOSED 5TH FLOOR FINISH PLAN





| ITEM | DESCRIPTION | MFR | MODEL | SIZE | HOOKUPS | NOTES |
|------|-------------|-----|-------|------|---------|-------|
| A | GRIDDLE | AVANTCO CHEF SERIES | CAG-24-NG | 24" | GAS | |
| B | GAS RANGE | MAIN STREET EQUIPMENT | E36-N | 36" | GAS | |
| C | DEEP FRYER | AVANTCO CHEF SERIES | FF50 | 15.5" | | |
| D | STOCK POT RANGE | COOKING PERFORMANCE GROUP | CPG-SP-18-N | 18" | GAS | |
| E | DOUBLE DECK ELECTRIC OVEN | COOKING PERFORMANCE GROUP | FEC-200-DK | 38" | 240V, 3PH, 23KW | |
| F | REFRIGERATED PREP TABLE | AVANTCO | SSPPT-2 | 67" | 115V, 60H, 2.63A | |
| G | THREE COMPARTMENT SINK | REGENCY | 600-517 | 17" | HOT, COLD WASTE | |
| H | THREE COMPARTMENT SINK | REGENCY | 600S3181BUXL | 78.5" | HOT, COLD WASTE | PROVIDE INDIRECT WASTE CONNECTION |
| I | WIRE SHELVING | METRO | | | PER PLAN | |
| J | STAINLESS STEEL WORK TABLE | REGENCY | 18-GAUGE WITH UNDERSHELF | | PER PLAN | |
| K | WORKTOP REFRIGERATOR | AVANTCO | SS-WT-27R-HC | 27" | 115V, 1.1 A, 60 HERTZ | |
| L | TUBULAR WALL MOUNTED SHELF | REGENCY | 600TWMS1672 | 16"X72" | | |
| M | GARBAGE DISPOSER | HOBART | FD4/150-1 | | 208-230V, | |
| N | ADA SHOWER STALL INSERT | ELLA BUBBLES (VIA HOME DEPOT) | E-6053WH-P4G5SS | 33"X60"X77" | | |
| O | SHOWER STALL INSERT | DELTA | 912205-3636-WH | 35-7/8"X 37-3/8"X72" | | |
| P | ADA TUB INSERT | AQUA BATH | C60SLT5-OT-RH-S | 37"X60"X94" | | OPEN TOP |
| Q | REACH IN FREEZER | AVANTCO | A-49F-HC | 54"X32-3/16" X 82-3/2" | | |
| R | REACH IN REFRIGERATOR | AVANTCO | A-49R-HC | 54"X32-3/16" X 82-3/2" | | |
| S | WALK-IN COOLER | TBD | | 8'X10' | | |
| T | ADA ROLL-IN SHOWER INSERT | FREEDOM SHOWERS | APF6238FF875 | 62"X32.75"X78.625" | HOT, COLD WASTE | |

DocuSign Envelope ID: E9290FDE-2ACB-42B2-B7BF-6C260C4712CE

## EXHIBIT G
## EXISTING LENDERS

Landlord represents and warrants that, as of the Effective Date, there are no Existing Lenders.

**DocuSign**

## Certificate Of Completion

Envelope Id: E9290FDE2ACB42B2B7BF6C260C4712CE
Subject: Complete with DocuSign: 216 N BROAD_IronStone-PMA Lease (FINAL).pdf
Source Envelope:
Document Pages: 120
Signatures: 2
Certificate Pages: 3
Initials: 0
AutoNav: Enabled
EnvelopeId Stamping: Enabled
Time Zone: (UTC-05:00) Eastern Time (US & Canada)

Status: Completed

Envelope Originator:
City of Philadelphia - Real Estate Law And Develop
1234 Market Street
Suite 1800
Philadelphia, PA  19107
realestatelaw@phila.gov
IP Address: 170.115.248.10

## Record Tracking

Status: Original
          2/29/2024 3:41:41 PM

Holder: City of Philadelphia - Real Estate Law And
Develop
          realestatelaw@phila.gov

Location: DocuSign

Security Appliance Status: Connected
Storage Appliance Status: Connected

Pool: StateLocal
Pool: City of Philadelphia - PS Contracts

Location: DocuSign

## Signer Events

| Signer Events | Signature | Timestamp |
|---|---|---|
| MATT CANNO<br>matt@iron-stone.com<br>none<br>IS3 Lender, LLC<br>Security Level: Email, Account Authentication (None) | *MATT CANNO*<br>696DC6ECB359407... <br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 50.196.62.77 | Sent: 2/29/2024 3:54:05 PM<br>Viewed: 2/29/2024 3:55:51 PM<br>Signed: 2/29/2024 4:11:17 PM |
| **Electronic Record and Signature Disclosure:**<br>Accepted: 2/29/2024 3:55:51 PM<br>ID: 1cef70ef-dcf7-462a-affe-c1b157b6ccad | | |
| Lorna Gallman<br>lorna.gallman@phila.gov<br>Executive Director<br>Philadelphia Municipal Authority<br>Security Level: Email, Account Authentication (None) | *Lorna Gallman*<br>EA18CB15419E48D... <br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 15.181.145.85 | Sent: 2/29/2024 4:11:25 PM<br>Viewed: 3/1/2024 11:22:54 AM<br>Signed: 3/1/2024 11:24:52 AM |
| **Electronic Record and Signature Disclosure:**<br>Accepted: 3/1/2024 11:22:54 AM<br>ID: 051a67ad-2087-4721-9ed1-02eed5f3f2de | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Austin J. McGreal<br>ausandmarg@yahoo.com<br>Security Level: Email, Account Authentication (None) | **COPIED** | Sent: 3/1/2024 11:25:00 AM |

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

**Electronic Record and Signature Disclosure:**
  Not Offered via DocuSign

| | | |
|---|---|---|
| Katharine L. Janoski<br>katharine.janoski@phila.gov<br>Senior Attorney<br>Security Level: Email, Account Authentication (None) | **COPIED** | Sent: 3/1/2024 11:25:01 AM |

**Electronic Record and Signature Disclosure:**
  Accepted: 3/1/2024 8:54:01 AM
  ID: 54b63f60-26c8-45d6-933f-4e5dd5e2d428

| | | |
|---|---|---|
| Daniel Reisman<br>DReisman@eckertseamans.com<br>Security Level: Email, Account Authentication (None) | **COPIED** | Sent: 3/1/2024 11:25:02 AM |

**Electronic Record and Signature Disclosure:**
  Not Offered via DocuSign

| | | |
|---|---|---|
| Mary Josephine Markle<br>maryjosephine.markle@phila.gov<br>Divisional Deputy City Solicitor<br>City of Philadelphia<br>Security Level: Email, Account Authentication (None) | **COPIED** | Sent: 3/1/2024 11:25:03 AM |

**Electronic Record and Signature Disclosure:**
  Accepted: 5/3/2017 10:11:35 AM
  ID: e0a4ddf9-d159-4188-ba8a-52119a050c72

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 2/29/2024 3:54:05 PM |
| Certified Delivered | Security Checked | 3/1/2024 11:22:54 AM |
| Signing Complete | Security Checked | 3/1/2024 11:24:52 AM |
| Completed | Security Checked | 3/1/2024 11:25:03 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on: 9/5/2018 1:40:22 AM
Parties agreed to: MATT CANNO, Lorna Gallman, Katharine L. Janoski, Mary Josephine Markle

This Electronic Records and Signature Disclosure is provided by the City of Philadelphia in connection with a pending electronic transaction. Any party proceeding with such electronic transaction is deemed to have consented i) to conduct the transaction by electronic means; and ii) where execution of an agreement is required, to the use of electronic signatures using the method provided in the agreement. Questions regarding this Electronic Records and Signature Disclosure should be addressed to econtractphilly@phila.gov.